Joseph R. Donohue, Esq. (BBO# 547320)
DONOHUE & ASSOCIATES
The Charlestown Navy Yard
Shipway Place Unit C2
Boston, Massachusetts 02129
Telephone: (508) 641-8848
Email: jrdonohuelaw@gmail.com

Steven G. Storch, Esq. (to seek admission *pro hac vice)*
STORCH AMINI PC
2 Grand Central Tower, 25th Floor
140 East 45th Street
New York, New York 10017
Telephone: (212) 490-4100
Email: sstorch@storchamini.com

*Attorneys for Plaintiff Sterling Suffolk Racecourse, LLC*

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
-------------------------------------------------------------x
                                                             :
STERLING SUFFOLK RACECOURSE, LLC,            :      Docket No. _____ CV _____
                                                             :
                    Plaintiff,                               :
                                                             :
              v.                                             :
                                                             :
WYNN RESORTS, LTD; WYNN MA, LLC;             :      **COMPLAINT**
STEPHEN WYNN; KIMMARIE SINATRA;              :
MATTHEW MADDOX; PAUL LOHNES;                 :
and FBT EVERETT REALTY, LLC;                                      :
                                                             :      (Jury Trial Demanded)
                    Defendants.                              :
-------------------------------------------------------------x

Plaintiff Sterling Suffolk Racecourse, LLC ("SSR"), by and through its undersigned counsel, as and for its Complaint against Defendants herein, alleges as follows, on personal knowledge as to its own actions and on information and belief as to all other matters:

### Summary of the Case

1.     This action is brought pursuant to the Racketeer Influenced Corrupt Organization Act ("RICO") (19 U.S.C. § 1961, *et seq.*) arising from the Defendants' illegal corruption of the application process for a Region A Gaming License overseen by the Massachusetts Gaming Commission (the "Gaming Commission").  Additionally, the claims herein arise under Mass. G.L. 93A, section 11.  As set forth in detail below, the Defendants conspired to fix the application process, circumvent laws in place to prevent the infiltration of mob elements, and interfere and eliminate various regulations aimed at protecting the public at large.

2.     The Suffolk Downs Racetrack, a property owned by SSR, was by far the best suited location for a casino to operate under the single Region A Category 1[1] Gaming License to be awarded under the recently enacted Massachusetts Gaming Act (Mass. G.L. 23K, the "Gaming Act").

3.     A major investor in SSR was Coastal Development, LLC ("Coastal"), a company headed by Richard Fields ("Fields") who had developed the extremely profitable Seminole Hard Rock Hotel & Casino in Fort Lauderdale, Florida, in conjunction with the Seminole Tribe.  Fields spearheaded the effort to save horseracing at Suffolk Downs by being the driving force behind enactment of the Gaming Act.  One purpose of the Gaming Act, which recognized the importance of maintaining existing horseracing, was to encourage the continuation of horseracing.  That is

---

[1] Region A covered the metropolitan Boston area, including Suffolk, Middlesex, Essex, Norfolk, and Worcester Counties; Category 1 permitted operation of a casino.  Only one such Category 1 "license" was to be permitted in each Region.

why the statute expressly provides that an applicant for a live racing license (like SSR) could receive a gaming license only if live racing would continue and, in fact, increase. *See* M.G.L. c. 23K §§ 19(e), 24.

4.     In short, not only was the site best suited for a casino but, as the Gaming Act acknowledged and sought to encourage, a casino could enable the historic racetrack to survive.

5.     In addition to having the best site, SSR had also put together a team (the "SSR Group") which consisted of the investors in SSR and Caesar's Entertainment Corp. ("Caesar's") as gaming operator, to apply for the single "Region A" license that would be awarded.

6.     The SSR Group also had the strong endorsement of the Mayor of Boston, among many others, to site a casino at Suffolk Downs.

7.     The Region A Gaming License was not awarded to the SSR Group.  Instead, it was awarded to the Wynn Defendants (defined below).  The Wynn Defendants were granted a license to operate their casino on a toxic waste site loaded with levels of arsenic still so high that a child day care center would not be permitted to be housed there, even after the site was remediated and the regulations amended to countenance higher levels.

8.     Casino gambling has long been viewed as an industry particularly vulnerable to criminal influence as well as unusually likely to encourage political corruption.   When Massachusetts decided to legalize casino gambling in 2011 after decades of discussion and debate, the enabling legislation contained numerous safeguards against those risks.  The Wynn Defendants purchased the toxic site from an entity owned jointly by associates of La Cosa Nostra and a friend and former business partner of the Chairman of the Gaming Commission, Stephen Crosby ("Crosby").  Not only did this sale run afoul of the Gaming Act, but this criminally-tainted entity was actually brought on to provide services to the Wynn Defendants and paid $100,000 per month

per the terms of an Option Agreement prior to the Wynn Defendants' acquisition of the property.

At least one of those "service providers" used threats and physical violence to further the Wynn

Defendants' pursuit of the Gaming License.  This was exactly the situation that the Gaming Act

sought to prevent.

9.      The Defendants herein conspired to, and did in fact, circumvent the safeguards and

protections that the Gaming Act was intended to provide.  Thus, in order to unlawfully acquire the

Gaming License, the Defendants and persons in concert with them each committed, or agreed to

commit, at least two of a series of unlawful acts, including;

a.      Submitting false applications to the Gaming Commission;

b.      Making false statements to the Gaming Commission about the true ownership of

the Everett Site (defined below);

c.      Threatening and committing extortion in order to suppress voter turnout for SSR's

community referenda;

d.      Improper *ex parte* contacts with members of the Commission to pressure them into

voting for Wynn;

e.       Making illegal campaign contributions in violation of the Gaming Act; and

f.      Committing violations of, or facilitating exceptions to, the gaming laws and

regulations for the Defendants' benefit.

10.     It was only because of these acts that the Wynn Defendants were able to acquire

the Region A License and to prevail over the SSR Group and the criminal owners of FBT Everett

were able to sell this land at a windfall profit in the tens of millions of dollars.  This case thus

presents the very situation the RICO statute (19 U.S.C. § 1961, *et seq*.) was adopted to address: a

criminal enterprise "competing" unfairly with legitimate businesses through a pattern of racketeering.

11.     Subsequent public disclosures have revealed just how unsuited the Wynn Defendants were. Defendants Steve Wynn, Kimmarie Sinatra, and others were recently compelled to step down or were fired when Steve Wynn's long and sordid history of inappropriate sexual conduct was finally disclosed, together with their pattern of concealment through lies, omissions and pay-offs.  Defendant Matthew Maddox, who has not yet stepped down, is no less culpable. These are the very same actors involved in the conspiracy to obtain the Region A License.

12.     While certain of the bad actors have been forced out of the Wynn organization, and Steve Wynn's name has been wiped from its casino in order to appear to "cleanse" the Wynn entities so as to attempt to retain the Region A License, this does not change the fact that the license could not have been awarded to the Wynn Defendants in the first place but for the RICO predicate acts which include those described herein.  Nor does it absolve any of the Defendants and others from permitting themselves to be drawn into a long-running criminal enterprise and conspiracy.

13.     SSR was injured by the Defendants' RICO violations to the tune of well over a billion dollars, and is entitled to receive treble its actual losses, in an amount to be proven at trial, plus attorneys' fees and costs.  The Wynn Defendants have also damaged SSR by violating Mass. G.L. 93A, proscribing unfair methods of competition and unfair business practices, and SSR is entitled to all appropriate and available relief under that statute as well.

## Jurisdiction and Venue

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under RICO.  This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over state law claims as they arise out of the same case or controversy.

15.     Defendants are subject to personal jurisdiction in this District as they reside in, have transacted and continue to transact business in, or have had more than minimum contacts with Massachusetts in connection with the acts and transactions alleged herein.

16.     Venue is appropriate in this district pursuant to 28 USC § 1391(b), because the events giving rise to these claims occurred in this district.

## The Parties

17.     SSR is a Massachusetts limited liability company with its principal place of business in East Boston.  SSR owned at all relevant times the historic Suffolk Downs Racecourse, which straddled East Boston and Revere and was at all relevant times an appropriate site for the building of a casino.

### The Wynn Defendants

18.     Wynn Resorts, Ltd. ("Wynn Resorts") is a Nevada corporation with its principal place of business at 3131 Las Vegas Blvd. South, Las Vegas, Nevada.

19.     Wynn MA, LLC ("Wynn MA") is a wholly owned subsidiary of Wynn Resorts, formed for the purpose of applying for a Category 1 Gaming License in Massachusetts, with its headquarters at 3131 Las Vegas Blvd. South, Las Vegas, Nevada.

20.     Stephen Wynn, often known as Steve Wynn ("Wynn"), is a resident of Nevada and was CEO of Wynn Resorts until his recent forced resignation due to his exposure as a serial sexual predator.

21.     Matthew or "Matt" Maddox ("Maddox") is a resident of Nevada, has been the President and Chief Financial Officer of Wynn Resorts since 2013, and he became the Chairman in 2018 after Wynn's resignation.  At relevant times, Maddox was also President and Treasurer of Wynn MA.

22.     Kimmarie Sinatra ("Sinatra") is a resident of Nevada and was, until fired in July 2018, the General Counsel and Executive Vice President of Wynn Resorts. She was functionally the second-most-senior member of the Wynn Resorts management team after Steve Wynn himself, and had much broader power and responsibilities than is typical for a public-company general counsel. Wynn Resorts, Wynn MA, Wynn, Maddox and Sinatra, are sometimes referred to collectively herein as the "Wynn Defendants."

23.     All of the Wynn Defendants had substantial contacts with Massachusetts through the process of obtaining a casino license and the meetings and transactions relating to the same.

 The Everett Defendants

24.      Paul Lohnes ("Lohnes") is a resident of Massachusetts. He is the largest shareholder of FBT Everett Realty LLC ("FBT Everett").

25.     FBT Everett is a Massachusetts LLC which owned highly contaminated property in Everett, Massachusetts, the former location of a munitions facility and a Monsanto Chemical facility (the "Everett Site") which is where the Wynn casino, the "Encore Boston Harbor" is being built today. According to the online database maintained by the Secretary of the Commonwealth of Massachusetts, the address of FBT Everett is c/o The DeNunzio Group LLC, 305 Cambridge Street, Cambridge, Massachusetts. At times relevant hereto, FBT Everett was owned by Defendant Lohnes, with a 50% interest, and by Gary DeCicco ("DeCicco') with a 19.5% interest, Anthony Gattineri ("Gattineri") with a 15% interest, Charles Lightbody ("Lightbody") with a 12.5% interest, and Dustin DeNunzio ("DeNunzio") with a 3% interest (all percentages approximate).

26.     FBT Everett and Lohnes are sometimes referred to collectively herein as the "Everett Defendants."

## FACTS COMMON TO ALL CAUSES OF ACTION

Massachusetts Gaming Act

27.     On November 22, 2011, Governor Deval Patrick signed into law the Gaming Act, Chapter 194 of the Acts of 2011, codified at M.G.L. c. 23K.  The Gaming Act established a process to allow the development of three destination resort casinos in Massachusetts, one in each of each of three geographic regions.  Region A, covering the Boston area, included Suffolk, Middlesex, Essex, Norfolk and Worcester Counties, with Norfolk County being a last-minute addition.  To be able to operate a casino, a prospective operator was required to apply for and obtain a "Category 1 License," only one of which could be granted in each region.  M.G.L. c. 23K § 19(a)(1).

28.     The Gaming Act was the fruition of more than two decades of intense political debate in Massachusetts and contains numerous provisions aimed at fighting organized crime and preventing its infiltration into Massachusetts casinos.  Among those provisions intended to prevent criminals from profiting from any casino business, is the requirement that applicants disclose "… **the location of the proposed gaming establishment** … and **ownership interests over the past 20 years, including all interests, options, agreements in property**."  M.G.L. c. 23K § 9(a)(15) (emphasis added).

29.     Applicants were to be pristine in their relationships.  The Gaming Act requires that "**In evaluating the suitability of the applicant, the commission shall consider** the overall reputation of the applicant including, without limitation … (6) **the suitability of all parties in interest** to the gaming license, **including affiliates and close associates** and the financial resources of the applicant." M.G.L. c. 23K § 12(a)(6) (emphasis added).

30.     Pursuant to **Section 12(b),** "If the [Commission's Investigations and Enforcement] bureau determines during its investigation that an **applicant has failed to: (i) establish the**

applicant's integrity or the integrity of any affiliate, close associate, …, **the bureau shall cease** **any further review and recommend that the commission deny the application.**" M.G.L. c. 23K § 12(b)(i) (emphasis added).

31.     Moreover, "**the commission shall deny an application** for a gaming license or a license for a key gaming employee issued under this chapter, if the applicant: (i) **has been** **convicted of a felony or other crime involving embezzlement, theft, fraud or perjury;** (ii) **submitted an application for a license under this chapter that contains false or misleading** **information;** (iii) **committed prior acts which have not been prosecuted** or in which the applicant was not **convicted** but form a pattern of misconduct that makes the applicant unsuitable for a license under this chapter; … or (iv) **has affiliates or close associates that would not** **qualify** for a license or whose relationship with the applicant may pose an injurious threat to the interests of the commonwealth in awarding a gaming license to the applicant." M.G.L. c. 23K § 16(a) (emphasis added).

32.     Finally, in making sure that the Gaming Commission is able to properly evaluate applications, the Gaming Act provides:   "**Whoever willfully resists, prevents, impedes,** **interferes with or makes any false, fictitious or fraudulent statement or representation to the** **bureau, commission** or division or to agents or employees of the bureau, commission or division in the lawful performance of the agent's or employee's duties under this chapter **shall be punished** **by imprisonment in the state prison for not more than 5 years or in the house of correction** **for not more than 2 1/2 years or by a fine not to exceed $25,000, or both**." M.G.L. c. 23K § 38 (emphasis added).

33.     In plain English, under the Gaming Act, any one of lying on an application, a pattern of unprosecuted and concealed sexual misconduct, conviction of the specific felonies by the

applicant, affiliates, or close associates, mandated disqualification and denial of a license.  The facts below establish that the Wynn Defendants should have been denied a license for each of those reasons and would have been denied the license but for the misconduct alleged herein.  Moreover, in order to discourage political corruption, the Gaming Act includes a "pay-for-play" restriction, providing that "No applicant for a gaming license…shall **directly or indirectly**, pay or contribute any money or thing of value to…any candidate for nomination or election to any public office in the commonwealth . . .; or any group, political party, committee or association organized in support of any such candidate or political party."  M.G.L. c. 23K § 46 (emphasis added).

### The Gaming Commission

34.     The Gaming Commission consisted of five Commissioners, headed by a Chairman.  M.G.L. 23K § 3(a).  Crosby served as the Chairman of the Gaming Commission and was granted "supervision and control over all the affairs of the commission."   This included ongoing supervision of the Investigations and Enforcement Bureau ("IEB"), a law enforcement agency within the Gaming Commission.  The function of the IEB was to investigate all applicants and licensees and serve as the primary enforcement agent under the Gaming Act.  M.G.L. c. 23K § 6.  The other four commissioners relied on the work of IEB but lacked the same direct supervisory control of it that Crosby possessed as Chairman.

35.     The Gaming Act required Crosby, like all members of the Gaming Commission, to adhere to an "Enhanced Code of Ethics."  This code required, among other things, that:

> a.   "No Commissioner … may participate in a particular matter … pending before the Commission that may affect the financial interest of … a person with whom they have a significant relationship." *Mass. Gaming Comm'n Enhanced Code of Ethics* ¶ 9(A) (First Ed.)

b. "Commissioners must recuse themselves from any licensing decision in which a potential conflict of interest exists." *Id.* ¶ 9(C)

36.    Crosby, like all members of the Gaming Commission, was also expressly prohibited from having any *ex parte* communications with applicants. *Id.* ¶ 22(A). None of these provisions are discretionary. They are absolute prohibitions.

The Defendants Form the Enterprise: The Wynn Defendants Need a Site

37.    From a time prior to the enactment of the Gaming Act, the Wynn Defendants were intent on obtaining the Region A Gaming License. Initially, in partnership with Robert Kraft, the principal owner of the New England Patriots, the Wynn Defendants sought a license to operate a casino in Foxborough, Massachusetts, which was originally part of Region B.

38.    That plan was derailed when the May 2012 town election for the Foxborough Board of Selectmen turned into a *de facto* casino referendum, with the town's voters supporting anti-casino candidates and ensuring that the Board would have no interest in negotiating with a Kraft/Wynn consortium.

39.    As a result, by May 2012, the Wynn Defendants were in search of a new site in the Boston area for their attempt to get the Region A casino license.

The Defendants Form the Enterprise: FBT Everett Needs a Buyer for the Everett Site

40.    At the same time that the Wynn Defendants were forced to abandon the Foxborough site, FBT Everett was looking for a buyer for the Everett Site, which Lohnes and his partners had purchased on the cheap three years previously in 2009. The Everett Site presented a challenge for any use due to the severe toxic contamination, resulting from its earlier uses as a Monsanto Chemical plant and munitions facility.

41.     The Everett Site was "toxic" for the additional reason that two of Lohnes's partners, DeCicco and Lightbody, were notorious and convicted felons.  Lightbody is widely understood to be associated with La Cosa Nostra, and is a longtime friend and political supporter of the Mayor of Everett, Carlo DeMaria.  Lightbody's criminal record includes ten assault charges, three counts of illegal weapons possession, two counts of witness intimidation, and admitted involvement in an identity theft ring targeting immigrants.  Lightbody received a felony conviction for grand larceny and identity theft in 2007.  For his part, DeCicco had been convicted on multiple counts of mail fraud related to insurance claims he made in the wake of suspicious fires on his property.

42.     The ownership interest and involvement of these convicted felons was open and notorious in the community as well as readily ascertainable from public records at the time the Wynn Defendants began negotiations to acquire the Everett Site.  Mayor DeMaria has admitted that his "only" contact was Lightbody when dealing with significant issues involving the Everett Site.

43.     A few months after FBT Everett acquired the property, in or about October 2009, a third convicted criminal, Jamie Russo, an affiliate of Lightbody who had also recently held a patronage job as a "consultant" for Mayor DeMaria at Everett City Hall, began "consulting" for FBT Everett.  Russo acted as an intermediary between FBT Everett and the Everett municipal government with respect to permit or licensing issues.  According to Russo, he was promised 3% of the proceeds from any sale of the Everett Site as compensation for his services.

The Lohnes-Crosby Dinner

44.     Crosby has now admitted that he had a private dinner with Lohnes in May 2012. Lohnes had been instrumental some years previously in bailing out Crosby from the negative consequences of a failed business deal, sustaining losses himself in the process.  Crosby did not,

as he was required to do, promptly disclose this meeting to his fellow Commissioners or, just as importantly, disclose to them the fact that he had a longstanding friendship with, and felt indebted to, the principal owner of the land to which he subsequently referred potential licensees as a casino site.  Instead, disclosure of this dinner was not made until August 22, 2013, until fifteen months after their dinner, and eight months after the Wynn Defendants submitted their Phase I application identifying Lohnes as an owner of the site planned for Wynn's casino.  Prior to August 2013, the other Commissioners had no reason to discount any suggestions Crosby might have made to them that would tend to favor the Wynn/Lohnes bid, because they were unaware of this motivation. Crosby never disclosed that he had been referring potential licensees to the Everett Site.

45.     The disclosure Crosby did eventually make in August 2013 was hardly voluntary. It was compelled by the fact that attention was focused on the Everett Site because, thirteen days earlier, the FBI had informed the Gaming Commission of information learned via wiretap that revealed Lightbody's involvement with FBT Everett.

46.      Nor were Crosby's disclosures truthful when he asserted, both in August 2013 and again in October 2013, that he and Lohnes had "never discussed casino issues" and thus sought to downplay the meeting fifteen months earlier as simply old friends catching up and involving nothing that would impact his role as Chairman of the Gaming Commission.

47.     Shortly after the dinner with his friend, Crosby began to show an interest in bringing potential casino operators to Everett, even though the Everett Site had not yet been marketed before that time, even by its owners, for use as a casino.  In the summer of 2012, Crosby first attempted to steer another potential bidder for the Region A License to the Everett Site, but that potential bidder rapidly lost interest.

48.    Crosby's lengthy concealment of his relationship with Lohnes is particularly striking given how starkly it contrasts with his prompt disclosure of far lesser conflicts.

49.    On May 10, 2012, Crosby ran into Joe O'Donnell, one of the owners of SSR, at a Harvard class reunion dinner.  In contrast to Crosby's belated and misleading disclosure about Lohnes, and even though Crosby stated that he had "no ongoing relationship" with O'Donnell and that the two "do not generally socialize," he promptly (within 8 days) filed a disclosure of that meeting pursuant to G.L. c. 268A, § 23(b)(3).

50.    Moreover, Crosby's belated disclosure of his relationship with Lohnes did not divulge the circumstances surrounding his "discovery" of Lohnes's ownership or why he chose not to report his relationship with Lohnes until August 2013—nine or ten months after, even by his own admission, he knew that he had been referring prospective licensees to his friend's property.

The Defendants Form the Enterprise: The Wynn Defendants Go to Everett

51.    The Wynn Defendants, desperate to find a Region A site to replace Foxborough, began to consider the Everett Site in the summer or fall of 2012, around the time the other potential bidder Crosby had steered to the site lost interest.  In late November 2012, the Wynn Defendants agreed to pay $100,000 per month for an option to purchase the Everett Site for $75 million (more than ten times what FBT Everett had paid) if and when the Wynn Defendants got the Region A License. That arrangement was finalized in writing signed by Maddox on or about December 19, 2012.   That agreement also provided that FBT Everett would collaborate with the Wynn Defendants in the development of the property, including with respect to obtaining subdivision approvals, permits, a permanent road easement and performing environmental remediation.  Thus,

this criminally-affiliated group was not merely a seller of property, it was to be an active, ongoing participant in the casino development.

## **Concealment of the Felons**

52.     On December 14, 2012, the *Boston Business Journal* published an article noting that convicted felon Gary DeCicco appeared on early 2012 FBT Everett corporate paperwork.  The Wynn Defendants immediately feigned surprise, claiming that this was the first they had heard that a felon was involved.

53.     In fact, during the first official meeting between FBT Everett and representatives of the Wynn Defendants at the Everett Site in November 2012, DeNunzio informed Sinatra and Maddox that "an individual with a checkered past" was then an owner of FBT Everett but was taking steps to give up his interest.  Thus, Sinatra and Maddox were aware by November 2012, at the latest, that an individual with a criminal history was a partial owner of FBT Everett.

54.     DeCicco purported to transfer his interests to Lightbody, another convicted felon, who already had an ownership interest in FBT Everett from the beginning and whose ownership interest was open and notorious, and known to the Wynn Defendants.

55.     When one of the Wynn Defendants' local lawyer/lobbyists met with Mayor DeMaria as part of due diligence in or about December 2012 and asked the mayor if anyone involved with FBT Everett had "any kind of a criminal background," the mayor readily volunteered Lightbody's name.

56.     Further, during the fall of 2012, Lightbody had at least once visited Wynn's Las Vegas casinos as a VIP "Guest of the Chairman" and was there to personally open the Everett Site gates for Steve Wynn when he visited the Everett Site.

57.     Sinatra and the Wynn Defendants claim to have taken no steps to look further into the ownership history of the Everett Site after the ownership interest of ex-felon DeCicco was publicized, nor to question when DeCicco transferred his interest, or to whom he transferred it to, despite the requirements of the Gaming Act that any applicant disclose in its application the ownership history of a gaming site for the past twenty years.  That denial is itself implausible. Sinatra was a seasoned gaming attorney overseeing the Wynn Defendants' due diligence before committing to the Everett Site; she and Maddox were not neophytes.  They surely knew the importance of "suitability" to all gaming regulators and that a gaming license application in Massachusetts required 20 years of historical ownership information, M.G.L. c. 23K § 9(a)(15). Sinatra's subsequent claim that their due diligence went no deeper than an investigation of only three people FBT Everett itself volunteered as its current "owners," if true, would have been gross malfeasance, especially when the agreement with FBT Everett went beyond the mere sale of land. Thus, the Wynn Defendants could not have been fooled by the Everett Defendants' attempts to conceal the felons' interests and subsequently cooperated to keep it concealed.

58.     In January 2013, fully aware of the Gaming Act's prohibition on the involvement of felons with gaming applicants (and at all times aware of both DeCicco and Lightbody's criminal pasts), DeNunzio, acting for the benefit of himself and the Defendants, created a backdated FBT Everett 2012 Operating Agreement so as to falsely reflect that DeCicco did not have an ownership interest in FBT Everett as of January 2012.   The backdated FBT Everett 2012 Operating Agreement purports to transfer DeCicco's interest to Gattineri (whose claimed ownership interest thereby increased from 15% to 34.64%).   However, prior to DeNunzio's backdating of the agreement, DeCicco executed a Memorandum of Transfer dated "April __ 2012," in which he transferred the entirety of his residual rights and membership interests to Lightbody.   To the extent

DeCicco's interest had been taken over by another felon, Lightbody, that was hardly an improvement.

59.     On January 17, 2013, DeNunzio, acting for the benefit of himself and the Defendants, emailed Sinatra to tell her that the only equity holders of FBT Everett were himself, Lohnes and Gattineri.  Sinatra and Maddox, of course, knew this was false – or at the least that this was not always the ownership structure given their attendance at the meeting at the Everett Site in November 2012 where the criminal nature of one of FBT Everett's owners was disclosed. Eleven days later, on January 28, 2013, DeNunzio, acting for the benefit of himself and the Defendants, arranged for Lightbody and Gattineri, likewise acting for the benefit of themselves and the Defendants, to execute a Memorandum of Transfer, backdated to December 14, 2012, memorializing Lightbody's supposed transfer of his interest to Gattineri for a $1.7 million promissory note, also backdated to December 14, 2012.

60.     After Lightbody's interest became known, in July 2013, FBT Everett, for the second time, backdated the memorandum of transfer and promissory notes to show the transfer of interest occurring on August 15, 2012, in an attempt to show that Lightbody did not have any interests in FBT Everett by the time the Wynn Defendants visited the Everett Site and began negotiations to purchase the Everett Site.  DeNunzio later admitted that he made those alterations. Even then, however, the backdated documentation indicated that Lightbody had not been paid for the transfer but had been given a promissory note by Gattineri, thus giving Lightbody an ongoing financial interest.  Indeed, throughout 2013 and 2014, Lightbody, for the benefit of himself and the Defendants, remained actively involved in trying to block SSR's bid.  He spent thousands of dollars, allegedly out of his own pocket, on signs and advertising supporting the anti-SSR side of the public referendum in Revere (which SSR needed to pass for its proposal to go forward) as well

as donating to the "No Eastie Casino" advocacy group seeking to block SSR's bid. Indeed, Lightbody was arrested in October 2013 for physically assaulting a participant in a pro-SSR rally in Revere with the apparent intent of suppressing the vote for SSR's bid.

61.     DeNunzio, Gattineri and Lightbody were subsequently indicted for their roles in falsifying documents to conceal the criminal ownership interests in FBT Everett. They were all acquitted at trial, however, apparently because the jury believed their defense that the alleged "victims" of the falsified documents, namely the Wynn Defendants, had known full well the truth about their involvement.

62.     Crucially, by accepting promissory notes rather than selling his interests outright, Lightbody never really gave up his interest in FBT Everett. Lightbody had recourse against Gattineri in the event Gattineri defaulted on the note – recourse that conferred a reversionary interest on the property to Lightbody. Moreover, the Gaming Act requires disclosure of twenty years of ownership history of any proposed gaming site. Even if the Wynn Defendants believed DeCicco and Lightbody no longer held an interest at the time they submitted their application, they were still required to – but failed to – disclose the ex-felons' previous ownership interests in the Everett Site.

63.     Thus, the Wynn Defendants' license applications were intentionally and materially false due to its non-disclosure of the involvement of convicted criminals in the ownership of the Everett Site as well as its non-disclosure of Wynn's own pattern of sexual abuse and its cover-up. Steve Wynn, Sinatra, and Maddox were each involved in the preparation and submission of the applications and each knew of their falsity.

## Alteration of the Rules for the Wynn Defendants' Benefit

64.     The Gaming Commission, including Crosby, had repeatedly and firmly concluded that it was necessary for the IEB to complete its background checks on applicants before permitting a community vote approving or disapproving of a potential licensee's proposal (as the Gaming Act required).  There were a number of rationales for that position, including a concern that community support for an unsuitable candidate would put unwarranted pressure on the Gaming Commission, as well as a desire for the public to have full information before it voted.

65.     But then Wynn called Crosby *ex parte* in violation of the Gaming Act in or about April 2013.  Wynn asked for special treatment, specifically, that he be permitted to have the Everett community vote occur before the IEB announced its determination as to suitability.  Crosby then persuaded the rest of the Gaming Commission (who were not yet aware of Crosby's connection to the Everett Site's principal owner) to adopt "emergency regulations" which permitted that to occur. That "emergency regulation" allowed the Everett community vote on the Wynn Defendants' proposal *before* their affiliation with felons and mobsters was fully revealed.   The Wynn Defendants won that vote in June 2013, just a few weeks before the FBI informed the IEB and Massachusetts State Police that, through wiretaps in an unrelated investigation, they learned that the convicted felon Lightbody appeared to have a hidden interest in the Everett Site.

## The Pretend Solution and Crosby's Purported Recusal

66.     Once the fruits of the FBI's wiretaps were passed to the Gaming Commission via its staff in July 2013, the Wynn Defendants were known to the Gaming Commission to have associated with known felons and to have failed to disclose those affiliations.  Building on the Everett Site would directly reward the very wrongdoers that the Gaming Act was designed to

prevent.  To avoid disqualification, the Wynn Defendants urged upon the Gaming Commission an illusory "cure.".

67.     The Gaming Commission was convinced to announce in December 2013 that it would overlook the tainted ownership history, if the exercise price of the Wynn Defendants' option to purchase the Everett Site were reduced from $75 million to $35 million, supposedly to eliminate the "casino premium" that FBT Everett would otherwise receive.

68.     In or about November 2013, before the public had been advised of the foregoing, FBT Everett and Sinatra, on behalf of Wynn MA, executed an amendment to the purchase Option Agreement that reduced the exercise price from $75 million to $35 million.   In doing so, however, the parties largely negated the impact on the felons of that reduction by also reallocating other financial burdens.  For example, the obligation to pay tens of millions of dollars to remediate the toxic contamination was shifted from FBT Everett to the Wynn Defendants, making the seemingly-dramatic reduction in the "ticket price" largely illusory, although it is not clear that the illusory nature of the price reduction was disclosed to the Gaming Commission.

69.     In addition, the Gaming Commission expected the owners of FBT Everett to confirm that they were the true owners and that there were no hidden interests in the property.

70.     Moreover, the Wynn Defendants entered into at least one secret side agreement to make an owner of FBT Everett whole under the terms of the original Option Agreement, despite the purported purchase price reduction.  Accordingly, their multiple representations to the Gaming Commission about the reduced price were knowingly false.

71.     Lohnes and DeNunzio signed confirmations of ownership on December 23, 2013. However, their confirmations did not conform to the stipulations proposed by the Gaming Commission with respect to the ownership of FBT Everett, a condition for the Gaming

Commission's suitability determination.  The confirmations signed by Lohnes and DeNunzio additionally disclosed the additional interest of Lightbody's longtime business partner, convicted criminal Jamie Russo, for 3% of the purchase price of the Everett Site, but without disclosing the criminal record of Russo, who been charged with a casino-related felony in the past (though ultimately pled down to a misdemeanor).  Russo eventually sued for the enforcement of his agreement with FBT Everett that it pay him 3% of the monies it received in the sale of the Everett Site upon Wynn MA's receipt of the Region A Gaming License.

72.    Though Lohnes and DeNunzio provided their signed confirmations of ownership on December 23, 2013, by June 2014, with only days left to meet the Gaming Commission's deadline for submission of the confirmations, Gattineri still had not provided any such confirmation and his lawyer had made public declarations that he had no intention to do so. Gattineri ultimately signed a materially different confirmation than the one purportedly required by the Gaming Commission, merely stating that he had "not mortgaged, pledged, or assigned [his] own interest in the Company, nor [had he] granted to any person or entity an option, warrant or other right to [his] interest in the Company or the economic interests represented hereby, in whole or in part."  Gattineri's confirmation was signed in conjunction with the execution of a promissory note to Lightbody for $1.9 million – confirming Lightbody's continued interest in FBT Everett and financial profit from its sale of the Everett Site.

73.    Gattineri later claimed in his June 2018 lawsuit against Wynn Resorts and Wynn MA that he had a side agreement for his reimbursement, and that he only signed the confirmation of ownership in consideration of that side agreement.  Specifically, Gattineri alleged that he met with Robert DeSalvio ("DeSalvio"), president of Wynn MA, who pressured him to sign a confirmation, and agreed, on behalf of the Wynn entities, to pay Gattineri $18,676,000,

representing Gattineri's 46.69% ownership interest of the $40 million purchase price reduction. Given that DeSalvio had to personally fly out to California on the very eve of the deadline the Gaming Commission imposed to obtain Gattineri's signature, it is certainly plausible that Gattineri was able to use his leverage as he claims.

74.     Notwithstanding whatever agreement Gattineri had with the Wynn Defendants, the certification he signed on or about June 14, 2014 for his own benefit and that of the Defendants was materially false, as had been the similar certifications signed by Lohnes and DeNunzio on or about December 23, 2013 for their own benefit and that of the Defendants.  All three of these certificates were presented to the Gaming Commission by the Wynn Defendants, who knew they were materially false, on or before the date of its vote on the license application on September 16, 2014, in order to deceive the Gaming Commission and fraudulently induce it to grant the Wynn/Lohnes application.

75.     On November 21, 2013, the Boston Globe made Lightbody's involvement with FBT Everett and the Everett Site public for the first time.  On the same date, the Wynn Defendants announced they had reached an agreement with FBT Everett to confirm the present ownership of FBT Everett and to reduce the purchase price of the Everett Site, as discussed above.  Wynn MA and FBT Everett executed an amendment to the Option Agreement on November 26, 2013.

76.     On December 5, 2013, the Wynn Defendants submitted a false and misleading petition to the Gaming Commission setting forth the terms of the amended Option Agreement as a "fix" with respect to the ownership of FBT Everett.  On that same date, the Boston Globe published an article describing Crosby's relationship with Lohnes.  Only after the public became

aware of his connection did Crosby finally, purportedly, recuse himself from the December 13, 2013 hearing on possible hidden interests in FBT Everett.

77.     Despite his initial purported recusal, Crosby continued to participate in hearings on the Wynn Defendants' suitability (on December 16, 2013), in issuing a favorable Phase I suitability decision to the Wynn Defendants (on December 27, 2013), in presiding over presentations by Wynn MA and Mohegan Sun (on January 22, 2014), and in public hearings involving Boston's host community status with respect to both Wynn MA and Mohegan Sun's applications (on March 20, 2014).

78.     Only after the publication of yet another article in the Boston Globe on May 7, 2014, questioning his conflict of interest, did Crosby purport to recuse himself from all matters involving Region A applicants on May 8, 2014.

**Wynn Solicits More Favors from Crosby**

79.     At the Wynn Defendants' request and initiative, Crosby evidenced clear favoritism in his treatment of the Wynn Defendants, not only in bending (or breaking) the rules for the Wynn Defendants' benefit, but by throwing artificial obstacles in SSR's path.

80.     For example, in or about February 2013, Steve Wynn contacted Crosby, yet again directly in violation of the Gaming Act, and demanded that Spectrum Gaming Group – an investigator hired by the IEB to vet applicants and which had extensive knowledge and experience with the gaming industry in Macau – not be assigned to vet the Wynn Defendants' application, and that it be assigned to SSR's instead.  The Wynn Defendants knew that any serious investigation

would uncover shady business dealings in Macau that could create suitability concerns and wished to keep those issues as concealed as Steve Wynn's career as a sexual predator was.

81.     While a Commissioner mindful of his ethical obligations would not even have taken Wynn's *ex parte* call, Crosby not only took it, but Wynn was ultimately successful in his demand that the Wynn Defendants be assigned an investigator that had no experience in Macau which ensured that the integrity of Wynn Resorts' Macau operations would not be seriously vetted.

82.     By contrast, the IEB, drove away SSR's operator Caesar's by threatening to find it "unsuitable" on extremely attenuated grounds – the most serious of which was that Caesar's had contemplated a transaction with the Gansevoort Hotel Group (owners of a boutique New York hotel) to license its brand for one of Caesar's own non-gaming properties in Las Vegas, and the IEB based its "unsuitability" determination solely on Caesar's "bad judgment" in having sought to license the brand despite a *New York Post* story linking one of Gansevoort's principals to criminals in Russia decades before.

83.     SSR was nonetheless able to overcome that obstacle by teaming at the last minute with Mohegan Sun ("MSM"), an operator that had already been qualified by the IEB.  Indeed, as described below, SSR had already met and overcome further unjustified attacks on SSR itself.

84.     SSR's qualifications and "suitability" were impeccable.  SSR, after all, had been operating the historic Suffolk Downs for years and was a valued member of the community. Nevertheless, recognizing and seeking to take advantage of the unsustainable economics of the horse track, as early as November 2012, Crosby sought to deliver the death-blow to SSR by voting, and urging the other members of the Gaming Commission to likewise vote, to deny renewal of SSR's racing license, without basis, which would have disqualified SSR from receiving a gaming license for failure to "maintain" its racing license.  *See* M.G.L. c. 23K § 24(a).  That attempt did

not succeed, since the other commissioners refused to go along with it and actively questioned Crosby to why he sought to deny Suffolk Downs a racing license for the first time in its history.

85.     Thus, despite being under constant assault from the Wynn Defendants, their cohorts, and Crosby, SSR had managed to satisfy all the requirements for becoming a licensee as the Gaming Commission's final vote approached.

86.     To further ensure a favorable outcome, in or about July or August of 2014, one of the Wynn Defendants' representatives engaged in improper *ex parte* communications with at least one member of the Gaming Commission in order to pressure them to change their vote in order to support the Wynn/Lohnes bid, as they ultimately did.

87.     On September 16, 2014, the Gaming Commission held its straw vote, and then subsequently signed a conditional agreement to award the license to Wynn MA on November 6, 2014 if certain conditions were fulfilled by then.  On or about November 6, 2014, the license was awarded to Wynn MA.  But for the Defendants' multiple acts of fraud and other misconduct, SSR's application would have prevailed in an honest competition.  Indeed, in an honest competition in which both the underlying facts and their fraudulent concealment was known to the Gaming Commission, Wynn/Lohnes would have been disqualified.

88.     Although still subject to the Gaming Act's complete bar on any contribution, however modest, to political candidates in Massachusetts, the Wynn Defendants decided to try to circumvent it.  On or about October 1, 2014, Wynn Resorts made a political contribution with the clear intent it be spent in Massachusetts, in violation of the Gaming Act.

**The Apparent Depth and Length of the Gaming Commission's Investigation Demonstrates the Materiality of the Fraud**

89.     As noted above, regulators worldwide seek to guard against the easy corruption the gaming industry often inspires by ensuring the suitability of those associated with a casino.  As

also discussed above, the Wynn Defendants were unsuitable under Massachusetts law because of their association with Lohnes and his felonious partners and, for that reason alone, were required under the law to be disqualified.  The Wynn Defendants' fraudulent concealment of that association should have sealed their fate if such association were not sufficient by itself.

90.     But as also noted above, the Wynn Defendants also were independently unsuitable and would have been disqualified but for the concealment of Steve Wynn's sexual misconduct (with, again, the concealment being independently wrongful).  Wynn Resorts' own reaction, as well as the well-publicized reaction of the Gaming Commission (and that of regulators in other states and countries) in immediately launching an investigation, when the fraud was revealed demonstrates its materiality.

91.     The Wynn Defendants' application was likewise fraudulent and misleading by failing to disclose the payment (disguised via the use of shell companies) of hush monies, including an astonishing $7.5 million to one victim of Steve Wynn's sexual misconduct in about 2005 – a payment that Sinatra, who was closely involved with the Massachusetts license application process, had personally known about since at least 2009.

92.     In May 2017, SSR sold Suffolk Downs to a developer for dramatically less than the property would have been worth with the casino license or, put another way, for dramatically less than the present value of the future revenue stream SSR would have received had the casino license been issued.

## CAUSES OF ACTION

### First Claim for Relief (Against All Defendants)
### (Violation of RICO, 18 U.S.C. 1962(c))

93.     Plaintiff realleges and incorporates all the allegations of paragraphs 1 through 93, above, as if fully set forth again herein.

94.     The Defendants all constitute persons within the meaning of 18 U.S.C. § 1961(3).

95.     The Defendants combined together as an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) engaged in and affecting interstate commerce, to achieve common goals they could not achieve lawfully, and could not achieve without each other's collusion and cooperation.  This enterprise had a purpose, namely construction and operation of a casino at the Everett Site, relationships among those associated with it, and longevity sufficient to permit those associates to pursue, and indeed achieve, the enterprise's primary purpose.

96.     The Defendants conducted and participated in the conduct of the enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) over an extended period of time, including:

a.     Multiple criminal violations of the Massachusetts Gaming Act by knowingly making false, misleading, and/or omissive statements in connection with the Wynn/Lohnes license application on multiple occasions from January 2013 through September 2014, and/or preparing or directing the preparation of false documents with the knowledge that they would submitted to the Gaming Commission.   These false, misleading, and/or omissive statements variously:

1.     Concealed and/or misrepresented the then-current and/or previous ownership and/or financial interest of convicted felons in the Everett Site.

2.     Falsely represented that none of the proceeds from the Wynn Defendants' purchase of the Everett Site would be shared with convicted felons.

3.     Falsely represented that the "revised" deal with FBT Everett was being adhered to by failing to disclose the secret side deal with Gattineri to

give him extra compensation in return for his signature on one of the needed false certifications.

4.      Intentionally concealed Steve Wynn's longstanding pattern of misconduct as a sexual predator and use of hush money to silence victims, while knowing that disclosure of this highly material information would lead to denial of the license application on suitability grounds.

b.      Multiple criminal violations of 18 U.S.C. §§ 1341 and 1343 by knowingly making false, misleading, and/or omissive statements in connection with the Wynn/Lohnes license application on multiple occasions from January 2013 through September 2014, and/or preparing or directing the preparation of false documents with the knowledge that they would be submitted to the Gaming Commission, as set forth above, by using the mail and/or wires to transmit such statements and documents as part of a scheme or artifice to defraud the non-defendant members of the Gaming Commission and/or fraudulently obtain money or property by deceiving the non-defendant members of the Gaming Commission into granting the Wynn/Lohnes group's license application.

c.      Multiple additional criminal violations of 18 U.S.C. § 1952 insofar as the Wynn Defendants' actual headquarters are in Nevada and it was necessarily known and recognized by all Defendants that it would be necessary for them to travel to Massachusetts and/or to use the mails, in order to consummate the scheme to violate the Massachusetts Gaming Act as described herein.

d.      State-law extortion felonies involving assault committed by Lightbody on behalf of the enterprise and other conduct constituting "criminal enterprise activity" under M. G. L. c. 271A §§ 1 and 2.

97.     As a direct and proximate result of the Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), SSR has been injured in its business and property.  Specifically:

a.      SSR has been deprived of the substantial future revenues it would have received had the MSM /SSR license application been granted, as it would have but for the Defendants' unlawful misconduct;

b.      SSR ultimately sold the Suffolk Downs property for dramatically less than it would have been worth had had the MSM/SSR license application been granted, as it would have but for the Defendants' unlawful misconduct; and

c.      SSR and certain of its members and/or affiliates incurred substantial expenses in connection with its license application which would not have been incurred had it been known that, due to the Defendants' unlawful misconduct, the Wynn/Lohnes group would be able to avoid the requirements of the Gaming Act.

98.     As a result, SSR and its members suffered actual damages in an amount to be determined at trial, but believed to be over $1 billion dollars.  Moreover, SSR is entitled to recover treble the actual damages sustained, plus costs of suit, including reasonable attorneys' fees, in accordance with 18 U.S.C. § 1964(c).

**Second Claim for Relief (Against Wynn, Wynn Resorts, Maddox and Sinatra)**
**(Violation of RICO, 18 U.S.C. §§ 1962(a) and (b))**

99.     Plaintiff realleges and incorporates all the allegations of paragraphs 1 through 99, above, as if fully set forth again herein.

100.    Wynn Resorts received income derived, directly or indirectly, from a pattern of racketeering activity, as described below, and used or invested, directly or indirectly, a part of such income, or the proceeds of such income, in acquisition of an interest in, or the establishment or

operation of, Wynn MA, an enterprise the activities of which affect interstate and foreign commerce.

101.    Likewise, Wynn, Maddox and Sinatra each acquired and/or maintained, through a pattern of racketeering activity described below, directly or indirectly, an interest in or control of Wynn MA.

102.    That pattern of racketeering activity included, among other things, travel to and from Massachusetts and Nevada, and other states and countries where the Wynn Defendants operated casinos, and the use of the mail and other facilities of interstate commerce including the Internet and wires, on ascertainable dates including those referenced herein, for the purpose of promoting, managing, establishing, carrying on, or to facilitate the promotion, management, establishment or carrying on of business enterprises involving gambling in violation of the laws of Nevada and Massachusetts and other applicable jurisdictions, and thereafter did or attempted to do so; *to wit*, through concealment of, and failure to disclose in accordance with the requirements of applicable gaming laws, the incidents of sexual harassment by Wynn, including those for which the victims were paid hush money.  As reported by the *Wall Street Journal* in a January 26, 2018, article, "dozens of people who have worked at Mr. Wynn's casinos" corroborated "behavior that cumulatively would amount to a decades-long pattern of sexual misconduct by Mr. Wynn."

103.    None of that had been disclosed to the applicable state gaming regulators, despite each of Wynn Resorts, Wynn, Maddox and Sinatra necessarily knowing that Wynn's suitability was a critical factor to be evaluated by the regulators in connection with the granting and continuing the efficacy of gaming licenses, and knowing full well that their duty to disclose all material facts under the respective state laws included facts about those settlements and allegations that were being concealed.

104.     The knowledge and participation of Wynn Resorts is not only imputed by reason of the knowledge of Wynn, Maddox and Sinatra, but through the admissions of Elaine Wynn who has admitted that, among other things, as a Director of Wynn Resorts, she had become aware in 2009 of, and discussed with Sinatra, Wynn's $7.5 million payment to a manicurist in 2005, concealed through a separate entity, as reported in the *Wall Street Journal* and the *Las Vegas Review-Journal* among other media.

105.     The omissions were material as evidenced by the investigations immediately undertaken by the respective regulators in Massachusetts, Nevada and Macau in the wake of the January 26, 2018, *Wall Street Journal* article revealing this pattern of abusive behavior and its concealment.

106.     That Wynn and Sinatra acquired and maintained control of Wynn MA through this pattern of racketeering is evidenced by the fact that each promptly lost control of Wynn MA when they were forced to resign from Wynn Resorts and affiliates as a direct result of their racketeering activity having been revealed and, as a consequence, stopped.  Maddox, a participant in the same racketeering activity, is no less culpable just because the Wynn Resorts Board of Directors have so far given him a pass; in fact, by having done so, the Board has reinforced the company's culpability.

107.     SSR suffered injury by reason of these Defendants' acquisition or maintenance of control over Wynn MA because Wynn MA was SSR's only remaining competitor for the Region A casino license and, but for Wynn MA, SSR would have been awarded the Region A License.

108.     As a result, SSR suffered actual damages in an amount to be determined at trial, but believed to be over $1 billion dollars.  Moreover, SSR is entitled to recover treble the actual

damages sustained, plus costs of suit, including reasonable attorneys' fees in accordance with 18 U.S.C. § 1964(c).

### Third Claim for Relief
### (Conspiracy to Violate RICO, 18 U.S.C. 1962(d)
### Against All Defendants)

109.    Plaintiff realleges and incorporates all the allegations of paragraphs 1 through 109, above, as if fully set forth again herein.

110.    As set forth above, all of the Defendants agreed and conspired to violate 18 U.S.C. § 1962(c), by forming the illegal enterprise and conducting and participating in the conduct of its affairs through a pattern of racketeering activity.

111.    Each Defendant, as set forth above, committed one or more overt acts in furtherance of the conspiracy.

112.    Each Defendant necessarily recognized, given the objective of the conspiracy, and agreed that the conspiracy would commit at least two predicate acts.

113.    As a direct and proximate result of Defendants' conspiracy, their overt acts taken in furtherance thereof, and their violations of 18 U.S.C. § 1962(d), SSR has been injured in its business and property.  Specifically:

      a.    SSR has been deprived of the substantial future revenues it would have received had the MSM/SSR license application been granted, as it would have but for the Defendants' unlawful misconduct;

      b.    SSR ultimately sold the Suffolk Downs property for dramatically less than it would have been worth had had the MSM/SSR license application been granted, as it would have but for the Defendants' unlawful misconduct; and

c.   SSR and certain of its members and/or affiliates incurred substantial expenses in connection with its license application which would not have been incurred had it been known that, due to the Defendants' unlawful misconduct, the Wynn Lohnes group would be able to avoid the requirements of the Gaming Act.

114.   As a result, SSR suffered actual damages in an amount to be determined at trial, but believed to be over $1 billion dollars.   Moreover, SSR is entitled to recover treble the actual damages sustained, plus costs of suit, including reasonable attorneys' fees, in accordance with 18 U.S.C. § 1964(c).

**Fourth Claim for Relief**
**(Mass. G.L. 93A, section 11, Against All Defendants)**

115.   Plaintiff realleges and incorporates all the allegations of paragraphs 1 through 115, above, as if fully set forth again herein.

116.   SSR was at all relevant times a person engaged in the conduct of trade or commerce. The Defendants were at all relevant times persons engaged in the conduct of a trade or commerce.

117.   The Defendants' acts as described above constituted unfair methods of competition and/or unfair and/or deceptive acts and practices, all aimed at unfairly obtaining the Region A casino license for the Wynn/Lohnes group to operate at the Everett Site at the expense of SSR, all in violation of Mass G.L. 93A.

118.   The Defendants knew that the SSR application (with Caesar's or MSM) would have prevailed in a fair, lawful, and untainted process, and their violations of the statute were willful and/or knowing.

119.   The Wynn Defendants' violations of the statute caused SSR loss of money and/or property, as set forth in detail above.

120.     As a result, SSR suffered actual damages in an amount to be determined at trial, but believed to be over $1 billion dollars.  Moreover, SSR is entitled to recover treble the actual damages sustained, plus costs of suit, including reasonable attorneys' fees, in accordance with section 11 of the statute.

### Fifth Claim for Relief
### (Tortious Interference with Advantageous Business Relations)

121.     Plaintiff realleges and incorporates all the allegations of paragraphs 1 through 121, above, as if fully set forth again herein.

122.     SSR had a business relationship of economic benefit with a third party, MSM, by way of the relationship contemplated in their partnership to submit the MSM/SSR gaming license application.

123.     Defendants knew of this business relationship generally and their partnership, specifically.

124.     Defendants knowingly interfered with this relationship and rendered performance under this relationship impossible, and otherwise prevented MSM and SSR from performing under their agreement, through the above-described conduct, including but not limited to their failure to properly disclose to the IEB and to the Commission the existence of the $7.5 million settlement, the allegations related thereto, the creation a limited liability company for the specific purpose of concealing the settlement and Wynn's involvement in same, the decades of Wynn's sexual misconduct, and Wynn Resorts' institutional failure to address employee complaints of same.

125.     As described above, Defendants' interference was through improper motive and means, including but not limited to the fact that their improper failure to disclosure disqualifying information to the IEB and the Gaming Commission was in violation of Massachusetts statute and regulations, was done with the knowledge that proper disclosure would result in a finding of non-

suitability by the Commission, and was done in order to obtain the Category 1 License in Region A of Massachusetts to which Wynn MA was not entitled and to thereby preventing MSM and SSR from performing under their agreement.

126.    SSR's loss of advantageous business relations with MSM, resulted directly from the Defendants' conduct.

127.    As a direct and proximate result of Defendants' interference, SSR has and will continue to suffer damages in an amount to be proven at trial.

### Sixth Claim for Relief
### (Tortious Interference with Contractual Relations)

128.    Plaintiff realleges and incorporates all the allegations of paragraphs 1 through 128, above, as if fully set forth again herein.

129.    SSR and MSM executed an agreement under which SSR agreed to lease the portion of Suffolk Downs in Revere to MSM for a term of 99 years in exchange for minimum rental payments of $35 million per year.  The agreement provided for annual payments that could have exceeded $100 million per year based on MSM's net revenues.

130.    Defendants were aware of the agreement between SSR and MSM.

131.    Defendant intentionally and improperly interfered with the performance of the agreement, rendering performance under the agreement impossible and otherwise preventing MSM and SSR from performing under the agreement.

132.    As described above, Defendants' interference with the agreement was improper in motive and means, including but not limited to the fact that their improper failure to disclosure disqualifying information to the IEB and Commission was in violation of Massachusetts statute and regulations, was done with the knowledge that proper disclosure would result in a finding of non-suitability by the Commission, and was done in order to obtain the Category 1 License in

Region A of Massachusetts to which Wynn MA was not entitled and to thereby preventing MSM and SSR from performing under the agreement.

133.    SSR's loss of the advantages of the agreement with MSM, including but not limited to minimum rental payments of $35 million per year, resulted directly from the Defendants' conduct.

134.    As a direct and proximate result of Defendants' interference with the agreement between SSR and MSM, SSR has and will continue to suffer damages in an amount to be proven at trial.

WHEREFORE, SSR seeks judgment against the Defendants as follows:

a.    Compensatory damages in an amount to be determined at trial, but believed to exceed $1 billion;

b.    Treble damages as provided for under both federal and Massachusetts law;

c.    Its costs of suit, including reasonable attorneys' fees, as provided for under both federal and Massachusetts law; and

d.    Such other and further relief as may be just.

## JURY DEMAND

Plaintiff Sterling Suffolk Racecourse, LLC hereby demands a trial by Jury.

Dated: September 17, 2018                    DONOHUE & ASSOCIATES

                                        By:      _/s/ Joseph R. Donohue_____
                                                 Joseph R. Donohue (BBO# 547320)
                                                 The Charlestown Navy Yard
                                                 Shipway Place Unit C2
                                                 Boston, Massachusetts 02129
                                                 Telephone: (508) 641-8848
                                                 Email: jrdonohuelaw@gmail.com

                                                 Steven G. Storch (to seek admission *pro hac vice*)
                                                 STORCH AMINI PC
                                                 2 Grand Central Tower
                                                 140 East 45th Street, 25th Floor
                                                 New York, NY  10017
                                                 Telephone: (212) 490-4100
                                                 Email: sstorch@storchamini.com

                                                 *Attorneys for Plaintiff*
                                                 *Sterling Suffolk Racecourse, LLC*