Joseph R. Donohue, Esq. (BBO# 547320)
DONOHUE & ASSOCIATES
The Charlestown Navy Yard
Shipway Place Unit C2
Boston, Massachusetts 02129
Telephone: (508) 641-8848
Email: jrdonohuelaw@gmail.com

Steven G. Storch, Esq. (admitted *pro hac vice*)
STORCH AMINI PC
2 Grand Central Tower, 25th Floor
140 East 45th Street
New York, New York 10017
Telephone: (212) 490-4100
Email: sstorch@storchamini.com

*Attorneys for Plaintiff Sterling Suffolk Racecourse, LLC*

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
-----------------------------------------------------------------x
                               :

STERLING SUFFOLK RACECOURSE, LLC,   :     Docket No.  18 CV 11963
                               :

              Plaintiff,         :

                               :

            v.               :

WYNN RESORTS, LTD; WYNN MA, LLC;   :     **AMENDED COMPLAINT**
STEPHEN WYNN; KIMMARIE SINATRA;    :
MATTHEW MADDOX;                  :
and FBT EVERETT REALTY, LLC;      :
                               :     (Jury Trial Demanded)

              Defendants.    :
-----------------------------------------------------------------x

Plaintiff Sterling Suffolk Racecourse, LLC ("SSR"), by and through its undersigned counsel, as and for its Amended Complaint against Defendants herein, alleges as follows, on personal knowledge as to its own actions and on information and belief as to all other matters:

## Summary of the Case

1.     This action is brought pursuant to the Racketeer Influenced Corrupt Organization Act ("RICO") (19 U.S.C. § 1961, *et seq*.) arising from the Defendants' illegal corruption of the application process for a Region A Gaming License (the "Gaming License") overseen by the Massachusetts Gaming Commission (the "Gaming Commission").  Additionally, the claims herein arise under Mass. G.L. 93A, section 11 and the common law.  As set forth in detail below, by fraud, kickbacks, political cronyism crossing the line of legality and other unlawful methods, the Defendants conspired to fix the application process, circumvent laws and regulations in place to prevent the infiltration of mob elements and protect the public at large, all with the goal of profiting at SSR's expense by fraudulently obtaining a valuable monopoly, and the revenue flowing from it, that would have, in a fair and untainted process, been awarded to SSR and its business partner.

2.     The Suffolk Downs Racetrack, a property owned by SSR, was by far the best suited location for a casino to operate under the single Region A Category 1[1] Gaming License to be awarded under the recently enacted Massachusetts Gaming Act (Mass. G.L. 23K, the "Gaming Act").  Among other things, Suffolk Downs had more than adequate acreage, already had an existing and operating racetrack and was uniquely situated close to public transportation with ready access from downtown Boston.

---

[1] Region A covered the metropolitan Boston area, including Suffolk, Middlesex, Essex, Norfolk, and Worcester Counties; Category 1 permitted operation of a casino.  Only one such Category 1 "license" was to be permitted in each Region.

3.      A major investor in SSR was Coastal Development, LLC ("Coastal"), a company headed by Richard Fields ("Fields") who had developed the extremely profitable Seminole Hard Rock Hotel & Casino in Fort Lauderdale, Florida, in conjunction with the Seminole Tribe.  Fields spearheaded the effort to save horseracing at Suffolk Downs by being the driving force behind enactment of the Gaming Act.  One purpose of the Gaming Act, which recognized the importance of maintaining existing horseracing, was to encourage the continuation of horseracing.  That is why the statute expressly provides that an applicant for a live racing license (like SSR) could receive a gaming license only if live racing would continue and, in fact, increase.  *See* M.G.L. c. 23K §§ 19(e), 24.  The award of a license to Suffolk Downs would have fulfilled a key object of the Gaming Act to increase revenue to the historic racetrack and enable it to survive.

4.      In addition to having the best site, SSR had initially put together a team which consisted of the investors in SSR and Caesar's Entertainment Corp. ("Caesar's") as gaming operator, to apply for the single "Region A" license that would be awarded.[2]

5.      SSR and its business partners also had the strong endorsement of the Mayor of Boston, among many others, to site a casino at Suffolk Downs.

6.      The Region A Gaming License was not awarded to SSR or its business partner. Instead, it was awarded to the Wynn Defendants (defined below).  In a split vote resulting from an irremediably tainted and fraudulent process, the Wynn Defendants as a direct result of multiple criminal acts that collectively constituted "racketeering activity" as defined in the federal RICO statute, (19 U.S.C. § 1961, *et seq*.)  were granted a license to operate their casino on a toxic waste site loaded with levels of arsenic still so high that a child day care center would not be permitted to be housed there, even after the site was remediated and the regulations amended to countenance

---

[2] As explained below, Caesar's was ultimately unfairly driven out of the process, but SSR was able to replace it with a new and equally-qualified business partner Mohegan Sun Massachusetts ("MSM").

higher levels.  Added to that was the lack of adequate and safe access to the site and the resultant threat of traffic and environmental harm to the residents of both Everett and the City of Boston.

7.     The irony is that this was exactly the situation that the legislature feared when it considered legalized gambling.  Casino gambling has long been viewed as an industry particularly vulnerable to criminal influence as well as unusually likely to encourage political corruption. When Massachusetts decided to legalize casino gambling in 2011 after decades of discussion and debate, the enabling legislation contained numerous safeguards against those risks.  In complete disregard of those restrictions, the Wynn Defendants knowingly purchased the toxic site from defendant FBT Everett Realty, LLC ("FBT"), an entity owned jointly by associates of La Cosa Nostra and a friend and former business partner of the then Chairman of the Gaming Commission, Stephen Crosby ("Crosby").  Not only did this sale run afoul of the Gaming Act, but the criminally-tainted FBT was actually brought on to provide services to the Wynn Defendants and paid $100,000 per month per the terms of an Option Agreement prior to the Wynn Defendants' acquisition of the property.  At least one of those "service providers" used threats and physical violence to further the Wynn Defendants' pursuit of the Gaming License.  Moreover, FBT's principal owner, told at least some of his dubious partners (who questioned the suitability of the site for a casino) that the Wynn Defendants would get the license and purchase the property because Crosby owed him.  And, in fact, Crosby kept his relationship secret until he was forced to partially disclose the relationship after being tipped off that the FBI was investigating FBT's ownership interests.  The rules of the Gaming Act were unlawfully applied differently, and more harshly, against SSR and in favor of Wynn.  Covering all bases, FBT had even arranged for a kickback to the Mayor of Everett, a fact not disclosed to the Gaming Commission. This was exactly the situation that the Gaming Act sought to prevent.

8.      The Defendants herein conspired to, and did in fact, circumvent the safeguards and protections that the Gaming Act was intended to provide. Thus, in order to unlawfully acquire the Gaming License, the Defendants and other persons acting in concert with them each committed, or agreed to commit, at least two of a series of unlawful acts, including;

a.      Submitting false and/or fraudulently omissive applications to the Gaming Commission;

b.      Making false statements and/or fraudulently omissive statements to the Gaming Commission and/or its agents and/or commissioners about the true ownership of the Everett Site (defined below) and/or generating false and/or fraudulently omissive documents to be used in support of such false statements;

c.      Making false statements and/or fraudulently omissive statements to the Gaming Commission and/or its agents and/or commissioners about the Wynn Defendants systematic violation of Nevada gaming regulations in connection with Steve Wynn's sexual predation as well as their systematic involvement with organized crime figures in Macau and the purchase of property with concealed and undocumented ownership interests.

d.      Improper *ex parte* contacts with members of the Commission to pressure them into voting for Wynn;

e.       Making illegal campaign contributions in violation of the Gaming Act;

f.      Misleading the untainted members of the Gaming Commission about the relationship between FBT and Crosby;

g.      Arranging for the Mayor to receive a concealed percentage in the casino project; and

h.      Committing violations of, or facilitating exceptions to, the gaming laws and regulations for the Defendants' benefit.

9.      It was only because of these acts, which collectively formed a pattern of numerous RICO predicate crimes as explained in detail below, that the Wynn Defendants were able to acquire the Gaming License and to prevail over SSR's proposal, and the owners of the criminally tainted FBT Everett were able to sell this land at a windfall profit in the tens of millions of dollars.  Because only one Gaming License would be awarded in Region A, the Defendants could only prevail at SSR's expense.  They knew that, and they knew that their illegal acts would cause SSR hundreds of millions of dollars in damages.  This case thus presents the very situation the RICO statute was adopted to address: a criminal enterprise "competing" unfairly with, and injuring, legitimate businesses through a pattern of racketeering.

10.     Subsequent public disclosures have revealed just how unsuited the Wynn Defendants were.  Defendants Steve Wynn, Kimmarie Sinatra, and others were recently compelled to step down or were fired when Steve Wynn's long and sordid history of inappropriate and at times criminal sexual conduct was finally disclosed, together with their pattern of concealment through lies, omissions and pay-offs.  Over half a dozen other senior members of Wynn Resorts management, now fired or otherwise separated, also participated in the cover-up of these incidents. Wynn Resorts has now publicly admitted that it, as a corporation, repeatedly violated Nevada's gaming regulations (both due to the acts of its then-CEO Steve Wynn and the acts of others in failing to respond appropriately when they became aware of those incidents) during the period from 2006 through and including 2013-14 when the Wynn Defendants were actively seeking and obtaining the Gaming License in Massachusetts from the Gaming Commission, and indeed continued to violate Nevada's suitability regulations in more recent years as well.    These are the

very same actors involved in the conspiracy to obtain the Gaming License.  Defendant Matthew Maddox, who remains employed and indeed has been promoted, is no less culpable and has in effect become the face of the "new" Wynn Resorts.

11.     Separately, the Wynn Defendants' behavior in Massachusetts was no novelty, because they had followed the exact same modus operandi in the lucrative Far Eastern gaming destination of Macau, where they built casinos on property obtained from highly questionable sellers with connections both to organized crime and influential local politicians, as well as continuing to consort with organized crime figures as part of their ongoing business model in Macau.  They both lied to the Gaming Commission in Massachusetts about their Macau activities and fixed the process to ensure that any further inquiry into those activities would be so cursory as to avoid revealing the truth.

12.     SSR was injured by the Defendants' RICO violations to the tune of well over a billion dollars, and is entitled to receive treble its actual losses, in an amount to be proven at trial, plus attorneys' fees and costs.  The Defendants have also damaged SSR by violating Mass. G.L. 93A, proscribing unfair methods of competition and unfair business practices as well, and SSR is additionally entitled to all appropriate and available relief under that statute as well.

<div align="center">**Jurisdiction and Venue**</div>

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under RICO.  This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over the state law claims as they arise out of the same case or controversy.

14.     Defendants are subject to personal jurisdiction in this District as they reside in, have transacted and continue to transact business in, or have had more than minimum contacts with Massachusetts in connection with the acts and transactions alleged herein.

15.     Venue is appropriate in this district pursuant to 28 USC § 1391(b), because the events giving rise to these claims occurred in this district.

**The Parties**

16.     SSR is a Massachusetts limited liability company with its principal place of business in East Boston.  SSR owned at all relevant times the historic Suffolk Downs Racecourse, which straddled East Boston and Revere and was at all relevant times an appropriate site for the building of a casino.

The Wynn Defendants

17.     Wynn Resorts, Ltd. ("Wynn Resorts") is a Nevada corporation with its principal place of business at 3131 Las Vegas Blvd. South, Las Vegas, Nevada, which directly or through subsidiaries operates casinos in both Nevada and Macau.

18.     Wynn MA, LLC ("Wynn MA") is a wholly owned subsidiary of Wynn Resorts, formed for the purpose of applying for a Category 1 Gaming License in Massachusetts, with its headquarters at 3131 Las Vegas Blvd. South, Las Vegas, Nevada.   During the period complained of, Wynn Resorts was not a passive owner of Wynn MA, which had no autonomous management team of its own given decision making discretion.  Rather, all significant decisions of Wynn MA, including without limitation its decisions to engage in the criminal and/or tortious acts set forth herein, were made for it by Wynn Resorts and Wynn Resorts' own senior management team, including the individual defendants herein.  Accordingly, all acts and omissions of Wynn MA complained of herein were acts and omissions of Wynn Resorts for which Wynn Resorts is fully accountable.

19.     Stephen Wynn, often known as Steve Wynn ("Wynn"), is a resident of Nevada and was CEO of Wynn Resorts until his February 2018 forced resignation due to his exposure as a

serial sexual predator.  He did not delegate the pursuit of the Gaming License in Massachusetts to subordinates but played an active and hand on role throughout the process, traveling to Massachusetts on multiple occasions, personally (and improperly) demanding special treatment and accommodations from the Gaming Commission, and making knowingly false statements both orally and in writing to the Gaming Commission.  Wynn also served as CEO of Wynn Macau, Limited ("Wynn Macau, Ltd."), a majority owned subsidiary of Wynn Resorts, from September 2009 until his resignation in February 2018.

20.     Matthew or "Matt" Maddox ("Maddox") is a resident of Nevada, has been the President and Chief Financial Officer of Wynn Resorts since 2013, and became the Chairman in 2018 after Wynn's resignation.  At relevant times, Maddox was also President and Treasurer of Wynn MA and intimately involved in the pursuit of the Gaming License, including by making knowingly false statements both orally and in writing to the Gaming Commission.   Before Wynn MA was formed to pursue the Gaming License in Massachusetts, Maddox was intimately involved in Wynn Resorts' Macau operations and fully familiar with (indeed, complicit in) its shady dealings with organized crime figures in that jurisdiction.  Maddox served as a non-executive director at Wynn Macau, Ltd. from March 2013 until his appointment as CEO of Wynn Macau, Ltd in February 2018, when he assumed a role as an executive director.  From March 2003 to June 2005, Maddox served as Chief Financial Officer of Wynn Macau, Ltd.'s wholly-owned subsidiary Wynn Resorts (Macau), S.A. ("Wynn Macau SA"), which owns and operates two casinos in Macau.

21.     Kimmarie Sinatra ("Sinatra") is a resident of Nevada and was, until fired in July 2018, the General Counsel and Executive Vice President of Wynn Resorts.  She was functionally the second most senior member of the Wynn Resorts management team after Steve Wynn himself,

and had much broader power and responsibilities than is typical for a public-company general counsel.  She was heavily involved in the pursuit of the Gaming License, including by making knowingly false statements both orally and in writing to the Gaming Commission.   Sinatra served as a director of Wynn Macau, Ltd. until her termination in July 2018.  Wynn Resorts, Wynn MA, Wynn, Maddox and Sinatra, are sometimes referred to collectively herein as the "Wynn Defendants."

22.     All of the Wynn Defendants had substantial contacts with Massachusetts through the process of obtaining a casino license and the meetings and transactions relating to the same.

 FBT

23.     Defendant FBT is a Massachusetts LLC which owned highly contaminated property in Everett, Massachusetts, the former location of a munitions facility and a Monsanto Chemical facility (the "Everett Site"), which is where the Wynn casino, currently renamed the "Encore Boston Harbor" is being built today.  According to the online database maintained by the Secretary of the Commonwealth of Massachusetts, the address of FBT is c/o The DeNunzio Group LLC, 305 Cambridge Street, Cambridge, Massachusetts.   At times relevant hereto, FBT was owned by Paul Lohnes, with a 50% interest, and by Gary DeCicco ("DeCicco') with a 19.5% interest, Anthony Gattineri ("Gattineri") with a 15% interest, Charles Lightbody ("Lightbody") with a 12.5% interest, and Dustin DeNunzio ("DeNunzio") with a 3% interest (all percentages approximate).  Jamie Russo ("Russo"), while apparently technically not an equity owner, was also given a percentage interest in any proceeds FBT might receive from a sale of the Everett Site in return for providing nebulous and corrupt "consulting services."   Russo in fact was a close confidant of, and front for, the mayor of Everett, who reportedly expected a "cut" of the proceeds

via Russo's supposed percentage interest, as well as a long-time associate of Lightbody.  DeCicco, Lightbody, and Russo are all convicted criminals.

## FACTS COMMON TO ALL CAUSES OF ACTION

Massachusetts Gaming Act

24.     On November 22, 2011, Governor Deval Patrick signed into law the Gaming Act, Chapter 194 of the Acts of 2011, codified at M.G.L. c. 23K.  The Gaming Act established a process to allow the development of three destination resort casinos in Massachusetts, one in each of each of three geographic regions.  Region A, covering the Boston area, included Suffolk, Middlesex, Essex, Norfolk and Worcester Counties, with Norfolk County being a last-minute addition.  To be able to operate a casino, a prospective operator was required to apply for and obtain a "Category 1 License," only one of which could be granted in each region.  M.G.L. c. 23K § 19(a)(1).

25.     The Gaming Act was the fruition of more than two decades of intense political debate in Massachusetts and contains numerous provisions aimed at fighting organized crime and preventing its infiltration into Massachusetts casinos.  Among those provisions intended to prevent criminals from profiting from any casino business, is the requirement that applicants disclose "… **the location of the proposed gaming establishment** … and **ownership interests over the past 20 years, including all interests, options, agreements in property**."  M.G.L. c. 23K § 9(a)(15) (emphasis added).

26.     Applicants were to be pristine in their relationships.  The Gaming Act requires that "**In evaluating the suitability of the applicant, the commission shall consider** the overall reputation of the applicant including, without limitation … (6) **the suitability of all parties in interest** to the gaming license, **including affiliates and close associates** and the financial resources of the applicant." M.G.L. c. 23K § 12(a)(6) (emphasis added).

27.     Pursuant to **Section 12(b),** "If the [Commission's Investigations and Enforcement] bureau determines during its investigation that an **applicant has failed to: (i) establish the applicant's integrity or the integrity of any affiliate, close associate,** …, **the bureau shall cease any further review and recommend that the commission deny the application.**" M.G.L. c. 23K § 12(b)(i) (emphasis added).

28.     Moreover, "**the commission shall deny an application** for a gaming license or a license for a key gaming employee issued under this chapter, if the applicant: (i) **has been convicted of a felony or other crime involving embezzlement, theft, fraud or perjury;** (ii) **submitted an application for a license under this chapter that contains false or misleading information;** (iii) **committed prior acts which have not been prosecuted** or in which the applicant was not **convicted** but form a pattern of misconduct that makes the applicant unsuitable for a license under this chapter; … or (iv) **has affiliates or close associates that would not qualify** for a license or whose relationship with the applicant may pose an injurious threat to the interests of the commonwealth in awarding a gaming license to the applicant." M.G.L. c. 23K § 16(a) (emphasis added).

29.     Finally, in making sure that the Gaming Commission is able to properly evaluate applications, the Gaming Act provides:   "**Whoever willfully resists, prevents, impedes, interferes with or makes any false, fictitious or fraudulent statement or representation to the bureau, commission** or division or to agents or employees of the bureau, commission or division in the lawful performance of the agent's or employee's duties under this chapter **shall be punished by imprisonment in the state prison for not more than 5 years or in the house of correction for not more than 2 1/2 years or by a fine not to exceed $25,000, or both**." M.G.L. c. 23K § 38 (emphasis added).

30.     In plain English, under the Gaming Act, anyone found lying on an application, a pattern of unprosecuted and concealed sexual misconduct, conviction of the specific felonies by the applicant, affiliates, or close associates, mandated disqualification and denial of a license.  The facts below establish that the Wynn Defendants should have been denied a license for each of those reasons and would have been denied the license but for the misconduct alleged herein.  Moreover, in order to discourage political corruption, the Gaming Act includes a "pay-for-play" restriction, providing that "No applicant for a gaming license…shall **directly or indirectly**, pay or contribute any money or thing of value to…any candidate for nomination or election to any public office in the commonwealth . . .; or any group, political party, committee or association organized in support of any such candidate or political party."  M.G.L. c. 23K § 46 (emphasis added).

The Gaming Commission and the Application Process

31.     The Gaming Commission consisted of five Commissioners, headed by a Chairman. M.G.L. 23K § 3(a).  Until he resigned under pressure in September 2018, due to the ongoing firestorm of controversy about his misconduct in connection with steering the Gaming License to the Wynn Defendants, Crosby served as the Chairman of the Gaming Commission and was granted "supervision and control over all the affairs of the commission."  This included ongoing supervision of the Investigations and Enforcement Bureau ("IEB"), a law enforcement agency within the Gaming Commission.  The function of the IEB was to investigate all applicants and licensees and serve as the primary enforcement agent under the Gaming Act.  M.G.L. c. 23K § 6. The other four commissioners relied on the work of IEB but lacked the same direct supervisory control of it that Crosby possessed as Chairman.  Accordingly, the other commissioners were at Crosby's mercy if, as he in fact did, he abused his powers to create an unlevel playing field where they did not receive full, accurate, and balanced information to base their decisions on.

32.     The Gaming Act required Crosby, like all members of the Gaming Commission, to adhere to an "Enhanced Code of Ethics."  This code required, among other things, that:

> a.   "No Commissioner … may participate in a particular matter … pending before the Commission that may affect the financial interest of … a person with whom they have a significant relationship." *Mass. Gaming Comm'n Enhanced Code of Ethics* ¶ 9(A) (First Ed.)

> b.   "Commissioners must recuse themselves from any licensing decision in which a potential conflict of interest exists." *Id.* ¶ 9(C)

33.     Crosby, like all members of the Gaming Commission, was also expressly prohibited from having any *ex parte* communications with applicants.  *Id.* ¶ 22(A).  None of these provisions are discretionary.  They are absolute prohibitions.

34.     The application for a Category 1 license proceeded in two phases.  In Phase I, the IEB conducts an investigation of an applicant's suitability in matters related to finance and integrity.  The applicant and anyone with a financial business in the applicant's company, close associates of the applicant, and all persons owning 5% or more of common stock in an applicant company are subject to the suitability investigation.

35.     Only upon a positive finding of suitability may an applicant proceed to Phase II of the application process.  In Phase II, applicants submit a site-specific proposal answering questions related to finances, economic development, building and site design, and mitigation to the Gaming Commission for evaluation.

<u>The Wynn Defendants' Prior Longstanding Pattern of Unlawful and Abusive Behavior in Nevada</u>

36.     It has now been revealed, and publicly conceded by Defendant Wynn Resorts, that Steve Wynn engaged in a systematic pattern of abusive sexual misconduct towards Wynn Resorts employees from at least 2005 through 2016, which was in many instances enabled and/or covered

up by numerous other senior members of the Wynn Resorts management team, thereby forming an ongoing and long-running pattern of violations of Nevada's suitability regulations for licensed operators of casinos and their affiliated persons, with those suitability violations involving both Steve Wynn's personal misconduct and the repeated failure of the senior management team to follow appropriate policies and procedures required of a licensed casino operator once they were made aware of the allegations of that misconduct.  Specifically, Wynn Resorts has now admitted that, prior to the Wynn Defendants' pursuit of the Gaming License in Massachusetts, it had violated Nevada gaming suitability regulations in connection with:

      a.     Steve Wynn's improper 2005 sexual contact (alleged to have involved rape) with an employee, that was hushed up via a $7.5 million payment through a shell company, Entity Y LLC, controlled by Steve Wynn himself, which multiple senior members of Wynn Resorts management (including Mark Schorr, subsequently involved with Wynn MA and the pursuit of the Gaming License) failed to appropriately investigate after it was reported to them – Sinatra knew of this hush-money payment no later than January 2012 and likewise did nothing;

      b.     Steve Wynn's improper 2005 and 2006 sexual contact (alleged to have been nonconsensual) with another employee, hushed up via a $975,000 settlement, which multiple senior members of Wynn Resorts management (including Schorr and Kevin Tourek, who was also subsequently involved with Wynn MA and the pursuit of the Gaming License) failed to appropriately investigate after it was reported to them;

      c.     Steve Wynn's alleged 2005 sexual misconduct against yet another employee, which Tourek was made aware of (and failed to appropriately respond to) no later than

2014, while the Wynn Defendants were touting their supposedly sterling compliance programs to the Gaming Commission;

d.      Tourek had previously, in 2007, failed to appropriately investigate allegations that another senior executive had a pattern of sexual misconduct with employees;

e.      Further instances of misconduct by Wynn that were known to, but not appropriately investigated by, senior members of the management team including Sinatra at various other times from 2014 forward.

37.      As detailed in the public filings of the Nevada Gaming Control Board, multiple Nevada statutes and regulations were violated by this course of misconduct, including but not limited to NRS 463.170 (obligating all persons granted a license or found suitable to continue to meet the applicable standards and qualifications of the Nevada Revised Statutes and any other qualifications established by the Nevada Gaming Commission by regulation), Nevada Gaming Commission Regulations 5.010 (making licensee responsible to employ and maintain suitable methods of operation, and stating that willful or persistent use or toleration of methods of operation deemed unsuitable will constitute grounds for license revocation or other disciplinary action) and/or Nevada Gaming Commission Regulations 5.011 (acts or omissions that may be determined to be unsuitable methods of operation include: "(1) Failure to exercise discretion and sound judgment to prevent incidents which might reflect on the repute of the State of Nevada and act as a detriment to the development of the industry" and "(10) Failure to conduct gaming operations in accordance with proper standards of custom, decorum and decency, or permit any type of conduct in the gaming establishment which reflects or tends to reflect on the repute of the State of Nevada and act as a detriment to the gaming industry."). Defendant Wynn Resorts conceded that each separate occasion when it, its agents or its employees, failed to initiate and/or conduct an

investigation after obtaining knowledge of allegations of sexual misconduct against Mr. Wynn, failed to report an allegation of sexual harassment against Mr. Wynn, failed to comply with its policies and procedures, and failed to ensure compliance with its policies and procedures constituted a separate violation of  the requirements of NRS 463.170(8) that any person found suitable continue to meet the applicable standards and qualifications Gaming Control Act and the Nevada Gaming Commission Regulations.   The failure to comply with NRS 463.170(8) is an unsuitable method of operation and grounds for disciplinary action and imposition of civil penalties.

38.     Pursuant to NRS 463.360(6), each such violation of NRS 463.170 was prosecutable criminally as a gross misdemeanor.   Wynn and Wynn Resorts committed these gross misdemeanors as part of carrying on or facilitating the carrying on of "unlawful activity" involving gambling in violation of state law within the meaning of 18 U.S.C. 1952.  Because at least some of these violations involved interstate travel or the use of the mail or other facilities in interstate commerce, they also constituted felony violations of the federal Travel Act.

<u>The Wynn Defendants' Prior Misconduct in Macau</u>

39.     The Wynn Defendants followed a similar pattern of flouting applicable law in the acquisition of land for and the continued operation of the two Wynn Resorts' casinos in Macau.

40.     Defendant Wynn Resorts' majority owned subsidiary, Wynn Macau SA, entered into a 20-year casino concession agreement with the Macau government in 2002, making it one of six operators (or "concessionaires") licensed to own and operate a casino in Macau.  Wynn Resorts through its indirect subsidiaries operates two casinos in Macau.  The Wynn Macau is located in Macau's inner harbor and opened in September 2006 and expanded in April 2010.  The Wynn Palace is located on the Cotai peninsula area of Macau and opened August 2016.  Because the

Macau government owns most of the property in Macau, private use of land is obtained through long-term leases/concessions with the government and, in the event the government has already granted the rights to another party, the purchase of the rights of the previous lessee third-parties. Both the Wynn Macau and the Wynn Palace are located on land leased from the Macau government that was acquired by purchasing the land rights to each property from third-parties.

41. In August 2009, Wynn Resorts' indirect subsidiary, Wynn Macau SA, paid approximately $18 million to an unrelated third-party Macau company, Nam Van Development Company ("Nam Van"), for its relinquishment of rights to a portion of the land acquired in connection with the expansion of the Wynn Macau. Maddox served as Chief Financial Officer of Wynn Macau SA at the time the agreement to purchase the land rights from Nam Van was executed and was extensively involved in the purchase of the rights to the property and in the development and construction efforts for the Wynn Macau. Nam Van was founded in 1990 by a consortium of local businessmen with wide ranging political power as well as checkered backgrounds. Any payment to a foreign government official is prohibited by U.S. law.

42. One of Nam Van's founding executives, Edmund Ho, went on to become Chief Executive of Macau and only divested of his ownership interest in the company when he took office in 1999. Edmund Ho is one of Wynn's close, personal friends and was also instrumental in the acquisition of the property for Wynn Resorts' second property in Cotai. Stanley Ho, another founding member who remained an executive at Nam Van through December 2009, held a gambling monopoly in Macau for over 40 years before the Macau government opened the industry to additional gaming operators in 2002. Stanley Ho has been identified as an associate of organized crime and has been found unsuitable to hold a gaming license in multiple jurisdictions including Australia, Canada and the Philippines. A third founder, Ng Lap Seng, is a longtime member of

the Chinese People's Political Consultative Congress and has also served on the Macau SAR preparatory committee, the committee for the election of the Chief Executive, and was appointed to the Macau Economic Development Committee.  Ng Lap Seng was an executive at Nam Van through at least 2014.  Ng Lap Seng was named in congressional documents in the 1990s for making illegal campaign contributions to the Democratic National Committee.  In those documents, he is described as a "front man in different investment projects for city and provincial governments in China."  More recently, in September 2015, he was arrested and later found guilty of bribing UN officials to build a conference center in Macau.  Beyond the principals involved in the land rights transaction, Wynn Macau SA also employed Chui Sai-Cheong, who was then a sitting politician and is the brother of the current Chief Executive of Macau.

43.     In May 2012, as reported in its filings with the Securities and Exchange Commission, Wynn Resorts made a "one-time payment of approximately $50 million "in consideration of an unrelated third party's relinquishment of certain rights in and to any future development on the Cotai land" where the Wynn Palace is now located.  Though the unrelated third party was not specifically named in the corporate filings' report of the payment, it has been identified in other corporate documents and public records as Tien Chiao Entertainment and Investment Company Limited ("Tien Chiao").  Wynn first contemplated the purchase of the rights to the Cotai land as early as 2005, when his close friend and then Chief Executive of Macau, Edmund Ho, told Wynn about the property was available and introduced him to one of the three individuals who purported to own the rights to the land who was identified to Wynn by his alias, "Ho Ho."  Though the Wynn Defendants claim to have performed due diligence on the sellers and their potential government or political affiliations (because U.S. law prohibits payments to foreign government officials), the fact that the sellers never disclosed their real identities and used aliases

in connection with the transaction would seemingly prohibit the ability to conduct any meaningful investigation.

44.     After the payment was made to Tien Chiao, the sellers were publicly identified as He Ganglin and He Gangyon, two brothers from the He family (also known as "Ho Hoi" and "Ho Ho", respectively), a prominent Beijing family with relatives in senior positions in the Chinese government and military, and Cliff Cheong, a longtime partner of and advisor to Chief Executive Edmund Ho.

45.     In July 2014, pursuant to a public records request for information about Tien Chiao and the property, Macau's Land and Public Works Department issued a statement that it had no information about the company in its file for the Cotai property land grant case.  Records produced by the same department in January 2015, show Wynn Macau SA as the earliest documented applicant for the land rights.  No earlier records exist that would indicate that Tien Chiao or the three individuals ever had earlier option rights to the land, raising significant compliance concerns and questions as to why such an exorbitant amount was paid to a seller who had no documented ownership rights in the first place.

46.     The Wynn Defendants' contravention of Macau and U.S. law and gaming regulations continues in its operations of the two Macau casinos.  Gaming operators in Macau rely heavily on the use of third-party junkets and junket operators that recruit and extend lines of credit to mainland Chinese high-roller clients due to the restrictions on the enforceability of gambling debts in mainland China.  Historically, organized crime entities, also known as triads, collected on unpaid debts on behalf of junket operators, while also participating in money laundering schemes and illegal-side betting practices.  With the arrival of U.S. gaming operators in Macau in 2002

came an attempt at implementing and enforcing licensing standards on junket operators in an effort to distance the casinos from the influence of organized crime and triads.

47.     However, the DICJ, the Macau regulatory authority that issues junket operator licenses, has been widely criticized by the US-China Economic and Security Review Commission, Nevada gaming regulators, and even the Macau government, for its failures of oversight.  The DICJ does not investigate any person or entity other than the named junket operator applicant and has no jurisdiction to regulate or approve any subjunket operator employed by an approved junket operator.  The pervasive use of aliases and front-men to conceal partnerships between junket operators and organized crime as well as junket operators' reliance on vast networks of subjunket operators who are not subject to licensing standards, have subjected the Macau casino industry to the continued influence of triads and organized crime in the casino industry.

48.     Both Wynn Resorts' Macau casinos contract or have contracted with a number of junket operators whose controlling members and financial backers have known affiliations with criminal triads and ties to criminal activity, but whose names do not appear as license-holders on the licenses themselves.  These affiliates often use family members and business partners and are therefore able to evade scrutiny from the DICJ's sub-par approval processes and due diligence investigations.

49.     The Weena Sae Kee sole-proprietorship junket operator has operated out of the Wynn Macau since at least October 2007.  The junket is ostensibly wholly-owned and controlled by Sae Kee Weena and uses the name "David VIP Club."  The junket is affiliated with the larger "David Group" of junket and VIP room operators in Macau.  Sae Kee Weena is the common law wife and business partner of David Wong Yuk Keung ("David Wong"), a senior member of the Wo Hop To triad that is engaged in the "promot[ion] of heroin trafficking, illegal gambling,

loansharking, extortion, and alien smuggling" per a 1992 US Senate Subcommittee on Investigations of the Committee on Governmental Affairs Report ("US Senate Report"). David Wong is known to direct and control the junket's activities and was even been identified by employees of the junket as the "big boss" of the David VIP Club junket, which would make sense given that the junket itself is named after him.

50.     The Dore Entertainment junket operator ("Dore") operated out of Wynn Macau from at least September 2006 through 2016. Charles Heung ("Heung") does not appear as the named license holder on the Dore license, but has deep ties to the junket and is widely known as its financial backer. Heung's father founded the Sun Yee On triad, which, per the US Senate Report, "has a presence in the United States, Canada, Australia, Thailand, Vietnam and Macao in addition to Hong Kong. The triad has been linked to a variety of activities, including heroin trafficking and the control of movies and entertainment in Hong Kong." Heung himself is identified in the US Senate Report as a senior figure of the triad. Heung was also identified as a member of a triad at a 2007 Nevada Gaming Control Board Hearing. Heung's direct interest in and control of the Dore junket was highlighted in a 2015 scandal involving an employee of the Dore junket who worked in a VIP room at the Wynn Macau and embezzled up to $250 million, prompting Dore investors to take to the streets (outside the Wynn Macau) in protest. Heung was personally sued by Dore investors who sought repayment from Heung as the alleged "big boss" of the junket.

51.     The Sheng Li junket operator was licensed to operate out of the Wynn Macau in January 2007. Frank Wong, the license-holder and owner of the Sheng Li junket, was sanctioned in the 1990s by the U.S. Commodity Futures Trading Commission for violating anti-fraud and off-exchange futures proscriptions. That background did not prevent the DICJ from approving his

application for a junket license.  Further, Frank Wong once attempted to transfer his interest in the Sheng Li junket to the girlfriend of known criminal Cheung Chi Tai, another known member of the Wo Hop To triad.

52.     Wynn Resorts and the individual Wynn Defendants at all times knew of the criminal affiliations of its junket promoters as described herein.

<u>The Wynn Defendants Need a Site For Their Massachusetts Application</u>

53.     From a time prior to the enactment of the Gaming Act, the Wynn Defendants were intent on obtaining a Gaming License in the metropolitan Boston area.  Initially, in partnership with Robert Kraft, the principal owner of the New England Patriots, the Wynn Defendants sought a license to operate a casino in Foxborough, Massachusetts.  That Foxborough site, like SSR's Suffolk Downs site, was located in Region A, and thus only one of those sites could be awarded a casino license.

54.     That plan was derailed when the May 2012 town election for the Foxborough Board of Selectmen turned into a *de facto* casino referendum, with the town's voters supporting anti-casino candidates and ensuring that the Board would have no interest in negotiating with a Kraft/Wynn consortium.

55.     As a result, by May 2012, the Wynn Defendants were in search of a new site in the Boston area for their attempt to get the Region A Gaming License.

<u>FBT's Everett Site Becomes a Prospective Seller</u>

56.     At the same time that the Wynn Defendants were forced to abandon the Foxborough site, FBT was looking for a buyer for the Everett Site, which Lohnes and his partners had purchased on the cheap three years previously in 2009.  By the summer of 2012, a number of non-casino

purchasers expressed strong interest in purchasing all or a portion of the site.  FBT's principals were initially intent on concluding such a transaction.

57.     The Everett Site (which is located in Region A) presented a challenge for any use due to the severe toxic contamination, resulting from its earlier uses as a Monsanto Chemical plant and munitions facility.  The Everett Site was "toxic" for the additional reason that two of Lohnes's partners, DeCicco and Lightbody, were notorious and convicted felons.  Lightbody is widely understood to be associated with La Cosa Nostra, and is a longtime friend and political supporter of the Mayor of Everett, Carlo DeMaria.  Lightbody's criminal record includes ten assault charges, three counts of illegal weapons possession, two counts of witness intimidation, and admitted involvement in an identity theft ring targeting immigrants.  Lightbody received a felony conviction for grand larceny and identity theft in 2007.  For his part, DeCicco had been convicted on multiple counts of mail fraud related to insurance claims he made in the wake of suspicious fires on his property.

58.     The ownership interest and involvement of these convicted felons was open and notorious in the community as well as readily ascertainable from public records at the time the Wynn Defendants began negotiations to acquire the Everett Site.  Mayor DeMaria has admitted that his "only" contact was Lightbody when dealing with significant issues involving the Everett Site.

59.     A few months after FBT acquired the property, in or about October 2009, a third convicted criminal, Jamie Russo, a known affiliate of Lightbody who had also recently held a patronage job as a "consultant" for Mayor DeMaria at Everett City Hall, began "consulting" for FBT.

60.    Russo was granted a 3% interest after Mayor DeMaria directly told at least one of FBT's principals that FBT should agree to "hire" Russo on that basis as a way of ensuring that the mayor would get his own personal cut of proceeds from an ultimate sale of the Everett Site.

61.    Lightbody and Russo were once identified by casino investigators engaging in a chip cashing scheme, wherein Lightbody gave Russo and two other associates his chips to cash out in order to avoid cash transaction requirements.  Separately, in the early 19902, Russo had been caught using forged and stolen credit card numbers to defraud a casino in Connecticut.  He was initially charged with second-degree conspiracy to commit larceny, third-degree larceny, first-degree forgery, criminal impersonation, illegal use of a credit card and illegal use of a credit card in the issuance of money, but plea-bargained to fourth-degree larceny, a misdemeanor involving fraud and/or theft, and was banned from the casino (Lightbody was banned from the same casino some years later).  This conviction involved fraud and/or theft, not to mention a casino as victim, it was relevant to Russo's suitability under Massachusetts gaming law despite not being a felony. Further, Lightbody and Russo were both old social acquaintance of Robert DeSalvio, an experienced casino operative who previously worked at the same casino that banned both Lightbody and, was hired in early 2014 by Wynn Resorts to help oversee Wynn MA's pursuit of the Gaming License and who is now president of Wynn MA.

62.    Because of these serious problems with both the owners and the site itself the property was not a realistic candidate for a gaming casino.

The Lohnes-Crosby-Wynn Nexus Turns Everett Into A Casino Candidate

63.    Crosby and Lohnes had a private dinner in May 2012 and Crosby attended a party together at Lohnes' house in the summer of 2012, also attended by certain of Lohnes' partners in FBT.  Lohnes had been instrumental some years previously in bailing out Crosby from the negative

consequences of a failed business deal, sustaining multi-million-dollar losses himself in the process.

64.     Shortly after the May 2012 dinner with his friend, Crosby began to show an interest in bringing potential casino operators to Everett, even though the Everett Site had not yet been marketed before that time, even by its owners, for use as a casino.  In the summer of 2012, Crosby first attempted to steer another potential bidder for the Region A License to the Everett Site, but that potential bidder rapidly lost interest.  However, during initial discussions with that potential bidder, FBT's partners both became aware of how lucrative a casino use might be for them compared to other uses for their site and also became aware that, due to the heavily-regulated nature of the gaming industry, the presence of convicted criminals in FBT's ownership structure could be a serious obstacle for their property's suitability for casino use.

65.     In the late spring of 2012, Lohnes told at least some of his partners in FBT that Crosby "owed him big time" for Lohnes having bailed him out of a bad business deal and that if they wanted a casino on the property, Crosby would help them get the license.  The FBT partners were skeptical, doubting that such a property so poorly located and in such poor condition could be a candidate.

66.     Lohnes insisted that FBT cease talks with the non-casino prospective buyers repeatedly assuring his partners that with Crosby's help the site would qualify and provided the impression that he had assurances from Crosby.

67.     Crosby did not, as he was required to do, promptly disclose his meeting or his attendance at the party with Lohnes to his fellow Commissioners or, just as importantly, disclose to them the fact that he had a longstanding friendship with, and felt indebted to, the principal owner of the land to which he subsequently referred potential licensees as a casino site.  Instead,

disclosure of this dinner and the relationship was not made until August 22, 2013, fifteen months after their dinner, and eight months after the Wynn Defendants submitted their Phase I application identifying Lohnes' company as the owner of the site planned for Wynn's casino.  Crosby never disclosed his attendance at Lohnes' party in the summer of 2012.

68.     The incomplete disclosure Crosby did eventually make of his relationship to Lohnes in August 2013 was hardly voluntary. It was compelled by the fact that attention was focused on the Everett Site because, thirteen days earlier, the FBI had informed the Gaming Commission of information learned via wiretap that revealed Lightbody's involvement with FBT.

69.      Nor were Crosby's disclosures truthful when he asserted, both in August 2013 and again in October 2013, that he and Lohnes had "never discussed casino issues" and thus sought to downplay the meeting fifteen months earlier as simply old friends catching up and involving nothing that would impact his role as Chairman of the Gaming Commission.

70.     Crosby's lengthy concealment of his relationship with Lohnes is particularly striking given how starkly it contrasts with his prompt disclosure of far lesser conflicts.

71.     On May 10, 2012, Crosby ran into Joe O'Donnell, one of the owners of SSR, at a Harvard class reunion dinner.  In contrast to Crosby's belated and misleading disclosure about Lohnes, and even though Crosby stated that he had "no ongoing relationship" with O'Donnell and that the two "do not generally socialize," he promptly (within 8 days) filed a disclosure of that meeting pursuant to G.L. c. 268A, § 23(b)(3).

72.     Moreover, Crosby's belated disclosure of his relationship with Lohnes did not divulge the circumstances surrounding his "discovery" of Lohnes's ownership or why he chose not to report his relationship with Lohnes until August 2013.

<u>SSR Overcomes Obstacles to Its Casino Proposal and Both It and Its Business Partner Are</u>
<u>Found Fully Suitable</u>

73.    Initially unaware of Crosby's concealed intention to favor the Everett Site, SSR was

actively working from 2012 through 2014 on its own proposal for a casino on the Suffolk Downs

site.

74.    The IEB, acting at Crosby's behest for the benefit of the Everett Site and FBT, drove

away SSR's original proposed operator Caesar's by threatening to find it "unsuitable" on

extremely attenuated grounds – the most serious of which was that Caesar's had contemplated a

transaction with the Gansevoort Hotel Group (owners of a boutique New York hotel) to license its

brand for one of Caesar's own non-gaming properties in Las Vegas.   The IEB based its

"unsuitability" determination solely on Caesar's "bad judgment" in having sought to license the

brand despite an unsubstantiated *New York Post* story linking one of Gansevoort's principals to

criminals in Russia decades before.

75.    SSR was itself found suitable but needed a qualified and experienced casino operator

in order to put forth the best possible proposal. It overcome the obstacle created by the wrongful

exclusion of Caesar's by teaming at the last minute with MSM, an operator that had already been

found qualified by the IEB.

76.    Pursuant to SSR's arrangement with MSM, embodied in a binding written contract

that Defendants and their co-conspirators were aware of, MSM would formally be the licensee and

casino operator, while SSR would be its landlord.   However, the proposal was essentially made on

behalf of both MSM and SSR because the rental payments SSR stood to receive from MSM over

the anticipated 30-year term of the Gaming License would be based on a percentage of MSM's net

revenues, subject to a guaranteed minimum of $35 million per year.   All concerned, including the

Defendants, were aware of this arrangement and thus what SSR stood to gain if the Gaming

Commission awarded the Gaming License to the MSM/SSR proposal and what injury SSR would suffer if it were fraudulently deprived of that license and the associated economic benefits by Defendants.

77.     SSR's qualifications and "suitability" were impeccable.  SSR, after all, had been operating the historic Suffolk Downs for years and was a valued member of the community. Nevertheless, recognizing and seeking to take advantage of the unsustainable economics of the horse track, as early as November 2012, Crosby sought to deliver the death-blow to SSR by voting, and urging the other members of the Gaming Commission to likewise vote, to deny renewal of SSR's racing license, without basis, which would have disqualified SSR from receiving a gaming license for failure to "maintain" its racing license.  *See* M.G.L. c. 23K § 24(a).  That attempt did not succeed, since the other commissioners refused to go along with it and actively questioned Crosby to why he sought to deny Suffolk Downs a racing license for the first time in its 90-year history.

78.     Thus, despite being under constant assault from the Wynn Defendants, their cohorts, and Crosby, SSR ultimately managed to satisfy all the requirements for its business partner MSM becoming the Region A licensee as the Gaming Commission's final vote approached.

The Wynn Defendants Go to Everett and Reach an Agreement to Conceal the Felons

79.     The Wynn Defendants, desperate to find a Region A site to replace Foxborough, began to consider the Everett Site in the late summer or fall of 2012, around the time the other potential bidder Crosby had steered to the site lost interest.

80.     In late November 2012, the Wynn Defendants agreed to pay $100,000 per month for an option to purchase the Everett Site for $75 million (more than ten times what FBT had paid) if and when the Wynn Defendants got the Region A License. That arrangement was finalized in

writing signed by Marc Schorr, former president of Wynn MA, on or about December 19, 2012. The December 19, 2012 agreement also provided that FBT would collaborate with the Wynn Defendants in the development of the property, including with respect to obtaining subdivision approvals, permits, a permanent road easement and performing environmental remediation. Thus, this criminally-affiliated group was not merely to be a passive seller of property, it was to be an active, ongoing participant in the casino development and, importantly, a conduit for money between the Wynn Defendants and, via Russo, Mayor DeMaria.

81.     During the first official meeting between FBT and representatives of the Wynn Defendants at the Everett Site in November 2012, DeNunzio, on behalf of FBT, informed Sinatra and Maddox that "an individual with a checkered past" (apparently Lightbody, a convicted felon) was then an owner of FBT but was allegedly taking steps to give up his interest. Thus, Sinatra and Maddox were aware by November 2012, at the latest, that at least one individual with a criminal history was a partial owner of FBT.

82.     DeCicco, another convicted felon, may have by then agreed in principle to transfer his interests to Lightbody, who already had an ownership interest in FBT from the beginning and whose ownership interest was open and notorious, and known to the Wynn Defendants.

83.     When one of the Wynn Defendants' local lawyer/lobbyists met with Mayor DeMaria as part of due diligence on or about December 11, 2012, before the Wynn Defendants went into contract with FBT, and asked the mayor if anyone involved with FBT had "any kind of a criminal background," the mayor readily volunteered Lightbody's name.

84.     FBT's lawyers likewise told the Wynn Defendants' lawyers before the December 19, 2012 agreement was signed that one or more FBT owners had had past problems with the criminal law.

85.     Further, during the fall of 2012, Lightbody had at least once visited Wynn's Las Vegas casinos as a VIP "Guest of the Chairman" and was there to personally open the Everett Site gates for Steve Wynn when he visited the Everett Site.

86.     On December 14, 2012, the *Boston Business Journal* published an article noting that convicted felon Gary DeCicco appeared on early 2012 FBT corporate paperwork that was a matter of public record.  The Wynn Defendants immediately feigned false surprise, claiming that this was the first they had heard that a felon was involved.

87.     Sinatra and the Wynn Defendants have claimed to have taken no steps to look further into the ownership history of the Everett Site after the ownership interest of ex-felon DeCicco was publicized, nor to question when DeCicco had transferred his interest, or to whom he transferred it, despite the requirements of the Gaming Act that any applicant disclose in its application the ownership history of a gaming site for the past twenty years.  That denial cannot be credited.  Sinatra was a seasoned gaming attorney overseeing the Wynn Defendants' due diligence before committing to the Everett Site; she and Maddox were not neophytes.  They knew the importance of "suitability" to all gaming regulators and that a gaming license application in Massachusetts required 20 years of historical ownership information, M.G.L. c. 23K § 9(a)(15).  Sinatra's subsequent claim that their due diligence went no deeper than an investigation of only three people FBT itself purportedly volunteered as its current "owners," if true, would have been gross malfeasance, especially when the agreement with FBT went beyond the mere sale of land.  Thus, the Wynn Defendants could not have been fooled, were not intended to be fooled, and were not fooled, by FBT's purported attempts (as detailed below) to conceal the felons' interests through phony and misleading documentation.

31

88.     Indeed, the only reason to conceal those interests was to make a casino buildable on the Everett Site, since open admission of those interests would prevent issuance of a license. Since the Wynn Defendants needed the site and certain FBT members believed they could make more money selling the site for a casino use, both of them desired that goal.  Accordingly, at some point no later than November or December 2012, the Wynn Defendants and FBT entered into a mutual understanding that FBT would create whatever false and backdated paperwork might be necessary for purposes of the Wynn Defendants' application, in order to make the ownership of the Everett Site appear less tainted than it actually was.  This understanding was an integral part of the deal the Wynn Defendants struck with FBT for the option to purchase the property.  Maddox and Sinatra consulted directly with Steve Wynn before making this deal with FBT.  Given Lohnes touting of his relationship with Crosby it is highly likely Wynn by then knew of the relationship and the benefits that would flow from it and factored that into the purchase price as well.  In fact, Steve Wynn spoke ex parte with Crosby before submitting the application.

89.     Sinatra and Maddox on behalf of themselves and the other Wynn Defendants traveled in interstate commerce from Nevada to Massachusetts in furtherance of this unlawful agreement to create false documentation for the purpose of defrauding the Gaming Commission and/or its unconflicted commissioners.

90.     Consistent with this conspiracy and agreement, the December 19, 2012 contract the Wynn Defendants signed with FBT contained a false representation that "[t]o the best of Seller's [i.e. FBT's] knowledge, neither Seller nor any Person associated with Seller has ever engaged in any conduct or practices which any of the foregoing Persons should reasonably believe would cause such Person to be" deemed unsuitable by the Gaming Commission.  This was knowingly false, given Lightbody's (and Russo's) ongoing associations with FBT and all Defendants'

knowledge that such criminal convictions created serious suitability problems.  But the false representation was not intended to deceive the Wynn Defendants, who already knew the true facts, but to create a false paper record to deceive the Gaming Commission and/or its commissioners.

91.    Indeed, on or about January 15, 2013, this contract, including the false representation, was included with the Wynn Defendants' initial RFA-1 suitability applications filed with the Gaming Commission, thus rendering those applications materially false and misleading.  Maddox, Sinatra, and Steve Wynn were each involved in preparing, submitting, and/or directing the preparation and submission of these fraudulent applications knowing of their falsity.

92.    In January 2013, fully aware of the Gaming Act's prohibition on the involvement of felons with gaming applicants (and at all times aware of both DeCicco and Lightbody's criminal pasts), DeNunzio, acting for the benefit of himself and the Defendants, created a backdated FBT Everett 2012 Operating Agreement so as to falsely indicate that DeCicco did not have an ownership interest in FBT Everett as of January 2012.  The backdated FBT Everett 2012 Operating Agreement purports to transfer DeCicco's interest to Gattineri (whose claimed ownership interest thereby increased from 15% to 34.64%).  However, prior to DeNunzio's backdating of the agreement, DeCicco had executed a Memorandum of Transfer dated "April __ 2012," in which he transferred the entirety of his residual rights and membership interests to Lightbody.  To the extent DeCicco's interest had been taken over by another felon, Lightbody, however, that was hardly an improvement, since Lightbody's interest in the Everett Site also needed to be concealed.

93.    On January 17, 2013, FBT's DeNunzio, acting for the benefit of himself and the Defendants, sent an email to Sinatra purporting to confirm that the only equity holders of FBT were himself, Lohnes and Gattineri.  Sinatra and the other Wynn Defendants, of course, both

already knew this was false.  There was no reason for DeNunzio to send this email other than to help create a false paper trail for the benefit of all Defendants.

94.     Eleven days later, on January 28, 2013, DeNunzio, acting for the benefit of himself and the Defendants, arranged for Lightbody and Gattineri, likewise acting for the benefit of themselves and the Defendants, to execute a Memorandum of Transfer, backdated to December 14, 2012, memorializing Lightbody's supposed transfer of his interest to Gattineri for a $1.7 million promissory note, also backdated to December 14, 2012.

95.     The Wynn Defendants' initial submissions to the MGC on/or about January 15, 2013 contained inadequate and false information about the ownership of FBT and thus the Everett Site.  Shortly thereafter, the IEB began asking for further information about the Everett Site's ownership as part of assessing the suitability of the Wynn Defendants.

96.     Before that investigation had been concluded, the Gaming Commission was tipped off by the FBI, as noted above, that wiretaps in an unrelated case suggested that Lightbody maintained a concealed ownership interest in FBT.

97.     After FBT became aware of the investigations looking into Lightbody's interest in July 2013, it again backdated the memorandum of transfer and promissory notes to show the transfer of interest from Lightbody to Gattineri occurring on August 15, 2012, in an attempt to make it appear that Lightbody had no longer owned any interest in FBT Everett by the time the Wynn Defendants first visited the Everett Site and began negotiations to purchase it.  DeNunzio later admitted that he made those alterations.

98.     Even then, however, the backdated documentation indicated that Lightbody had not been paid for the transfer but had been given a promissory note by Gattineri, thus giving Lightbody an ongoing financial interest, since it was anticipated that Gattineri would repay the note from the

proceeds of a sale of the Everett Site.  Indeed, Lightbody never really gave up his interest in FBT.

Lightbody had recourse against Gattineri in the event Gattineri defaulted on the note – recourse

that conferred a reversionary interest on the property to Lightbody.

99.     When DeCicco's and Lightbody's involvement with FBT became undeniable, the

Wynn Defendants defended themselves by falsely claiming to the Gaming Commission that they

had not known of their involvement before signing and had been taken by surprise.

100.     Specifically, in July 2013 interviews with the Gaming Commission's IEB, taken

under oath, both Sinatra and Maddox falsely claimed to have never heard of Lightbody and to have

no idea who he was, and likewise claimed to have been unaware of any additional, unnamed

owners of FBT other than Lohnes, DeNunzio, and perhaps Gattineri.  Moreover, when asked

directly whether "it was important to you at that time to know whether a person with a criminal

background was involved in the deal," Maddox asserted in reply: "Not my job."  Further, when

Wynn was asked in his September 9, 2013 sworn suitability interview if he had any knowledge

that owners with criminal backgrounds were involved in FBT, he replied, "Steve Wynn, under

oath, zero. Matt Maddox, zero." Wynn then posed the question to Sinatra, who also answered

"zero."

101.     Contrary to what was implied by the backdated paperwork, throughout 2013 and

2014, Lightbody, for the benefit of himself and the Defendants, remained actively involved in

trying to promote the Wynn Defendants' casino bit and block SSR's competing bid.  He spent

thousands of dollars, allegedly out of his own pocket, on signs and advertising supporting the anti-

SSR side of the public referendum in Revere (which SSR needed to pass for its proposal to go

forward) as well as donating to the "No Eastie Casino" advocacy group seeking to block SSR's

bid.  Indeed, Lightbody was arrested in October 2013 for physically assaulting a participant in a pro-SSR rally in Revere with the apparent intent of suppressing the vote for SSR's bid.

102.    On or around June 18, 2013, Lightbody spoke with John Tocco, an employee of Wynn Resorts who had been detailed to work on drumming up grass-roots political support for the Wynn casino bid, in connection with facilitating busses for transportation to the upcoming community vote to approve or deny the Wynn Defendants' proposal for a casino in Everett.  In an email to FBT's DeNunzio on June 19, 2013, Tocco confirmed the conversation, and thanked DeNunzio for his "help and introduction to Charlie."   Maddox and Sinatra had primary responsibility for overseeing the referendum process and knew of Lightbody's involvement

103.    On June 22, 2013, Everett voters approved Wynn MA's public proposal.  Shortly thereafter, Mayor DeMaria recalled Lightbody expressing his excitement about the approval. Mayor DeMaria was at that time under the impression that Lightbody was still actively involved in FBT and stood to profit in the event Wynn MA was awarded the license and purchased the Everett Site.

104.    Moreover, Lightbody's connections and "muscle" were called upon during the same time period to remove another obstacle to the Defendants' scheme – again at a time when he had supposedly ceased his involvement with FBT.

105.    In or about April 2013, Maddox on behalf of the Wynn Defendants was attempting to purchase a small parcel of real estate occupied by a carwash adjacent to the Everett Site that would be necessary for access to the casino to be built on the Everett Site, but found the owner reluctant to sell.

106.    On April 24, 2013, Maddox emailed FBT's DeNunzio asking for help persuading the owner to sell.  Maddox indicated that the owner only would deal with Lightbody.  DeNunzio

agreed and within an hour had called Lightbody to enlist his assistance. A week later, DeNunzio and Lightbody had separate conversations with the owner which were sufficient to induce him to finally respond to Maddox's overtures with a counterproposal.

107.    Maddox and Lightbody met on at least two occasions in the spring of 2013 to discuss the fact the owner would not deal with anyone but Lightbody. Lightbody remained in active communication with both DeNunzio and the owner throughout May as the owner's reluctance to deal with Maddox and the other Wynn Defendants was further worn down. Eventually, the owner agreed to terms for an option on a long-term lease of the site to an unspecified affiliate of Wynn Resorts on or about June 11, 2013, with DeNunzio euphemistically explaining in an email to Maddox that he and Lightbody had "held [the seller's] hand" until he was willing to sign. Thus, Maddox statement under oath to the commission in July 2013 that he was unaware of Lightbody was false.

108.    Similarly, the Wynn Defendants required another adjacent parcel of land for the casino which was being occupied by a tenant, ADH Collision ("ADH"). ADH, who was running an auto body business on the premises, had a lease with the owner of the property entitling it to occupy the premises through October 2019 and to extend through October of 2029. On or about June 8, 2016, the owner of the property ultimately accepted an offer for the sale of the property pursuant to an agreement that required that the property be "free and clear of all tenants." ADH refused to terminate its lease early. Steve Wynn discussed the problem with Mayor DeMaria and Maddox. In addition, Christopher Gordon, an executive of Wynn, discussed with ADH's landlord how to terminate the lease early.

109.    As set forth in a lawsuit recently filed by ADH in this Court, within days of a complaint filed by the landlord to the City of Everett Building Department, inspectors from the

Building Department visited ADH in August 2016 for an inspection despite having previously done one earlier that year and finding no violations.  On August 16, 2016 ADH received a Notice of Violations from the Building Department, a department under the sway of Mayor DeMaria.

The Pretend Solution

110.    Once the fruits of the FBI's wiretaps were passed to the Gaming Commission via its staff in July 2013, the Wynn Defendants were known to the Gaming Commission to have associated with known felons and to have failed to disclose those affiliations.  Building on the Everett Site would directly reward the very wrongdoing that the Gaming Act was designed to prevent.  To avoid disqualification, the Wynn Defendants urged upon the Gaming Commission an illusory "cure."  They renegotiated their deal with FBT in November 2013, and then "sold" the revised deal to the Gaming Commission at a December 13, 2013 public hearing.

111.    A majority of the commissioners were convinced to go along with this cure only because they believed the Wynn Defendants' false story that they had acted in good faith and had not learned of the criminal element in FBT's ownership until after they were already in contract.  Indeed, Sinatra falsely testified under oath at the December 13, 2013 hearing that she had been "shocked" and "surprised" when confronted in summer 2013 with evidence of criminal participation in FBT's ownership structure (i.e. the same information she had long been aware of) and self-servingly complained that "it's awfully hard if people are running around and not telling you the truth."

112.    In or about November 2013, FBT and the Wynn Defendants negotiated an amendment to the purchase Option Agreement that reduced the exercise price from $75 million to $35 million, supposedly to eliminate the "casino premium" from the deal.   In doing so, however, the parties largely negated the impact on FBT's criminally-affiliated owners of that reduction by

also reallocating other financial burdens.  For example, the obligation to pay tens of millions of dollars to remediate the toxic contamination was shifted from FBT Everett to the Wynn Defendants, making the seemingly-dramatic reduction in the "ticket price" largely illusory, although it is not clear that the illusory nature of the price reduction was disclosed to the Gaming Commission.  The Wynn Defendants publicly announced this proposed "cure" on November 21, 2013, the same day the Boston Globe broke the story of Lightbody's previously-concealed interest in the Everett Site.

113.    As part of approving this "cure," the Gaming Commission expected the owners of FBT to confirm that they were the true owners and that there were no ongoing hidden interests in the property.

114.    Lohnes and DeNunzio, on behalf of FBT and knowing that the Wynn Defendants would provide them to the Gaming Commission, signed confirmations of ownership on December 23, 2013.  The confirmations signed by Lohnes and DeNunzio additionally publicly disclosed for the first time the additional interest of convicted criminal Jamie Russo in the sale proceeds of the Everett Site, but without disclosing Russo's criminal record.   While these confirmations purported to merely confirm representations made in FBT's revised contract with Wynn MA (which had been shown to the Commission before it voted to find the revised deal acceptable at a December 13, 2013 meeting), the Russo disclosure had not been previously made and the Gaming Commission had thus been duped into approving the revised deal.

115.    Given the prior concerns over DeCicco and Lightbody, all Defendants knew that Russo's criminal record (involving fraud and/or theft, and with a casino as victim) was material and its concealment from the Gaming Commission fraudulent.  As noted above senior Wynn operative DeSalvio knew Russo (as well as Lightbody).  Moreover, FBT (and thus the Wynn

Defendants) did not disclose that Russo was to be paid an agreed percentage of proceeds from the sale of the Everett Site, making him a de facto equity holder in FBT, but was worded to suggest that payment of fees calculated on some other basis had merely been deferred until FBT had sale proceeds to pay them from.  Nor was it discussed that some portion of what Russo would be paid would flow through to Mayor DeMaria.  Thus, the Gaming Commission was not given adequate information to assess whether further inquiry into the relationship with Russo and Mayor DeMaria was needed.  The Wynn Defendants either knew, or were willfully blind to, the actual role and purpose of Russo.

116.    Finally, both the revised contract (signed by Sinatra on behalf of Wynn MA and presented by the Wynn Defendants to the Gaming Commission before the hearing), and the confirmations signed by Lohnes and DeNunzio (and presented to the Gaming Commission after the hearing) were materially false and misleading because they promised that no owner of FBT had any agreement to pay any of the proceeds from the sale of the Everett Site to any undisclosed person, but as the Defendants knew full well, the backdated multi-million-dollar promissory note given by their partner Gattineri to their "former" partner Lightbody remained outstanding and was anticipated to be repaid from those proceeds.

117.    Though Lohnes and DeNunzio had provided their fraudulent signed confirmations of ownership on December 23, 2013, by June 2014, with only days left to meet the Gaming Commission's deadline for submission of the confirmations, Gattineri still had not provided any such confirmation and his lawyer had made public declarations that he had no intention to do so. Gattineri ultimately signed (on behalf of FBT as well as himself, and with the knowledge that the Wynn Defendants would give it to the Gaming Commission) a materially different confirmation than the one purportedly required, merely stating that he had "not mortgaged, pledged, or assigned

[his] own interest in the Company, nor [had he] granted to any person or entity an option, warrant or other right to [his] interest in the Company or the economic interests represented hereby, in whole or in part." This was still materially false because it failed to disclose the note that he had given to Lightbody on the assumption it would be repaid from Gattineri's share of the proceeds of the sale of the Everett Site. Indeed, Gattineri even admitted that if he failed to pay the note according to its terms, Lightbody would be able to take back his equity interest in FBT.

118.    Moreover, Gattineri balked at signing even this confirmation because he was upset about the price reduction FBT had granted the Wynn Defendants in November 2013 and the consequent reduction in the amount he had stood to receive. In order to get him to sign, the Wynn Defendants sent their operative DeSalvio to California to meet with Gattineri in person. On behalf of the Wynn Defendants, DeSalvio entered into a secret side agreement with Gattineri, promising to make him whole by giving him value equivalent to his share (claimed to be almost $1.9 million) of the gap between the original price and the revised lower price for the Everett Site.

119.    Submitting Gattineri's confirmation to the Gaming Commission without disclosing that he was to be paid additional compensation at variance with the revised agreement that had been presented to and approved by the Gaming Commission in December 2013 was another material act of fraud by the Wynn Defendants.

120.    Notwithstanding whatever agreement Gattineri had with the Wynn Defendants, the certification he signed on or about June 14, 2014 for his own benefit and that of the Defendants was materially false, as had been the similar certifications signed by Lohnes and DeNunzio on or about December 23, 2013 for their own benefit and that of the Defendants. All three of these certificates were presented to the Gaming Commission by the Wynn Defendants, who knew they were materially false, on or before the date of its vote on the license application on September 16,

2014, in order to deceive the Gaming Commission and fraudulently induce it to grant the Wynn/Lohnes application.

### Wynn Solicits More Favors from Crosby and Ensures Macau Will Not Be Examined

121.    At the Wynn Defendants' request and initiative, Crosby continued to evidence clear favoritism in his treatment of the Wynn Defendants.

122.    For example, in or about February 2013, Steve Wynn contacted Crosby, yet again directly in violation of the Gaming Act, and demanded that Spectrum Gaming Group – an investigator hired by the IEB to vet applicants and which had extensive knowledge and experience with the gaming industry in Macau – not be assigned to vet the Wynn Defendants' application, and that it be assigned to SSR's instead.  The Wynn Defendants knew that any serious investigation would uncover its shady business dealings in Macau that could create suitability concerns and wished to keep those issues as concealed as Steve Wynn's career as a sexual predator was.

123.    While a Commissioner mindful of his ethical obligations would not even have taken Wynn's *ex parte* call, Crosby not only took it, but Wynn was ultimately successful in his demand that the Wynn Defendants be assigned an investigator that had no experience in Macau which ensured that the integrity of Wynn Resorts' Macau operations would not be seriously vetted.

### The Wynn Defendants Mislead the Unconflicted Commissioners About Their Conduct In Nevada and Macau

124.    The Wynn Defendants' true pattern of misconduct in Macau, as detailed above, never came to the attention of the non-Crosby members of the Gaming Commission, nor were those commissioners aware that Steve Wynn had lied to them when making false claims about the integrity of the Macau operations.  Specifically,

   a.    On September 9, 2013, Wynn stated in his interview with the IEB, "Criminal activity is criminal activity […] And there's no place for it in a relationship with us.

And if we're sloppy and we allow people who are engaged in criminal activity to do business with us, we should be criticized for it and held responsible."

b.      On October 17, 2013 at hearing before the MGC, Wynn stated, "[ ] we are obeying all of the rules and regulations of Macau and employing all of the standard and ethical standards for which we are known for over 45 years -- I am the longest lasting continuous licensee in the history of the state at this point 46 or 47 years."

c.      At that same hearing, Wynn shot back at persons alleging criminal activity and affiliations at the Macau casino, stating "when you press them and you say is there any criminal activity going on in my company, they shut up, because if they said it, they couldn't prove it because it's not true. And I would sue them from here to next week." Wynn continued, "[t]he question is I am concerned about any criminal activity, illegal activity going on on [sic] the premises of my businesses in Las Vegas or Macau…And that I am willing to be held responsible for that standard of behavior. I hope I am being very specific now. I am referring to the standard of conduct that we employ on our own premises and the diligence that we employ to avoid criminal activity on our own premises."

d.      On December 16, 2013, Wynn falsely told the commission, "But the issue is do we allow illegal activity in our casinos? The answer is no, no. Do we do everything that you can reasonably do to stop it? Yes."

125.    In fact, criminal activity and associations are very much a part of the operation and history of the Macau casinos.  Not only do Wynn Resorts' Macau casinos maintain relationships with junket operators who have documented affiliations with criminal triad leaders, as discussed above, there have also been instances of criminal activity taking place *inside the Wynn Macau*

casino itself.  In June 2011, Carson Yeung, a wealthy businessman and former English soccer club owner, was arrested on suspicion of operating a massive money laundering scheme out of Macau casinos.  Yeung frequented two casinos in Macau – the casino in the New Century Hotel and the casino in the Wynn Hotel (the Wynn Macau) – in furtherance of his criminal endeavors.  In March 2014, Yeung was convicted by a Hong Kong Court on the money laundering charges.

126.    In November 2012, Macau police detained Pang Yufeng, one of four partners of the David Star junket operator (an affiliate of the David Group of junket operators discussed above), and his associates at the Wynn Macau casino.  Mr. Pang's ties to disgraced former politician Bo Xilai and the possible relation to money laundered by Mr. Bo were cited in reports of his arrest, which took place as part of a crackdown on corruption initiative implemented by China's new leadership.  Wynn Macau continued its relationship with the junket operator despite the arrest.

127.    Wynn Resorts and the individual Wynn Defendants at all times were aware of the criminal activity occurring inside the Wynn Macau casino.

128.    Wynn also lied to the commission in his September 9, 2013, interview with the IEB when he claimed that "everything was done verbally" in reference to the agreement under which the Macau government had committed land rights to the "unrelated" party which ultimately received $50 million from Wynn Resorts in consideration of relinquishing those rights.  Though Wynn insisted that "they're not as contract oriented in China," [t]hat whole culture is relationship driven[,]" and the transaction was "very Macau-ish," the Macau Land and Public Works Department's July 2014 statement and records from the land concession file produced in January 2015 refute Wynn's allegations that the government did not keep records of land rights at the time the parties began their negotiations.  Further, the fact that the records do not show any evidence

that Tien Chiao (the selling company) ever had rights to the land in the first instance contradict records also contradict Wynn's statements that  there was nothing alarming about the allegations about the lack of due diligence because "they're not as contract oriented in China," [t]that whole culture is relationship driven" and that the transaction was "very Macau-ish."

129.    Separately, the Wynn Defendants made multiple knowingly false statements to the Gaming Commission touting their purported excellent compliance record in Nevada, which were materially false given their ongoing concealed pattern of suitability violations.

130.    Specifically,

a.    On July 30, 2013, Sinatra falsely told the IEB "there's a regulatory standard and then there's an 'us' standard.  And we've generally considered ourselves to have a higher standard of probity with respect to people that we employ";

b.    On December 16, 2013, Wynn falsely told the Gaming Commission "Our history in Las Vegas has been exemplary, spotless in every regard";

c.    At that same December 16, 2013 meeting, Sinatra falsely told the Gaming Commission, "the idea of compliance is that it needs to be an essential part of your entire corporate culture" and "One of the hallmarks and essential features of a successful compliance program is what the books will tell you is the tone at the top.  I think that you probably got an idea of our tone at the top from Mr. Wynn's presentation";

d.    Ms. Sinatra went on at the same meeting to falsely tout the quality on Wynn Resorts' compliance committee, which included both herself and Tourek, both of whom were integral parts of the actual "tone at the top" who were hushing up and/or

failing to appropriately respond to allegations of Steve Wynn's serial sexual predation against employees;

e.      In the RFA-2, submitted to the Gaming Commission on or about December 31, 2013, with Sinatra listed as the applicant's primary contact person, the Wynn Defendants falsely asserted that "Wynn Resorts is fully committed to full and complete regulatory compliance in every jurisdiction in which it operates" and that the proposed casino at the Everett Site would "be an extension of and leverage Wynn Resorts' extensive experience and best practices in implementing, performing and integrating internal controls" – all at time when, as it has now admitted, Wynn Resorts was systematically out of compliance with Nevada's suitability requirements not least due to failures of internal controls.

Alteration of the Rules for the Wynn Defendants' Benefit

131.    The Gaming Commission, including Crosby, had repeatedly and firmly concluded that it was necessary for the IEB to complete its background checks on applicants before permitting a community vote approving or disapproving of a potential licensee's proposal (as the Gaming Act required).  There were a number of rationales for that position, including a concern that community support for an unsuitable candidate would put unwarranted pressure on the Gaming Commission, as well as a desire for the public to have full information before it voted.

132.    But then Wynn called Crosby *ex parte* in violation of the Gaming Act in or about April 2013.  Wynn asked for special treatment, specifically, that he be permitted to have the Everett community vote occur before the IEB announced its determination as to suitability.  Fully aware that anything that benefitted the Wynn Defendants' bid would enrich his old friend Lohnes, Crosby then persuaded the rest of the Gaming Commission (who were not yet aware of Crosby's

connection to the Everett Site's principal owner Lohnes) to adopt "emergency regulations" which permitted that to occur.  That "emergency regulation" allowed the Everett community vote on the Wynn Defendants' proposal *before* their affiliation with felons and mobsters was fully revealed.

### Crosby's Belated Recusal

133.    On December 5, 2013, the Boston Globe published an article describing Crosby's relationship with Lohnes.  Only after the public became aware of his connection did Crosby finally, purportedly, recuse himself from the Gaming Commission's December 13, 2013 hearing on possible hidden interests in FBT.

134.    Despite his initial purported recusal, Crosby continued to participate in hearings on the Wynn Defendants' suitability (on December 16, 2013), in issuing a favorable Phase I suitability decision to the Wynn Defendants (on December 27, 2013), in presiding over presentations by Wynn MA and MSM (on January 22, 2014), and in public hearings involving Boston's host community status with respect to both Wynn MA and MSM's applications (on March 20, 2014).

135.    Only after the publication of yet another article in the Boston Globe on May 7, 2014, questioning his conflict of interest, did Crosby purport to recuse himself from all matters involving Region A applicants on May 8, 2014.

### Additional Misrepresentations by the Wynn Defendants' and the Tainted Vote to Award Them the Gaming License

136.    To further ensure a favorable outcome, in or about July or August of 2014 one of the Wynn Defendants' representatives engaged in improper *ex parte* communications with at least one member of the Gaming Commission in order to pressure them to change their vote in order to support the Wynn/FBT bid, as they ultimately did.

137.    On or about August 1, 2014, the Gaming Commission asked the Wynn Defendants to disclose by August 22, 2014 any pending regulatory investigations against them in any

jurisdiction that had not previously been disclosed. The Wynn Defendants knowingly and intentionally a) failed to disclose an IRS investigation regarding whether Wynn Resorts violated money-laundering laws and b) misrepresented the subject matter and concealed the scope of a new investigation commenced by the government of Macau in July 2014, into the Wynn Defendants' purchase of land rights from unknown and/or suspicious beneficial owners based on recently disclosed public records – strikingly parallel to their dealings with the Everett Site.

138.  The Wynn Defendants falsely represented that the new investigation was simply an order one that had already been disclosed. The new Macau investigation into the purchase of the Cotai land rights was particularly material given the striking parallels to the purchase of the Everett Site, where phony documentation had been used to conceal the real parties in interest. Moreover, knowledge of the subject of the active Macau investigation would likely have caused the Gaming Commission to revisit its earlier failure to ensure that a deeper and more critical investigation of the Wynn Defendants' Macau activities was conducted before the Gaming License decision was made in Massachusetts. Fear of exactly these consequences is what motivated the Wynn Defendants to fraudulently misrepresent the Macau investigation from the Gaming Commission.

139.  On September 16, 2014, the Gaming Commission held its straw vote, and then subsequently signed a conditional agreement to award the license to Wynn MA on or about November 6, 2014. Defendant Wynn Resorts submitted a response to the Gaming Commission's proposed conditions for licensing and affirmatively represented its acceptance of the condition to "compl[y] with all applicable federal, state and applicable and lawful local laws, rules and regulations, now in effect or as hereafter promulgated or amended." The conditions of the award of the license to Wynn MA include "[c]ompliance with all of the requirements of G.L. c. 23K, including but not limited to all conditions set forth in G.L. c.23K, §21(a) and (b), as now in effect

and as hereafter amended and 205 CMR 101 et seq., as now in effect and as hereafter promulgated or amended."

140.    On or about November 6, 2014, the license was awarded to Wynn MA.  Each of the Wynn Defendants had a continuing duty to maintain suitability in accordance with the Phase 1 Suitability Determination Standards and Grounds for Denial of an Application for License; and a to provide information and documents requested by the commission and to cooperate with any investigation or hearing even after Wynn MA received the license.  Wynn MA had the additional duty to inform the commission of any action which the gaming licensee reasonably believes would constitute a violation of M.G.L c.23k.

141.    As of September 16, 2014, the SSR/MSM proposal and the Wynn/FBT proposal were the only two alternatives before the Gaming Commission for consideration for the Region A Gaming License.  One commissioner, even on a record hopelessly tainted by the Defendants' fraud, found the SSR/MSM proposal superior to the Wynn/FBT proposal and voted accordingly. As noted above, SSR and MSM had both been fully adjudicated suitable, and there were no shortcomings in their proposal that would have led to its rejection but for the Defendants' misconduct.

142.    But for the Defendants' multiple acts of fraud and other misconduct, the MSM/SSR application would have prevailed in an honest competition, with at least two, if not all three, of the Gaming Commission members who voted for Wynn/FBT as a result of that misconduct voting for MSM/SSR instead.   Indeed, in an honest competition in which both the underlying facts and their

fraudulent concealment was known to the Gaming Commission, Wynn/FBT would have been disqualified.

143.    Although still subject to the Gaming Act's complete bar on any contribution, however modest, to political candidates in Massachusetts, the Wynn Defendants decided to try to circumvent it.  On or about October 1, 2014, Wynn Resorts made a political contribution with the clear intent it be spent in Massachusetts, in violation of the Gaming Act.

144.    As noted above, regulators worldwide seek to guard against the easy corruption the gaming industry often inspires by ensuring the suitability of those associated with a casino.  The strength of this concern was reemphasized recently when November 2018 press coverage highlighted the Pennsylvania Gaming Control Board's decision to revoke permission for a prominent New York City pizzeria to operate a branch inside a casino in Bensalem, Pennsylvania due to concerns about the pizzeria's owner's associations with reputed organized crime figures.

145.    As also discussed above, the Wynn Defendants were unsuitable under Massachusetts law because of their association with FBT and its criminal owners and other associated persons and, for that reason alone, were required under the law to be disqualified.  The Wynn Defendants' affirmative lies about, fraudulent concealment of, that association should have sealed their fate if such association were not sufficient by itself.

146.    The Wynn Defendants' application was also at all times fraudulent and misleading by failing to disclose the payment (disguised via the use of shell companies) of hush monies, including an astonishing $7.5 million to one victim of Steve Wynn's sexual misconduct in about

2005 – a payment that Sinatra, who was closely involved with the Massachusetts license application process, had personally known about since at least 2009.

147.   Significantly, because of the continuing, ongoing senior roles and in connection with the proposed casino, Wynn, Maddox and Sinatra have been required to show their suitability as individual qualifiers.   In particular, the personal RFA-1 submitted by Steve Wynn to the Gaming Commission in or about January 2013 was required to identify any company in which he had held an ownership interest of 5% of more during the prior 20 years, yet he omitted to disclose the wholly-owned shell company, Entity Y LLC, he had used for the $7.5 million payoff. Disclosure of his interest in that shell company could have course led to further unwelcome inquiries about its activities.   As the furor surrounding the subsequent public revelation of those activities revealed, and as Wynn Resorts' public admission that those activities violated Nevada's gaming regulations confirmed, this intentional omission was highly material.

148.   The ongoing violations of Nevada statutes and Nevada Gaming Commission Regulations after the November 2014 issuance of the Gaming License now publicly admitted to were also violations of the analogous Massachusetts statutes and Gaming Commission Regulations that impose a continuing duty upon applicants and qualifiers to maintain suitability and subject licensees to disciplinary action. *See* NRS 463.170(8), NGCR 5.010, NGCR 5.011, M.G.L c.23k § 23, 205 CMR 115.01(4) and 205 CMR 132.00.

149.   Many of the Wynn Defendants' communications to the Gaming Commission, both before and after the November 2014 issuance of the Gaming License, were ex parte and are still not part of the public record or available to SSR.   Plaintiff believes that discovery is likely to

reveal further false statements, material omissions, and/or other predicate acts in addition to those set forth herein, possibly covering a much wider timespan.

150.   Obtaining the Gaming License in November 2014 was not the end of the Wynn Defendants' scheme, but merely the beginning of the next phase of the scheme, during which they would be constructing their casino on the Everett Site.  They needed to keep their past (and ongoing, in Nevada and Massachusetts) misconduct concealed as long as possible, because as the casino approached the completion of the construction stage it necessarily became more and more of a fait accompli, making it more challenging as a practical matter for the Gaming Commission to start over on a blank slate if the commissioners learned they had been hoodwinked.  The Wynn Defendants were, at a minimum, prepared to commit such additional predicate acts of fraud and deception as might be necessary to retain their ill-gotten gains.

151.   Because its original horse-racing business was no longer economically viable, in May 2017, SSR sold Suffolk Downs to a developer who planned non-casino uses for it for dramatically less than the property would have been worth with the casino license or, put another way, for dramatically less than the present value of the future revenue stream SSR would have received had the casino license been issued.  The Wynn Defendants' successful ongoing fraudulent concealment of their systematic violation of Nevada and Massachusetts law had thus reached the milestone of eliminating the Suffolk Downs site as a readily-available alternative for a casino in Region A should the truth be revealed and political pressure lead to reexamination of the Wynn Defendants' suitability to retain the Gaming License and open their casino on the Everett Site.

## **CAUSES OF ACTION**

### **First Claim for Relief (Against All Defendants)**
### **(Violation of RICO, 18 U.S.C. 1962(c))**

152.    Plaintiff realleges and incorporates all the allegations of paragraphs 1 through 151, above, as if fully set forth again herein.

153.    For purposes of this First Claim for Relief, all Defendants are persons under 18 U.S.C. § 1961(3), as defined in 18 U.S.C. § 1961(3).

154.    The Defendants combined together as an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) engaged in and affecting interstate commerce, to achieve common goals they could not achieve lawfully, and could not achieve without each other's collusion and cooperation.  This enterprise had a purpose, namely construction and operation of a casino at the Everett Site with corresponding financial benefits that could not be otherwise or lawfully obtained thus accruing to FBT as well as the Wynn Defendants, relationships among those associated with it.  The enterprise had longevity sufficient to permit those associates to pursue, and indeed achieve, the enterprise's primary purpose, which extended beyond obtaining the Gaming License to the construction and operation of a casino on the Everett Site without that venture being endangered by exposure of their prior misconduct.

155.    The Defendants conducted and participated in the conduct of the association-in-fact-enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) over an extended period of time, including:

    a.    Multiple felony violations of the Massachusetts Gaming Act, thus constituting "act[s] or threat[s] involving . . . gambling . . . chargeable under State law and punishable by imprisonment for more than one year" and thus "racketeering activity," by knowingly making false, misleading, and/or omissive statements in connection with

the Wynn/FBT license application on multiple occasions from January 2013 through September 2014, and/or preparing or directing the preparation of false documents with the knowledge that they would submitted to the Gaming Commission.  These false, misleading, and/or omissive statements variously:

   1. Concealed and/or misrepresented the then-current and/or previous ownership and/or financial interest of convicted criminals in the Everett Site.

   2. Falsely represented that none of the proceeds from the Wynn Defendants' purchase of the Everett Site would be shared with convicted criminals.

   3. Falsely represented that the "revised" deal with FBT Everett was being adhered to by failing to disclose the secret side deal with Gattineri to give him extra compensation in return for his signature on one of the needed false certifications.

 b. Multiple criminal violations of 18 U.S.C. §§ 1341 and 1343 by knowingly making false, misleading, and/or omissive statements as specified above in connection with the Wynn/FBT license application on multiple occasions from January 2013 through September 2014, and/or preparing or directing the preparation of false documents with the knowledge that they would be submitted to the Gaming Commission, as set forth above, by using the mail and/or wires to transmit such statements and documents as part of a scheme or artifice to fraudulently deprive SSR of, and fraudulently obtain for themselves, the money, property, and other benefits of the license that would otherwise have accrued to the MSM/SSR proposal, all via

deceiving the non-defendant members of the Gaming Commission into granting the Wynn/FBT group's license application and as an inevitable consequence denying the MSM/SSR license application.

c.        Additional violations of 18 USC 1341 and 1343 by using the mails and/or wires in pursuit of the scheme to fraudulently deprive the public of its intangible right to honest services by causing Mayor DeMaria to abuse the powers of his public office for the benefit of the Wynn Defendants and FBT in return for payment from the Wynn Defendants funneled to DeMaria via FBT and Russo.

d.        Multiple criminal violations of 18 U.S.C. § 1952 by travel by or on behalf of the Wynn Defendants in interstate commerce and/or use of the mails and other facilities in interstate commerce with the intent to promote, carry on, or facilitate the promotion or carrying on of unlawful activity, i.e. a business enterprise involving gambling but violation the provisions of the Massachusetts Gaming Act as described herein –by among other things, traveling to Massachusetts to conspire with FBT regarding the preparation of false documents, traveling to Massachusetts to give false testimony, and traveling to California to conspire with Gattineri, with such travel occurring as early as November 2012 and as late as June 2014.

e.        The details of these predicate acts are set forth above.

156.    As a direct and proximate result of the Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), SSR has been injured in its business and property.  Specifically:

a.        SSR has been deprived of the substantial future revenues it would have received from MSM per the terms of its binding contract with MSM had the MSM /SSR license

application been granted, as it would have but for the Defendants' unlawful misconduct;

b.     SSR ultimately sold the Suffolk Downs property for dramatically less than it would have been worth had had the MSM/SSR license application been granted, as it would have but for the Defendants' unlawful misconduct; and

c.     SSR and certain of its members and/or affiliates incurred substantial expenses in connection with its license application which were lost as a direct result of the Defendants' unlawful misconduct.

157.    As a result, SSR and its members suffered actual damages in an amount to be determined at trial, but believed to be over $1 billion dollars.  Moreover, SSR is entitled to recover treble the actual damages sustained, plus costs of suit, including reasonable attorneys' fees, in accordance with 18 U.S.C. § 1964(c).

**Second Claim for Relief (Against Wynn, Wynn Resorts, Maddox, and Sinatra)**
**(Violation of RICO, 18 U.S.C. 1962(c))**

158.  Plaintiff realleges and incorporates all the allegations of paragraphs 1 through 157, above, as if fully set forth again herein.

159.  Defendants Wynn, Wynn Resorts, Maddox, and Sinatra (the "Wynn MA Control Defendants," who are all of the Wynn Defendants other than Wynn MA) all constitute persons within the meaning of 18 U.S.C. § 1961(3).

160.  In addition to the association-in-fact enterprise set forth above, Wynn MA (not sued as a defendant for this claim for relief) was at all relevant times an enterprise within the meaning of 18 U.S.C. § 1961(4) engaged in and affecting interstate commerce.

161. The Wynn MA Control Defendants conducted and participated in the conduct of Wynn MA's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) over an extended period of time, including:

      a.      Committing or causing to be committed the predicate acts referenced above;

      b.      Committing or causing to be committed additional predicate crimes, including felony violations of the Massachusetts Gaming Act, 18 U.S.C. §§ 1341, 1343, and 1952 in connection with false statements concerning and/or fraudulent concealment of Steve Wynn's sexual predation and the Wynn MA Control Defendants' Nevada law violations a referenced above.

      c.      Committing or causing to be committed additional predicate crimes, including felony violations of the Massachusetts Gaming Act, 18 U.S.C. §§ 1341, 1343, and 1952 in connection with false statements concerning and/or fraudulent concealment of the Wynn MA Control Defendants' unsavory activities and organized-crime affiliations in Macau, as referenced above.

      d.      Committing additional concealed violations of 18 U.S.C. § 1952 in connection with their violations of the Nevada suitability statutes, as specified above.

      e.      The details of these predicate acts and the roles of the individual defendants in committing these predicate acts and/or causing them to be committed are set forth above.

162. As a direct and proximate result of the Wynn MA Control Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), SSR has been injured in its business and property. Specifically:

a.        SSR has been deprived of the substantial future revenues it would have received

from MSM per the terms of its binding contract with MSM had the MSM /SSR license

application been granted, as it would have but for the Defendants' unlawful misconduct;

b.        SSR ultimately sold the Suffolk Downs property for dramatically less than it

would have been worth had had the MSM/SSR license application been granted, as it

would have but for the Defendants' unlawful misconduct; and

c.        SSR and certain of its members and/or affiliates incurred substantial expenses

in connection with its license application which were lost as a direct result of the

Defendants' unlawful misconduct.

163.  As a result, SSR and its members suffered actual damages in an amount to be

determined at trial, but believed to be over $1 billion dollars.  Moreover, SSR is entitled to recover

treble the actual damages sustained, plus costs of suit, including reasonable attorneys' fees, in

accordance with 18 U.S.C. § 1964(c).

**Third Claim for Relief**
**(Conspiracy to Violate RICO, 18 U.S.C. 1962(d)**
**Against All Defendants)**

164.  Plaintiff realleges and incorporates all the allegations of paragraphs 1 through 163,

above, as if fully set forth again herein.  As set forth above, all of the Defendants agreed and

conspired to violate 18 U.S.C. § 1962(c), by forming the illegal association-in-fact enterprise set

forth above and conducting and participating in the conduct of its affairs through a pattern of

racketeering activity.

165.  Each Defendant, as set forth above, committed one or more overt acts in furtherance

of the conspiracy.

166. Each Defendant necessarily recognized, given the objective of the conspiracy, and agreed that the conspiracy would commit at least two predicate acts.

167. In addition to this conspiracy, all of the Wynn MA Control Defendants agreed and conspired to violate 18 U.S.C. § 1962(c),by conducting and participating in the in the conduct of Wynn MA's affairs through a pattern of racketeering activity, and each Wynn MA Control Defendant, as set forth above committed one or more overt acts in furtherance of the conspiracy and necessarily recognized, given the objective of the conspiracy, and agreed that the conspiracy would commit at least two predicate acts.

168. As a direct and proximate result of Defendants' conspiracy, their overt acts taken in furtherance thereof, and their violations of 18 U.S.C. § 1962(d), SSR has been injured in its business and property. Specifically:

    a.        SSR has been deprived of the substantial future revenues it would have received had the MSM/SSR license application been granted, as it would have but for the Defendants' unlawful misconduct;

    b.        SSR ultimately sold the Suffolk Downs property for dramatically less than it would have been worth had had the MSM/SSR license application been granted, as it would have but for the Defendants' unlawful misconduct; and

    c.        SSR and certain of its members and/or affiliates incurred substantial expenses in connection with its license application which were lost as a direct result of the Defendants' unlawful misconduct.

169. As a result, SSR suffered actual damages in an amount to be determined at trial, but believed to be over $1 billion dollars. Moreover, SSR is entitled to recover treble the actual

damages sustained, plus costs of suit, including reasonable attorneys' fees, in accordance with 18 U.S.C. § 1964(c).

### Fourth Claim for Relief
### (Mass. G.L. 93A, section 11, Against All Defendants)

170.  Plaintiff realleges and incorporates all the allegations of paragraphs 1 through 169, above, as if fully set forth again herein.

171.  SSR was at all relevant times a person engaged in the conduct of trade or commerce. The Defendants were at all relevant times persons engaged in the conduct of a trade or commerce. Moreover, each of the defendants was a competitor of SSR's.  FBT was a competitor of SSR because only one parcel of real estate in Region A could benefit from receiving additional revenue by being used for a casino, and both FBT and SSR actively sought that use for their real estate. Because SSR was not selling its real estate and its future income stream under its contract with MSM would depend (beyond the guaranteed minimums) on the revenues of the casino intended to be built on its Suffolk Downs site, Wynn MA (which hoped to profit from building and operating a casino) and the Wynn MA Control Defendants (who all stood to profit from the success of Wynn MA's intended casino), all of the Wynn Defendants were also competitors of SSR's.

172.  The Defendants' acts as described above constituted unfair methods of competition and/or unfair and/or deceptive acts and practices, all aimed at unfairly obtaining the Region A casino license for the Wynn/FBT group to operate at the Everett Site at the expense of, and to the damage of, SSR, all in violation of Mass G.L. 93A.

173.  The Defendants knew that the SSR application (whether partnered with Caesar's or MSM) would have prevailed in a fair, lawful, and untainted process, and their violations of the statute were willful and/or knowing.

174.  The Wynn Defendants' violations of the statute caused SSR loss of money and/or property, as set forth in detail above.

175.  As a result, SSR suffered actual damages in an amount to be determined at trial but believed to be over $1 billion dollars.  Moreover, SSR is entitled to recover treble the actual damages sustained, plus costs of suit, including reasonable attorneys' fees, in accordance with section 11 of the statute.

### Fifth Claim for Relief
### (Tortious Interference with Advantageous Business Relations, Against All Defendants Other Than FBT)

176.  Plaintiff realleges and incorporates all the allegations of paragraphs 1 through 175, above, as if fully set forth again herein.

177.  SSR had a business relationship of economic benefit with a third party, MSM, by way of the relationship contemplated in their partnership to submit the MSM/SSR gaming license application.

178.  The Wynn Defendants knew of this business relationship generally and their partnership, specifically.

179.  The Wynn Defendants knowingly interfered with this relationship and rendered performance under this relationship impossible, and otherwise prevented MSM and SSR from performing under their agreement, through the above-described conduct, including but not limited to their failure to properly disclose to the IEB and to the Commission Steve Wynn's long-standing pattern of sexual predation and Wynn Resorts' related long-standing violations of Nevada gaming law.

180.  As described above, the Wynn Defendants' interference was through improper motive and means, including but not limited to the fact that their improper fraudulent concealment

of, and failure to disclose, disqualifying information to the IEB and the Gaming Commission was in violation of Massachusetts statute and regulations, was done with the knowledge that proper disclosure would result in a finding of non-suitability by the Commission, and was done in order to obtain the Gaming License in Region A of Massachusetts to which Wynn MA was not entitled and to thereby prevent MSM and SSR from performing under their agreement.

181.  SSR was not aware of, and could not in the exercise of reasonable diligence become aware of, this misconduct by the Wynn Defendants prior to January 2018.

182.  SSR's loss of advantageous business relations with MSM, resulted directly from the Wynn Defendants' conduct.

183.  As a direct and proximate result of the Wynn Defendants' interference, SSR has and will continue to suffer damages in an amount to be proven at trial.

**Sixth Claim for Relief**
**(Tortious Interference with Contractual Relations,**
**Against All Defendants Other Than FBT)**

184.  Plaintiff realleges and incorporates all the allegations of paragraphs 1 through 183, above, as if fully set forth again herein.

185.  SSR and MSM executed an agreement under which SSR agreed to lease the portion of Suffolk Downs in Revere to MSM for a term of 99 years in exchange for minimum rental payments of $35 million per year.  The agreement provided for annual payments that could have exceeded $100 million per year based on MSM's net revenues.

186.  The Wynn Defendants were aware of the agreement between SSR and MSM.

187. The Wynn Defendants intentionally and improperly interfered with the performance of the agreement, rendering performance under the agreement impossible and otherwise preventing MSM and SSR from performing under the agreement.

188. As described above, the Wynn Defendants' interference was through improper motive and means, including but not limited to the fact that their improper fraudulent concealment of, and failure to disclose, disqualifying information to the IEB and the Gaming Commission was in violation of Massachusetts statute and regulations, was done with the knowledge that proper disclosure would result in a finding of non-suitability by the Commission, and was done in order to obtain the Gaming License in Region A of Massachusetts to which Wynn MA was not entitled and to thereby prevent MSM and SSR from performing under their agreement.

189. SSR's loss of the advantages of the agreement with MSM, including but not limited to minimum rental payments of $35 million per year, resulted directly from the Defendants' conduct.

190. SSR was not aware of and could not in the exercise of reasonable diligence become aware of, this misconduct by the Wynn Defendants prior to January 2018.

191. As a direct and proximate result of the Wynn Defendants' interference with the agreement between SSR and MSM, SSR has and will continue to suffer damages in an amount to be proven at trial.

WHEREFORE, SSR seeks judgment against the Defendants as follows:

a.      Compensatory damages in an amount to be determined at trial, but believed to exceed $1 billion;

b.      Treble damages as provided for under both federal and Massachusetts law;

c.      Its costs of suit, including reasonable attorneys' fees, as provided for under both federal and Massachusetts law; and

d.      Such other and further relief as may be just.

## **JURY DEMAND**

Plaintiff Sterling Suffolk Racecourse, LLC hereby demands a trial by Jury.

Dated: February 15, 2019                STORCH AMINI PC


By:      /Steven G. Storch_____
         Steven G. Storch (admitted *pro hac vice*)
         2 Grand Central Tower
         140 East 45th Street, 25th Floor
         New York, NY  10017
         Telephone: (212) 490-4100
         Email: sstorch@storchamini.com

         Joseph R. Donohue (BBO# 547320)
         DONOHUE & ASSOCIATES
         The Charlestown Navy Yard
         Shipway Place Unit C2
         Boston, Massachusetts 02129
         Telephone: (508) 641-8848
         Email: jrdonohuelaw@gmail.com

         *Attorneys for Plaintiff*
         *Sterling Suffolk Racecourse, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I certify that this Amended Complaint was filed electronically through the Court's

CM/ECF system on February 15, 2019 and served electronically on all counsel of record.


                    Steven G. Storch
               Steven G. Storch (admitted *pro hac vice*)