**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| **STERLING SUFFOLK RACECOURSE, LLC,** | ) | |
| | ) | |
| **v.** | ) | **Civil No: 18-CV-11963-PBS** |
| | ) | |
| **WYNN RESORTS, LTD, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT FBT EVERETT REALTY LLC'S**
**MOTION TO DISMISS THE AMENDED COMPLAINT**

Sterling Suffolk Racecourse ("Sterling") has doubled down on its frivolous original complaint. Sterling is betting that it can fool the Court into thinking that a litany of salacious allegations relating to Steve Wynn and Wynn Resorts Limited's not-yet-open casino hotel are sufficient to state a federal RICO violation. Like its original complaint, however, Sterling's amended complaint plainly fails to allege the commission of a single act of "racketeering," let alone a "pattern" of racketeering activity as the RICO statute requires. Sterling's state law claim against FBT Everett Realty LLC ("FBT"), under M.G.L. ch. 93A, § 11, fares no better—it is both jurisdictionally deficient and fails on the merits. Finally, all of Sterling's claims against FBT are clearly time-barred, because they were filed more than four years after Sterling's alleged injury.

The Court should not only dismiss Sterling's claims against FBT with prejudice, but it should also sanction Sterling for using this Court as a forum for what is at best a political stunt and at worst a brazen attempt at a shake-down of Wynn Resorts Limited ("Wynn Resorts").[1] Sterling's

---

[1] Sterling's vexatious lawsuit is clearly targeted against the deep-pocketed Wynn Resorts; FBT is merely the collateral damage. Undersigned counsel has notified Sterling's counsel of record multiple times, in writing, that Sterling's claims are frivolous and that FBT would seek sanctions under Federal Rule of Civil Procedure 11 and 28 U.S.C. § 1927 if Sterling persisted in its spurious claims against FBT.

1

RICO claims, which are the sole basis for Sterling filing its lawsuit in federal court, reflect either a total lack of legal research or a callous disdain for this Court's time and FBT's scarce resources. This Court previously has imposed Rule 11 sanctions where the plaintiff continued to pursue frivolous RICO claims despite being on notice of the claims' frivolity.  *See Divot Golf Corp. v. Citizens Bank*, No. 02-civ-10654, 2003 U.S. Dist. LEXIS 187, at *7-12 (D. Mass. Jan. 8, 2003) (Saris, J.).  The Court should not hesitate to do the same here.

## BACKGROUND

**1.**  FBT is a Massachusetts limited liability company that sold a 33-acre parcel of industrial land in Everett, Massachusetts (the "Everett Parcel") to Wynn Resorts in January 2015.  In early 2013, Wynn Resorts entered into an option agreement with FBT to purchase the Everett Parcel. Soon thereafter, Wynn submitted to the Massachusetts Gaming Commission ("MGC") a detailed plan to develop the Everett Parcel into a luxury casino hotel with high-end shopping and a gourmet restaurant plaza, located minutes from the heart of Boston.  On September 16, 2014, on the basis of that development plan, the MGC publicly announced that, by a vote of 3-1, it was awarding Wynn Resorts the coveted "Region A" casino license.[2]  Wynn Resorts closed on the Everett Parcel four months later.

Besides Wynn Resorts, there was one other applicant competing for the Region A casino license—Mohegan Sun.  Sterling, though not itself an applicant for the Region A license, had entered into a business partnership with Mohegan Sun and had a direct economic interest in Mohegan Sun winning the competition.  Mohegan Sun's failure to win the competition was thus painful and embarrassing for Sterling.  Rather than move on, Sterling and Mohegan Sun for the

---

[2] The MGC members who participated in the vote, which also was public, were Gayle Cameron, Bruce Stebbins, Enrique Zuniga, and James McHugh.  McHugh served as the Acting Commissioner for purposes of the vote.  Chairman Steven Crosby did not participate in the vote.

74612566_1

past four years has been using various means to try to delay and upend Wynn Resorts's development of the Everett Parcel, as well as to force the MGC into a "do-over."  This RICO lawsuit, which Sterling filed roughly nine months before the scheduled opening of the Wynn Resorts Encore Hotel, is Sterling's latest (and hopefully last) gambit.

**2.**  As the Court may be aware, FBT's real estate transaction with Wynn Resorts was the subject of a high-profile federal prosecution against current FBT members Anthony Gattineri and Dustin DeNunzio, as well as former FBT member Charles Lightbody, on charges of wire fraud and conspiracy to commit wire fraud.[3]  The federal charges were based on the allegation that Gattineri, DeNunzio, and Lightbody had conspired to "obtain money from Wynn [Resorts] in exchange for the Everett Parcel on the basis of false representations and concealment of material facts concerning the financial interests in the Everett Parcel."  United States v. DeNunzio et al., No. 14-cr-10284-NMG (D. Mass.), ECF No. 3, at ¶ 14.  In simple terms, the federal prosecutors charged that Gattineri, DeNunzio, and Lightbody made false statements to Wynn Resorts in order to defraud the company into agreeing to buy the Everett Parcel for more than it was worth.  As the jury quickly concluded, however, Gattineri, DeNunzio, and Lightbody had not engaged in any federal offense of any kind, let alone a wire fraud conspiracy.  After a three-week trial, the jury acquitted Gattineri, DeNunzio, and Lightbody on every count in the indictment in less than five hours of deliberation.

Importantly, Sterling's amended complaint is *not* a copycat of, or an attempt to re-litigate, the federal criminal prosecution of Gattineri, DeNunzio, and Lightbody.  To the contrary, Sterling's amended complaint implausibly seeks to turn that prosecution on its head.  Sterling's amended complaint fantasizes a massive federal RICO conspiracy that the United States

---

[3] Undersigned counsel from Ropes & Gray LLP had the honor of representing Mr. DeNunzio in that trial.

Attorney's Office and the FBI, despite a multi-year investigation, somehow missed. Sterling's amended complaint requires the Court to believe the following: (1) Completely contrary to the position that the United States Attorney's Office had taken in its criminal prosecution, FBT and its members, Wynn Resorts and its top executives, and possibly even the MGC's then-Chairman Steven Crosby were in fact *secret co-conspirators* in a grand racketeering scheme to deceive the voting members of the MGC into awarding Wynn Resorts the Region A casino license; (2) Wynn Resorts, aided and abetted by its outside counsel at Mintz Levin, then knowingly used false pretenses to fool the United States Attorney's Office into thinking that Gattineri, DeNunzio, and Lightbody actually had conspired to defraud Wynn Resorts of money in connection with its purchase of the Everett Parcel; and (3) finally, several Wynn Resorts executives and Mintz Levin lawyers repeatedly perjured themselves at Gattineri's, DeNunzio's, and Lightbody's federal trial while testifying as prosecution witnesses. Sterling's decision to peddle this absurd scenario to the Court calls for the harshest possible Rule 11 sanctions.

## ARGUMENT

In addition to its sheer factual implausibility, Sterling's amended complaint is riddled with defects that betray Sterling's total lack of understanding of—or perhaps its total lack of concern for—the plain language of the RICO statute, well-established RICO case law, and the basic requirements of Chapter 93A. But, so as not to burden this Court with unnecessary briefing, FBT focuses its memorandum of law on the most simple, most straightforward reasons why the Court should summarily dismiss Sterling's claims against FBT with prejudice:

First, the amended complaint fails to allege a single act of "racketeering," let alone a "*pattern* of racketeering activity," as required to state a viable RICO claim. This fundamental

legal defect is fatal to the amended complaint's two substantive RICO claims and its RICO conspiracy claim.[4]  This defect cannot possibly be cured through further amendment.

<u>Second</u>, once the RICO claims are dismissed, Sterling's single state law claim against FBT under Chapter 93A lacks any independent basis for continued federal subject matter jurisdiction.

<u>Third</u>, Sterling's claim against FBT under Chapter 93A fails on the merits because the amended complaint does not allege facts showing that FBT and Sterling engaged in a "commercial transaction" with each other, as Chapter 93A requires.  This defect cannot possibly be cured through further amendment either.

<u>Fourth</u>, Sterling's RICO claims and its Chapter 93A claim against FBT were filed after the expiration of the four-year statute of limitations that apply to them, and the claims must therefore be dismissed as time-barred.  This too is a defect that cannot be cured.

## I.   None of the Conduct Alleged in the Amended Complaint Constitutes "Racketeering."

"Civil RICO is an unusually potent weapon—the litigation equivalent of a thermonuclear device."  *Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 44 (1st Cir. 1991).  "The very pendency of a RICO suit can be stigmatizing and its consummation can be costly."  *Id.*  For this reason, courts review civil RICO complaints with "particular care," in order to "prevent[ ] abusive or vexatious treatment of defendants."  *Id.*  A plaintiff does not state a RICO claim by waltzing into federal court with a litany of salacious allegations punctuated with "the self-serving conclusion that the [alleged] conduct amounted to racketeering."  *Id.*

"Racketeering activity" is a statutory term of art.  The RICO statute's definitional section, 18 U.S.C. § 1961(1), sets forth an exhaustive list of conduct that constitutes "racketeering activity."

---

[4] The bases for dismissal of the RICO claims discussed in detail below apply equally to all three RICO claims pled in the amended complaint.  *Cf. Langan v. Smith*, 312 F. Supp. 3d 201, 208 (D. Mass. 2018) (Saris, J.) ("A RICO conspiracy claim . . . typically cannot survive without a viable substantive RICO claim.").

74612566_1

*See Beck v. Prupis*, 529 U.S. 494, 497 n. 2 (2000) (holding that § 1961(1)'s list is exhaustive). If particular conduct is not contained within § 1961(1)'s list, then that conduct is not "racketeering activity" and, as a matter of law, cannot provide the basis for a RICO claim. *See, e.g.*, *United States v. Latorre-Cacho*, 874 F.3d 299, 306-307 (1st Cir. 2017) (reversing RICO conviction where trial judge's instruction allowed jury to convict based on unlawful acts not contained within § 1961(1)'s exhaustive list); *Miranda*, 948 F.2d at 44 (holding that plaintiff's "jerry-built" civil RICO complaint failed as a matter of law because the conduct alleged in the complaint, even if proven true, would not constitute "racketeering activity").

Paragraphs 155(a)-(d) of the amended complaint set forth the supposed acts of "racketeering" that form the basis for Sterling's RICO claims.[5] A plain reading of the amended complaint, however, reveals that the underlying conduct that Sterling alleges, even if assumed true, does not qualify "racketeering." The alleged state law "gambling" felony is not actually a "gambling" offense; the alleged deception of the MGC is not actually a mail or wire fraud; the alleged gratuity to Mayor Carlo DeMaria does not actually state an honest services fraud; and the alleged Travel Act violations are not actually Travel Act violations.

A.   **Defendants' Alleged Violations of the Massachusetts Gaming Act Do Not Constitute Offenses "Involving . . . Gambling" Under 18 U.S.C. § 1961(1)(A).**

Paragraph 155(a) of the amended complaint alleges that FBT, Wynn Resorts, and various Wynn Resorts executives (collectively, "Defendants") conspired to make "false, misleading, and/or omissive statements" to the MGC "in connection with" the Wynn Resorts casino license

---

[5] Paragraph 161, which is not part of the substantive RICO claim against FBT but is incorporated by reference into the RICO conspiracy claim, alleges that, during the casino license application process, Wynn Resorts concealed from the MGC Steve Wynn's "sexual predation" and the company's "unsavory activities and organized-crime affiliations in Macau." Am. Compl, ¶ 161(b)-(d). These spicy allegations add nothing of consequence to the amended complaint's four alleged RICO predicates (state law felonies "involving . . . gambling," mail and wire fraud, honest services fraud, and Travel Act violations).

application, in "violation[ ] of the Massachusetts Gaming Act."  Amended Complaint, ¶ 155(a).

In an attempt to shoehorn this conduct into § 1961(1)'s definition of "racketeering," Sterling tacks

on the bare legal conclusion—which, of course, the Court is not bound to accept even on a motion

to dismiss[6]—that making false, misleading, or omissive statements on a Massachusetts casino

license application is an "'act[ ] or threat[ ] involving . . . gambling[.]'"  Amended Complaint, ¶

155(a) (quoting 18 U.S.C. § 1961(1)(A)).  For purposes of § 1961(1)(A), "gambling" means "'the

act or practice of betting,' or 'the act of risking something on an uncertain event.'"  *United States

v. Mark*, 460 F. App'x 103, 107 (3d Cir. 2012) (quoting Webster's Dictionary); *see also Fuller v.

Harrah's Entm't, Inc.*, No. 04-cv-2108, 2004 U.S. Dist. LEXIS 22097, at *12 (E.D. La. Oct. 29,

2004) (holding that "gambling" means "risking money" on a game "in order to realize a profit").

     Sterling is correct that knowingly making material false statements to the MGC on a casino

license application is a felony violation of the Massachusetts Gaming Act's false statements

provision, M.G.L. ch. 23K, § 38.[7]  But Sterling is wrong that it constitutes an act "involving . . .

gambling" for purposes of § 1961(1)(A).  The "test for determining whether" particular conduct

"fit[s] into" § 1961(1)(A)'s list of state law felonies is whether the conduct involves "a type of

activity generally known or characterized in the proscribed category . . . ."  *United States v.

Forsythe*, 560 F.2d 1127, 1137 (3d Cir. 1977); *see also Roma Constr. Co. v. Russo*, 96 F.3d 566,

580 (1st Cir. 1996) (Lynch, J., concurring) (recognizing this bedrock principle of RICO law).

Thus, the question for the Court here is whether applying and competing for the Region A casino

---

[6] *See, e.g.*, *Periyaswamy v. Karuppasamy*, No. 13-cv-11548, 2014 U.S. Dist. LEXIS 107509, at *12 (D. Mass. July 30, 2014) (Saris, J.) ("A court is not 'bound to accept as true a legal conclusion couched as a factual allegation.'" (quoting *Twombly*, 550 U.S. at 555)).

[7] M.G.L. ch. 23K, § 38, prohibits making any "false, fictitious or fraudulent statement or representation to the bureau, commission or division."

license involved "activity generally known or characterized" as "gambling."  The answer clearly is no.  Applying for the Region A casino license involved filling out paperwork, submitting development proposals, sitting for interviews with the state regulators, and lobbying the relevant state agencies.  None of this, even if it involves the use of false statements, can plausibly be described as "gambling."  Indeed, in the seven years since the casino license application process began and the nearly five years since it ended, Wynn Resorts still has not taken a single wager in the Commonwealth of Massachusetts.

To be sure, applying for a casino license might *relate* to gambling, insofar as a party that receives a casino license is thereby legally permitted to own and operate a casino.  But this is inconsequential for purposes of § 1961(1)(A), which by its plain language requires that the unlawful "act or threat *involv[e]* . . . gambling."  The district court's decision in *United States v. Genova*, 187 F. Supp. 2d 1015 (N.D. Ill. 2002), is instructive in this regard.  In *Genova*, the government proved at trial that the defendant, the mayor of a small town in Illinois, filed a false statement of economic interest in violation of Illinois law.  *Id.* at 1018.  The government's theory was that, because the defendant filed the false statement "with the intent of concealing" an underlying felony "bribery scheme," the filing of the false statement itself constituted an act involving bribery "for purposes of [§ 1961(1)(A)]."  *Id.* at 1021 (citations omitted).  The district court disagreed.  While recognizing "that Congress intended for RICO to be read broadly," the court distinguished "acts of bribery" from "acts committed to conceal bribery," holding that only the former fits within § 1961(1)(A).  *Id.*  In other words, even though the defendant's filing of a false statement had some logical *relationship* to prior acts of bribery, this was not sufficient to

make it a RICO predicate.[8]   *Id.*   Consistent with *Genova*'s logic, Sterling's allegation that Defendants lied to the MGC, in violation of M.G.L. 23K, § 38, does not describe a state law felony "involving . . . gambling," regardless of the fact that the alleged lies pertained to a casino license application.[9]

### B.   Defendants' Alleged Deception of the MGC Does Not Constitute a Mail or Wire Fraud, Even If It Caused Sterling's Partner Mohegan Sun to Lose Out on a Fair Opportunity to Win the Lucrative Region A Casino License.

Paragraph 155(b) of the amended complaint essentially repeats paragraph 155(a)'s allegation that FBT, Wynn Resorts, and Wynn Resorts executives conspired to use false, misleading, and omissive statements to deceive the MGC into issuing Wynn Resorts the Region A casino license.  Again relying on formulaic labels and bare legal conclusions, Sterling says this conduct constituted a violation of the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343, because Defendants knew it would "deprive [Sterling] of . . . the money, property, and other benefits of the [Region A casino] license," which Sterling surmises its partner Mohegan Sun would have won but for Defendants' alleged corruption of the competition for the license.  Sterling's mail and wire fraud allegations are pure gobbledygook—a legally defective effort to evade the Supreme Court's decision in *Cleveland v. United States*, 531 U.S. 12 (2000), and the First Circuit's recent decision in *United States v. Berroa*, 856 F.3d 141 (1st Cir. 2017).

---

[8] On appeal, the Seventh Circuit affirmed the district court's ruling on the further ground that the prior conduct that the false statement was intended to conceal did not meet the definition of bribery.  *United States v. Genova*, 333 F.3d 750, 758 (7th Cir. 2003).

[9] It is also inconsequential that the Massachusetts law that paragraph 155(a) alleges that Defendants violated is called the Massachusetts Gaming Act.  Whether conduct "falls within the category of gambling offenses" turns on the nature of the conduct itself, not the "segment of the [state's] Code" that the conduct violates. *Mark*, 460 F. App'x at 107; *see also United States v. Garner*, 837 F.2d 1404 (7th Cir. 1987) (holding that the "labels placed on a state statute do not determine whether" a violation of it is a RICO predicate).

In *Cleveland*, the Supreme Court held that a party does not commit mail or wire fraud by using false statements to obtain a gaming license from a state gaming regulator, because a state-issued gaming license does "not rank as 'property,' for purposes of [the mail and wire fraud statutes], in the hand of the official licensor." *See* 531 U.S. at 15.  In *Berroa*, the First Circuit held that, under *Cleveland*, a scheme to deceive a state medical board into issuing a medical license is not a mail or wire fraud either—even if the defendant's goal was to use the "fraudulent licenses to obtain payment for medical services."  856 F.3d at 149.  The First Circuit reasoned that it would impermissibly "circumvent *Cleveland*" to allow a mail or wire fraud prosecution to go forward simply because the defendant's goal was to monetize the state-issued license that he had used false statements to obtain.  *Id.*  Almost every commercial license, the First Circuit explained, is "sought and obtained in an effort to realize some monetary profit."  *Id.* at 150.  Thus, if *Cleveland* could be evaded through an expedient allegation that the defendant's goal was to make money from the fraudulently obtained license, "virtually any false statement in an application for a [commercial] license could constitute a federal crime."  *Id.*  The First Circuit held that "[s]uch a broad reading of the [mail and wire fraud] statute[s] would impermissibly infringe on the states' 'distinctively sovereign authority to impose criminal penalties for violations of' licensing schemes, 'including making false statements in a license application.'"  *Id.* at 150 (quoting *Cleveland*, 531 U.S. at 23).

Sterling knows that, under *Cleveland* and *Berroa*, its wire fraud theory cannot be predicated on Defendants' alleged use of false statements to obtain the Region A casino license from the MGC.  So Sterling tries to end run *Cleveland* and *Berroa* by alleging that, because it caused Mohegan Sun to lose out on the Region A license, Defendants' deception of the MGC caused Sterling to suffer consequential economic damages.  Sterling's mail and wire fraud theory goes bust, however, because suffering consequential economic damages as a result of the defendant's

corruption of a competitive bidding process is not the same thing as being *defrauded out of money or property*, and only the latter implicates the mail and wire fraud statutes. Defendants did not steal the Region A casino license out of Mohegan Sun's or Sterling's pocket; to the contrary, the Region A casino license was up for grabs. Thus, assuming all of Sterling's factual allegations are true, Defendants' alleged deception of the MGC deprived Mohegan Sun and Sterling of only one thing—a fair competition for the Region A casino license. Defendants' alleged deception of the MGC might have been unethical, and even criminal under Massachusetts state law. But even if it resulted in consequential damages to Mohegan Sun and Sterling, it did not constitute a violation of the mail or wire fraud statutes.[10]

The Second Circuit's decision in *United States v. Henry*, 29 F.3d 112 (2d Cir. 1994), is dead on point. In *Henry*, the defendant was indicted for wire fraud, based on the allegation that he had spearheaded the "corruption of the [competitive bidding] process by which banks were chosen to be the depositories of the [Delaware River Joint Toll Bridge] Commission's toll bridge revenues." *Id.* at 113. Specifically, the government alleged that the defendant rigged the Commission's bidding process to cause the Commission to give all of the toll bridge deposits to "Bank A." *Id.* The government's wire fraud charge alleged that the defendant's conduct "'defrauded the other banks bidding for these public funds of money and property, in that [the conduct] denied these other bidding banks a fair and honest opportunity to receive this public money' or 'a fair and honest opportunity to bid on' it." *Id.* (quoting indictment). The district court dismissed the wire fraud charges for failure to state an offense, and the Second Circuit affirmed. "Even in a fair process," the Second Circuit explained, "Bank A might still have won the deposits.

---

[10] To be sure, Sterling's amended complaint does not plausibly allege that Mohegan Sun would have won the Region A license competition but for Defendants' alleged deception of the MGC. But the Court can dismiss the amended complaint without needing to address the plausibility of Sterling's causation allegations.

The issue, therefore, is whether the competing banks' interest in having a fair opportunity to bid for something that would become their property if and when it were received is *itself property*. We conclude that it is not." *Id.* at 115 (emphasis added). The Second Circuit deemed it "irrelevant" that a fair bidding process was "valuable" to the other banks, as well as that the bid-rigging resulted in Bank A reaping "$34,000,000 in deposits" that might have gone to its competitor banks had the bidding process been fair. *Id.* at 115-116. Because, the Second Circuit explained, the economic "benefits Bank A and [the defendant] received were not [obtained] *from* the competing banks," the wire fraud charges had to be dismissed for failure to an offense. *Id.* (emphasis added).

*Henry*'s legal analysis distinguishing deprivations of intangible rights from deprivations of "money or property" is impeccable; this Court should adopt it wholesale, and it is fatal to Sterling's mail and wire fraud theory. Defendants' alleged deception of the MGC in order to give Wynn Resorts an unfair edge in the Region A casino license competition is the precise analogue to the *Henry* defendant's corruption of the Commission's bidding process in order to give Bank A an unfair advantage in the competition for the Commission's told bridge deposits. As in *Henry*, Sterling has alleged merely that it suffered consequential economic damages from the deprivation of an intangible right that is not cognizable under the mail or wire fraud statutes. That is not sufficient to state a mail or wire fraud offense.

### C. Defendants' Alleged Financial Arrangement With Everett Mayor Carlo DeMaria Does Not State an Honest Services Fraud Offense, Let Alone One That Provides Sterling Standing to Pursue a Civil RICO Claim.

Paragraph 155(c) of the amended complaint alleges that Defendants engaged in a "scheme to fraudulently deprive the public of its intangible right to honest service by causing Mayor DeMaria to abuse the powers of his public office for the benefit of [Defendants] in return for

payment . . . funneled to DeMaria via FBT and [James] Russo." There are myriad fatal defects with this alleged RICO predicate.

First, while paragraph 60 of the amended complaint alleges that Mayor DeMaria urged FBT to hire Russo as a consultant as a "way of ensuring" that Mayor DeMaria would "get his own personal cut of [FBT's] proceeds from an ultimate sale" of the Everett Parcel, the complaint comes nowhere close to pleading this supposed deal with the particularity that Federal Rule of Civil Procedure 9(b) demands.[11] Rule 9(b) requires a plaintiff to "set forth the 'who, what, when, where, and how' of the alleged fraud." *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp. 2d 39, 46 (D. Mass. 2001) (Saris, J.). The amended complaint does not specify, either in paragraph 60 or anywhere else, (i) which FBT member Mayor DeMaria discussed this idea with; (ii) whether FBT ever actually agreed to the idea and, if so, when; or (iii) whether any proceeds from FBT's sale of the Everett Parcel were ever actually delivered to Mayor DeMaria. This pleading failure alone is fatal to paragraph 155(c)'s alleged honest services fraud predicate.

Second, Sterling's amended complaint fails to plead, with particularity or otherwise, a quid pro quo involving Mayor DeMaria that would constitute honest services fraud. To allege an honest services fraud, it is not sufficient to plead "an unlawful gratuity." *United States v. Sawyer*, 239 F.3d 31, 41 (1st Cir. 2001). This is because the giving of a gratuity, even if a violation of state law, "does not necessary entail any improper motive to influence, or otherwise affect, the official *duties* of the recipient." *United States v. Sawyer*, 85 F.3d 713, 728 (1st Cir. 1996) (emphasis in

---

[11] Where a civil RICO complaint alleges fraud-based racketeering predicates, the "allegations must meet the heightened pleading standard of Rule 9(b)." *Langan v. Smith*, 312 F. Supp. 201, 207 (D. Mass. 2018) (Saris, J.). If the plaintiff fails to satisfy Rule 9(b), the predicate at issue cannot be considered in determining whether the complaint pleads a "pattern" of racketeering activity. *See, e.g.*, *First Capital Asset Mgmt. v. Brickelbush, Inc.*, 219 F. Supp. 2d 576 (S.D.N.Y. 2002) (Kaplan, J.) (holding that a RICO predicate that fails to "meet Rule 9(b)'s requirement . . . cannot be considered in evaluating [the defendant's alleged] pattern of racketeering activity").

original).  Sterling's amended complaint implies that Defendants arranged to deliver a portion of the Everett Parcel sales proceeds to Mayor DeMaria, but this merely describes a gratuity, not a quid pro quo.  Sterling's amended complaint does allege that, in June 2016, the Everett Building Department issued a "Notice of Violations" to an auto body shop that was leasing space in a building that Wynn Resorts wanted to buy free and clear of tenants.  *See* Am. Compl., ¶¶ 108-109. But it does not allege, let alone with the particularity that Rule 9(b) requires, that Mayor DeMaria arranged for the Building Department to issue an illegitimate violations notice in order to hold up his end of an illegal kickback deal he had with Defendants.  Instead, the amended complaint merely states, in wholly conclusory and general fashion, that the Building Department was "under the sway of Mayor DeMaria."  *Id.*, ¶ 108.

Third, Sterling's amended complaint fails to plead facts that would logically connect the alleged honest services fraud scheme to the three other RICO predicates that the amended complaint alleges.  To form a "pattern" of racketeering activity, alleged acts must be "connected to each other in some logical manner so as to effect an unlawful end . . . ."  *United States v. Starnes*, 644 F.2d 673, 678 (7th Cir. 1981).  The complaint does not allege that Defendants arranged a kickback to Mayor DeMaria so that he would influence the outcome of the Region A casino license competition.[12]  Construed most favorably to Sterling, the amended complaint alleges merely that Defendants paid a kickback to Mayor DeMaria in exchange for him helping Wynn Resorts with a local real estate dispute in 2016—something that is completely disconnected from the alleged

---

[12] It is notable that even Sterling, which clearly has no compunction about pursuing frivolous and vexatious claims, recognizes that it would be beyond the pale to allege that Mayor DeMaria had the capacity to influence the MGC's final vote on which applicant would be awarded the Region A casino license.

scheme to deceive the MGC into granting Wynn Resorts the casino license in 2014.[13]  The honest services fraud allegation thus offers Sterling no assistance with establishing a "pattern" of racketeering activity.

Fourth, insofar as Sterling's complaint does not allege that Mayor DeMaria, in exchange for a kickback, took any official action that influenced the outcome of the MGC's licensing decision, Sterling has not alleged an honest services fraud scheme with respect to which it has statutory standing to sue.  To have standing to bring a civil RICO claim, the plaintiff must show that it was "injured in his business or property by reason of" the alleged violation.  18 U.S.C. § 1964(c).  Even assuming Defendants paid Mayor DeMaria a kickback in exchange for favorable action from the Everett Building Department in 2016, Sterling has not alleged that the scheme caused Sterling any injury to its business.  The alleged honest services fraud scheme must therefore be disregarded in assessing whether the amended complaint alleges a "pattern" of racketeering. *See Gov't of Berm. v. Lahey Clinic, Inc.*, No. 17-cv-10242, 2018 U.S. Dist. LEXIS 38696, at *19-20 (D. Mass. Mar. 8, 2018) (Talwani, J.) (holding that a civil RICO claim cannot be premised on an alleged honest services fraud that did not cause the plaintiff "competitive injury").

### D.    Defendants' Alleged Deception of the MGC Does Not Constitute a Violation of the Federal Travel Act, Because That Conduct Does Not "Involve Gambling."

Paragraph 155(d) of the amended complaint alleges that Defendants' alleged deception of the MGC violated the Travel Act, 18 U.S.C. § 1952, because Wynn Resorts executives travelled between Nevada, California, and Massachusetts to accomplish it.  The alleged scheme to deceive the MGC, however, does not constitute a violation of the Travel Act, because it does not qualify as "unlawful activity" as defined by § 1952(b).

---

[13] Sterling alleges that the MGC's licensing decision might have been different had it known of Defendants' improper relationship with Mayor DeMaria.  But that is different from an allegation that the *unlawful purpose* of the alleged kickback scheme was to influence the MGC's licensing decision.

Section 1952(b) defines "unlawful activity," in relevant part, as "any business enterprise involving gambling . . . offenses in violation of the laws of the State in which they are committed or of the United States[.]"  18 U.S.C. § 1952(b).  For an alleged state law offense to satisfy this definition, the offense must involve conduct "that can be described generically as gambling." *United States v. Barbeito*, No. 2:09-cr-00222, 2010 U.S. Dist. LEXIS 55688, at *118 (W.D. Va. June 3, 2010) (citing *United States v. Nardello*, 393 U.S. 286, 295-296 (1969)).  Sterling's amended complaint does not allege that FBT, Wynn Resorts, or Wynn Resorts executives engaged in "gambling" in violation of Massachusetts state law.  Instead, the amended complaint alleges only that Defendants deceived the MGC in order to obtain the Region A casino license.  Once again, while lying to the MGC may have some logical relationship to gambling, the conduct is not *itself* gambling.  For that reason, the conduct does not meet § 1952(b)'s definition of "unlawful activity."

### E.    The Amended Complaint Does Not Allege a "Pattern" of Racketeering Activity.

To plead a "pattern" sufficient to state a RICO claim, a complaint must allege "at least two acts of racketeering activity."  18 U.S.C. § 1964(d).  The number "two," however, is the *minimum* required to plead a pattern.  In every case, the plaintiff's ultimate burden is to allege facts sufficient to satisfy the "'continuity plus relationship'" standard.  *Efron v. Embassy Suites (P.R.), Inc.*, 223 F.3d 12, 15 (1st Cir. 2000).

Under well established First Circuit law, a plaintiff fails to adequately plead the requisite "continuity" where its complaint alleges "multiple related acts of deception" that were "aimed at [a] single [finite] goal" and caused economic injury to a single or closed set of a few victims. *Efron*, 223 F.3d at 18-22 (collecting cases).  This is true even if the alleged scheme unfolds over a period of multiple years.  *Id.* at 21 (holding that a 21-month fraud scheme did not meet the

"continuity" requirement because the various fraudulent acts "comprise[d] a single effort, over a finite period of time, to wrest control of a particular partnership from a limited number of its partners"). "The core inquiry is 'whether the specific fact pattern of the case . . . suggests the 'kind of broad or ongoing criminal behavior at which the RICO statute [is] aimed.'" *Langan*, 312 F. Supp. 3d at 209 (Saris, J.) (quoting *Home Orthopedics Corp. v. Rodriguez*, 781 F.3d 521, 529 (1st Cir. 2015)).

Here, paragraph 155(a), (b), and (d) of the amended complaint describe a series of related deceptive acts, taking place over approximately 18 months, directed toward a single recipient (the MGC) for a single finite purpose (to win the Region A casino license). Sterling alleges that this scheme to deceive the MGC caused cognizable economic injury to only two entities—Sterling and its partner Mohegan Sun. The First Circuit's decision in *Efron* is "lethal" to Sterling's theory that the scheme alleged in paragraph 155(a), (b), and (d) of the amended complaint satisfies RICO's "pattern" requirement. *Divot Golf*, 2003 U.S. Dist. LEXIS 187, at *9 (dismissing plaintiff's civil RICO claims and imposing Rule 11 sanctions where "the picture sketched by the Amended Complaint does not adumbrate the long-term, complex, multi-victim criminal conduct with which RICO [is] concerned"). And Sterling cannot evade *Efron*'s sting by pointing to paragraph 155(c) of the amended complaint, because that paragraph (i) does not allege an honest services fraud scheme with the requisite particularity; (ii) alleges a scheme that is wholly disconnected from, and thus cannot form a "pattern" with, the scheme to deceive the MGC alleged in paragraphs 155(a), (b), and (d); and (iii) describes a scheme that is not even alleged to have caused any injury to Sterling's business or property. *See supra* at 12-15.

**II.      Sterling's Chapter 93A Claim Against FBT Should Be Dismissed for Lack of Subject Matter Jurisdiction.**

FBT and Sterling are both Massachusetts residents.  Thus, the Court does not have diversity jurisdiction over Sterling's sole state law claim against FBT—unfair business practices in violation of M.G.L. c. 93A, § 11 (Fourth Claim for Relief).  The only basis for federal jurisdiction over that state law claim is supplemental jurisdiction under 28 U.S.C. § 1367.  The Supreme Court has made clear that federal district courts should decline to exercise supplemental jurisdiction over state law claims where the complaint's federal claims are "completely devoid of merit[,]"  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (citation omitted); *Rodriguez v. Doral Mortg. Corp.*, 57 F.3d 1168, 1177 (1st Cir. 1995).  Where federal claims are disposed of early in the proceedings, dismissal of pendent state claims is all but mandatory.  *See Gibbs*, 383 U.S. at 726 ("[I]f the federal claims are dismissed before trial, . . . the state claims should be dismissed as well."); *Martinez v. Colon*, 54 F.3d 980, 990 (1st Cir. 1995) (affirming the dismissal without prejudice of pendent claims when the district court determined "far in advance of trial that no legitimate federal question existed" (citation omitted)).  Thus, dismissal of the RICO claims warrants the concomitant dismissal of the Chapter 93A claim.

**III.     Sterling's Chapter 93A Claim Fails on the Merits Because Sterling Has Not Alleged a "Commercial Transaction" With Either FBT or Wynn Resorts.**

Though it may dismiss Sterling's Chapter 93A against FBT for lack of subject matter jurisdiction, FBT would not object to the Court killing the claim on the merits, so that Sterling does not have an opportunity to saddle a Massachusetts state court judge with this type of frivolous litigation.

To state a claim under Chapter 93A, § 11, there must have been "a commercial transaction between a person engaged in trade or commerce with another person engaged in trade or

commerce." *Szalla v. Locke*, 421 Mass. 448, 451 (1995) (emphasis added); *see also Milliken & Co. v. Duro Textiles, LLC*, 451 Mass. 547, 563 (2008) ("As a threshold matter, analysis of the applicability of G.L. c. 93A, § 11, requires a dual inquiry whether there was a commercial transaction between a person engaged in trade or commerce and another person engaged in trade or commerce, such that they were acting in a 'business context.'"). The decision in *Mastoran Restaurants v. Commonwealth of Massachusetts Division of Capital Assets Management*, No. 001998BLS, 2001 WL 1811963 (Mass. Super. Ct. Dec. 31, 2001) (van Gestel, J.), is instructive here. In that case, Judge van Gestel dismissed a Chapter 93A, § 11 claim that the loser of a competitive bidding process brought against the winning bidder. Judge van Gestel held that two parties are not "involved in a commercial transaction with each other" where they are merely "bidding for contracts" against one another. *Id.* at *5 (citation omitted).

*Mastoran* is fatal to Sterling's Chapter 93A claim against FBT. Sterling and FBT had no commercial relationship whatsoever—at most, they each had a rooting interest in one of the competitors for the Region A casino license (FBT for Wynn Resorts, and Sterling for Mohegan Sun).[14] If, for purposes of Chapter 93A, there is not a sufficient commercial relationship even between the *actual competitors* in a bidding process, as *Mastoran* holds, surely there is not one between two parties that merely have differing rooting interests in the outcome of that competition.

To the extent Sterling's theory is that a commercial transaction is not required where the gravamen of the Chapter 93A claim is unfair competition, this Court should decline to accept it. As Judge Tauro observed, "the Supreme Judicial Court has stressed the existence of some

---

[14] Paragraph 171 alleges, in terms that are both confusing and conclusory, that Sterling and FBT were "competitors" because each wished for a casino to be developed on real estate that it owned. This makes no sense. If Sterling had been trying to woo Wynn Resorts into partnering on the Suffolks Downs project rather than the Everett Parcel, the analysis might be different. But that is not what happened here and, not surprisingly, not what the amended complaint alleges.

contractual or business relationship between the parties as a precursor to liability under Chapter 93A." *John Boyd Co. v. Boston Gas Co.*, 775 F. Supp. 435, 440 (D. Mass. 1991) (dismissing Chapter 93A claim brought by commercial landowner against predecessor-in-title who had allegedly contaminated parcel); *see also Joe Hand Promotions, Inc. v. Rajan*, No. 10-civ-40029, 2011 U.S. Dist. LEXIS 83311, at *7 (D. Mass. July 28, 2011) ("Plaintiff's Complaint states that both parties 'engaged in trade or commerce' but does not state that parties engaged in business practice together. Plaintiff's Ch. 93A claim fails for failing to state a claim." (quoting complaint; citation omitted)). This case is not one in which this Court should be looking to make new law.

## IV.    Sterling's RICO Claims and Its Chapter 93A Claim Against FBT Are Time-Barred.

As discussed above, Sterling's RICO claims and its Chapter 93A claim fail miserably on the merits. They are also foreclosed by the statute of limitations.

A civil RICO claim accrues, and the limitations period begins to run, as of the date the plaintiff knew or should have known of its injury, regardless of whether the plaintiff was aware that its injury was the result of a pattern of racketeering. *See Rotella v. Wood*, 528 U.S. 549, 554 (2000); *Skwira v. United States*, 344 F.3d 64, 75 (1st Cir. 2003) (holding that a civil RICO claim "does not accrue when the plaintiff learns of the conspiracy, but, rather, when he learns of his injury" (citation omitted)); *Lares Group, II v. Tobin*, 221 F.3d 41, 44 (1st Cir. 2000) (agreeing that "the law of this Circuit" is that "'discovery of the injury, not discovery of the other elements of a claim, is what starts the clock'" (quoting *Rotella*, 528 U.S. at 556)). A Chapter 93A claim accrues "when the plaintiff knew or should have known of the appreciable harm resulting from the defendant's [actions]." *Schwartz v. Travelers Indem. Co.*, 50 Mass. App. Ct. 672, 678 (2001); *see also Cambridge Plating Co., Inc. v. Napco, Inc.*, 991 F.2d 21, 25 (1st Cir. 1993) (holding that a Chapter 93A claim accrues when "a plaintiff discovers, or reasonably should have discovered, that

she may have been injured as a result of the defendant's conduct").  A civil RICO claim and Chapter 93A claim must be filed within four years of the accrual date.  *See Agency Holding Corp. v. Malley–Duff & Assocs., Inc.,* 483 U.S. 143, 156 (1987) (four-year limitations period for civil RICO claims); *Lambert v. Fleet Nat. Bank*, 449 Mass. 119, 126 (2007) (four-year limitations period for Chapter 93A claims).

Here, Sterling understood by no later than September 16, 2014—the date that the MGC publicly announced that it had voted to award the Region A casino license to Wynn Resorts—that the Mohegan Sun application for the Region A casino license had lost.[15]  The MGC's determination to award the Region A license to Wynn Resorts rather than Mohegan Sun is what Sterling's amended complaint alleges to be the root event from which all its alleged consequential economic injuries have flowed.  Sterling thus had until September 16, 2018 to file its RICO and Chapter 93A claims against FBT.  Sterling, however, filed its original complaint on September 17, 2018.  That Sterling only "missed the deadline 'by [one day]' is inconsequential—[its] claim is time-barred nevertheless."  *Halstrom v. Dube*, ___ Mass. ___, 2019 WL 639441, at *4 (Mass. 2019).

Sterling has attempted to plead around the obvious statute of limitations problems by loading up the amended complaint with extraneous allegations concerning Wynn Resorts's

---

[15] A year prior to the MGC's vote, its Investigations and Enforcement Bureau ("IEB") issued a public report alleging that FBT's members had made false statements to the MGC related to the Wynn Resorts casino license application.  *See* IEB Report, available at http://massgaming.com/wp-content/uploads/Commissioners-Packet-12-13-13-PART-TWO-UPDATE.pdf.  These are the allegations that form the core of Sterling's Chapter 93A claims against FBT.  Thus, Sterling cannot save its Chapter 93A claim from a time-bar by arguing that it was aware of its injury but not the FBT conduct that it alleged caused it.  The Court may consider the IEB's report in deciding this motion to dismiss because, among other reasons, it is a public record the authenticity of which Sterling cannot dispute.  *See, e.g., Watterson v. Page*, 987 F.2d 1, 4 (1st Cir. 1993).

dealings in Macau, Steve Wynn's alleged sexual misconduct, and FBT's supposed corrupt agreement with the Everett Mayor.  None of these additions, however, save Sterling's claims against FBT from being time barred—they do not, as a matter of law, move Sterling's injury for RICO purposes to a later point in time, nor are they part of the nucleus of facts on which Sterling bases its Chapter 93A claim against FBT.

## CONCLUSION

For the reasons set forth above, the Court should dismiss Sterling's amended complaint with prejudice.  FBT also hereby adopts the arguments made in the motions to dismiss that the other defendants in this action may file, to the extent not inconsistent with the arguments that FBT raises herein.  FBT hereby reserves the right to seek attorney's fees and sanctions under Federal Rule of Civil Procedure 11, Federal Rule of Civil Procedure 54(d)(2), and 28 U.S.C. § 1927.

DATED: March 5, 2019

Respectfully submitted,

/s/ Aaron M. Katz

Aaron M. Katz (BBO# 662457)
aaron.katz@ropesgray.com
Joshua S. Levy (BBO# 563017)
Joshua.Levy@ropesgray.com
Ropes & Gray LLP
800 Boylston Street
Boston, MA 02199
Telephone: (617) 951-7000

Christopher Weld, Jr.
cweld@toddweld.com (BBO# 522230)
Christian G. Kiely (BBO# 684308)
ckiely@toddweld.com
Todd & Weld LLP
One Federal Street, 27th Floor
Boston, MA 02110
(617) 720-2600

74612566_1

## **CERTIFICATE OF SERVICE**

  I, Aaron M. Katz, hereby certify that, on March 5, 2019, true and accurate copies of the foregoing were served on counsel for all parties through ECF.

          /s/ Aaron M. Katz
          Aaron M. Katz

74612566_1