# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

STERLING SUFFOLK RACECOURSE, LLC,

                        Plaintiff,

v.

WYNN RESORTS, LTD; WYNN MA, LLC;
STEPHEN WYNN; KIMMARIE SINATRA;
MATTHEW MADDOX; and FBT EVERETT
REALTY, LLC,

                        Defendants.

CIVIL ACTION
Case No. 1:18-cv-11963-PBS

## MEMORANDUM OF LAW IN SUPPORT OF WYNN RESORTS, LTD AND WYNN MA, LLC'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

**WYNN RESORTS, LTD and WYNN MA, LLC**

By their counsel,

/s/ *Peter A. Biagetti*
Peter A. Biagetti, BBO # 042310
Samuel M. Starr, BBO #477353
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
One Financial Center
Boston, MA 02111
Phone: 617.542.6000
Fax: 617.542.2241
PABiagetti@mintz.com
TStarr@mintz.com

Mark Holscher (*admitted pro hac vice*)
Kirkland & Ellis LLP
333 South Hope Street
Los Angeles, California 90071
Phone: 213-680-8190
Fax: 213-808-8097
Mark.holscher@kirkland.com

March 8, 2019

## SUMMARY OF THE ARGUMENT

Having chosen to wait over four years before filing in this forum, Sterling Suffolk Racecourse ("SSR") now resorts to RICO to impugn an exhaustive state-agency process which SSR has never even attempted to challenge via timely state-court review.  In September 2014, after undertaking years of scrutiny and requiring tailored disclosure, the Massachusetts Gaming Commission ("MGC") awarded Wynn MA, LLC the single license to operate a casino in Eastern Massachusetts.  Mohegan Sun, the losing applicant, promptly sought review of the MGC's selection process in the Massachusetts state courts.[1]  Unlike Mohegan Sun, SSR was *not* an applicant that lost out to Wynn MA; it was simply Mohegan Sun's would-be landlord.  And tellingly, SSR never has sought to join in Mohegan Sun's challenge to the MGC's selection process.  Instead, SSR now offers a First Amended Complaint ("FAC") that comes too late and still fails to overcome the several deficiencies identified by defendants in their motions to dismiss SSR's original pleading:

- First, SSR knew or should have known of its alleged injury by no later than December 2013, so its claims have not been asserted within the four-year statute of limitations.  *Infra* at pages 7-9.

- Second, the course of purported racketeering on which SSR relies— though peppered with malicious accusations of Wynn MA's alleged ties to "La Cosa Nostra" and concealment from regulators of its former CEO's allegedly "long and sordid history of inappropriate sexual conduct," FAC ¶s 1, 7, 10—had only a singular and short-lived goal, the obtaining of a Massachusetts gaming license, which alone cannot constitute an actionable pattern of continuing conduct in violation of RICO.  *Infra* at pages 9-14.

- Third, SSR's two substantive RICO claims, even as overhauled, fail to allege "enterprises" legally distinct from the "persons" who allegedly operated those enterprises through alleged acts of racketeering.  *Infra* at pages14-17.

---

[1]      Mohegan Sun's challenge remains pending. *Revere v. Massachusetts Gaming Commission*, 476 Mass. at 612-613; *City of Revere v. Mass Gaming Commission*, SU CV 2014-3253-BLS2, 2018 Mass. Super. Lexis 109 (Mass. Sup. Ct. July 12, 2018)

- Fourth, to meet its requirements of proximate cause and actionable injury, SSR substitutes sleight-of-hand for RICO substance. It misleadingly calls Mohegan Sun its "business partner," and reaches to claim that a competing casino "proposal was *essentially* made on behalf of both MSM [Mohegan Sun] and SSR." FAC ¶ 76, 78 (emphasis added). But as SSR elsewhere is forced to admit, *only* Mohegan Sun was the applicant competing with Wynn MA; SSR simply hoped to be Mohegan Sun's landlord if the MGC, in its discretion, ever chose to award a license to Mohegan Sun. FAC ¶ 76. Because SSR's speculative injury is several causal steps removed from any alleged fraud on the MGC, SSR has no standing to claim harm proximately caused by any RICO violation. *Infra* at pages 18-23.

- Fifth, SSR's conclusory conspiracy claim is betrayed by the specific facts alleged and well-settled law precluding claims of intra-corporate conspiracy. *Infra* at pages 23-24.

- And sixth, SSR runs afoul of the *Noerr-Pennington* doctrine because all of its claims arise out of protected petitioning of the MGC. *Infra* at pages 24-25.

These deficiencies are no accidents of inartful pleading. They remain despite having been spotlit by defendants' four prior motions to dismiss SSR's original complaint. In response, SSR has lengthened its narrative of purported facts by 59 paragraphs, and swapped out two RICO theories, under 18 U.S.C. § 1962(a) and (b), for a new but equally futile claim under § 1962(c). FAC at ¶s 158-163. None of these amendments, however, has answered any of defendants' substantive challenges. Instead, SSR implicitly has acknowledged the fatality of its pleading's flaws by seeking to divert this Court's attention away from them and toward a stale and scurrilous litany of accusations ranging from "hush monies" in Nevada to "organized-crime affiliations in Macau." FAC at ¶s 145, 161(c). As a matter of law, these salacious additions do not remedy SSR's deficiently alleged RICO "pattern," or its identity of purported "persons" and "enterprises," or its too-attenuated theory of RICO causation. Because the FAC's deficiencies remain incurable, and because SSR apparently timed its filing to unfairly infect the MGC's current inquiry regarding Wynn MA's suitability, SSR's strike suit should be dismissed swiftly

and with prejudice.  *See Ruiz v. Algeria*, 896 F.2d 645, 650 (1st Cir. 1990) ("The mere assertion of a RICO claim . . . has an almost inevitable stigmatizing effect on those named as defendants . . . [therefore,] courts should strive to flush out frivolous RICO allegations at an early stage of the litigation.").

### SUMMARY OF THE RICO ALLEGATIONS AND THE DOCUMENTS THEY REFERENCE

SSR's claims rest on the assumption that, "But for the Defendants' multiple acts of fraud and other misconduct, the MSM [Mohegan Sun's SSR] application would have prevailed in an honest competition."  FAC ¶ 142.  SSR's constituent allegations, however, ignore the two-phased and multi-faceted regulatory inquiry by which that "competition" was overseen, scrutinized and brought to informed resolution.  The Massachusetts Expanded Gaming Act, G.L. c. 23K (the "Gaming Act"), sets out the framework for legalized gambling in Massachusetts and establishes the MGC as the agency charged with developing regulations, licensure and oversight. The MGC is authorized to award one Category 1 license in each of three geographic regions statewide.  G.L. c. 23K § 2 and 19.  Parties applying for one of these licenses must complete a two-phase process.  First, each applicant must submit a Phase-I application which the MGC evaluates to determine whether the applicant is suitable for a license, G.L. c. 23K § 12.  The Phase-I application requires applicants to disclose, among other things, "ownership interests [in the proposed site] over the past 20 years," specifically including information about "all parties in interest to the gaming license, including affiliates and close associates . . ." so that the MGC can determine each party's "suitability."  G.L. c. 23K § 9(a)(15) and § 12(a)(6).  Second, each applicant thusly deemed "suitable" must submit a Phase-II application which the MGC evaluates *based on a separate array of project-centric factors*—such as "overview of [the] project,"

"finance," "economic development," "building and site design," and "mitigation"—to determine which applicant, *if any*, should get the license.  G.L. c. 23K § 15; 205 C.M.R. 119.03.

Wynn Resorts' wholly-owned subsidiary, Wynn MA, LLC, applied for the Category 1 gaming license by submitting its Phase-I application on January 14, 2013.[2/]  Pursuant to G.L. c. 23K § 9(15), Wynn MA was required to disclose, among other things, "the location of the proposed gaming establishment . . . and ownership interests over the past 20 years . . ."  With regard to that requirement, SSR alleges that Wynn MA's submissions "contained inadequate and false information about the ownership of FBT and thus the Everett Site."  FAC ¶ 95.  In finding that Wynn MA was suitable to proceed to Phase II of the application process, however, *the MGC specifically addressed those concerns* by requiring additional information "regarding potentially undisclosed ownership interests" in the site, and by emphasizing that, "once [Wynn MA] was made aware of [the concerns], it took immediate action to cure the situation."  Ex. 1 at 7.

---

[2/]        SSR refers to this application at FAC ¶s 18, 95.  Throughout the FAC, SSR alludes to or characterizes certain documents, including Wynn MA's Phase-I application (FAC ¶s  67, 88, 91, 140, 146, 155), the MGC's suitability decision (FAC ¶s 110, 111, 134), the IEB's report on Wynn MA's suitability (FAC ¶s 123 and 132), the MGC's Phase-II decision to award the license (FAC ¶s 6, 139, 140), the IEB's report on SSR's and Caesar's suitability (FAC ¶s 74-75), the MGC's suitability decision regarding SSR (FAC ¶s 75, 141), and Mohegan Sun's Phase-II application identifying SSR as its prospective landlord (FAC ¶s 134, 142, 155, 156, 162, 168, 173, 177).  At the motion-to-dismiss stage, this Court may consider all facts alleged and "(a) implications from documents attached to or fairly incorporated into the complaint, (b) facts susceptible to judicial notice, and (c) concessions in plaintiff's response to the motion to dismiss."  *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55-56 (1st Cir. 2012) (internal quotations and citations omitted); *Jorge v. Rumsfeld*, 404 F.3d 556, 559 (1st Cir. 2005) ("the district court appropriately may consider the whole of a document integral to or explicitly relied upon in a complaint, even if that document is not annexed to the complaint").  This Court therefore may consider the entirety of these documents as they bear on the FAC's allegations.

        Furthermore, "[f]acts susceptible to judicial notice" include "matters of public record" such as agency findings.  *Giragosian v. Ryan*, 547 F.3d 59, 66 (1st Cir. 2008); *In re Vertex Pharms., Inc., Sec. Litig.*, 357 F.Supp.2d 343, 352 fn.4 (D. Mass. Feb. 18, 2005) (taking judicial notice "of reports of administrative bodies"); *Ratner v. Ovascience*, 123 F.Supp.3d 621, 632 fn. 12 (D.Mass Sept. 28, 2015) (allowing judicial notice of postings on the FDA website).  Because the MGC's "Phase I Suitability Decision, Wynn MA" is such a matter of public record, and because it too is "integral to [and] explicitly relied upon in [the] complaint," *see Jorge v. Rumsfeld*, 404 F.3d at 559, this Court may consider the document itself, attached hereto as Exhibit ("Ex.") 1, at p. 2.

SSR also claims that it competed with Wynn MA "by teaming at the last minute with MSM [Mohegan Sun]," FAC ¶ 75, but that suggestion is belied by the actual sequence of application documents incorporated by repeated reference in the FAC.  SSR did file a *Phase-I* application, proposing to partner with Caesars Entertainment Corporation ("Caesars") to build a casino on the site of the Suffolk Downs racecourse. [3/]  SSR concedes, however, that during the suitability investigation, the MGC's Investigations and Enforcement Bureau ("IEB") stated that it would not recommend that the MGC find Caesars a suitable applicant.  *Id*.  Caesars therefore withdrew as SSR's partner, forcing SSR to either find a new casino operator with which to "team" or withdraw entirely from the process.  *Id*. At pp. 5-6.  SSR then chose *not* to advance its application into *Phase II*.[4/]  Instead, it approached another successful Phase-I applicant, Mohegan Sun, to become Mohegan Sun's landlord if Mohegan Sun prevailed during Phase II. [5/] Significantly, in its application, Mohegan Sun specified that it alone was the Phase-II applicant and that, only if several conditions came to pass, SSR would become its landlord.[6/]  At no time, however, did Mohegan Sun list SSR among its affiliates, prospective investors or funding sources in its application to the MGC.[7/]

Weighing a range of statutorily prescribed factors, (which the FAC itself summarizes at ¶35) the MGC considered Wynn MA's and Mohegan Sun's Phase-II applications and chose Wynn MA's on September 16, 2014.  Ex. 3 at 34; FAC ¶s 120, 139.  Mohegan Sun and others

---

[3/]     MGC's Phase I Suitability Decision for SSR, attached hereto as Ex. 2, at pp. 1, 3-4.
[4/]     MGC's Determination of Issuance of a License to Operate a Category 1 Gaming Establishment in Region A at 1, attached hereto as Ex. 3, (listing only Mohegan Sun and Wynn Resorts as the applicants for a license at Phase 2). An excerpt of the document is attached. If it would aid the Court, Wynn Resorts can provide the supporting exhibits, which are in excess of 100 pages and have not been included.
[5/]     Ex. 3 at 1 and 32; *See also* "Binding Agreement for a Definitive Ground Lease in Revere, Massachusetts," excerpts attached hereto at Ex. 4 (listing SSR as the landlord and Mohegan Sun as the tenant).
[6/]     Mohegan Sun's "RFA-2 Application for a Category 1 Gaming License," attached hereto as Ex. 5, at 18, 35.
[7/]     *See* the IEB's "Report of Suitability of Applicant Entities and Individual Qualifiers" for Mohegan Sun, with the accompanying letter to the MGC, excerpt attached hereto as Exhibit 6, at p.2-3 (listing all of Mohegan Sun's qualifying entities and not including SSR).

promptly challenged several aspects of the selection process by filing suit in Massachusetts state court.[8/] SSR did not seek such review, nor has it ever attempted to join in Mohegan Sun's pending challenge, but it now claims that the MGC's decision was "fraudulently induce[d]" by, among other things, Wynn Resorts' and its executives' alleged concealment of "their association with [defendant] FBT and its criminal owners" and "the payment . . . of hush monies." *See e.g.*, FAC ¶s 120, 145, 146.

On amendment, SSR has appended to this fraud claim equally inflammatory—and legally irrelevant—allegations that:

- The prospective casino site was environmentally "toxic."  FAC ¶ 57.

- MGC Commissioner Crosby had improper ex parte contacts with individuals from groups to which he wanted to award the Region A license.  FAC ¶s 8, 88, 123, 132.

- An owner of defendant FBT and Commissioner Crosby had a personal relationship which led Crosby to improperly favor Wynn MA's application.  FAC ¶s 63-72.

- Stephen Wynn committed acts of sexual misconduct from 2005 through 2016, which certain senior employees at Wynn Resorts "failed to appropriately investigate."  FAC ¶ 36.

- Wynn Resorts paid Nam Van Development Company—a corporation that employed two Chinese politicians—for the right to build an expansion of the Wynn Macau Casino on its land, FAC ¶s 41-42; paid Tien Chiao Entertainment and Investment Company Limited—another corporation allegedly run by individuals who were related to Chinese politicians—for the right to build a casino on its land, FAC ¶s 43-44; and allowed junket promoters with criminal affiliations to operate out of the Wynn Macau casino.  FAC ¶s 11, 48.

Notably, not one of these alleged acts are ever specified as predicate crimes in SSR's

RICO claims, but the defendants *are* alleged to have fraudulently *concealed* these past actions

---

[8/]     *Revere v. Massachusetts Gaming Commission*, 476 Mass. 591, 604 (2017).  The SJC remanded the case to the Superior Court to evaluate the merits of Mohegan Sun's certiorari petition. *Id.* at 612-613.  That case is ongoing. *See City of Revere*, 2018 Mass. Super. Lexis at *3.

from the MGC in violation of federal and state statutes which allegedly constitute RICO predicate acts. FAC ¶s 1, 154, 155(a), 161(b), (c) and (d). As the FAC now reads, the defendants' "pattern of racketeering activity" included "knowingly making false, misleading and/or omissive statements in connection with the Wynn/FBT license application," and making "false statements concerning and/or fraudulent concealment of" Mr. Wynn's "sexual predation" and the abovementioned "unsavory activities and organized crime affiliations in Macau," all to allow the prospective casino in Massachusetts to be licensed, built and operated "without that venture being endangered by exposure of their prior misconduct." FAC ¶s 154, 155(a) and 161(b) and (c).

## ARGUMENT

### A.   The Statute of Limitations Has Run.

First and foremost, SSR's RICO claims fail because SSR filed this action after the statute of limitations had run. A plaintiff must bring a RICO claim within four years of the date that he knew or should have known of his injury. *Matt v. HSBC Bank USA, NA*, No. 1:10-11621-PBS, 2011 U.S. Dist. Lexis 108621, *5 (D.Mass. Sept. 23, 2011) (citations omitted). If a plaintiff fails to do so, the court must dismiss his case. *See Dickey v. Kennedy*, 583 F.Supp.2d 183, 188 (D. Mass. Sept. 26, 2008).

Here, SSR's seminal allegation is that Wynn MA, Wynn Resorts and certain of its executives fraudulently concealed material facts from the MGC to induce "a favorable Phase I suitability decision to the Wynn Defendants (on December 27, 2013)." FAC ¶s 110, 134 and 155(a)(i). But significantly, SSR acknowledges that it knew about at least some of defendants' alleged fraud by December 14, 2012, when "the *Boston Business Journal* published an article noting that convicted felon Gary DeCicco appeared on early 2012 FBT corporate paperwork that was a matter of public record." FAC ¶ 86. By that time as well, SSR concedes that the alleged

ownership interest of any felon "widely understood to be associated with La Cosa Nostra" was already "open and notorious in the community as well as readily ascertainable from public records at the time the Wynn Defendants began negotiations to acquire the Everett Site."  FAC ¶s 57, 58; *see* FAC ¶ 112 ("the Boston Globe broke the story of Lightbody's previously-concealed interest in the Everett Site" on November 21, 2013); *see also* FAC ¶ 82.

Accepting all of these allegations as true, SSR knew or should have known that it had sustained injury caused by defendants' allegedly fraudulent submissions by the date the MGC acted in reliance on them, December 27, 2013.  Indeed, at a public hearing just two weeks earlier, the MGC had explored the central strands of those allegations in detail.[9/]  The four-year statute of limitations therefore ran on December 27, 2017 – more than nine months prior to SSR's filing of its complaint.  Moreover, even if this Court were to look beyond SSR's averment that it was injured at the time of the allegedly fraudulently procured "suitability" finding – in December 2013, FAC ¶134 – and assume instead that SSR's injury was not sustained until the MGC publicly voted to grant the license, that vote was on September *16*, 2014.  FAC at ¶ 139. SSR did not file its complaint until September 17, 2018, still one day beyond the four-year limitations period.

Well aware of this fatal flaw, SSR's amended pleading now claims that "[o]btaining the Gaming License . . . [was] merely the beginning of the next phase of the scheme, during which [Wynn MA] would be constructing their casino on the Everett Site."  FAC ¶150.  This

---

[9/]      At a December 13, 2013 hearing (transcript excerpt attached hereto as Exhibit 7), the MGC heard testimony from IEB Director Karen Wells.  Ms. Wells reported that the IEB investigation had revealed, among other evidence, "an attempt to conceal the involvement of at least one convicted felon . . . [E]vidence exists to suspect that Charles Lightbody, a convicted felon, may have retained an interest in the Everett property well after the applicant had been advised that he had been removed.  Also, Charles Lightbody may have a legal reversionary interest in the event Anthony Gattineri does not repay his promissory obligations."  Exhibit 7 at 13.  Ms. Wells also stated, "Dustin DeNunzio provided sworn testimony that he personally altered the dates on the August 2012 promissory note and memorandum of transfer forms provided by his attorney to reflect the earlier date so as to provide documentary support after he and other sellers had been interviewed by IEB investigators[.]"  Exhibit 7 at 14.

transparent attempt to plead around RICO's statute-of-limitations requirement also fails.  As this Court has recognized, "[T]he First Circuit has adopted 'the injury discovery rule' under which 'discovery of the injury, not discovery of the other elements of a claim, is what starts the clock.'" *Matt v. HSBC Bank USA, N.A.*, 2011 U.S. Dist. Lexis at \*7 (citations omitted); *see also Rodriguez v. Banco Cent.*, 917 F.2d 664, 666-667 (1st Cir. 1990) (RICO statute of limitations not tolled by alleged predicate acts occurring after plaintiff's injury was discoverable).  Here, SSR alleges that Wynn Resorts and certain of its executives concealed Mr. Wynn's alleged sexual misconduct so that they subsequently could pursue "construction and operation" of the casino "without that venture being endangered by exposure of their prior misconduct."  FAC ¶154. That nimble phrasing, however, does not alter the dispositive fact that SSR's injury *by reason of the allegedly fraudulent submissions as to site ownership alone* was known – or certainly knowable – by December 2013, or at the latest, by the MGC's final vote in September 2014.[10] SSR's RICO claims therefore should be dismissed because it failed to timely file this action.

### B.     The Single-Purpose Scheme Alleged Cannot Constitute an Actionable "Pattern of Racketeering Activity."

SSR begins its 65-page pleading with what emerges as a legally dispositive sentence: "This action is brought pursuant to [RICO] *arising from the Defendants' illegal corruption of the application process* for a Region A Gaming License (the 'Gaming License') overseen by the Massachusetts Gaming Commission (the 'Gaming Commission')."  FAC ¶1 (emphasis added). As such, all of SSR's RICO claims fail because they "have their origin in . . . a single transaction"—the now-completed competition for a casino license—which possessed neither the

---

[10]     *See Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 387 (7th Cir. 2010) (once alleged injury is discoverable, a RICO plaintiff "should not be entitled to an automatic extension of the statute of limitations by the length of the period of concealment by the defendants"); *Hodas v. Sherburne, Powers & Needham, P.C.*, 938 F.Supp. 60, 63 (D.Mass. 1996) (the fact that plaintiff knew of the injury and many of the acts of racketeering was enough to start the clock on the statute of limitations; it did not toll merely because the plaintiff was unaware of some of the acts).

continuity nor multiplicity of acts necessary to prove a "pattern of racketeering activity" actionable under RICO. *Home Orthopedics Corp. v. Rodriguez*, 781 F.3d 521, 530 (1st Cir. 2015).

RICO requires that such a "pattern" include "at least two acts of racketeering activity," which are "related" and possess some "continuity": "either . . . a closed period of repeated conduct [closed-ended continuity] or . . . past conduct that by its nature projects into the future with a threat of repetition [open-ended continuity]." *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 241 (1989). Here, SSR gratuitously alleges that Wynn Resorts and certain of its executives chose a site that was environmentally "toxic," "flouted applicable law" in Macau, and abided sexual misconduct in Nevada. FAC at ¶s 36, 41-44, 48, 57. Importantly, however, SSR's RICO claims specify *none* of these alleged wrongdoings as qualifying "acts of racketeering." FAC ¶s 155, 161, 167.[11] Instead, SSR avers that it was the *concealment* of this past misconduct during Phase I of the application process – allegedly accomplished through four false submissions made within less than a year – which constitutes defendants' acts of racketeering.[12] As SSR succinctly notes, "It was only because of these acts . . . that the Wynn Defendants were able to acquire the Gaming License." FAC ¶9. By SSR's own terms, then, that

---

[11] Nor could those acts be part of a sufficiently "related" pattern. The activity allegedly concealed from the MGC—such as the corruption of government officials in Macau from 2003 through 2005 and Mr. Wynn's alleged sexual misconduct in Nevada—is not sufficiently related to the obtaining of the Massachusetts gaming license to constitute part of SSR's alleged "pattern of racketeering activity." *See Ahmed v. Rosenblatt*, 118 F.3d 886, 889 (1st Cir. 1997) ("the predicate acts must have the same or similar purposes, participants, victims, or methods, or otherwise be interrelated by distinguishing characteristics and not be isolated events."); *Laker v. Fried*, 854 F.Supp. 923, 929-930 (D.Mass. June 10, 1994); *see also Apparel Art Int'l v. Jacobson*, 967 F.2d 720, 724 (1st Cir. 1992) (claim that the defendant had fraudulently conveyed property to other entities to avoid its seizure in a lawsuit was *not related* to the proffered predicate acts of fraud that were undertaken to obtain a government contract).

[12] Specifically, the affirmative acts of concealment alleged are: (1) Wynn MA's statements in its Phase-I suitability application, submitted in January 2013, FAC ¶s 91, 95; (2) Ms. Sinatra's and Mr. Maddox's statements in an interview with the MGC in July 2013 that they were unaware of alleged felons' involvement with FBT, FAC ¶s 99-100, 107; (3) Wynn Resort's claims to have "cured" the issue of involvement of convicted felons as "sold" to the MGC at the December 2013 public hearing, FAC ¶s110-111; and (4) the alleged presentation in December 2013 of the certificates of the owners of FBT stating that no one else shared their ownership interest in FBT. FAC ¶120.

short-lived scheme had only a single, narrow and now-accomplished goal.  It therefore possesses neither open- nor closed-ended continuity.

Open-ended continuity consists of "racketeering acts [that] . . . include a specific threat of repetition extending indefinitely into the future . . . [or that are] part of an ongoing entity's regular way of doing business." *H.J.*, 492 U.S. at 242.  To allege it, a plaintiff must show "a realistic prospect of continuity over an open-ended period yet to come." *Home Orthopedics*, 781 F.3d at 531.  Again and again, however, SSR concedes that defendants' alleged acts of racketeering were "*all aimed* at unfairly obtaining the Region A casino license for the Wynn/FBT group to operate at the Everett Site at the expense of, and to the damage of, SSR[.]" FAC ¶ 172 (emphasis added); *see also* ¶s 1, 6, 9, 18, 155 and 161.  In alleged reliance on those acts, the MGC awarded the single gaming license available for Eastern Massachusetts to Wynn MA in September 2014.  There are no more gaming licenses needed by Wynn MA, nor any to be awarded, in that region.  With its professed goal therefore accomplished, there is no prospect of the scheme as alleged continuing into the future, so SSR cannot plausibly allege open-ended continuity.

Closed-ended continuity in turn requires "a series of related predicates extending over a substantial period of time." *H.J.*, 492 U.S. at 242, 250.  As the First Circuit has made clear, "a single narrow scheme to defraud a single victim" does not possess closed-ended continuity. *Home Orthopedics*, 781 F.3d at 529-530 (no closed-ended continuity found where "the defendants engaged in unlawful conduct for the purpose of accomplishing a singular, narrow goal—to help [the defendant] collect from [the plaintiff] the consulting fees he believed he was owed").  Even where a defendant has engaged in "several instances of criminal behavior," closed-ended continuity cannot be established if "the[ ] events all took place over a comparatively short period of time . . . and, taken together, they comprise a *single effort to obtain*

*(and to keep) one . . . contract.*"  *Apparel Art Int'l v. Jacobson*, 967 F.2d 720, 723 (1st Cir. 1992) (emphasis added).  Similarly, "multiple related acts of deception" committed over almost two years but which "comprise[d] a single effort, over a finite period of time, to wrest control of a particular partnership" do not establish closed-ended continuity.  *Efron v. Embassy Suites (P.R.), Inc.*, 223 F.3d 12, 18-19 (1st Cir. 2000).

In two particularly apt cases, this Court has engaged in the required closed-ended-continuity inquiry and emphasized facets that underscore the deficiencies of SSR's purported "pattern."  In *Laker v. Freid*, this Court found an actionable "pattern," but only because plaintiff had alleged "40 predicate acts" perpetrated in "9 fraudulent securities transactions" over 37 months, all "sufficiently spaced apart and distinctive (i.e., different amounts of money, different loan participation terms) so as not to constitute a single criminal episode."  854 F. Supp. at 929-930.  By contrast, in *Bowdoin Construction Corp.*, this Court dismissed a RICO claim premised on 103 acts of mail and wire fraud perpetrated by nine defendants over almost two years.  869 F.Supp. at 1010.  Though the Court recognized that plaintiff had claimed "2 distinct injuries" suffered in defendants' "various phases of loan restructuring," and that defendants allegedly had engaged in a "cover-up which lasted at least 18 months [and] was itself two-fold," it nonetheless rejected the proffered "pattern" because "[a]ll alleged acts revolve around the perpetration and concealment of an allegedly fraudulent arrangement for the renovation of the Sea Crest hotel."  *Id.* at 1011.

Here, SSR's allegations of predicate acts all arise out of conduct "from January 2013 through September 2014," and were directed toward only the preparation and wrongful acceptance by the MGC of "false, misleading, and/or omissive statements" to accomplish a single goal:  "to fraudulently deprive SSR of, and wrongfully obtain for [defendants], the money property, and other benefits of the license" awarded to Wynn MA.  FAC ¶s 155, 161.

Even indulged for the purposes of the instant motion, those allegations set forth no "distinct episodes" beyond procurement of that license, no direct victims beyond the MGC which granted that license, no "distinct injuries" beyond the alleged deprivation of a license to Mohegan Sun, no variety of cognizable predicate acts beyond four allegedly false statements or submissions, and no more than 21 months of duration.  For all of these flaws, and particularly when "special emphasis" properly is given by this Court to the "number and duration of the predicate acts," SSR's preferred pattern lacks closed-ended continuity.  *Bowdoin Construction Corp.*, 869 F.Supp. at 1010 (citing *Fleet*, 893 F.2d at 446).

On amendment, SSR attempts to repair these deficiencies by leavening its pleading with allegations of "flouting applicable law in the acquisition of land" in Macau in 2002, FAC ¶s 39-40, and of Mr. Wynn's "sexual misconduct toward Wynn Resorts employees" allegedly beginning in Nevada in 2005.  FAC ¶36.  This wholly unrelated purported conduct may add prurience, but it does not – and cannot as a matter of law – inflate SSR's single-goal scheme into an actionable "pattern" for two primary reasons.  First, as explained *supra*, neither the alleged "unsavory activities" in Macau nor Mr. Wynn's alleged misconduct in Nevada themselves are alleged to constitute predicate acts of racketeering.  Second, while the alleged concealment of these acts from the MGC through "false, misleading, and/or omissive statements in connection with the Wynn/FBT license application" is alleged as a predicate act, FAC ¶s 155 and 161, SSR concedes that that concealment was simply the final step in defendants' overarching scheme, namely, to allow the now-licensed casino to go forward "without that venture being endangered by exposure of their prior misconduct."  FAC ¶154.  As this Court and others have made clear, however, allegations that a RICO defendant subsequently "covered its tracks" by "concealment of an allegedly fraudulent arrangement," even where that "cover-up… lasted at least 18 months [and] was itself two-fold," do not breathe "continuity" into an alleged "pattern" whose animating

purpose was the forging of the original "arrangement" itself.[13/]  Because SSR's amendment similarly does no more than tack on defendants' alleged concealment to their "single effort to obtain (and to keep)" one gaming license, it too fails to state a continuing "pattern" of racketeering activity.  *Apparel Art*, 967 F.2d at 723.

**C.**    **SSR Fails to Allege an "Enterprise" Distinct from Any Defendant "Persons."**

Given the narrowness of its purported RICO "pattern," it is no surprise that both of SSR's §1962(c) claims also fail to allege RICO "enterprises" sufficiently distinct from the defendant "persons" who allegedly conducted them.  FAC ¶s 153-154; 159-160.

1.    The First Claim Fatally Alleges an "Association in Fact" Enterprise
Whose Membership is Identical to the Alleged "Persons."

SSR's First Claim patently fails to allege an association-in-fact "enterprise" distinct from the defendant "persons" who allegedly conducted that association's affairs, conceding that "For purposes of this First Claim for Relief, *all* Defendants are persons," and "*The Defendants combined* together as an association-in-fact enterprise[.]"  FAC ¶ 153-154 (emphasis added).  To preclude such inflation of any defendants' collaboration into a RICO "enterprise," however, the Supreme Court has emphasized that a plaintiff "must allege and prove the existence of two "distinct" entities: (1) a 'person'; and (2) an 'enterprise' that *is not simply the same person referred to by a different name*."  *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001). (emphasis added).  As such, "liability depends on showing that the defendants conducted or participated in the conduct of the enterprise's affairs*, not just their own affairs."*  *Id.* at 163 (emphasis in original).  Thus, as this Court has recognized in an analogous case, SSR's cast of

---

[13/]      *Bowdoin*, 869 F.Supp. at 1010-1011 (citing *Apparel Art*, 967 F.2d at 723 (rejecting "pattern" allegation which included "a cover-up" because it simply "comprise[d] a single effort to obtain (and to keep) one . . . contract")); *see Framingham Union Hosp., Inc. v. Travelers Ins. Co.*, 721 F.Supp. 1478, 1484 (D. Mass. 1989) (allegations of "continuous acts of concealment" through 1984 did not constitute a "pattern" where the predicate acts' "focus was a single bundle of insurance policies taken out in 1982").

"persons" – a mirror-image of its alleged "association in fact" – lacks requisite distinctiveness because, by that complete overlap, "SSR has 'alleged an 'enterprise' simply by 'naming the defendants.'" *Trustees of Boston Univ. v. ASM Communs., Inc.*, 33 F.Supp.2d 66, 73 (D.Mass. Dec. 4, 1998); *see also C.A. Westel de Venez. v. American Tel. & Tel. Co.*, 90 Civ 6665 (PKL), 1994 U.S. Dist. Lexis 14481, *21 (S.D.N.Y. Oct. 11, 1994) (finding no requisite distinction where the "enterprise is in reality *no more than the defendants themselves.*") (emphasis added).

The First Claim's person/enterprise identity inevitably results in a fatal lack of operational distinction as well.  To allege operation of a genuinely distinct association-in-fact, plaintiff must set forth the working of a "larger unit, *over and above* [the] separate structures and operations" of the "persons" themselves, such that those "persons" engage through that association in "coordinated activity in pursuit of a common objective." *Libertad v. Welch*, 53 F.3d 428, 442 (1st Cir. 1995) (emphasis added).  As a consequence, "Criminal actors who jointly engage in criminal conduct that amounts to a pattern of 'racketeering activity' do not automatically thereby constitute an association-in-fact RICO enterprise *simply by virtue of having engaged in the joint conduct*." *United States v. Cianci*, 378 F.3d 71, 82 (1st Cir. 2004) (emphasis added).  In its First Claim, however, SSR's "association-in-fact" fails to set out how the defendants joined together specifically to accomplish anything more than what those same defendants could do on their own.  SSR therefore fails to allege *any* sort of discrete structure or organization separate from the association necessary to effect defendants' allegedly joint conduct.

Indeed, the circularity of SSR's single averment in this regard highlights its fatal deficiency:

> This enterprise had a purpose, namely construction and operation
> of a casino at the Everett Site with corresponding financial benefits
> that could not be otherwise or lawfully obtained *[sic]* thus accruing

> to FBT as well as the Wynn Defendants, *[sic]* relationships among
> those associated with it.  FAC ¶ 154.

By such contortion, SSR essentially concedes that it cannot allege a free-standing or

independently ongoing relationship between the Wynn-related defendants on the one hand and

FBT on the other, beyond that of parties committed by contract to a sale of land and subsequent

provision of services.  FAC ¶7.  And while SSR has added inflammatory allegations about FBT's

unilateral contacts with the MGC, it has not specified any ongoing coordination between the

leaders of FBT and the named Wynn Resorts executives, resorting instead to the unsupported

inference that Messrs. DeNunzio, Lightbody and Gattineri were "acting for the benefit of

themselves and the Defendants."  FAC ¶ 94.  *United States v. Cianci*, 378 F.3d at 82.  In sum,

because the defendant "persons" do not, as a matter of law, constitute a distinct "association-in-

fact," SSR's First Claim fails.

2. The Second Claim's Alleged Enterprise is a Wholly-Owned and Wholly-Controlled Subsidiary of Wynn Resorts Which is Not Sufficiently Distinct to Sustain That Claim.

In its Second Claim, SSR has amended to alternatively allege that defendants Stephen

Wynn, Matthew Maddox, and Kimmarie Sinatra – all Wynn Resorts executives – joined with

Wynn Resorts to conduct the affairs of its wholly-owned subsidiary, Wynn MA.  FAC ¶s 159-

160, 19-21.  For a different but equally well-settled reason, that alternative also fails to meet

RICO's requirement of a person/enterprise distinction.

While a corporation generally can be either a RICO "person" or "enterprise," it cannot be

both at the same time. In any one case, a corporation must be *either* a "person" or the

"enterprise" which RICO "persons" conducted through their racketeering activity.  *Trustees of*

*Boston Univ. v. ASM Communs., Inc.*, 33 F.Supp.2d 66, 74 (D.Mass. Dec. 4, 1998) citing

*Rodriguez v. Banco Central,* 777 F. Supp. 1043, 1054 (D.P.R. 1991) (further quotations and

citations omitted).  As a result, a parent corporation may not be cast as a "person" operating its subsidiary or other corporate arm (such as a franchise or dealership) as a distinct "enterprise."[14] Finally, following similar rationale, a corporation and its officers cannot as "persons" operate a distinct "enterprise" consisting of the corporation itself.[15]

SSR attempts to evade all of these well-settled prohibitions in its Second Claim, but cannot escape that, during the relevant period, all of its alleged participants inhabited an integrated corporate unity:  Wynn Resorts was the parent corporation, Wynn MA was the wholly-owned and wholly-controlled subsidiary, and Mr. Wynn, Ms. Sinatra and Mr. Maddox were all officers of Wynn Resorts or Wynn MA or both.  FAC ¶s 17-21.  Indeed, as further evidence of this conflation of corporate roles, SSR concedes both that Wynn MA "had *no autonomous management team of its own*" during the relevant period, and that "all significant decisions of Wynn MA, including… its decisions to engage in the criminal and/or tortious acts set forth herein, *were made for it by Wynn Resorts and Wynn Resorts' own senior management team*, including the defendants."  FAC ¶ 18 (emphasis added).  As plainly acknowledged in the FAC, Wynn MA was not sufficiently separate from Wynn Resorts or its executives to qualify as a distinct RICO "enterprise."

---

[14]    *Bucklew v. Hawkins, Ash, Baptie & Co., LLP*, 329 F.3d 923, 934 (7th Cir. 2003) ("rejecting RICO claim where enterprise was "a wholly owned subsidiary of the alleged racketeer (the other defendant, Hawkins, Ash, Baptie & Co.).")); *Entre Computer* (to the same effect in franchisee context); *Fitzgerald*, 116 F.3d 225, 227 (finding no distinct enterprise where parent Chrysler Corporation allegedly operated three subsidiary corporations as "enterprises").

[15]    *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1357 (11th Cir. 2016); *Official Publications v. Kable News Co.*, 775 F.Supp. 631, 635-636 (S.D.N.Y. Oct. 7, 1991) (dismissing a RICO claim alleging an enterprise composed of "a corporation and its principal officers" because "an organization cannot join with its own members to do that which it normally does and thereby form an enterprise separate and apart from itself."); *C.A. Westel de Venez. v. American Tel. & Tel. Co.*, 90 Civ 6665 (PKL), 1994 U.S. Dist. Lexis 14481, *21-22 (S.D.N.Y. Oct. 11, 1994) ("The court stated, "An organization cannot join with its own members to do that which it normally does and distinctiveness required between a RICO defendant and a RICO enterprise cannot be subverted by alleging that subsidiaries, affiliates, agents, and employees of AT&T associated in fact to form an enterprise.").

**D.      Even If Defendants Had Violated RICO, That Violation Could Not Have Proximately Caused SSR's Alleged Injuries.**

SSR's alleged harm—losses of hoped-for rental income and sales proceeds when SSR sold its land years after the license award—was not proximately caused by defendants' alleged RICO violations for three reasons: (1) SSR was not even a competing applicant at the time Wynn MA was awarded the gaming license; (2) the MGC had discretion to award the license—or not award any license at all—based on several factors of which the respective suitability of Wynn Resorts, Wynn MA, and their executives was but one; and (3) SSR admits at least one independent cause for its decision to sell the land—its slumping horse-racing business.  FAC ¶ 151.  "A plaintiff alleging a §1964(c) violation 'may not succeed merely by proving that the predicate acts were *a* cause in fact of the plaintiff's injuries; rather, Section 1964(c) requires that the defendant's specified acts of racketeering were *the proximate* cause of the plaintiffs' injuries." *George Lussier Enters. v. Subaru of New Eng., Inc.*, 393 F.3d 36, 51 (1st Cir. 2004)) (emphasis added).  "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led *directly* to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) (emphasis added).  SSR's claims fall far short of this demanding standard.

1.      SSR Was *Not* a Competing Applicant When the MGC Awarded the License to Wynn MA.

According to SSR, "But for the Defendants' multiple acts of fraud and other misconduct, the *MSM/SSR* application would have prevailed in honest competition . . ."  FAC ¶142 (emphasis added).  SSR employs this "MSM/SSR" shorthand to misleadingly suggest that it was a *co*-applicant with Mohegan Sun (or "MSM"), and therefore that, once the MGC chose Wynn MA over the purported "team" of Mohegan Sun and SSR, SSR was "deprived of substantial future revenues it would have received from MSM per the terms of its binding contract with MSM had

the *MSM/SSR license application* been granted." FAC ¶ 156(a) (emphasis added). As documented, however, in filings with the MGC to which SSR alludes (but tellingly does not attach), by the time the MGC awarded the gaming license to Wynn MA (i.e., the time of the alleged injury) *only Mohegan Sun was a competing applicant*. Ex. 3 at 32. Indeed, while Mohegan Sun had separately identified for the MGC its various affiliates and anticipated investors, Ex. 5 at 3-5, it identified SSR only as a prospective "landlord" pursuant to a draft lease which Mohegan Sun "intends to execute" should the license ever be awarded to it. Ex. 3 at 32; Ex. 4 at 1; Ex. 5 at 8. Moreover, the prospective lease which SSR mischaracterizes as a "binding agreement" was, by its own terms, subject to a host of conditions and contingencies—all having nothing to do with defendants' alleged racketeering activity—which had to be met before SSR ever would realize a dollar of rental income or appreciation in its property's value.[16] Looking beneath its facile shorthand and wishful conclusions, SSR as potential landlord has not alleged – and cannot conjure –a loss proximately caused by the MGC's failure to choose Mohegan Sun. *George Lussier*, 393 F.3d at 51 (holding that "indirect and derivative injuries are insufficient" to maintain a RICO claim) *Boston Cab Dispatch, Inc. v. Uber Techs., Inc.*, No. 13-10769-NMG, 2015 U.S. Dist. Lexis 8508, (D.Mass. Jan, 26, 2015) (RICO claim dismissed because Uber's fraudulent

---

[16] Even if Mohegan Sun had been awarded the gaming license, any number of other contingencies could have come to pass that would have given Mohegan Sun the right to terminate the prospective lease and thereby directly "injure" SSR in the same way that it claims defendants indirectly did. Specifically, the prospective lease provides that "The Definitive Documentation [the final ground lease] may be terminated . . . by either party in the event that . . . a Material Adverse Change . . . has occurred," Ex. 4 at 3, and defines "Material Adverse Change" as when "the underlying condition of the land . . . renders the Premises unfit for the development of the Project . . . [or] Tenant, despite best efforts . . . is unable to obtain all permits, licenses, variances and other approvals from applicable governmental authorities required for the development of the Project . . . [or any] fact, circumstance, event, change, effect or occurrence not caused by . . . Tenant . . . that . . . does prevent Tenant from completing the development of the Hotel and Casino within a period that is two years longer than the Tenant's construction schedule . . ." *Id.* at 17-18. The Court may consider the prospective Mohegan Sun-SSR lease at the motion to dismiss stage because it is characterized in the FAC at ¶s 76, 78, 141, 142, 156, 162, 168, and 185, and because it was a public filing to an administrative agency (the MGC). *Jorge v. Rumsfeld*, 404 F.3d at 559; *Ratner v. Ovascience*, 123 F.Supp.3d at 632 fn. 12.

misrepresentations about tips to its drivers was too removed from reduction in value of a competitor's cab medallions)

        2.      <u>The MGC Had Discretion to Award the Region A License to An Applicant – or to No Applicant – Based on a Variety of Factors Other Than Suitability.</u>

SSR's alleged injury is also too attenuated because the MGC exercised broad discretion at numerous points between defendants' alleged fraud in the Phase-I suitability process and the award of the license after Phase II.  Where governmental action—particularly action that is discretionary—intervenes between the alleged RICO violation and the alleged harm, that action cuts the causal chain.[17/]  The point was aptly illustrated in *Rectrix Aerodome Ctrs., Inc. v. Barnstable Mun. Airport Comm'n*, 632 F.Supp.2d 120, 127-128 (D. Mass. July 10, 2009).  There, Barnstable Airport officials prohibited Rectrix, the operator of a private jet hangar, from selling jet fuel, thusly preserving the Airport's monopoly on sales of jet fuel.  The Airport fraudulently concealed its jet-fuel monopoly from the FAA in order to obtain federal funds.  *Id.* at 124-125.  Rectrix sued the Airport under RICO, claiming that the Airport's fraudulent concealment of its monopoly deprived Rectrix of the profits it would have earned selling jet fuel. *Id.* at 127.  Rectrix alleged that if the Airport had told the FAA that it had the exclusive right to sell jet fuel on its premises, the FAA would have threatened to cut the Airport off from federal funds unless the Airport gave Rectrix the right to sell jet fuel.  *Id.* at 128.  Because the Airport allegedly needed federal funds to survive, it would have complied with the FAA's demand and

---

[17/]     *See Hemi Group LLC v. City of New York*, 559 U.S. 1, 11 (2010) ("the conduct directly responsible for the City's harm was the customers' failure to pay their taxes . . . [while] the conduct constituting the alleged fraud was Hemi's failure to file the Jenkins Act reports.  Thus, as in *Anza*, the conduct directly causing the harm was distinct from the conduct giving rise to the fraud."); *see George v. National Water Main Cleaning Co.*, 286 F.R.D. 168, 186 (D.Mass. Sept. 27, 2012) (dismissing RICO claim where defendant's fraudulent activity—its fraudulent concealment from certain municipalities that it was paying statutorily-required wages to its employees—was too attenuated from the harm—deprivation of full wages to those employees—because "the alleged concealment was as to third parties (the municipalities).").

allowed Rectrix to sell jet fuel, which would have resulted in profits for Rectrix.  *Id.* at 128.  By failing to tell the FAA that it had the exclusive right to sell jet fuel, Rectrix claimed, the Airport had prevented this chain of events from taking place.  *Id.* at 128.  The court, however, held that this injury (lost profits from the sale of jet fuel) was too attenuated from the RICO violation (failure to disclose to the regulator) to establish proximate cause.  *Id.* at 128.

Similarly here, the MGC evaluated Wynn MA's Phase-I application on a range of statutorily prescribed factors, including not only the relevant individuals' "good character" but also, for example, Wynn MA's "financial stability."[18]  Only after considering *all* of those factors did the MGC find Wynn MA and Wynn Resorts suitable.  Ex. 1 at 2.  Moreover, at Phase II, the MGC compared the merits of the two remaining applications by weighing a very different set of project-centric criteria, including the "overview of the project, finance, economic development, building and site design, and mitigation,"[19] none of which had any connection to the prior suitability determination.  Only after this second multifaceted inquiry did the MGC choose Wynn MA.  Ex. 3 at 34.  It could have rejected Wynn MA—or rejected both Wynn MA and Mohegan Sun—for various reasons having nothing to do with the alleged fraud regarding suitability.[20]

---

[18]    *See* G.L. c. 23K § 12 (at Phase I, the MGC must consider, "the integrity, honesty, good character, and reputation of the applicant; the financial stability . . . of the applicant; the business practices and business ability of the applicant . . . ; whether the applicant has a history of compliance with gaming licensing requirements . . . ; whether the applicant . . . is a defendant in litigation involving its business practices; the suitability of all parties in interest . . . ; and whether the applicant is disqualified from receiving a license under section 16 . . ."); *see also Revere*, 476 Mass. at 593.

[19]    205 C.M.R. 119.03; *Revere v. Massachusetts Gaming Commission*, 476 Mass. 591, 593, 604 (2017) (at Phase II, "the Commission evaluate[s] the applicants based on nineteen statutory criteria . . . [and] exercises . . . [its] professional expertise and judgment in weighing and balancing a wide range of considerations peculiar to the petitioner in light of the public interest") (internal quotation and citation omitted).

[20]    *See* G.L. c. 23K § 19(a) ("Within any region, if the Commission is not convinced that there is an applicant that has both met the eligibility criteria and provided convincing evidence that the applicant will provide value to the region in which the gaming establishment is proposed to be located and to the commonwealth, no gaming license shall be awarded in the region."); *see also* MGC's Annual Report 2016, attached as Exhibit 8, at 5 ("During FY 16 this Commission . . . (2) concluded the review and evaluation of the remaining applicant for a Region C Category 1 license: Mass Gaming & Entertainment proposal for a casino at the Brockton Fairgrounds.  The Commission decided not to award a license to the applicant.").

*See Caesars Mass. Mgmt. Co., LLC v. Crosby*, 778 F.3d 327, 334 (1st Cir. 2015) (emphasizing the MGC's discretionary authority).  Thus, even more vividly than in *Rectrix*, the MGC's exercise of discretion and resulting decisions in both Phase I and Phase II broke the causal chain between defendants' alleged fraud and any alleged harm to Mohegan Sun or, even more remotely, to its prospective landlord, SSR.

      3.    <u>SSR's Alleged Injury Had a Separate, Independently Sufficient Cause.</u>

Finally, as its chronology concedes, SSR waited almost three years *after* the MGC's license award before choosing to sell its land "because its original horse-racing business was no longer economically viable." FAC ¶151.  Where a plaintiff's harm "could have resulted from factors other than [the defendant's] alleged acts of fraud," courts will not attribute even a portion of that harm to the alleged violations.  *See Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 459 (2006).  Thus, even if SSR was forced to sell its property because Mohegan Sun failed to obtain the casino license *and* because SSR's horse-racing business no longer was economically viable, this Court should not attribute SSR's alleged loss on that sale solely to Mohegan Sun's failure to obtain the license.

Of course, had SSR believed in 2014 that it had been injured by the MGC's decision, it could have—and should have—sought to bring a certiorari action in Massachusetts state court. *Revere*, 476 Mass. at 604.  Pursuant to Massachusetts General Law c. 249 § 4, a party may bring "a civil action in the nature of certiorari to correct errors in proceedings which are not according to the course of the common law [and] . . . are not otherwise reviewable by motion or by appeal . . .," but must do so "within sixty days next after the proceeding complained of."  Indeed, within months after the MGC awarded the license to Wynn MA, Mohegan Sun and others sought to challenge that award by just such an action, with the Supreme Judicial Court ultimately affirming Mohegan Sun's standing to challenge because it was a party with an interest in the licensing decision. *Revere*, 476 Mass. at 604 ("Here, Mohegan Sun had a legitimate expectation, backed up

by substantial investments of resources in the application process, that the commission would follow the law in awarding the license that Mohegan Sun sought."). SSR, however, chose not to pursue this procedural path and never sought to join in Mohegan Sun's challenge to the MGC's decision. This Court should not now permit SSR to misapply RICO so that it may mount a belated back-door challenge to the MGC's decision.[21]

On all of these grounds, even if any of the defendants had engaged in "racketeering activity" by fraudulent submissions to the MGC, and even if those submissions had induced regulatory action to the eventual detriment of SSR, SSR suffered no injury proximately caused by any alleged violations of § 1962 (c) or (d).[22]

### E.   SSR Has Failed to Allege a RICO Conspiracy.

SSR's conspiracy claim also must be dismissed because it has failed to state any substantive RICO violation. *Langan v. Smith*, 312 F.Supp. 3d 201, 208 (2018). In addition, SSR has failed to specify any actionable conspiracy between Wynn Resorts and its executives, subsidiary and agent by contract, FBT. "A RICO conspiracy allegation should be more than a conclusory add-on at the end of a complaint. It should state with specificity what the agreement

---

[21]   Even if there were some indirect link between defendants' alleged fraud and SSR's alleged harm, SSR still should not be allowed to proceed because the MGC is better situated to vindicate any alleged wrongdoing here. *George*, 286 F.R.D. 168, 186 (D.Mass. 2012) (where a RICO plaintiff "alleges a fraud with direct injury to the municipalities, that plaintiff "may not step in and assert those municipalities' rights."); *Rectrix*, 632 F.Supp.2d at 128 ("[I]f the FAA were to conclude that it was the victim of a fraud at the hands of defendants, it has the means and ability to seek the appropriate redress."). As SSR recognizes, anyone who makes a "false, fictitious, or fraudulent statement" to the MGC may face prosecution and imprisonment or fines. FAC ¶ 29; G.L. c. 23K § 38; *See, e.g.,* Exhibit 7 at 95-96 (at the conclusion of the December 13, 2013 hearing on the potential issues with the ownership of the Everett property, the MGC stated, "the IEB [is] instructed to deliver its entire file in this matter . . . to the U.S. attorney, the district attorney for Suffolk County, and the attorney general for such action, if any, as one or more of those bodies chooses to take").

[22]   SSR also claims a third strain of injury, premised solely on the allegation that Mohegan Sun "incurred substantial expenses in connection with its license application." FAC ¶ 156(c). These alleged expenses—even if arguably shared or reimbursed by SSR —also do not establish an actionable injury because they were paid to have the MGC *consider* the application. *Emerson College v. Boston*, 391 Mass. 415, 424-425 (1984) ("fees . . . are charged in exchange for a particular governmental service which benefits the party paying the fee in a manner not shared by other members of society . . . [therefore, being] paid by choice, . . . the party paying the fee has the option of not utilizing the governmental service and thereby avoiding the charge. . .") (quotations and citations omitted). These fees were never going to be recovered, whether or not Mohegan Sun was successful in its bid.

was, who entered into the agreement, when the agreement commenced, and what actions were taken in furtherance of it." *Calabrese v. CSC Holdings, Inc.*, 283 F.Supp.2d 797, 813 (E.D.N.Y. August 13, 2003) (quotations and citations omitted).

Here, SSR's boilerplate claim is premised only on the conclusion that "all of the Defendants agreed and conspired to violate [RICO]… by forming the illegal association-in fact enterprise set forth above and conducting and participating in the conduct of its affairs through a pattern of racketeering activity." FAC ¶164. That ostensible "conspiracy" fails for two primary reasons. First, SSR primarily claims that Wynn Resorts, its subsidiary and its executives conspired with each other. FAC ¶s 167, 117-22. On its face, however, that collaboration began and continued only by virtue of these defendants' corporate affiliation, not out of any separate agreement to commit RICO predicate acts.[23] Similarly, any allegedly concerted activity by these Wynn-related defendants and FBT arose only from an option and contract for vendor services executed months *before* the first alleged act of racketeering even occurred. FAC ¶ 80. As such, SSR has alleged no more than that Wynn Resorts and Wynn MA "conspir[ed] with agents, servants, and employees and others to conduct their affairs through a pattern of racketeering activity." *Hecht*, 897 F.2d at 25-26.

**F.    The *Noerr-Pennington* Doctrine Bars SSR's Suit Because It is Based on Wynn Resorts' Petitioning Activity.**

Looking past these several RICO-centric flaws, this Court still should dismiss SSR's claims because the allegedly fraudulent submissions on which they are premised constituted protected petitioning activity which cannot give rise to a cause of action. "Under the *Noerr-*

---

[23]    *See Gaudette v. Panos*, 650 F.Supp. 912, 913 (D. Mass. Jan. 7, 1987) ("[W]henever employees act within the scope of their duties, they act as the corporation and as such are incapable of civil conspiracy with it.") (reversed on other grounds, 852 F.2d 30, 30 (1st Cir. 1988)); *Pioneer Contr., Inc. v. Eastern Exterior Wall Sys.*, No. 04-CV-01437, 2005 US Dist. Lexis. 5197, *3-*4 (E.D. Pa. March 30, 2005) ("conspiracy cannot lie against the corporation for the actions of its employees who violate RICO on its behalf . . . [m]oreover, employees of a corporation, while acting in the course and scope of their employment, cannot conspire with each other.").

*Pennington* doctrine, those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct." *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006) (quotations and citations omitted).  Though this doctrine was first applied in cases involving violations of the Sherman Act, it is grounded in the First Amendment, so courts have extended its protection to claims of harm caused by the defendant's petitioning activity regardless of whether those claims were alleged under the Sherman Act. *United Food et al. v. Novartis Pharms. Corp.,* 902 F.3d 1, 5 (1st Cir. 2018) (applying *Noerr-Pennington* to dismiss claims for copyright infringement and patent infringement).[24]

Here, the *Noerr-Pennington* doctrine requires dismissal of SSR's RICO claims because they all arise out of petitioning activity during the license-application process.  FAC ¶ 155. Further, even if any defendant had made false statements to the MGC in Wynn MA's application for a gaming license, the *Noerr-Pennington* doctrine still would require dismissal of SSR's claims. *See Davric*, 216 F.3d at 147. *See also Sosa*, 437 F.3d at 929.  Finally, no "sham exception" applies because neither Wynn MA nor Wynn Resorts tried to use *the application process itself* to harm SSR. *See Davric*, 216 F.3d at 147-148.  Rather, Wynn Resorts and Wynn MA participated in the application process to seek a legitimate goal—the award of the gaming license to Wynn MA.

---

[24]     *See also Davric Maine Corp. v. Rancourt*, 216 F.3d 143, 147 (1st Cir. 2000) ("the Noerr-Pennington . . . doctrine . . . derives from the First Amendment's guarantee of the right to petition the government for redress of grievances") (internal citations and quotations omitted); *Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 128-129 (3d Cir. 1999). Significantly, the *Davric* panel held that "the Noerr-Pennington . . . doctrine . . . applies to petitions before legislatures, administrative agencies, and courts [and that] even *false* statements presented to support such petitions are protected." *Id.* at 147.  Davric alleged that defendant Rancourt and others had violated antitrust law primarily by petitioning the Maine Horseracing Commission to "deny race dates to" Davric's horseracing track. *Id.* at 145-147.  The court dismissed these claims pursuant to the *Noerr-Pennington* doctrine, confirming that only "sham" petitioning activity is not protected by the doctrine, i.e., activity which is "objectively baseless" and "intended only to burden a rival with the governmental decision-making process itself." *Id.* at 147-148.  This "sham exception" therefore applies only to "situations in which persons use the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon." *Id.* (quotations and citations omitted).

Respectfully submitted,

**WYNN RESORTS, LTD and WYNN MA, LLC**

By their counsel,

/s/ *Peter A. Biagetti*
Peter A. Biagetti, BBO # 042310
Samuel M. Starr, BBO #477353
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
One Financial Center
Boston, MA 02111
Phone: 617.542.6000
Fax: 617.542.2241
PABiagetti@mintz.com
TStarr@mintz.com

Mark Holscher (*admitted pro hac vice*)
Kirkland & Ellis LLP
333 South Hope Street
Los Angeles, California 90071
Phone: 213-680-8190
Fax: 213-808-8097
Mark.holscher@kirkland.com

March 8, 2019

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing on

March 8, 2019.

/s/ *Peter A. Biagetti*
Peter A. Biagetti