**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STERLING SUFFOLK RACECOURSE, LLC,<br><br>Plaintiff,<br><br>v.<br><br>WYNN RESORTS, LTD; WYNN MA, LLC; STEPHEN WYNN; KIMMARIE SINATRA; MATTHEW MADDOX; and FBT EVERETT REALTY, LLC,<br><br>Defendants. | CIVIL ACTION<br>Case No. 1:18-cv-11963-PBS |

**MEMORANDUM OF LAW IN SUPPORT OF MATTHEW MADDOX'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

As amply demonstrated by each of the co-defendant's motions to dismiss, plaintiff Suffolk Racecourse, LLC's ("SSR's") amended RICO claims are fatally deficient as to all defendants, Moreover, SSR's amended complaint fails to allege with anything close to the required specificity that defendant Matthew Maddox personally committed a single RICO predicate act. SSR seeks to mask its failure by pointing to Mr. Maddox's corporate positions at Wynn Resorts and Wynn MA, LLC, noting that he "remains employed and indeed has been promoted" in the wake of Stephen Wynn's departure, and since then "has in effect become the face of the 'new' Wynn Resorts." First Amended Complaint ("FAC") at ¶ 10. Mr. Maddox did indeed become Chairman of Wynn Resorts in 2018, *id.* at ¶ 20, but that was over three years *after* the Massachusetts Gaming Commission awarded a gaming license to Wynn MA, LLC through what SSR alleges was a scheme to defraud. *Id.* at ¶ 120. And while SSR broadly accuses certain co-defendants and "[o]ver half a dozen other senior members of Wynn Resorts

management" of participating in a "pattern of concealment," SSR also acknowledges that Mr. Maddox is *not* among them. FAC ¶10.

By his Motion to Dismiss, Mr. Maddox respectfully submits that his alleged status as the "new face" of Wynn Resorts – which SSR couples only with impermissibly collective, conclusory and substantively deficient allegations of RICO predicate acts – cannot state a viable claim against him individually. In support of that Motion, Mr. Maddox adopts by reference the grounds set out in the memoranda in support of each of his co-defendants' motions to dismiss, which demonstrate that all of SSR's claims fail as against all defendants. In addition, as set out in this Memorandum, Mr. Maddox submits that SSR's three RICO claims also must be dismissed with prejudice with respect to him specifically because SSR, even after amendment, has failed to particularize his alleged role in any act of racketeering as required by Federal Rule 9(b) and 18 USC § 1961(1).

## SUMMARY OF THE RICO ALLEGATIONS

Mr. Maddox respectfully refers this Court to the "Summary of the RICO Allegations" contained in the Memorandum of Wynn Resorts, Limited and Wynn MA, LLC in Support of Their Motion to Dismiss at pp. 3-7. Any additional allegations regarding Mr. Maddox are addressed in the Argument below.

## ARGUMENT

### A. SSR Fails to Particularize Any Participation by Mr. Maddox in Any Predicate Acts in Violation of RICO

The alleged racketeering activity at the center of SSR's three deficient RICO claims is Wynn Resorts' allegedly fraudulent failure to disclose to the Massachusetts Gaming Commission ("MGC") the alleged prior ownership of the casino site by convicted felons, Mr. Wynn's alleged prior acts of sexual predation, and alleged prior payments to government officials in connection

with the Wynn casino in Macau. FAC ¶ 155, 161. None of that alleged concealment, as alleged or as a matter of law, constitutes either an actionable predicate act or an element of a viable RICO "pattern." *See* Memorandum of Law in Support of Wynn Resorts, Ltd and Wynn MA, LLC's Motion to Dismiss the First Amended Complaint at pp. 9-14. Moreover, as they apply to Mr. Maddox individually, SSR's allegations must be held to the heightened pleading standard set out in Federal Rule 9(b), which requires that a complaint "state with particularity the circumstances constituting fraud or mistake." See *Fleet Credit Corp. v. Sion*, 893 F.2d 441, 444-445 (1st Cir. 1990); *New England Data Servs., Inc v. Becher*, 829 F.2d 286, 289 (1st Cir. 1987). As this Court has recognized, the Rule's requirements demand that a plaintiff specify "the time, place, and content of *each* alleged false representation." *Laker v. Freid*, 854 F.Supp. 923, 931 (D. Mass. 1994) (emphasis in original) (citing *Bio-Vita, Ltd. v. Rausch*, 759 F.Supp. 33, 37 (D. Mass. 1991)).

Courts in this circuit uniformly have held that Rule 9 (b)'s specificity requirements for each alleged false representation preclude grouping individual defendants together into generalized claims. As a consequence, *plaintiffs cannot "lump[] all the defendants together as a unitary force."* *Jones v. Experian Info. Sols., Inc.*, 141 F. Supp. 3d 159, 162 (D. Mass. 2015). (emphasis added) Instead, "where there are multiple defendants, *the specific role of each must be alleged."* *Rick v. Profit Mgmt. Assocs., Inc.*, 241 F. Supp. 3d 215, 224 (D. Mass. 2017) (emphasis added); *Ezell v. Lexington Ins. Co.*, 286 F.Supp.3d 292, 300 (D.Mass. 2017) (dismissing claim for fraudulent misrepresentations where "plaintiffs continue to refer collectively to 'AIG' and 'defendants' and do not specify which party made representations or owed a duty to disclose."). And where corporate action is alleged, the complaint must particularize "some showing of direct personal involvement by the [defendant] corporate officer

in some decision or action which is causally related to plaintiff's injury." *Escude Cruz v. Ortho Pharm. Corp.*, 619 F.2d 902, 907 (1st Cir. 1980).  In its baseless effort to implicate Mr. Maddox, SSR's complaint, even as amended, falls short of each of these requirements.

1. <u>SSR"s "Lumped" Allegations Specify No Culpable Acts or Knowledge of Mr. Maddox Individually</u>

In fully 100 of its 191 paragraphs, including *every* paragraph purporting to set out alleged acts of racketeering, SSR broadly ascribes conduct or attributes knowledge only to three collections of alleged actors:  (1) all six of the defendants[1]; (2) the five "Wynn Defendants," comprised of, Wynn Resorts Ltd., ("Wynn Resorts"), three of its executives, and its wholly-owned subsidiary, Wynn MA, LLC[2]; or (3) the "Wynn Control Defendants," comprised of the same three executives plus Wynn Resorts.[3]  Such impermissible "lumping" violates Rule 9(b) because it fails to particularize the alleged acts of any one of the individual defendants, *Jones*, 141 F. Supp. 3d at 162. This deficiency is particularly glaring as to Mr. Maddox in light of the very limited role which SSR, even on amendment, imputes to him.

During the entire period of alleged fraud on the MGC, SSR alleges that Mr. Maddox served as President and CFO of Wynn Resorts, but also emphasizes that, during that same period, it was Mr. Maddox's superior, Mr. Wynn, who, as CEO of both Wynn Resorts and Wynn Macau, Ltd., "did not delegate the pursuit of the Gaming License in Massachusetts to subordinates but played an active and hand[s-]on role throughout the process . . . making knowingly false statements both orally and in writing to the Gaming Commission . . .." FAC

---

[1] The FAC alleges that "the Defendants" acted together in paragraphs 1, 8, 9, 12, 76, 90, 92, 93, 94, 101, 104, 115, 116, 120, 141, 142, 154, 155, 156, 164, 168, 171, 172, 173, and 189.
[2] The FAC alleges that "the Wynn Defendants" acted together in paragraphs 6, 7, 8, 9, 10, 11, 22, 30, 31, 36, 39, 43, 46, 52, 53, 55, 56, 58, 67, 78, 80, 81, 82, 83, 84, 86, 87, 88, 89, 90, 91, 93, 95, 97, 99, 101, 102, 105, 107, 108, 110, 111, 112, 114, 115, 116, 117, 118, 119, 120, 121, 122, 123, 124, 127, 129, 132, 134, 136, 137, 138, 140, 143, 145, 146, 150, 151, 155, 171, 174, 178, 179, 180, 181, 182, 183, 186, 187, 188, 190, and 191.
[3] The FAC alleges that the "Wynn Control Defendants" acted together in paragraphs 159, 161, 162, 167, and 171, and that "Maddox, Sinatra and Steve Wynn" collaborated in ¶91.

¶19.  Similarly SSR alleges that, as General Counsel of Wynn Resorts during the entire relevant period, "Kimmarie Sinatra . . . was functionally the second most senior member of the Wynn Resorts management team after Steve Wynn himself."  FAC ¶21.  Finally, while SSR also alleges that Mr. Maddox served as President and Treasurer of Wynn MA, LLC, *id.*, it again concedes that, during his presidency, Mr. Maddox played no role in the purported decisions to engage in criminal conduct.  As SSR portrays it:

> Wynn MA …had no autonomous management team of its own [which was] given decision-making discretion.  Rather, all significant decisions of Wynn MA, including without limitation its decision to engage in the criminal and/or tortious acts set forth herein, were made for it by Wynn Resorts and Wynn Resorts' own senior management team, including the individual defendants herein.

*Id.* ¶ 18.  Thus, even within its unspecified "lumps" of Wynn-related defendants, SSR alleges a hierarchy in which Mr. Wynn and Ms. Sinatra were the purported actors, while Mr. Maddox, served primarily as part of a subordinate "team" vested with "no autonom[y]" and no "decision-making discretion."  FAC ¶ 18.

Three examples illustrate the misleading consequence of SSR's inclusion of Mr. Maddox in the casts of its salacious subplots:

First, the FAC exploits both Mr. Wynn's alleged sexual misconduct and its alleged cover-up by "numerous other senior members of the Wynn Resorts management team."  FAC ¶36.  Again, these allegations are neither alleged to be – nor could they as a matter of law constitute – part of a viable "pattern of racketeering activity."  *See* Memorandum of Law in Support of Wynn Resorts, Ltd and Wynn MA, LLC's Motion to Dismiss the First Amended Complaint at pp. 9-14.  But as important for the purposes of the instant motion, in the single instance in which SSR

specifies *which* executives allegedly even knew of this alleged misconduct, three are accused by name and Mr. Maddox tellingly is left off the list. *Id.* ¶36.

Second, the FAC devotes six pages to "The Wynn Defendants' Prior Misconduct in Macau," reaching back to 2002, when a Wynn Resorts' subsidiary agreed to operate a casino in Macau. *Id.* ¶s 39-52. SSR begins by again invoking Mr. Maddox's corporation position, as CFO of that Macau subsidiary, and then alleges that, in that job, Mr. Maddox was "extensively involved in the purchase of the rights to the [casino] property and in the development and construction effort for the Wynn Macau [casino]." *Id.* at ¶ 41. *Nowhere in the six pages that follow*, however, does SSR ever ascribe a single allegedly illegal – or even improper – act specifically to Mr. Maddox, *id.* at ¶s 42-52, nor does it so specify when its purported RICO claims make a singular, conclusory reference to "the Wynn MA Control Defendants' unsavory activities and organized-crime affiliations in Macau… ." *Id.* at ¶ 161(c).

Third, SSR trumpets that Wynn Resorts has now allegedly "publicly conceded" that Mr. Wynn and "numerous other senior members of the Wynn Resorts management team" committed "an on-going and long-running pattern of violations of Nevada's suitability regulations…." FAC ¶s 36, 37-38, 161(d). Again, these alleged "violations" in Nevada cannot rescue SSR's deficient allegations of a RICO "pattern" in Massachusetts, but with specific regard to Mr. Maddox, it must be noted that, in the "public concession" to which SSR refers, Wynn Resorts admitted to allegations by the Nevada Gaming Control Board which implicated by name *eight* such Wynn Resorts executives but *never* alleged any acts by Mr. Maddox.[4] Moreover, only one paragraph of

---

[4] *See Nevada Gaming Control Board v. Wynn Las Vegas, LLC dba Wynn Las Vegas; Wynn Resorts, Limited (PTC)*, NGC 18-15, Complaint, attached as Exhibit 1, at ¶ 15, 16, 17, 23, 40, 48, 56, 64, 71, 100, 101, 102 (alleging claims against Stephen Wynn); ¶ 38, 39, 49, 50 (alleging claims against Mark Schorr); ¶ 38, 39 (alleging claims against Doreen Whennen); ¶ 38, 39, 49, 50, 79 (alleging claims against Arte Nathan); ¶ 41, 72 (alleging claims against Kimmarie Sinatra); ¶ 49, 50, 57, 58, 84, 85 (alleging claims against Kevin Tourek); ¶57, 58 (alleging claims against Maurice Wooden); ¶73 (alleging claims against Stacie Michaels); *Nevada Gaming Control Board v. Wynn Las Vegas, LLC dba Wynn Las Vegas; Wynn Resorts, Limited (PTC)*, NGC 18-15, Stipulation for Settlement and Order,

the Nevada Control Board's Commission's complaint arguably could even include Mr. Maddox among the unnamed "executives" who allegedly learned of *certain* acts "performed on [Mr. Wynn] in *2014*." *Id.* at ¶ 66 (emphasis added). Yet even if this (false) allegation is assumed as true at the Rule 12(b)(6) stage, Mr. Maddox allegedly could have learned of those acts only *after* defendants' alleged fraud had yielded – in December *2013* – the Massachusetts Gaming Commission's decision on the suitability of Mr. Wynn, Wynn MA, LLC and Wynn Resorts. *Id.* at ¶ 134.

2. SSR Fails to Allege Acts By Maddox Which Constitute Racketeering

Even in the dozen paragraphs in which SSR does individually identify Mr. Maddox, SSR's allegations fall short of Rule 9(b)'s demands that his alleged roles and the time, place and context of his allegedly fraudulent statements be particularized. These paragraphs and their respective deficiencies are:

(1) Paragraph 20:

> Matthew or 'Matt' Maddox ('Maddox') is a resident of Nevada, has been the President and Chief Financial Officer of Wynn Resorts since 2013, and became the Chairman in 2018 after Wynn's resignation. At relevant times, Maddox was also President and Treasurer of Wynn MA and intimately involved in the pursuit of the Gaming License, including by making knowingly false statements both orally and in writing to the Gaming Commission. Before Wynn MA was formed to pursue the Gaming License in Massachusetts, Maddox was intimately involved in Wynn Resorts' Macau operations and became fully familiar with (indeed, complicit in) its shady dealings with organized crime figures in that jurisdiction. Maddox served as a non-executive director at Wynn Macau, Ltd. from March 2013 until his appointment as CEO of Wynn Macau, Ltd. in February 2018, when he assumed a role as an executive director. From March 2003 to June 2005, Maddox served as Chief Financial Officer of Wynn Macau, Ltd.'s wholly-owned subsidiary Wynn Resorts (Macau), S.A. ('Wynn Macau SA'), which owns and operates two casinos in Macau.

attached as Exhibit 2, at ¶1 (admitting all of the allegations in the Nevada Gaming Control Board's complaint except for ¶72-73 and the portion of ¶ 57 that states that Maurice Wooden knew of the allegations of sexual misconduct).

Beyond this allegation's identification of Mr. Maddox's corporate position, it claims only that, sometime between 2003 and 2005, he "became fully familiar with (indeed, complicit in) its [Wynn Resorts'] shady dealings with organized crime figures" in Macau.  SSR specifies nothing about, for example, which "shady figures" Mr. Maddox allegedly knew, what "dealings" he allegedly participated in, or how he became "complicit" in those dealings.

    (2) Paragraph 41:

> In August 2009, Wynn Resorts' indirect subsidiary, Wynn Macau SA, paid approximately $18 million to an unrelated third-party Macau company, Nam Van Development Company ("Nam Van"), for its relinquishment of rights to a portion of the land acquired in connection with the expansion of the Wynn Macau.  Maddox served as Chief Financial Officer of Wynn Macau SA at the time the agreement to purchase the land rights from Nam Van was executed and was extensively involved in the purchase of the rights to the property and in the development and construction efforts for the Wynn Macau.  Nam Van was founded in 1990 by a consortium of local businessmen with wide ranging political power as well as checkered backgrounds.

This allegation, too, merely states that Mr. Maddox had a position as an officer in a company that in 2009 purchased certain building rights from a Chinese company.  SSR never alleges that anything about the purchase was fraudulent.  At most, this paragraph accuses certain founders of Nam Van of having had "checkered backgrounds."  There is no allegation that Mr. Maddox knew of these purportedly "checkered backgrounds," nor any allegation that any of these founders were involved in criminal activity, or even had anything to do with Nam Van, by the time of the transaction in which Mr. Maddox allegedly participated.

    (3) Paragraph 81:

> During the first official meeting between FBT and representatives of the Wynn Defendants at the Everett Site in November 2012, DeNunzio, on behalf of FBT, informed Sinatra and Maddox that 'an individual with a checkered past' (apparently Lightbody, a

> convicted felon) was then an owner of FBT but was allegedly taking steps to give up his interest.

Even indulged as true, the allegation that Mr. Maddox heard that an "individual with a checkered past" had an ownership interest in FBT falls far short of alleging that Mr. Maddox knew that there was anything about this owner that would disqualify FBT from being found suitable by the Commission. Moreover, even if this paragraph were sufficient to allege that Mr. Maddox knew that an owner of FBT was a criminal, the paragraph does not identify any concealment by Mr. Maddox in the face of a legal obligation to disclose. *See In re Lupron Mktg. & Sales Practices Litig.*, 295 F.Supp.2d 148, 165-166 (D.Mass. 2003) (dismissing RICO claim based on fraud allegedly fraudulent failure to disclose where plaintiff failed to sufficiently plead defendant's duty to disclose).

(4) Paragraph 87:

> Sinatra and the Wynn Defendants have claimed to have taken no steps to look further into the ownership history of the Everett Site after the ownership interest of ex-felon DeCicco was publicized, nor to question when DeCicco had transferred his interest, or to whom he transferred it, despite the requirements of the Gaming Act that any applicant disclose in its application the ownership history of a gambling site for the past twenty years. . . Sinatra was a seasoned gaming attorney overseeing the Wynn Defendants' due diligence before omitting to the Everett Site; she and Maddox were not neophytes.

The passing characterization of Mr. Maddox as no "neophyte" apparently is intended to imply guilty knowledge, but none is actually alleged, nor would there be any basis to do so. Instead, SSR claims that it was Ms. Sinatra – not Mr. Maddox – who was overseeing the "due diligence" that impliedly would have given rise to such knowledge. *Laker*, 854 F.Supp. at 931 ("A complaint is inadequate if it makes merely a general averment of the defendant's 'knowledge' of material falsity, unless the complaint also sets forth specific facts that make it reasonable to

believe that the defendant knew that a statement was materially false or misleading.") (internal quotations and citations omitted). There is no allegation that Mr. Maddox actually knew that any other of the FBT owners had criminal backgrounds, nor any allegation that Mr. Maddox represented to the MGC anything false about those backgrounds.

    (5) Paragraph 88:

> [N]o later than November or December 2012, the Wynn Defendants and FBT entered into a mutual understanding that FBT would create whatever false and backdated paperwork might be necessary for purposes of the Wynn Defendants' application, in order to make the ownership of the Everett Site appear less tainted than it actually was. . . Maddox and Sinatra consulted directly with Steve Wynn before making this deal with FBT.

While SSR alleges only that one or both of Mr. Maddox and Ms. Sinatra "consulted" with Mr. Wynn about a prospective "deal," it never specifies which of them allegedly did so, or which of the "Wynn Defendants" actually entered into the alleged "mutual understanding" with FBT. Beyond its impermissible "lumping" of two defendants' alleged roles, this type of conclusional implication that a defendant "agreed to commit fraud" is not sufficient to satisfy Rule 9(b)'s stringent standard. *See Fleet Credit Corp.*, 893 F.2d at 444 (alleging numerous acts of mail fraud "including but not limited to" certain examples is not specific enough to allow the defendant an opportunity to defend against the allegations); *Loan v. Fed. Deposit Ins. Corp.*, 717 F.Supp. 964, 968 (D. Mass. 1989) (claims that "defendants caused [a fraudulent document] to be prepared and circulated" without specifying that a defendant "actually prepared, signed or even read the document" did not satisfy Rule 9(b)).

    (6) Paragraph 89:

> Sinatra and Maddox on behalf of themselves and the other Wynn Defendants traveled in interstate commerce from Nevada to Massachusetts in furtherance of this unlawful agreement to create

> false documentation for the purpose of defrauding the Gaming Commission and/or its unconflicted commissioners.

Here again, a broad allegation that Mr. Maddox at some point traveled across some state lines "in furtherance of this unlawful agreement to create false documentation" provides none of the time, place or content specification which a plaintiff must provide to allow a RICO defendant fairly to defend against it. *Laker*, 854 F.Supp. at 930-931.

(7-11) Paragraphs 100, 102, 105, 106 and 107:

> [I]n July 2013 interviews with the Gaming Commission's IEB, taken under oath, both Sinatra and Maddox falsely claimed to have never heard of Lightbody and to have no idea who he was, and likewise claimed to have been unaware of any additional, unnamed owners of FBT other than Lohnes, DeNunzio, and perhaps Gattineri… when asked directly whether 'it was important to you at that time to know whether a person with a criminal background was involved in the deal,' Maddox asserted in reply: "Not my job." ¶100.
>
> Maddox and Sinatra had primary responsibility for overseeing the referendum process and knew of Lightbody's involvement. ¶102.
>
> In or about April 2013, Maddox on behalf of the Wynn Defendants was attempting to purchase a small parcel of real estate occupied by a carwash adjacent to the Everett Site that would be necessary for access to the casino to be built on the Everett Site, but found the owner reluctant to sell. ¶105.
>
> On April 24, 2013, Maddox emailed FBT's DeNunzio asking for help persuading the owner to sell. Maddox indicated that the owner would only deal with Lightbody. DeNunzio agreed and within an hour had called Lightbody to enlist his assistance. A week later, DeNunzio and Lightbody had separate conversations with the owner which were sufficient to induce him to finally respond to Maddox's overtures with a counterproposal. ¶106.
>
> Maddox and Lightbody met on at least two occasions in the spring of 2013 to discuss the fact the owner would not deal with anyone but Lightbody. . . Maddox's statement under oath to the Commission in July 2013 that he was unaware of Lightbody was false. ¶107.

All five of these paragraphs allude to or imply that, by April 2013, Mr. Maddox allegedly knew that a convicted felon had an interest in FBT but failed to disclose that fact. SSR elsewhere admits, however, that the MGC itself discovered that fact, addressed it fully, and with that knowledge, approved Wynn MA's application in September 2014. FAC ¶58, 79 ("the ownership interest and involvement of these convicted felons was open and notorious in the community" by late summer of 2012); ***Id.*** ¶¶110-111 ("[I]n July 2013, the Wynn Defendants were known to the Gaming Commission to have associated with known felons and to have failed to disclose those affiliations . . . [nevertheless] a majority of the commissioners were convinced to go along with this cure . . ."). Therefore, any failure by Mr. Maddox to disclose this fact—even if alleged with sufficient particularity—could not have induced the MGC to award the license to Wynn MA.

(12) Paragraph 108:

> [T]he Wynn Defendants required another adjacent parcel of land for the casino which was being occupied by a tenant, ADH Collision ("ADH"). ADH, who was running an auto body business on the premises, had a lease with the owner of the property entitling it to occupy the premises through October 2019 and to extend through October 2029. On or about June 8, 2016, the owner of the property ultimately accepted an offer for the sale of the property pursuant to an agreement that required the property to be 'free and clear of all tenants.' ADH refused to terminate its lease early. Steve Wynn discussed the problem with Mayor DeMaria and Maddox. In addition, Christopher Gordon, an executive of Wynn, discussed with ADH's landlord how to terminate the lease early.

SSR alleges only that Mr. Maddox "discussed" with Mr. Wynn a commercial tenant's lease of property that Wynn MA allegedly was trying to acquire. While *another* Wynn executive is alleged to have discussed "how to terminate the lease early," SSR never alleges that Mr. Maddox was even involved in those separate discussions, much less in any purported effort to force early termination of the lease.

In sum, even as amended, the FAC does not allege with particularity that Mr. Maddox committed any predicate acts of racketeering under 18 USC § 1961(1). SSR's three RICO claims as asserted against him therefore fail for this deficiency as well.

## CONCLUSION

For all of the foregoing reasons and those set forth by his co-defendants' motions to dismiss, defendant Matthew Maddox respectfully asks this Court to dismiss Sterling's First Amended Complaint with prejudice.

Respectfully submitted,

MATTHEW MADDOX

By his counsel,

/s/ Peter A. Biagetti
Peter A. Biagetti, BBO # 042310
Samuel M. Starr, BBO # 477353
Mintz, Levin, Cohn, Ferris,
Glovsky & Popeo, P.C.
One Financial Center
Boston, MA 02111
Phone: 617.542.6000
Fax: 617.542.2241
PABiagetti@mintz.com
TStarr@mintz.com

Dated: March 8, 2019

**LOCAL RULE 7.1(A)(2) CERTIFICATION**

I certify that counsel for Defendant has conferred with counsel for Plaintiff in a good faith attempt to resolve or narrow the issues raised by this motion.

/s/ Peter A. Biagetti
Peter A. Biagetti

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on March 8, 2019.

Joseph R. Donohue
The Charlestown Navy Yard
Shipway Place Unit C2
Boston, MA 02129
jrdonohuelaw@gmail.com

Steven G. Storch
Storch Amini PC
2 Grand Central Tower
140 E.45th St., 25th Floor
New York, NY 10017
sstorch@storchamini.com

/s/ Peter A. Biagetti
Peter A. Biagetti