UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
---------------------------------------------------------------x
                                        :
STERLING SUFFOLK RACECOURSE, LLC,       :      Docket No.  18-CV-11963 PBS
                                        :
              Plaintiff,                :
                                        :
          v.                            :
                                        :
WYNN RESORTS, LTD; WYNN MA, LLC;        :
STEPHEN WYNN; KIMMARIE SINATRA;         :
MATTHEW MADDOX;                         :
and FBT EVERETT REALTY, LLC;            :
                                        :
              Defendants.               :
---------------------------------------------------------------x
```

## MEMORANDUM OF LAW IN OPPOSITION TO
## <u>DEFENDANTS' MOTIONS TO DISMISS</u>

**STORCH AMINI PC**
**2 Grand Central Tower**
**140 East 45th Street, 25th Floor**
**New York, New York, 10017**
**(212) 490-4100**
*Attorneys for Plaintiff*

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ....................................................................1

KEY FACTUAL ALLEGATIONS OF THE FAC AND OTHER PUBLIC-RECORD
BACKGROUND ..........................................................................................1

ARGUMENT ..............................................................................................14

I.   THE STATUTE OF LIMITATIONS DID NOT REQUIRE THIS ACTION TO BE
FILED ON A SUNDAY ..........................................................................15

II.   THE FAC ADEQUATELY ALLEGES PROXIMATE CAUSE ....................17

A. That the Defendants Misrepresentations Were Aimed at the MGC Does Not Attenuate
Causation.....................................................................................17

B. The Contractual Relationship Between MSM and SSR Does Not Attenuate Causation
.....................................................................................................23

III.   THE NOERR-PENNINGTON DOCTRINE DOES NOT IMMUNIZE DEFENDANTS'
RICO VIOLATIONS................................................................................25

A. The Noerr-Pennington Doctrine Has No Application to Claims Outside the Antitrust
Context........................................................................................25

B. Obtaining a Government-Sponsored Monopoly Via Fraud Is Not Part of the First
Amendment Right to Petition for the Redress of Grievances..........................26

IV.   THE ENTERPRISE ELEMENT OF THE RICO CLAIMS IS SUFFICIENTLY
ALLEGED .............................................................................................28

A. The FAC Pleads an Association-In-Fact Enterprise ....................................28

B. Wynn MA Is Sufficiently Alleged to Be the RICO Enterprise In the Second Cause of
Action Because It Does Not Violate the "Distinctness Rule" ...........................33

V.   ALL OF THE CRIMES THE FAC ACCUSES DEFENDANTS OF COMMITTING
ARE "RACKETEERING ACTIVITY" ........................................................36

A. The Travel Act Violations Alleged Here are RICO Predicate Acts ..............37

B. Felony Violations of the Massachusetts Gaming Act's Anti-Fraud Provisions Are
RICO Predicate Acts......................................................................40

C. The Mail and Wire Fraud Claims Sufficiently Plead Deprivation of Property............42

VI.   THE ROLES AND CULPABILITY OF EACH DEFENDANT IN THE SCHEME AND IN THE COMMISSION OF RICO PREDICATE ACTS ARE ADEQUATELY ALLEGED ...................................................................................................47

A. FBT ..................................................................................................................47

B.  Steve Wynn ...................................................................................................51

C. Matthew Maddox ..........................................................................................54

C. Kim Sinatra ....................................................................................................57

VII.  THE FAC ADEQUATELY PLEADS THAT THE DEFENDANTS' RACKETEERING ACTIVITY CONSTITUTED A PATTERN ....................................................................59

A. The FAC Pleads Continuity ..........................................................................60

B.  The FAC Sufficiently Alleges Relatedness of All Predicate Acts Alleged .................68

VIII.  THE FAC SUFFICIENTLY ALLEGES RICO CONSPIRACY LIABILITY AGAINST ALL DEFENDANTS ..........................................................................................70

IX.   SSR HAS ADEEQUATELY PLEADED ITS STATE LAW CLAIMS ..........................71

X.   DEFENDANTS' ANTI-SLAPP "SPECIAL MOTION" IS GROUNDLESS .................73

XI.   IN THE ALTERNATIVE, LEAVE TO AMEND SHOULD BE GRANTED ...............78

CONCLUSION....................................................................................................79

**<u>TABLE OF AUTHORITIES</u>**

<u>Cases</u>                                                        <u>Page(s)</u>

*A.I. Credit Corp. v. Hartford Computer Group, Inc.*,
   847 F. Supp. 588 (N.D. Ill. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

*Aetna Cas. Sur. Co. v. P & B Autobody*
   43 F.3d 1546 (1st Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Agency Holding Corp. v. Malley–Duff & Assocs., Inc.*,
   483 U.S. 143 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Al-Rayes v. Willingham*,
   914 F.3d 1302 (11th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 29

*Allum v. BankAmerica Corp.*,
   1998 WL 467021 (9th Cir. Aug 3, 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*American Expositions Co. LP v. Corcoran*,
   898 N.E.2d 831 (Mass. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*Anza v. Ideal Steel Supply Corp.*,
   547 U.S. 451 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

*Ashland Oil Inc. v. Arnett*,
   875 F.2d 1271 (7th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*Atlas Pile Driving Co. v. DiCon Fin. Co.*,
   886 F.2d 986 (8th Cir.1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Augat, Inc. v. Aegis, Inc.*,
   565 N.E.2d 415 (Mass. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

*Beninati v. Borghi*,
   61 N.E.3d 476 (Mass. App. Ct. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*Blackstone v. Cashman*,
   860 N.E.2d 7 (Mass. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

*Blanchard v. Steward Carney Hosp., Inc.*,
   75 N.E.3d 21 (Mass. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73, 75, 76, 77

*Blanchard v. Steward Carney Hosp., Inc.*,
   2017 WL 7361049 (Super Ct. Suffolk Co. Dec. 7, 2017) . . . . . . . . . . . . . . . . . . . . . 74

*Boston Cab Dispatch, Inc. v. Uber Techs., Inc.*,
   2015 WL 314131 (D. Mass., Jan. 26, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 25

*Bowdoin Construction Corp. v. Rhode Island Hospital Trust Nat'l Bank*,
   869 F. Supp. 1004 (D. Mass. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

*Boyle v. United States*,
   556 U.S. 938 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 28, 29, 30

*Bridge v. Phoenix Bond & Indemnity Co.*,
   553 U.S. 639 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Passim*

iii

*Bucklew v. Hawkins, Ash, Baptie & Co., LLP*,
  329 F.3d 923 (7th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Caesars Mass. Mgmt. Co., LLC v. Crosby*,
  778 F.3d 327 (1st Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Cardtoons, L.C. v. Major League Baseball Players Ass'n*,
  208 F.3d 885 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Cedric Kushner Promotions, Ltd. v. King*,
  533 U.S. 158 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33-36

*Central Bank of Denver v. First Interstate Bank of Denver*,
  511 U.S. 164 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

*Cheminor Drugs, Ltd. v. Ethyl Corp.*,
  168 F.3d 119 (3d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Cleveland v. United States*,
  531 U.S. 12 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42-45

*Cullen v. Margiotta*,
  811 F.2d 698 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Davric Maine Corp. v. Rancourt*,
  216 F.3d 143 (1st Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Draghetti v. Chmielewski*,
  626 N.E.2d 862 (Mass. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

*Duracraft Corp. v. Holmes Products Corp.*,
  691 N.E.2d 935 (Mass. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

*Efron v. Embassy Suites (Puerto Rico), Inc.*,
  223 F.3d 12 (1st Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62, 65, 67

*Feinstein v. Resolution Trust Corp.*,
  942 F.2d 34 (1st Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60, 68, 70

*Framingham Union Hosp., Inc. v. Travelers Ins. Co.*,
  721 F. Supp. 1478 (D. Mass. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*Fuller v. Harrah's Entertainment, Inc.*,
  2004 WL 2452771 (E.D. La. Oct. 29, 2004) . . . . . . . . . . . . . . . . . . . . . . . 40-41

*George Lussier Enterprises Inc. v. Subaru of New England Inc.*,
  2002 WL 1349523 (D.N.H. June 3, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*George Lussier Enters. v. Subaru of New Eng., Inc.*,
  393 F.3d 36 (1st Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*George v. Nat'l water Main Cleaning Co.*,
  286 F.R.D. 168 (D. Mass. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Giles v. Phelan, Hallinan & Schmieg, L.L.P.*,
  2013 WL 2444036 (D.N.J. June 4, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Giuliano v. Fulton*,
399 F.3d 381 (1st Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64, 66

*Grover v. Larkin Iron Works, Inc.*,
2011 WL 476619 (D. Mass. Feb. 7, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

*H.J., Inc. v. Northwestern Bell Tel. Co.*,
492 U.S. 229 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Passim*

*Harmoni Int'l Spice, Inc. v. Hume*,
914 F.3d 648 (9th Cir. 2019) (reversing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Harrison v. NetCentric Corp.*,
744 N.E.2d 622 (Mass. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*Heinrich v. Waiting Angels Adoption Servs., Inc.*,
668 F.3d 393 (6th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Holmes v. Secs. Investor Protection Corp.*,
503 U.S. 258 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Home Orthopedics Corp. v. Rodriguez*,
781 F.3d 521 (1st Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59, 65, 67

*Hunneman Real Estate Corp. v. Norwood Realty, Inc.*,
765 N.E.2d 800 (Mass. App. Ct. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

*ICONICS, Inc. v. Massaro*,
192 F. Supp. 3d 254 (D. Mass. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

*In re Celexa & Lexapro Marketing & Sales Practices Litig.*,
915 F.3d 1 (1st Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*In re Neurontin Marketing & Sales Practice Litig.*,
712 F.3d 21 (1st Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20, 22

*Kattar v. Demoulas*,
739 N.E.2d 246 (Mass. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

*Kemp v. American Tel. & Tel. Co.*,
393 F.3d 1354 (11th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Kobrin v. Gastfriend*,
821 N.E.2d 60 (Mass. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*Kripp v. Luton*,
466 F.3d 1171 (10th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Laker v. Freid*,
854 F. Supp. 923 (D. Mass. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53, 66

*Libertad v. Welch*,
53 F.3d 428 (1st Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 62, 70

*Mastoran Restaurants, Inc. v. Commonwealth Div. of Capital Asset Mgmt.*,
2001 WL 1811963 (Mass. Super. Ct. Dec. 31, 2001) . . . . . . . . . . . . . . . . . . . . . 71

v

*McGinty v. Beranger Volkswagen, Inc.*,
  633 F.2d 226 (1st Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Meijer, Inc. v. Ranbaxy Inc.*,
  2016 WL 4697331 (D. Mass., June 16, 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Metro. Prop. & Cas. Ins. Co. v. Savin Hill Family Chiropractic, Inc.*,
  266 F. Supp. 3d 502 (D. Mass. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Mowett v. City of Detroit*,
  2017 WL 85835 (E.D. Mich. Jan. 10, 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*New England Data Servs., Inc. v. Becher*,
  829 F.2d 286 (1st Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Olive Can Co. v. Martin*,
  906 F.2d 1147 (7th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Owen v. Williams*,
  77 N.E.2d 318 (Mass. 1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*Peckham v. Continental Cas. Ins. Co.*,
  895 F.2d 830 (1st Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Phoenix Bond & Indem. Co.*,
  911 F. Supp. 2d 661 (N.D.Ill. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Puerto Rico Telephone Co., v. San Juan Cable LLC*,
  874 F.3d 767 (1st Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Ray v. Spirit Airlines, Inc.*,
  836 F.3d 1340 (11th Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Rectrix Aerodome Ctrs., Inc. v. Barnstable Mun. Airport Comm'n*,
  632 F.Supp.2d 120 (D. Mass. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Resolution Trust Corp. v. Stone*,
  998 F.2d 1534 (10th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*RJR Nabisco, Inc. v. European Cmty.*,
  136 S. Ct. 2090 (2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Russello v. United States*,
  464 U.S. 16 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Sebago, Inc. v. Beazer East, Inc.*,
  18 F.Supp.2d 70 (D. Mass. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22-23

*Sedima, S.P.R.L. v. Imrex Co.*,
  473 U.S. 479 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 47

*Shields Enterprises v. First Chicago Corp.*,
  975 F.2d 1290 (7th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*Shirokov v. Dunlap, Grubb & Weaver, PLLC*,
  2012 WL 1065578 (D. Mass. Mar. 27, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Smith v. Pasqualetto,*
   246 F.2d 765 (1st Cir. 1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
*Sosa v. DIRECTV, Inc.,*
   437 F.3d 923 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27
*Steinmetz v Coyle & Caron Inc.,*
   862 F.3d 128 (1st Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73, 74-77
*Stop & Shop Supermarket Co. v. Loomer,*
   837 N.E.2d 712 (Mass. App. Ct. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71
*Sullivan v. National Football League,*
   34 F.3d 1091 (1st Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71
*Swift v. United States,*
   866 F.2d 507 (1st Cir.1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
*Systems Management, Inc. v. Loiselle,*
   303 F.3d 100 (1st Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67
*Trustees of Boston Univ. v. ASM Comms., Inc.,*
   33 F. Supp. 2d 66 (D. Mass. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
*United Food et al. v. Novartis Pharms. Corp.,*
   902 F.3d 1 (1st Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 27
*United States v. Barbeito,*
   2010 WL 2243878 (W.D. Va. June 3, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
*United States v. Berroa,*
   856 F.3d 141 (1st Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
*United States v. Christopher,*
   142 F.3d 46 (1st Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44-45
*United States v. DeLuna,*
   763 F.2d 897 (8th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37-38
*United States v. Fattah,*
   914 F.3d 112 (3d Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
*United States v. Ferber,*
   966 F. Supp. 90 (D. Mass. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38-39
*United States v. Forsythe,*
   560 F.2d 1127 (3d Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
*United States v. Garner,*
   837 F.2d 1404, (7th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
*United States v. Genova,*
   187 F. Supp.2d 1015 (N.D. Ill. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41-42
*United States v. Genova,*
   333 F.3d 750 (7th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*United States v. Goldfarb*,
  643 F.2d 422 (6th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
*United States v. Harris*,
  695 F.3d 1125 (10th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
*United States v. Henry*,
  29 F.3d 112 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
*United States v. Inadi*,
  475 U.S. 387 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
*United States v. Krasniqi*,
  555 F. App'x 14 (2d Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
*United States v. Lee*,
  660 F. App'x 8 (2d Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
*United States v. Mark*,
  460 F. App'x 103 (3d Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40-41
*United States v. Palacios*,
  677 F.3d 234 (4th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
*United States v. Polizzi*,
  500 F.2d 856 (9th Cir.1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
*United States v. Ramirez-Rivera*,
  800 F.3d 1 (1st Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
*United States v. Sawyer*,
  239 F.3d 31 (1st Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
*United States v. Vaccaro*,
  602 F. Supp. 1132 (D. Nev. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
*United States v. Vigil*,
  478 F. Supp. 2d 1285 (D.N.M. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
*United Truck Leasing Corp. v. Geltman*,
  551 N.E.2d 20 (Mass. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73
*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*,
  382 U.S. 172 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 27
*Warnock v. State Farm Mut. Auto. Ins. Co.*,
  2008 WL 5272063 (S.D. Miss. Dec. 17, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**<u>Statutes</u>**

18 U.S.C. §1952 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
18 U.S.C. §1952(b)(i)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
18 U.S.C. §1962(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17

18 U.S.C. §1964(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

18 U.S.C. §1961 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

18 U.S.C. §1961(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 40, 42, 49

18 U.S.C. §1962(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Passim*

M.G.L. c. 23K § 19(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

M.G.L. c. 93A § 11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71, 72

M.G.L. c. 23K § 16(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 21

M.G.L. c. 23K § 38 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 40

M.G.L. c. 93A, § 1(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71, 72

M.G.L. c. 93A, § 11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

Restatement (Second) of Torts § 766 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

## **Rules**

Fed. R. Civ. P. 6(a)(1)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Plaintiff Sterling Suffolk Racecourse, LLC ("SSR") respectfully submits this consolidated memorandum of law in opposition to the defendants' six separate motions seeking dismissal and other relief against the First Amended Complaint (the "FAC", Doc. No. 71).[1]

## PRELIMINARY STATEMENT

Despite defendants' attempts to resurrect long obsolete precedent, inject new requirements that the United States Supreme Court and lower courts have rejected, and otherwise treat this lawsuit dismissively, the FAC presents exactly the situation the civil RICO statute was designed to address. It is not an ordinary business dispute. Rather, the detailed factual allegations of the FAC outline a wide-ranging and long-lasting scheme which, among other things, corrupted the Massachusetts Gaming Commission's ("MGC") decision as to which of two applicants would open the first legal casino in the metropolitan Boston area ("Region A"). The scheme has had devastating consequences not only for SSR, but for the entire Boston metropolitan area and, indeed, the Commonwealth of Massachusetts. In obtaining the license for Wynn MA, defendants succeeded in permitting a thoroughly corrupt applicant to circumvent the protections that the Massachusetts legislature so carefully constructed to avoid just this result. Even as this matter is briefed, the damage to the Commonwealth is evident in the ongoing MGC adjudicatory hearings concerning the past and ongoing suitability of the Wynn Defendants. The

---

[1] Capitalized terms not otherwise defined herein are used as defined in the FAC. The five memoranda of law in support of the defendants' motions to dismiss are referenced herein as follows: (i) FBT Everett Realty LLC's brief (Doc. No. 73) as "FBT Br."; (ii) Matthew Maddox's brief (Doc. No. 78) as "MM Br."; (iii) Stephen Wynn's brief (Doc. No. 84) as "SW Br."; (iv) Kim Sinatra's  brief (Doc. No. 82) as "KS Br."; (v) Wynn Resorts, Ltd. ("Wynn Resorts") and Wynn MA, LLC's ("Wynn MA") brief (Doc. No. 76) as "WR Br." The sixth and separate brief in support of Maddox, Wynn Resorts and Wynn MA's "Special Motion" to dismiss the FAC pursuant to the Massachusetts Anti-SLAPP statute (Doc. No. 81) is referenced as "AS Br.".

MGC's investigators' year-long suitability investigation determined there was a corporate culture of deception and complicity at the highest level of Wynn Resorts and Wynn MA, as well as secret payoffs, the mistreatment of women and a clear attitude that the rules do not apply to those in charge. Added to that is defendants' association with felons, false certifications to the MGC, false testimony to the MGC, the plainly conflicted relationship between the Chairman of the MGC and one of the FBT owners, enlisting the Everett's Mayor DeMaria on the FBT payroll and DeMaria's ongoing efforts to drive an innocent businessman out of his business for the benefit of FBT and Wynn.

The right to obtain the sole Region A casino license ("License") was obviously of great value.  And the threat of criminal infiltration into Massachusetts' incipient gaming industry was of paramount concern to the Massachusetts' legislature. The state statute authorizing the License thus took great pains to ensure that no one who was unsuitable due to, for example, association with organized crime figures or other convicted felons or a pattern of compliance violations in other legal-casino jurisdictions could receive the License.   Moreover, the risk of criminal infiltration of the legal casino industry was not simply a Massachusetts concern, it was one of the core federal concerns motivating the enactment of RICO in the first place, to provide federal enforcement mechanisms over and above those provided by state law.

Wynn MA, the ultimate awardee of the License, and its current and former control persons together with the criminally-owned business (FBT) from which they purchased the land (the "Everett Site") on which the Wynn casino is now being built could never have prevailed in a fair contest.  Defendants systematically deceived the unrecused members of the MGC about the true facts which would have required, pursuant to the Massachusetts Gaming Act, a finding that each of the Wynn Defendants was unsuitable and the denial of their applications.  Defendants

joined together to steal the future income stream, which all parties hereto knew would flow from the operation of a casino, out of the pocket of SSR, owner of the historic Suffolk Downs racetrack site in Revere and East Boston.  But for their RICO violations (and related violations of Massachusetts statutory and common law), SSR's business partner Mohegan Sun Massachusetts ("MSM") would have obtained the License via a proposal to build and operate a casino on SSR's property, contractually guaranteeing SSR a minimum risk-free income stream of $35 million per year, and quite likely much more, for decades to come.

Defendants have collectively filed 107 pages of briefing seeking to avoid liability on a whole grab-bag of grounds and, to be blunt, seeking dismissal on the pleadings in order to avoid the discovery they fully know would confirm the truth of the allegations.  Their arguments attempt to impose technical requirements for a RICO claim that are simply not in the statute and which other courts have rejected.  Over and over again, for example, they simply ignore the controlling Supreme Court precedent on the issue at hand that is fatal to the argument they seek to make.   Given the vast number of separate issues raised, however, we will deal with each of them in turn below.

### KEY FACTUAL ALLEGATIONS OF THE FAC AND OTHER PUBLIC-RECORD BACKGROUND

We respectfully refer the Court to the FAC in its entirety for the full statement of the detailed factual allegations upon which SSR's claims are based.  In order to keep this submission from being unnecessarily long we give only the crucial highlights here.

**The Opportunity**.  When Massachusetts decided to legalize casino gambling in 2011, it did so with numerous procedural limitations and safeguards.  Only three casinos would be permitted in the state as a whole, and only one in Region A, the metropolitan Boston area.  FAC

¶ 24.  Receiving the sole Region A License was anticipated to be an extraordinarily lucrative business opportunity, so lucrative, in fact, that each of the ultimate applicants was prepared to spend in excess of $500 million in construction costs and still expect to be profitable almost immediately.  WR Br., Ex. 3 (the "Wynn License Award", Doc. No. 76-3) at 12.  A new agency, the MGC, was set up to oversee the licensing process, and instructed to apply strict criteria for the suitability and integrity of applicants and their affiliates, including the propriety of their associations going back many years.  Details of those statutory criteria are quoted at FAC ¶¶ 24-31.

**The Parties**.  SSR was the owner of the long-established Suffolk Downs racetrack site, which was a perfect Boston area location for a casino, and was interested in pursuing the License, in combination with a suitably-experienced business partner with casino-specific experience, from the beginning.  FAC ¶¶ 2-4, 16, 75-77.  Defendant Wynn Resorts, together with its principals – defendants Steve Wynn (the founder and CEO), Kim Sinatra (the general counsel, with an unusually broad and active management role), and Matt Maddox (the remaining senior figure in the management triumvirate) – were also interested, and formed Wynn MA (a subsidiary of Wynn Resorts) as their vehicle to pursue the License and, if obtained, build their Boston-area casino.  These five defendants are sometimes collectively called the Wynn Defendants or the Wynn applicants (because, even though Wynn MA was the specific entity seeking the License, the other four were all required to be independently found suitable and qualified by the MGC as part of the same process).  However, their initial plan to use a location in Foxborough fell apart in spring 2012 due to local political opposition.  FAC ¶¶ 17-21, 53-54.  At the same time, FBT was looking for a buyer for the Everett Site, a former Monsanto Chemical facility and earlier a munitions factory that was still badly contaminated with toxic waste, which

it had bought some years earlier in the speculative hope of utilizing the site for a waste transfer station or selling it to a buyer who could make use of it.  FAC ¶¶ 23, 56-57, SW Br., Ex. A (the "2013 Wynn Report", Doc. No. 84-2) at 62.

**The Defendants Form Their Scheme**.  The Everett Site, was, not least due to its contamination with toxic waste and serious transportation and access problems, not a promising location to build a casino.  However, FBT had two illegal advantages it could offer any prospective buyer.  First, several years earlier, FBT had been approached by Everett's Mayor Carlo DeMaria, who was looking for a piece of the action.  FAC ¶ 60.  FBT agreed with DeMaria to hire a DeMaria hanger-on and bagman named Jamie Russo (a convicted criminal who had sought to defraud a casino in neighboring Connecticut) to provide unspecified "consulting" services and pay Russo, as a conduit to funnel money to Mayor DeMaria, 3% of the eventual sale proceeds from the Everett Site.  FAC ¶¶ 59-60.  By putting Russo on the payroll, it put the mayor on the payroll as well.  This arrangement fully incentivized Mayor DeMaria to abuse the powers of his office in whatever ways would help maximize the ultimate total sales proceeds from the Everett Site.

Nor was the mayor the only public official affiliated with FBT.  The MGC's then-Chairman Stephen Crosby (who eventually resigned in disgrace amidst adverse publicity caused by the handling of the license award process) was an old friend and business partner of FBT's principal Paul Lohnes who felt a sense of obligation to pay Lohnes back for bailing Crosby out of a failed venture some years earlier.  FAC ¶ 63. FBT, for good reason, had never previously thought of a casino operator as a potential buyer for the Everett Site.  FAC ¶ 64.  However, shortly after Lohnes had a private dinner with Crosby in May 2012, Lohnes raised the idea with his FBT business partners and bragged that his personal connection with Crosby ensured that

Crosby would manipulate the process in favor of any casino proposal that would use the Everett Site and thereby create profit for FBT.  FAC ¶¶ 64-66.  In fact, Lohnes was so confident of Crosby's help that he dissuaded certain of his partners in FBT from pursuing another sale opportunity to a non-casino buyer.  FAC ¶ 66.  Lohnes met again with Crosby and introduced him to at least one of his FBT partners at a party at Lohnes' house in the summer of 2013.  FAC ¶ 63.  Although Crosby has an obligation to disclose these two meeting with Lohnes, he did not disclose the May 2012 dinner until more than a year later and only after the FBI began to raise questions about the ownership of FBT (FAC ¶¶ 67, 68) and never disclosed his attendance at Lohnes' party in the summer of 2012 (FAC ¶ 12).

The first prospective casino operator steered to the site by Crosby lost interest quickly due to the site's manifest unsuitability.  FAC ¶64.  The Wynn applicants, still looking for an alternative after their Foxborough plans had fallen through, were not so picky.  In proceeding with the Everett Site, the Wynn applicants not only had to look past the site's physical manifest unsuitability, but also disregard a disqualifying flaw arising from FBT's ownership structure.  Two of FBT's five owners (Gary DeCicco and Charlie Lightbody, the latter widely understood to be affiliated with La Cosa Nostra) were convicted felons.  FAC ¶¶ 81, 82.  All defendants knew that the MGC would not issue the License to any applicants associated with felons or whose plan would benefit felons.  FAC ¶¶ 28 (citing M.G.L. c. 23k § 16(a)), 57, 64.  In November and December 2012, Steve Wynn, Sinatra and Maddox all traveled to Massachusetts to view the Everett Site.  Sinatra and Maddox had specific discussions with FBT about the problems posed by its convicted-felon owners.  Sinatra and Maddox, after directly consulting with Steve Wynn himself, struck a corrupt deal with FBT on behalf of Wynn Resorts and Wynn MA in which the Wynn entities would pay FBT $75 million for the Everett Site if and when they

got the license, plus $100,000 a month to hold the option open while the License was pursued, with the unwritten mutual understanding that all parties would conceal from the MGC the involvement of DeCicco and Lightbody from the MGC.  FAC ¶¶ 80-81, 87-89.

**The Scheme Goes Into Operation**.  FBT then proceeded to create multiple forged and/or backdated documents falsely purporting to show that DeCicco and Lightbody had been bought out in August 2012, a few months before the Wynn applicants arrived on the scene.  All defendants participated in creating a false paper trail with the specific intent of concealing the felons' interests and involvement.  FAC ¶¶ 92-95, 97-98.

Lightbody had not really been bought out and the Wynn Defendants, including Steve Wynn's right-hand man Maddox, knew it.  In the spring of 2013, the Wynn Defendants required Lightbody's "services" in connection with obtaining a parcel of land adjacent to the Everett Site that was necessary for access to and from the proposed casino.  FAC ¶¶ 105-106.  The owner, who had built and operated a carwash on the parcel and was friendly with the FBT owners, however, insisted that he would only deal with Lightbody in his negotiation with the Wynn Defendants for the option to purchase the land.  FAC ¶ 106.  Maddox and other agents of the Wynn Defendants therefore enlisted Lightbody's aid and Maddox himself met with Lightbody in person on at least two occasions in the spring of 2013 to discuss the Wynn Defendants' proposed purchase.  FAC ¶¶ 106- 107.  Maddox's efforts proved fruitful and Lightbody was able to broker the deal. FAC ¶ 106.   The carwash owner signed an option on or about June 11, 2013, and when asked by Maddox in email correspondence about the owner's acceptance of the Wynn Defendants' terms, DeNunzio euphemistically wrote back that Lightbody "held [the owner's] hand" until he signed.  FAC ¶ 106.

Wynn MA employed Lightbody's services once again in connection with facilitating busses for transportation to the June 22, 2013 Everett community referendum for approval of the proposed casino.  FAC ¶ 102.  Another of Lightbody's contributions to the Wynn applicants' casino efforts was his October 2013 assault of a participant in the pro-SSR rally in Revere in full public view, an act, when given Lightbody's notoriety, undoubtedly was intended for broader effect.  FAC ¶ 101.  Lightbody's involvement was known to others at Wynn Resorts and Wynn MA, including John Tocco, a Wynn Resorts' employee who coordinated the referendum efforts in 2013 and whose father worked as a lobbyist for Wynn in connection with the application process.  FAC ¶ 101.  In short, even after being apprised of Lightbody's criminal background, and months after Lightbody supposedly separated from FBT, matt Maddox and others at Wynn actively solicited his services.  FAC ¶¶ 101-107.

However, the initial scheme hit a significant road-bump in the summer of 2013 when the FBI learned of Lightbody's concealed interest in the Everett Site via wiretaps in an unrelated criminal investigation and tipped off the MGC.  FAC ¶ 96.  Having been caught lying, the defendants then decided to lie their way out of getting caught.  While FBT lay low, Steve Wynn, Matt Maddox, and Kim Sinatra each lied under oath to the MGC about their prior knowledge of the involvement of felons in FBT's ownership, falsely claiming to have been totally unaware of Lightbody's ownership interests and continued involvement and to have themselves been victims of deceit.  FAC ¶¶ 100, 111.  Maddox, who had been working face-to-face with Lightbody only a few months earlier in sorting out the option to obtain the carwash property adjacent to the Everett site, falsely denied even knowing who Lightbody was.  FAC ¶¶ 106-107, 100.  These lies convinced the MGC to give the Wynn applicants another chance.

The Wynn applicants went back to FBT and renegotiated their deal to purportedly require FBT to take a $40 million haircut to eliminate the "casino premium" with part of the deal being specific new representations from all of FBT's disclosed non-felon principals that no other concealed ownership interests remained.  FAC ¶¶ 112-113.  The MGC blessed this revised proposal at the "Phase 1" suitability stage in December 2013 (FAC ¶¶ 110, 134; WR Br., Ex. 1 (the "Wynn Suitability Decision", Doc. No. 76-1) at 8-9), before it was ready (in "Phase 2") to evaluate the merits of the Wynn applicants' full proposal against those of SSR's competing proposal. The defendants' fraud continued, however, because each of the three FBT principals signed false certifications, knowing that the Wynn applicants would be submitting them to the MGC to confirm compliance with the supposedly revised deal.  FAC ¶¶ 116-117, 119-120. Those false certifications:  a) concealed Lightbody's ongoing interest in the Everett Site, since he had sold out for a promissory note that gave him rights to a reversionary interest if the note were not paid (FAC ¶ 116); b) vaguely mentioned that Russo would be receiving unspecified compensation at closing but without disclosing Russo's highly material own criminal record or that Russo was being used as a conduit to funnel money to Mayor DeMaria (FAC ¶¶ 114-115); and c) in the case of the most reluctant principal (Gattineri) failed to disclose that the Wynn applicants had finally overcome his reluctance to sign the certification the Wynn applicants had needed to deliver to the MGC only by offering him, in June 2014, a secret side payment inconsistent with the revised deal the MGC had thought it was approving (FAC ¶¶ 118-119).

**The Wynn Defendants' Misconduct In Other Jurisdictions And Its Fraudulent Concealment**.  The Wynn Defendants (except for the newly-formed Wynn MA) had long operated casinos in Nevada and Macau.  Unknown to the general public until the Wall Street Journal broke the story in early 2018, Steve Wynn himself had engaged in a long-running

pattern, going back to at least 2005 and continuing through and after the period of the License application in Massachusetts, of sexual abuse of female employees of Wynn Resorts, which was kept secret through the complicity and misconduct of other senior management, specifically including Sinatra, and the use of multi-million-dollar hush-money payments funneled through shell companies.  FAC ¶¶ 36, 146-147.  Far from being mere personal peccadillos, this misconduct (both in Steve Wynn's individual treatment of subordinate employees and in the corporate concealment rather than fair resolution of employee complaints) violated Nevada's regulatory laws for casino licensees to the extent of constituting gross misdemeanors.  FAC ¶¶ 37-38.

Once the magnitude of the scandal was initially revealed in early 2018, Steve Wynn abruptly left the company he had founded and named.  FAC ¶ 19.[2]  Sinatra was forced out a few months later due to her complicity.  FAC ¶ 21.  In early 2019, the Nevada regulators filed a public complaint detailing the numerous violations of Nevada's suitability laws that had been committed, and Wynn Resorts immediately settled, with an explicit admission of the truth of virtually all of the factual allegations.  FAC ¶¶ 36-37; MM Br., Ex. 1 (the "Nevada Complaint", Doc. No. 78-1), Ex. 2 (the "Nevada Settlement", Doc. No. 78-2).  Criminal sanctions were avoided as part of a negotiated settlement, but Wynn Resorts was subsequently ordered to pay $20 million (2019 Wynn Report at 18), reportedly the largest fine of a casino operator in Nevada history.  The MGC has been pursuing its own investigation, which included a multi-day public hearing earlier this week, April 2-4, 2019.

---

[2] *See also* Investigative Report Regarding Ongoing Suitability of Wynn MA, LLC, dated March 15, 2019 (the "2019 Wynn Report"), attached hereto Exhibit 1, at 1; Stephen Wynn Qualifier Decision and Order of the MGC, dated May 7, 2018) ("2018 Wynn Order"), attached hereto as Exhibit 2, at 3. The Court can take judicial notice of the 2019 Wynn Report and the 2018 Wynn Order. *See*, *e.g.*, WR Br. at 4 n. 1; MM Br. at 6 n. 4; SW Br. at 9 n. 4.

None of this ongoing pattern of misconduct in violation of Nevada's casino regulatory laws was disclosed to the MGC while the Wynn applicants were pursuing and obtaining the License in Massachusetts, despite its obvious salience to their suitability to be issued that License.  Moreover, both Steve Wynn and Sinatra lied under oath, making claims about their Nevada compliance record that were false given what they knew had already been done but not yet detected, and Steve Wynn lied on his own personal suitability application to the MGC by failing to disclose his interest in one of the shell companies that had been used for the largest hush-money payment, since such disclosure would have inevitably encouraged follow-up questions about the nature of that company's activities.  FAC ¶¶ 129-130, 146-147.  Continuing his reputation for suing anybody who dares raise a complaint, in this action Steve Wynn's lawyer threatened Rule 11 sanctions if the allegation that Steve Wynn owned the shell company (FAC ¶ 147) was not retracted. SW Br. at 17 n. 11.  SSR requested that Steve Wynn provide evidence as to the ownership and membership interests of the shell company and SSR would reconsider the allegation.  There has been no response, presumably because in the ongoing MGC hearings as to the Wynn applicants' suitability and whether Wynn MA's License should be revoked, the MGC's investigators found that Steve Wynn's lawyer formed the company "so that Steve Wynn and Wynn Resorts could avoid being named parties to the [settlement] agreement" and that "Mr. Wynn presumably retained a reversionary interest in the [settlement] funds yet to be paid" by Entity Y as of 2013. 2019 Wynn Report at 33, 89.

Nor was the Wynn applicants' compliance record in Macau any better.  Indeed, it involved multiple instances that previewed their actions in Massachusetts via consorting with organized-crime elements and doing land deals with suspicious sellers with concealed ownership structures.  FAC ¶¶ 39-52.  Again, they defrauded the MGC via Steve Wynn himself giving false

sworn testimony about their compliance record in Macau (FAC ¶¶ 124-128) and the applicants (with Sinatra as the responsible point person) failing to disclose a new regulatory inquiry into their Macau activities in response to a specific August 2014 MGC direction requiring License applicants to disclose all pending regulatory inquiries in any jurisdiction that had not previously been disclosed (FAC ¶¶ 137-138).

**Ongoing Attempts to Rig the Competition And Sabotage SSR's Bid**.  Crosby, in order to financially benefit Lohnes and FBT (which required steering the License to the Wynn applicants, as those willing to pay FBT a premium for the Everett Site), repeatedly abused the powers of his office by engaging in illegal ex parte communications with Steve Wynn himself, agreeing to minimize the MGC's inquiry into the situation in Macau, and placing any numbers of obstacles in the way of SSR's own bid, including undermining the approval of SSR's chosen casino-operator business partner.  FAC ¶¶ 88, 123, 132.  Eventually Crosby was forced by public pressure (after media revelations of his ties with Lohnes) to recuse himself.  FAC ¶ 133.  None of these efforts sufficed to drive SSR out, however.  Despite the best efforts of the defendants and their collaborators, SSR reached a new agreement where MSM, who had previously been found qualified by the MGC while pursuing an unsuccessful casino project elsewhere in Massachusetts, would become the applicant for the License and build casino on SSR's Suffolk Downs site, with SSR receiving a contractually-agreed percentage of the revenues subject to a $35 million guaranteed annual minimum.  FAC ¶¶ 76-78.  The MSM/SSR proposal remained the Wynn Defendants and FBT's sole competitor under consideration by the MGC and met all statutory and policy criteria to be awarded the License.  FAC ¶ 141; Wynn License Award at 35.

**License Award**.  On September 16 or 17, 2014, the MGC (with Crosby purportedly recused) tentatively voted 3-1 to award the License to the Wynn applicants (FAC ¶ 139, Wynn

12

License Award at 3), and on November 6 or 7, the MGC issued a decision (*id*.) explicitly

granting the Wynn application and denying the MSM/SSR application.  But for defendants'

RICO violations (and state-law violations) the License would have been awarded to the

MSM/SSR proposal.  Due to the zero-sum nature of the competition where only one License

would be awarded in Region A, the resultant injury to SSR's property and business was both

foreseeable and inevitable.  SSR has lost future revenue in the amount of approximately one

billion dollars.  It sold the Suffolk Downs site for dramatically less than it would have been

worth had the License been issued and a casino been built or in the process of being built on the

site.  FAC ¶ 139.

   **Post-2014 Events**.  The Wynn casino (subsequently rebranded to take the scandal-tarred

Wynn name off of the property) has been under construction and is reported to be ready to open

in a few months.  In early 2015 Russo sued FBT claiming he had not been paid all of his

promised share of the proceeds from the sale of the Everett Site.  *See Russo v. FBT Everett*

*Realty LLC*, Middlesex Superior Court, Civil Case No. 1581CV00712 ("Russo Docket").  That

lawsuit was settled on undisclosed terms in December 2016.  *Id*.  While it was pending Mayor

DeMaria (whose own payout from the sale of the Everett Site was to be routed to him via Russo)

abused the powers of his office to pressure an adjoining landowner who was presenting an

obstacle to the construction of the Wynn casino.  FAC ¶¶ 108-109.

   The MGC has been considering the impact of the public revelation of the long-running

pattern of suitability violations in Nevada on Wynn MA's continuing suitability to hold the

License, with no decision announced as of the date this brief is filed.[3]  There have also been calls

_____

[3] The MGC held adjudicatory hearings earlier this week in connection with its suitability
evaluation.  In advance of the hearings, the MGC's investigators issued a 209-page report that
outlines the results of its investigation.  The report also indicates that the investigation was

for further investigation into the campaign contributions of Wynn Resorts shortly after the vote

on the license.  As noted in the FAC (¶ 143), such contributions by an applicant are illegal.  As a

result of the MGC's investigation and other developments, more evidence of the defendants' past

wrongdoing has emerged into the public record and is likely to continue to emerge.

## ARGUMENT

"To state a [civil RICO] claim under [18 U.S.C.] § 1962(c), a plaintiff must allege each

of the four elements required by the statute:  1) conduct; 2) of an enterprise; 3) through a

pattern; 4) of racketeering activity."  *Libertad v. Welch*, 53 F.3d 428, 441 (1st Cir. 1995).  Any

private plaintiff "injured in his business or property by reason of" a violation of 1962(c) may

bring suit to recover damages and other relief.  18 U.S.C. § 1964(c).

The standard for 12(b)(6) motions is well-established, and the Supreme Court has

repeatedly rejected attempts by defendants to conjure up specially-onerous pleading rules for

RICO that go beyond a fair reading of the language of the statute itself.  As the Eleventh Circuit

recently summarized some of those statements in *Al-Rayes v. Willingham*, 914 F.3d 1302, 1307–

10 (11th Cir. 2019):

> RICO is widely regarded as a broad statute; indeed, the RICO text itself 'provides
> that its terms are to be 'liberally construed to effectuate its remedial purposes.'
> *Boyle [v. United States]*, 556 U.S. at 944; *see also Sedima, S.P.R.L. v. Imrex Co.*,
> 473 U.S. 479, 497 (1985) ("RICO is to be read broadly."); *Russello v. United States*,
> 464 U.S. 16, 21 (1983) (recognizing "the pattern of the RICO statute in utilizing
> terms and concepts of breadth").

---

impeded in that the Wynn Resorts' executives' "efforts at secrecy made it exceedingly difficult,
if not impossible, for gaming regulators to detect potentially derogatory information through
typical regulatory means, which rely heavily on robust and voluntary self-disclosures by the
applicant/licensee." 2019 Wynn Report at 3, 199.  Wynn Resorts does not contest facts contained
in the report.

14

*See also Bridge v. Phoenix Bond & Indemnity Co. v. Bridge*, 553 U.S. 639, 660 (2008). ("We have repeatedly refused to adopt narrowing constructions of RICO in order to make it conform to a preconceived notion of" narrow Congressional intent).

Because defendants[4] have raised several issues that they contend would shield them from liability even if all the elements of a 1962(c) violation are established, we address those claims (statute of limitations, proximate cause, and alleged *Noerr-Pennington* immunity) in the first three sections of the argument, before dealing in sections IV through VII with the various 1962(c) elements and defendant-specific arguments. We conclude by briefly responding to defendants' arguments on the RICO conspiracy claim under 18 U.S.C. § 1962(d) and the pendent state-law claims, including the "anti-SLAPP" special motion made by several of them.

## I.   THE STATUTE OF LIMITATIONS DID NOT REQUIRE THIS ACTION TO BE FILED ON A SUNDAY

Defendants argue (FBT Br. at 21, WR Br. at 8) that the statute of limitations started running on September 16, 2014 and that this action is thus untimely because it was filed on September 17, 2018 rather than September 16, 2018.[5] But September 16, 2018 was a Sunday, and the deadline to file was thus automatically extended to the following day by Fed. R. Civ. P. 6(a)(1)(C). This has been the law for decades. *See*, *e.g.*, *Smith v. Pasqualetto*, 246 F.2d 765, 768 (1st Cir. 1957) (applying comparable provision of Massachusetts law to hold that when

---

[4] Because defendants have to large degree coordinated their briefing and largely seek to adopt each other's arguments by reference, we will refer generically to "defendants' arguments" rather than attributing them to the specific defendant(s) who briefed them unless the context makes such greater specificity appropriate.

[5] In any event, defendants' own exhibit indicates the MGC's conditional vote took place on September 17, 2014 (Wynn License Award) at 3), not September 16, as the FAC suggests. Therefore, SSR's claims brought on September 17, 2014 were in fact timely under defendants' arguments. *See* FBT Br. at 21; WR Br. at 8.

15

limitations period would otherwise have run on Sunday, June 20, 1954, action filed on June 21 was timely); *Giles v. Phelan, Hallinan & Schmieg, L.L.P.,* 2013 WL 2444036, at *8 (D.N.J. June 4, 2013) (when four-year RICO limitations period would otherwise have run on Sunday, October 23, 2011, action filed on October 24 was timely); *Mowett v. City of Detroit*, 2017 WL 85835, at *2 (E.D. Mich. Jan. 10, 2017) (when limitations period for section 1983 claims would otherwise have run on Sunday, August 14, 2016, action filed on August 15 was timely).  Unsurprisingly, defendants cite no authority holding a Monday-filed lawsuit time-barred because the statute of limitations had expired the day before.

In any event, September 16, 2014 is not even the date when the limitations period started running, because the concrete monetary injuries that gave rise to SSR's right to sue for damages all result from the MGC's denial of its business partner MSM's license application and the simultaneous grant of the Wynn application. There is no dispute that those simultaneous actions occurred on or about November 6, 2014 (FAC ¶¶ 139, 140; Wynn License Award at 36) indicating the final order granting the License to Wynn MA was not signed until November 7, 2014) following an earlier tentative MGC vote on September 16 or 17, 2014. The MGC's decision was not final (and SSR's injury thus not concrete) until it was final.[6]  Here, however the Court need not consider the argument that the limitations period started running on September 16 or 17, 2014 rather than November 6 or 7, because the action is timely either way.

Some but not all defendants now also argue (WR Br. at 8) that SSR's causes of action accrued on December 27, 2013 because SSR had already been "injured" when the MGC initially

---

[6] *See*, *e.g.*, *Kripp v. Luton*, 466 F.3d 1171, 1178 (10th Cir. 2006) (reversing in part dismissal of RICO claims on statute of limitations grounds, because plaintiff's injury—the event that started the limitations period from alleged scheme to deprive him of his property did not occur when the property was initially seized by police, but on the later date when he was formally and permanently deprived of title to it in an allegedly procedurally-defective civil forfeiture action).

found the Wynn applicants suitable as a result of the defendants' fraud. But this makes no sense, because SSR had not yet suffered any injury. The same defendants contradict themselves by arguing (WR Br. at 21) that "[o]nly after this second multi-faceted inquiry [the "Phase II" process which did not end until the November 2014 decision] did the MGC choose Wynn MA" and even at that stage it "could have rejected Wynn MA – or rejected both Wynn MA and [MSM] – for various reasons having nothing to do with the alleged fraud regarding suitability." Thus, any RICO or other action brought before completion of the MGC's Phase 2 decision-making would no doubt have been met with the response that it was premature and speculative, because SSR had not yet suffered any injury.[7]

## II.     THE FAC ADEQUATELY ALLEGES PROXIMATE CAUSE

Defendants argue (WR Br. at 20-22) that they can escape liability even assuming they violated RICO because the connection between their wrongdoing and SSR's injury is too "attenuated." They insinuate that perhaps the MGC or MSM could sue them, but, conveniently enough, SSR cannot. But facts sufficient to establish proximate cause are alleged in the FAC, and defendants' arguments are contrary to the controlling Supreme Court precedents.

### A.  That The Defendants Misrepresentations Were Aimed At the MGC Does Not Attenuate Causation

First of all, the suggestion (WR Br. at 23 n. 21) that defrauding a government agency necessarily means no one other than the defrauded agency has a potential claim against the fraudster is directly foreclosed by *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008). In *Bridge*, the defendants had allegedly defrauded a local government running an

---

[7] Moreover, defendants committed additional predicate acts after December 27, 2013 with a direct causal impact on the MGC's ultimate decision, not least because they prevented the MGC from being aware of evidence that would have made it revisit its earlier suitability decision. FAC ¶¶ 108, 109,117, 120,130(e), 137, 138.

auction of tax liens, thereby allowing defendants to obtain a higher percentage of the liens than

they would have otherwise obtained.  Plaintiffs were other bidders who, as a result of the fraud,

had been deprived of the ability to receive their own fair share of the tax liens being auctioned.

The district court had dismissed their RICO claims because plaintiffs "at best were indirect

victims of the alleged fraud" on the government agency (553 U.S. at 645), which is exactly

defendants' argument here.  But the Supreme Court held to the contrary that plaintiffs had

sufficiently alleged their RICO claims because they plausibly alleged that they had been injured,

in the statutory language, "by reason of" the pattern of alleged mail fraud, even though the

misrepresentations had been directed to the county government rather than the plaintiffs, and the

plaintiffs themselves had not relied on them.  *Id*. at 650.  The Court further held that for

proximate-cause purposes there was a "sufficiently direct relationship between the defendant's

wrongful conduct and the plaintiff's injury," because it "was a foreseeable and natural

consequence of petitioners' scheme to obtain more liens for themselves that other bidders would

obtain fewer liens."  *Id*. at 657-58.

As the Supreme Court subsequently explained, the theory of causation recognized in

*Bridge* was "'straightforward:' Because of the zero-sum nature of the auction, and because the

county awarded bids on a rotational basis, each time a fraud-induced bid was awarded, a

particular legitimate bidder was necessarily passed over."[8] *Hemi Group, LLC v. City of New*

---

[8] *Bridge*'s finding of proximate cause contrasted, because of its different facts, with the prior
decision in *Anza v. Ideal Steel Supply Corp*., 547 U.S. 451 (2006), where defendants had
allegedly defrauded the government by not paying their taxes, which allegedly injured plaintiffs
(competitors of defendants) by giving the defendants an unfair competitive advantage which
allowed them to charge customers lower prices due to the "cost savings" associated with tax
evasion.  In that situation, the Court quite understandably ruled that any link between plaintiff's
shortfall in sales and the alleged tax evasion was too uncertain and remote to plead proximate
cause, especially given the number of other uses the "proceeds" of tax evasion could have been
put to and the multitude of other factors that could have influenced the level of plaintiff's sales.

*York*, 559 U.S.1, 14-15 (2010). This case is indistinguishable from the "straightforward" theory

recognized in *Bridge* –this was a zero-sum situation (FAC ¶ 141) where only one License could

or would be awarded in Region A and it was thus a "foreseeable and natural consequence of" the

defendants' scheme to obtain that License for Wynn MA by fraud and racketeering that the only

viable rival proposal on the table at the end of the process (the License application of SSR,

eventually superseded by the application of SSR's business partner MSM) would be injured by

that fraud and racketeering.[9]

Moreover, the causation theory here is even more direct than that approved post-*Bridge*

by the First Circuit in *In re Neurontin Marketing & Sales Practice Litig.* ("*Kaiser*"), 712 F.3d 21

(1st Cir. 2013).  Plaintiff there ("Kaiser") was an HMO that claimed to have been injured

---

*Hemi*, considering both of those precedents, expressly ruled that the fact pattern presented was more like that of *Anza* than of *Bridge*, and that proximate cause was thus not established. Specifically, the causation theory rejected in Hemi was that the defendants' failure to file mandated regulatory reports made it more difficult for the government plaintiff to identify and pursue customers of the defendants who might have independently failed to pay the government their own independent tax liabilities.  But it was those non-parties' own acts of tax evasion, rather than the defendants' failure to assist the government in detecting them, that had caused the government's injury.

None of the other cases defendants cite help them.  In *Rectrix Aerodome Ctrs., Inc. v. Barnstable Mun. Airport Comm'n*, 632 F.Supp.2d 120, 127-128 (D. Mass. 2009), for example, the court expressly held that a causation theory with several speculative assumptions (that the FAA would cut off defendant's federal funding if its allegedly improper monopoly on jet-fuel sales had been properly disclosed and that fear of loss of that funding would in turn have avoided or ameliorated plaintiffs' alleged injuries) was like that rejected in *Anza* than like that sustained in *Bridge*.  In *George v. Nat'l water Main Cleaning Co.*, 286 F.R.D. 168, 186 (D. Mass. 2012), the plaintiffs' alleged injury was that they had not been paid the wages they were supposedly entitled to, which the court held was an injury proximately caused by the non-payment itself (which did not constitute a RICO predicate act), rather than being caused by their employers' alleged subsequent false certifications to the government that they had paid plaintiffs all wages due.

[9] The claim that SSR could have instead brought a state-law claim directly against the MGC seeking to challenge the decision as MSM elected to do (WR Br. at 22-23) is a non sequitur. Defendants cite no authority that a RICO plaintiff is required to exhaust administrative remedies before bringing suit, and there is no such authority.

because defendant pharmaceutical marketers used fraudulent marketing techniques to inappropriately inflate the number of prescriptions written for their drug, thereby causing out-of-pocket loss to Kaiser who then had to pay for the excess prescriptions.  Defendants argued on appeal from the jury verdict that causation was too attenuated as a matter of law, because any given doctor might well have still written any given prescription without having been affected by the fraud, and plaintiff offered no evidence that specifically established the causal impact of the fraud on any specific doctor writing any specific prescription, only expert testimony on how much, as a statistical matter, the fraud likely increased defendants' overall sales volumes. *Kaiser*, 712 F.3d at 41-43.

The First Circuit however, "reject[ed] Pfizer's core defense that there are too many steps in the causal chain between its misrepresentations and Kaiser's alleged injury to meet the proximate cause 'direct relation' requirement as a matter of law." *Id*. at ¶ 45.  And earlier this year the First Circuit reaffirmed the holding of *Kaiser* when it reversed a grant of summary judgment to defendants in another case also involving fraudulent pharmaceutical marketing practices, holding that the district court had erred in finding insufficient evidence of causation and injury to create an issue for trial.  *In re Celexa & Lexapro Marketing & Sales Practices Litig*., 915 F.3d 1, 14 (1st Cir. 2019) ("As for proximate causation, it is of no moment that pediatricians were the immediate target of [defendant's] fraudulent marketing. ... [A] jury could find that [plaintiffs] were 'the primary and intended victims of [defendant's] scheme to defraud.' ... Moreover, [plaintiffs'] alleged harm (*i.e.,* reimbursing or purchasing more pediatric prescriptions than they otherwise would have) was a 'foreseeable and natural consequence' of [the defendant's] scheme.").  *See also Harmoni Int'l Spice, Inc. v. Hume*, 914 F.3d 648, 652 (9th Cir. 2019) (reversing lower court grant of 12(b)(6) dismissal of RICO claims on proximate cause

grounds where both government agency and plaintiff plausibly suffered different injuries as result of defendant's fraud on the agency: "The defendants assume there can be only one direct victim entitled to recover damages under RICO, but that it not always the case," so any potential RICO claim by the agency would not preclude the private plaintiff from recovering the separate damages it suffered).

Nor is proximate cause too attenuated because of defendants' self-serving speculation (WR Br. at 21) that it is not 100% certain that but for the fraud the License would have been awarded to MSM/SSR because, for example, they could potentially have chosen to award no License at all in Region A.[10]  But as one of the cases defendants themselves cite expressly points

---

[10] Defendants cite *Caesars Mass. Mgmt. Co., LLC v. Crosby*, 778 F.3d 327, 334 (1st Cir. 2015), as "emphasizing the MGC's discretionary authority," but that was a section 1983 case where the defendants were senior officials of the MGC itself, making their considerable statutory discretion a highly relevant defense to claims that they were legally obligated to have treated the plaintiff differently.  What matters here is not whether the MGC would have had some theoretical discretion to issue no License to either applicant had the Wynn applicants' fraud been revealed, but how it would likely have exercised its discretion in practice, at most a potentially-disputed fact question on which the commissioners themselves may be asked questions in deposition or at trial in this case.

Specifically, the statute here provides in mandatory terms that the MGC "shall deny an application for a gaming license…if the applicant" (the individual defendants were all individual qualifiers of the applicant and subject to the same terms as Wynn MA, the entity applicant) has, among other things, "submitted an application . . . that contains false or misleading information" or "committed prior acts which have not been prosecuted . . . but form a pattern of misconduct that makes the applicant unsuitable."  M.G.L. c. 23K § 16 (a) (quoted in FAC ¶ 28).

Moreover, the statute provides that a decision to award no License at all in Region A (i.e. denying both the Wynn application and the MSM/SSR application) would be statutorily permissible only if the MGC was "not convinced that there is an applicant that has both met the eligibility criteria and provided convincing evidence that the applicant will provide value to the region in which the gaming establishment is proposed to be located and to the commonwealth." M.G.L. c. 23K § 19(a)).  Given the MGC's final decision (Wynn License Award at 27-35) noting the comparative strengths of both applications, but purporting to give more weight to the categories in which the Wynn proposal was considered stronger than to the areas where the MSM/SSR proposal was considered stronger and/or the proposals were evenly matched, there is

out, any argument "that the plaintiffs must negate all potential causes of loss other than those related to [defendants'] activities in order to allege damages causation exceeds the pleading requirements necessary to survive a motion to dismiss." *Boston Cab Dispatch, Inc. v. Uber Techs., Inc.*, 2015 WL 314131, at *4 (D. Mass., Jan. 26, 2015). *See also Kaiser*, *Kaiser*, 712 F.3d at 45 (internal quotations and citations omitted) ("plaintiff need not prove a series of negatives; he doesn't have to offer evidence which positively excludes every other possible cause . . . [Rather,] [o]nce a plaintiff presents evidence that he suffered the sort of injury that would be the expected consequence of the defendant's wrongful conduct, the burden shifts to the defendant to rebut this causal inference.").

Thus, the mere possibility of successfully disputing the FAC's factual allegations about causation on a full evidentiary record can be no basis for 12(b)(6) dismissal. *See Sebago, Inc. v. Beazer East, Inc.*, 18 F.Supp.2d 70, 85 (D. Mass. 1998) (sustaining adequacy of RICO pleading and noting that once a plausible theory has been alleged "it is for a jury to apply the law of proximate causation"); *Peckham v. Continental Cas. Ins. Co.*, 895 F.2d 830, 837 (1st Cir. 1990) (questions of causation "are normally grist for the jury's mill."); *Swift v. United States*, 866 F.2d 507, 510 (1st Cir.1989) ("Application of the legal cause standard to the circumstances of a particular case is a function ordinarily performed by, and peculiarly within the competence of, the factfinder."); *Meijer, Inc. v. Ranbaxy Inc.*, 2016 WL 4697331, at *24 (D. Mass., June 16, 2016) (sustaining RICO claims even though court considered proximate cause "a close call" because while "the outcome will depend heavily on the facts to be unearthed in discovery,

---

no non-speculative basis for thinking that outcome plausible, but at this stage of the case that remains at best a fact-intensive defense that defendants may seek to explore in discovery.

Plaintiffs have set out a plausible logical connection" between the alleged misconduct and their alleged injury).[11]

### B. The Contractual Relationship Between MSM and SSR Does Not Attenuate Causation

Defendants also try to argue (WR Br. at 19) that even if a private party could be a RICO plaintiff here, it could only have been MSM, the applicant and thus the entity that would have received the License, rather than its business partner SSR.  But this is not a case that runs the risk of requiring the courts to discern "complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries," *Bridge*, 553 U.S. at 654 (quoting *Holmes v. Secs. Investor Protection Corp.*, 503 U.S. 258 (1992)), which the Supreme Court gives as the key test for denying standing to a plaintiff whose injury is insufficiently direct.  *See also Sebago*, 18 F.Supp.2d at 84-85 (finding proximate cause aspect of RICO claim adequately pleaded and citing *Holmes* for same proposition, as well as noting importance of whether it will or will not be too difficult to distinguish harm caused by the RICO violation from loss caused by independent factors).

Here, calculation of the damages caused to SSR by defendants' wrongdoing will be straightforward, with no need for apportionment, no risk of multiple recovery, and no risk of

---

[11] To the extent defendants claim no causation because the fraud had all been discovered and the MGC, in what would have been a clear violation of its governing statute, went ahead and granted Wynn MA's application anyway, they are simply mischaracterizing the allegations of the FAC. It is common ground that *some* of the initial fraud committed via false and backdated documentation had been revealed to the MGC during 2013. FAC ¶¶ 96, 97, 110.  The key for proximate cause is the second phase of the fraud, where the Wynn Defendants covered up their prior conspiracy with FBT, falsely claimed to have been ignorant of the true facts and themselves have been victims of misrepresentation, and obtained and submitted new and different false attestations from the non-criminal principals of FBT, all of which induced the MGC to allow a cosmetic renegotiation of the deal with FBT and let the Wynn Defendants off the hook for the portion of the fraud that had already been uncovered.  FAC ¶¶ 99-100, 110-120.

confusion from alternative causes of the same loss.[12]   Under the terms of SSR's agreement with

MSM, MSM was required, if it obtained the License, to pay SSR a specified percentage of its

revenues from the casino to be built on SSR's Suffolk Downs site, subject to a guaranteed annual

minimum.[13]  FAC ¶ 76; *see also* WR Br., Ex. 4 (the "MSM/SSR Lease", Doc. No. 78-4).

MSM's own damages, if it were bringing a parallel suit of its own, would have to be reduced

dollar-for-dollar for all of the contractual payments it would have owed to SSR, since it is

excused from having to make those payments due to the License having been fraudulently

obtained by the Wynn applicants instead.[14] Indeed, SSR's contractually-guaranteed minimums

---

[12]That SSR ultimately sold its property several years after being injured by defendants' RICO violations because its prior business utilizing the property had been losing money (WR Br. at 18) is an irrelevant red herring, because had the defendants' scheme not led to the fraud-induced award of the License to the Wynn applicants, the income stream SSR would have received would have made the property a cash cow.  The difference between what SSR was able to sell the property for (with no casino) and the property's value if MSM was operating a casino on it and making the contractually required payments is one measure of damages, referenced in the complaint as an alternative to the present value of all of those payments that would have been received by SSR under its contract with MSM, and the Court need not decide between those potential measures of damages at this stage of the case.  Similarly, whether SSR might be able to recover incidental out-of-pocket expenses in addition to or as an alternative to its lost revenues can be assessed at a different stage of the case.  All that matters at the 12(b)(6) stage is that *some* compensable injury proximately caused by the defendants' wrongdoing has been alleged.

[13] That MSM's contract with SSR gave MSM various standard outs if, for example (WR Br. at 19 n. 16), zoning problems or a material adverse change in the condition of the property made it infeasible to construct the contemplated casino, does not entitle defendants to dismissal on the face of the pleadings.  Building the casino on SSR's land pursuant to that contract was an integral part of the MSM/SSR proposal.  FAC ¶¶ 3, 75-77, 185; Wynn License Award at 7, 19, 15.  Again, that it is *possible* that future contingencies might have prevented the project from coming to fruition is a fact-driven denial of the complaint's allegations, not a basis for holding the allegations insufficient to state a claim.  Defendants will have every opportunity at trial to seek to prove such a defense.

[14] Thus, a lawsuit by MSM would not protect SSR or vindicate its independent interests in being compensated for the harm it has been caused.

meant it was taking less economic risk than MSM, and makes the calculation of its damages

even less speculative that MSM's would be.[15]

### III.  THE NOERR-PENNINGTON DOCTRINE DOES NOT IMMUNIZE DEFENDANTS' RICO VIOLATIONS

#### A.  The *Noerr-Pennington* Doctrine Has No Application to Claims Outside the Antitrust Context

This is not an antitrust case, and the *Noerr-Pennington* doctrine is specific to antitrust

law.  *See*, *e.g.*, *Puerto Rico Telephone Co., v. San Juan Cable LLC,* 874 F.3d 767 (1st Cir. 2017)

(affirming summary judgment under the doctrine to defendant sued under Sherman Act and

Puerto Rico Anti-Monopoly Act).   Defendants' assertion (WR Br. at 25) that "courts have

extended its protection . . . regardless of whether those claims were alleged under the Sherman

Act," is completely unsupported by its citation to *United Food et al. v. Novartis Pharms. Corp.*,

902 F.3d 1, 5 (1st Cir. 2018), which relied on the doctrine to affirm "orders dismissing two

antitrust class actions."[16]

---

[15] *George Lussier Enters. v. Subaru of New Eng., Inc.*, 393 F.3d 36, 51 (1st Cir. 2004) has nothing to do with this fact pattern but rejected a causation theory as "indirect and derivative" when plaintiffs' alleged losses were directly caused by other actions of defendants (not alleged to be RICO violations) rather than by the concealment of those actions (alleged to be a RICO violation).  *Boston Cab*, 2015 WL 314131 at *7, found proximate cause inadequately pleaded for the RICO claims because it was impossible to determine which portion of the alleged losses were attributable to the RICO violations versus independent causes.

[16] Contrary to defendants' inaccurate description (WR Br. at 25), *United Food* did not recognize *Noerr-Pennington* immunity as a potential *defense* to patent or copyright infringement claims. Rather it followed well-established caselaw recognizing *Noerr-Pennington* as a defense to antitrust claims where the alleged acts of monopolization by the *defendant* consisted of the defendant having, as a plaintiff, previously filed non-sham infringement actions to enforce its disputed patent or copyright rights.  *United Food*., 902 F.3d at 15-16.

In a footnote (WR Br. at 25 n. 24), defendants also cite *Davric Maine Corp. v. Rancourt*, 216 F.3d 143, 147 (1st Cir. 2000), which likewise affirmed summary judgment in defendants' favor on federal and state antitrust claims.  While *Davric* also affirmed summary judgment in favor of defendants on a state-law tortious interference claim, it did so because of plaintiff's failure to

Indeed, defendants' only apparent authority for the application of *Noerr-Pennington* to

RICO claims is a Ninth Circuit case, *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006).

*Shirokov v. Dunlap, Grubb & Weaver, PLLC*, 2012 WL 1065578, at \*19 (D. Mass. Mar. 27,

2012), considered the issue at length and rejected the application of *Noerr-Pennington* to non-

antitrust claims, including RICO claims, finding *Sosa* unpersuasive and instead following the en

banc Tenth Circuit's rejection of an extension of *Noerr-Pennington* in *Cardtoons, L.C. v. Major*

*League Baseball Players Ass'n*, 208 F.3d 885 (10th Cir. 2000). *See also Warnock v. State Farm*

*Mut. Auto. Ins. Co.*, 2008 WL 5272063, at \*3 (S.D. Miss. Dec. 17, 2008) (declining to extend

*Noerr-Pennington* to RICO claims without "express direction" from the relevant court of

appeals). Defendants have provided no reason why this court should not follow the same course.

### B. Obtaining a Government-Sponsored Monopoly Via Fraud Is Not Part of the First Amendment Right to Petition for the Redress of Grievances

In any event, even in the antitrust context, *Noerr-Pennington* does not immunize a

defendant who obtains a government grant of a monopoly via fraud on the government agency.

A patent is a classic example of a "legal monopoly" (just like the "legal monopoly" of the only

License to operate a casino in Region A) and *Noerr-Pennington* thus generally immunizes

against any antitrust liability any non-sham litigation, however aggressive, brought to enforce a

patent.  However, if the underlying patent is itself plausibly alleged to have been obtained via

---

produce evidence, *not* because *Noerr-Pennington* had any application to that separate cause of
action.  In *Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 128-129 (3d Cir. 1999), cited in
the same footnote, the Third Circuit held 2-1 over a vigorous dissent that *Noerr-Pennington*
applied to state-law tort claims based on the same operative facts as a federal antitrust claim,
based on an *Erie*-doctrine prediction that the New Jersey Supreme Court would under the
circumstances recognize a *Noerr-Pennington* defense to New Jersey tort claims.  However, the
First Circuit has not taken that view (nor is there any basis for thinking the Massachusetts state
courts would), and in any event here there is no federal antitrust claim at all, so the state-law
claims here are not an attempt to plead around antitrust-specific defenses by relabeling an
antitrust claim as a common-law tort claim.

fraud on the patent office, it has long been the blackletter law that *Noerr-Pennington* does not apply and a defendant's purportedly "legal" monopoly based on the fraudulently-obtained patent is subject to ordinary antitrust liability in any lawsuit brought by an injured plaintiff.[17] *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177-78 (1965). *See also United Food*, 902 F.3d at 7-8. (explaining *Walker Process* exception to *Noerr-Pennington* immunity).[18] Here, the MGC's issuance of the sole Region A license to the Wynn applicants is functionally identical to the issuance of a patent by the patent office, the *Walker Process* exception would apply even if there were antitrust claims being brought in this case, which there are not.[19]

---

[17] Notably, the fact pattern in the outlier Ninth Circuit case defendants cite as extending *Noerr-Pennington* beyond the antitrust context, *Sosa*, is strikingly similar to the typical antitrust fact pattern where *Noerr-Pennington* applies. The primary *Sosa* defendant (437 F.3d at 927) was a satellite tv provider who had sent numerous non-sham pre-litigation demand letters to persons who were allegedly stealing its signal without authorization. While the demand letters apparently did not allege statutory intellectual property infringement claims and the subsequent lawsuit complaining about those demand letters was not framed in antitrust terms, the case was otherwise comparable to, for example, the fact pattern the First Circuit applied *Noerr-Pennington* to in *United Food*, where a patentholder had allegedly profited by using non-sham litigation and litigation settlements to get a potential competitor to delay its entry into the market. *See* 902 F.3d at 7.

[18] *United Food* held that the specific antitrust complaint failed to sufficiently allege the *Walker Process* exception because the misrepresentations allegedly made by defendant to the patent office were immaterial as a matter of law and thus could not have had any causal impact on the patent office's decision to issue the challenged patent. *See* 902 F.3d at 10. Here, by contrast, the materiality and causal impact of defendants' misconduct on the MGC's decision to award to License to the Wynn applicants is fully alleged. FAC ¶¶ 111-116, 118-120, 132, 136-138, 141-142, 145-149.

[19] Although SSR (and eventually its business partner MSM) were also applicants for the same License, it was a competition rather than the equivalent of a fully contested litigation. In particular, many of the Wynn applicants' statements and representations to the MGC were made ex parte and confidentially, so SSR did not even know what all of the false statements had been before the MGC made its decision, nor did SSR have an opportunity to cross-examine or impeach the Wynn applicants' witnesses. FAC ¶¶ 88, 123, 132, 136. Indeed, SSR suspects there

27

Indeed, the Supreme Court's *Bridge* decision, discussed supra at 17-10, implicitly rejects any such immunity. If the fraudsters there could have characterized their deceit of the county treasurer's office in connection with that office's public auction of tax liens as constitutionally-favored act of "petitioning the government for the redress of grievances" (i.e. their "grievance" that a fair process would not give them as many tax liens as they desired) and for that reason been entitled to absolute immunity from any civil liability in a private-plaintiff action, the case would have come out the other way.

## IV.   THE ENTERPRISE ELEMENT OF THE RICO CLAIMS IS SUFFICIENTLY ALLEGED

The FAC alleges two different RICO enterprises: (a) for the First Cause of Action an association-in-fact among and including the Wynn Defendants and FBT; and (b) for the Second Cause of Action, Wynn MA (specifically not named as a defendant for that cause of action) as an entity. It is undisputed that a RICO enterprise must be distinct from any of the defendants, but both enterprises alleged are distinct from any defendant named in the relevant cause of action, and defendants' contrary arguments ignore the controlling Supreme Court case law.

### A.  The FAC Pleads an Association-In-Fact Enterprise

Defendants complain that SSR fails to plead such supposedly-required elements of an association-in-fact enterprise as "systematic linkage" among members, "overlapping leadership," "structural ties," "common decision-making processes," members' "control" over one another, and "coordinated effort" towards a "common objective." KS Br. at 5-6. *See also* WR Br. at 15. Whether or not that characterization of the FAC is fair, defendants' arguments all fail because all of the cases they cite pre-date the Supreme Court's decision in *Boyle v. U.S.,* 556 U.S. 938

---

may be additional material misstatements defendants made to the MGC that its investigation has not yet revealed and that will not be uncovered until there is full discovery. FAC ¶ 149.

(2009), which is the controlling case yet one which they do not even bother to acknowledge.

*Boyle* rejected the notion that "a RICO enterprise must have structural features in addition to those that we think can be fairly inferred from the language of the statute," 556 U.S. at 947-48, and *Boyle* specifically holds that an association-in-fact enterprise:

> need not have a hierarchical structure or a "chain of command"; decisions may be made on an ad hoc basis and by any number of methods—by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence.

*Id.* at 948. *Accord, e.g., United States v. Ramirez-Rivera,* 800 F.3d 1, 19 (1st Cir. 2015) ("as the Supreme Court has pointed out, RICO's 'enumeration of included enterprises is obviously broad, encompassing 'any ... group of individuals associated in fact'."); *United States v. Fattah,* 914 F.3d 112, 163 (3d Cir. 2019) ("The structure necessary for a § 1962(c) enterprise is not complex [as] *Boyle* explained"); *Al-Rayes v. Willingham,* 914 F.3d at 1307–10 (As the Supreme Court has emphasized, the "term 'any' ensures that the definition has a wide reach, and the very concept of an association in fact is expansive." ); *United States v. Lee,* 660 F. App'x 8, 15 (2d Cir. 2016) ("Congress deliberately defined the term [enterprise] 'as broadly as possible.'");

*Metro. Prop. & Cas. Ins. Co. v. Savin Hill Family Chiropractic, Inc.*, 266 F. Supp. 3d 502, 522–23 (D. Mass. 2017) (The Supreme Court has held on multiple occasions that [the] definition [of 'enterprise'] is to be interpreted broadly.")[20]

---

[20] *See also e.g., RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2105 (2016) (quotations omitted) (RICO association-in-fact enterprises, [] need not have a hierarchical structure or a chain of command."); *United States v. Krasniqi,* 555 F. App'x 14, 17 (2d Cir. 2014) (Citing *Boyle:* "It is beyond peradventure that a RICO enterprise is not required to have business-like attributes such as a name, a hierarchical structure, a set membership, or established rules.");

*Boyle* noted that the statutory definition of association-in-fact was "obviously broad" and "expansive" and thus found "no basis in the language of RICO for the structural requirements that [defendant] asks us to recognize," which included essentially all of those that the defendants here are arguing for. 556 U.S. at 944, 948.[21] The much more minimal requirement *Boyle* held was mandated by the RICO statute was that "an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose.

The FAC alleges all three of the features *Boyle* requires.[22] First, the enterprise's purpose was to allow the participants, including FBT and its principals as well as the Wynn Defendants,

---

*United States v. Harris*, 695 F.3d 1125, 1135–36 (10th Cir. 2012) ("After *Boyle*, this Court revisited the question of what is necessary to establish an association-in-fact … "*Boyle*'s test now governs the disposition of this and future RICO cases in our circuit,"); *United States v. Palacios*, 677 F.3d 234, 248–49 (4th Cir. 2012) ("[*Boyle*] cautioned, … against reading the term "enterprise" too narrowly").

[21] The association-in-fact enterprise proven at trial in *Boyle* was an ad hoc group of criminals who cooperated to carry out a series of burglaries of banks. "The group was loosely and informally organized. It does not appear to have had a leader or hierarchy; nor does it appear that the participants ever formulated any long-term master plan or agreement." 556 U.S. at 941. Nonetheless, that was a sufficient RICO enterprise to sustain Boyle's criminal conviction, and the decision expressly *rejected* the defendant's claim (*id*. at 958) that he had been entitled to a jury instruction that an association-in-fact RICO enterprise must have "an ongoing organization, a core membership that functioned as a continuing unit, and an ascertainable structural hierarchy distinct from the charged predicate acts." To the contrary, the Supreme Court sustained the legal accuracy of instructions that charged the jury that they could "find an enterprise where an association of individuals, without structural hierarchy, formed solely for the purpose of carrying out a pattern of racketeering acts" and that "[c]ommon sense suggests that the existence of an association-in-fact is oftentimes more readily proven by what it does, rather than by abstract analysis of its structure."

[22] *Boyle* also expressly deals with, and rejects (556 U.S. at 948), defendants' claim (KS Br. at 5) that an enterprise must be inherently more structurally complex than a conspiracy or "ad hoc criminal confederation."

While the existence of an enterprise and a pattern of racketeering acts are separate elements of a RICO violation, *Boyle* recognized that they often overlap and involve the same evidence, and indeed that the evidence of the pattern may itself suffice in a particular case to demonstrate the

to profit illicitly at SSR's expense by developing a casino on FBT's land even though that

purpose could not be accomplished non-criminally.  FAC ¶¶ 88-89.  Multiple meetings,

connections, and ongoing relationships among all of the participants are alleged, running from

the initial late 2012 agreement to conceal the involvement of criminals in the ownership of the

Everett Site, through their cooperation in dealing with other landowners necessary for the casino

project to work, to the June 2014 obtaining of the last false certification by an FBT principal that

the Wynn Defendants needed to fool the MGC with.  FAC ¶¶ 88-95, 97-98, 104-109, 114-120.

Finally, the association-in-fact enterprise lasted long enough for the defendants to obtain the

License, a crucial step toward the Wynn Defendants' long-term goal of actually opening and

profiting from the casino and likewise a crucial step for FBT, since Wynn MA was not obligated

to pay, and did not pay, FBT the agreed eight-figure consideration for the Everett Site unless and

until the License was obtained.[23]  FAC ¶¶ 80, 88.

        The argument that the association-in-fact is "identical" to the named defendants who are

its members, and thus fails the rule that the enterprise must be distinct, is both legally wrong and

factually beside the point.  *See, e.g., Atlas Pile Driving Co. v. DiCon Fin. Co.*, 886 F.2d 986,

995 (8th Cir.1989) ("A collective entity is something more than the members of which it is

comprised. If five persons form an association in fact and engage in a pattern of racketeering

---

existence of the association-in-fact enterprise.  556 U.S. at 950.  That said, defendants' attempt to
reiterate pattern arguments in the enterprise context (KS Br. at 9) is a red herring, and we address
the adequacy of the pattern allegations at 59-7 below.

[23] The claim (KS Br. at 5-7) that the Wynn Defendants' ultimate goal of actually building and
operating the casino was not, as such, shared by FBT is neither here nor there.  FBT's interest
was in getting paid as much as possible for the Everett Site, realizing that a prospective casino
operator would pay more for the site than any other buyer, and FBT could not and did not get
paid until some time after the final November 2014 License decision through which SSR
suffered its injury. FAC ¶¶ 64, 88, 117.

activity such as drug smuggling and murder [and the collective entity were not viewed as greater than each member], an individual member could never be prosecuted for violating RICO ... because he or she would not be considered distinct from the enterprise"); *Cullen v. Margiotta,* 811 F.2d 698, 729-30 (2d Cir. 1987) ("we see no reason why a single entity could not be both the RICO 'person' and one of a number of members of the RICO 'enterprise'"), overruled on other grounds, *Agency Holding Corp. v. Malley–Duff & Assocs., Inc.,* 483 U.S. 143 (1987).  Moreover, it is obvious here that the association-in-fact also included multiple individuals who are not named as defendants in the FAC.[24]

Finally, the FAC alleges that association-in-fact enabled its participants to accomplish together something they could not achieve separately.  Defendants' contention (WR Br. at 15) that the FAC "fails to set out how the defendants joined together specifically to accomplish anything more than what those same defendants could do on their own" is simply false.  All participants knew that the common purpose of using the Everett Site for a casino could not be achieved without defrauding the MGC about its ownership, and the Wynn Defendants could not carry out that fraud without false documentation created by FBT and its associated individuals, both at the first stage (where it was hoped to fool the MGC completely), and at the second stage (where it was necessary to perpetuate the fiction that the Wynn Defendants had not been in on the initial fraud, and obtain additional false certifications from FBT's principals that the supposedly revised deal had been fully complied with).  FAC ¶¶ 87-95, 97, 99-100, 110-120.  In addition, FBT offered the Wynn Defendants other "amenities" such as Crosby's willingness to bend the rules to benefit his old friend FBT's principal Lohnes, and Mayor DeMaria's

---

[24] Such individuals would include, at a minimum, FBT's principals Lohnes, DeNunzio, Gattineri, and Lightbody.  To the extent the FAC does not expressly allege their membership in the association-in-fact, it could be amended to do so, although that seems pointless.

prearranged willingness to be helpful as required in return for a piece of the action.[25]  FBT and

its principals, for their part, could not obtain the financial windfall they sought without the Wynn

Defendants' own deceit of the MGC and capital.

### B.   Wynn MA Is Sufficiently Alleged to Be the RICO Enterprise In the Second Cause of Action Because It Does Not Violate the "Distinctness Rule"

Defendants' assertion that Wynn MA is not sufficiently distinct from its parent

corporation (defendant Wynn Resorts) is yet another argument inconsistent with the controlling

Supreme Court decision, in this instance *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158

(2001).  In that case, the RICO enterprise, not named as a defendant, was alleged to be Don King

Productions, a corporation 100% owned and controlled by its president, the legendary boxing

promoter Don King, who was the named defendant and thus the "person" alleged to have

violated 18 U.S.C. § 1962(c) by conducting the enterprise's affairs through a pattern of

racketeering activity.  The Supreme Court resolved a circuit split by holding that Don King

Productions was sufficiently distinct from Don King himself that Don King Productions was a

viable enterprise, i.e. that Don King Productions was not simply Don King "referred to by a

different name."  533 U.S. at 161.  Don King, as the legally distinct person controlling Don King

Productions and named as a defendant, was thus not entitled to dismissal of the RICO claims

against him on the grounds that no enterprise distinct from him had been alleged.  The Supreme

Court's holding that any corporation is "a legally different entity with different rights and

responsibilities [than its shareholders] due to its different legal status," and that there is "nothing

---

[25] The claim, not made by FBT itself (KS Br. at 7), that FBT is not alleged to have had
knowledge of the other defendants' misconduct in Macau or the lengthy period of Nevada
suitability violations relating to the commission and coverup of Steve Wynn's sexual misconduct
is a red herring.  No recovery for the predicate acts related to those subjects is sought under the
first cause of action, but only under the second cause of action, where FBT is not a named
defendant and the association-in-fact including FBT is not the enterprise.

in [the] RICO [statute] that requires more 'separateness' than that" (533 U.S. at 158, 163) is

dispositive here.

There is no plausible argument that Wynn MA is not at least as distinct from Wynn

Resorts as Don King Productions was from Don King.  Just as with their other meritless

enterprise argument, virtually all of the case law defendants cite for the proposition that a

separately-incorporated subsidiary cannot be an enterprise (WR Br. at 16-17, KS Br. at 8-9) was

decided before *Cedric Kushner* and is thus, to the extent it might otherwise be helpful to them, is

no longer good law.[26]  That Wynn MA did not have an "autonomous management team of its

own" and had its significant decisions made for it by Wynn Resorts and the individual

defendants (WR Br. at 17), for example, cannot help defendants when *Cedric Kushner* is not

premised on any assumption that Don King Productions had had an autonomous management

team of its own, or that anyone other than its president and 100% stockholder Don King himself

had directed its significant corporate decisions.  As *Cedric Kushner* explains, in "ordinary

English one speaks of employing, being employed by, or associating with others, not oneself."

---

[26] The only post-2001 decision defendants cite for this proposition appears to be *Bucklew v. Hawkins, Ash, Baptie & Co., LLP*, 329 F.3d 923 (7th Cir. 2003) (WR Br. at 17 n. 14), in which the RICO discussion is in a throwaway single paragraph at the end of a decision primarily about copyright infringement.  That brief discussion cites pre-*Cedric Kushner* precedents without even mentioning or attempting to distinguish *Cedric Kushner*, suggesting that the parties' briefing, primarily focused on non-RICO issues, may have failed to even raise the applicability of *Cedric Kushner*.

In any event, *Bucklew* acknowledged, 329 F.3d at 934, that pre-*Cedric Kushner* authority accepted that a subsidiary could be a RICO enterprise sufficiently distinct from its parent corporation if the use of a subsidiary rather than a corporate division not separately incorporated had facilitated the scheme.  Here, the role of Wynn MA was not fortuitous, because Wynn Resorts set it up as the specific legally-distinct vehicle to pursue the Massachusetts License, and do so unlawfully, rather than have Wynn Resorts itself apply for the License.  FAC ¶ 18; WR Wynn Suitability Decision at 2; Wynn License Award at 2; 2013 Wynn Report at 15, 20, 106 ("Wynn MA has neither gaming nor operating history other than the preliminary work done in Massachusetts with the proposed casino project in Everett.").

533 U.S. at 161.   Nonetheless, Don King was held sufficiently distinct from Don King

productions to be associated with and operating its affairs in violation of RICO, not simply

operating his own affairs.   For the same reasons, Wynn Resorts is not merely operating its own

affairs or associating with itself when it uses its ownership control to operate the affairs of Wynn

MA.

Since Don King was president as well as controlling shareholder of the Don King

Productions, *Cedric Kushner* likewise conclusively disposes of any insinuation that the

individual defendants can escape liability because they were control persons of Wynn MA.   Not

only does 1962(c) specifically impose liability on persons "employed by or associated with" the

enterprise who conduct the enterprise's affairs through a pattern of racketeering activity, making

it obvious that such an employment relationship is not a defense to liability, RICO seeks both to

"prevent a person from victimizing, say, a small business" and "to prevent a person from using a

corporation for criminal purposes," where the person using a corporation as a vehicle for

wrongdoing will quite typically be a member of senior management.   *Cedric Kushner*, 533 U.S.

at 162.   Don King's personal RICO liability was thus held adequately alleged because a

"corporate employee who conducts the corporation's affairs though an unlawful RICO pattern . .

. uses that corporation as a vehicle [for wrongdoing] whether he is, or is not, its sole owner."   *Id*.

at 164-65.   *See George Lussier Enterprises Inc. v. Subaru of New England Inc*., 2002 WL

1349523, *2 (D.N.H. June 3, 2002) (denying motion to dismiss RICO complaint and rejecting

argument analogous to that made by defendants here, because to extent such argument had had

any basis in language of prior First Circuit decisions those decisions were, to that extent, no

longer good law in wake of *Cedric Kushner*).

Cases defendants cite such as *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1357 (11th Cir.

2016) (WR Br. at 17 n. 15), have nothing to do with the Second Cause of Action's allegation that

Wynn MA is the RICO enterprise, because they address an entirely separate issue by forbidding

the pleading of an association-in-fact enterprise consisting *solely* of a corporation *and* its

officers, agents, and employees when the corporation itself is *also* named as a defendant alleged

to have conducted that enterprise's affairs.[27]  But that is not what the plaintiff did in that case,

and is not what SSR has done here.  In order to succeed on its enterprise theory, the *Cedric*

*Kushner* plaintiff had to be willing to make the tactical decision not to name Don King

Productions as a defendant and to live with the consequences of that decision.[28]  SSR has

likewise not named Wynn MA as a defendant in the Second Cause of Action and will live with

the consequences of that decision.

## V.    ALL OF THE CRIMES THE FAC ACCUSES DEFENDANTS OF COMMITTING ARE "RACKETEERING ACTIVITY"

Uneasy about their arguments that the factual elements of each specific violation have not

been adequately pleaded (which we address at 47-59 below), defendants seek to evade liability at

a higher level of generality by arguing that whatever crimes they may have committed did not

constitute "racketeering" because some allegedly overriding technical defect keeps them outside

---

[27] Here by contrast, the association-in-fact enterprise alleged in the First Cause of Action does not consist exclusively of a corporation and its own officers, agents, and/or shareholders because FBT did not stand in that role with respect to either Wynn Resorts or Wynn MA and, as explained above, FBT's participation in the enterprise was critical.

[28] This Court itself recognized this point before *Cedric Kushner* in *Trustees of Boston Univ. v. ASM Comms., Inc.*, 33 F. Supp. 2d 66, 74 (D. Mass. 1998) (quotations and citations omitted), cited by defendants here (WR Br. at 14), where it observed that when "a plaintiff has allegedly suffered harm at the hands of an enterprise that consists only of a single corporation and its employees, subsidiaries or agents, the plaintiff must choose between the corporation and its constituents as persons liable."

the specified set of crimes generally known as RICO predicate acts.  FBT Br. at 6-16, SW Br. at 1-6.  These arguments are meritless.  For the sake of clarity, we will address these high-level arguments here for each of the relevant criminal statutes in this section, while addressing the more detailed pleading-adequacy arguments separately in section VI below.[29]

### A.  The Travel Act Violations Alleged Here Are RICO Predicate Acts

There is no dispute that violations of the Travel Act (18 U.S.C. § 1952) are specifically included on the list of RICO predicate acts in 18 U.S.C. § 1961(1).  Defendants concede (FBT Br. at 16) that the Travel Act itself defines the "unlawful activity" it proscribes as including "any business enterprise involving gambling . . . offenses in violation of the laws of the State in which they were committed."  And defendants do not deny that the multiple fraudulent and omissive misrepresentations, if proven, violated the criminal provisions of the Massachusetts Gaming Act. M.G.L. c. 23K § 38.  They simply claim not to have engaged in "gambling" as such.

But that the Travel Act reaches state-law violations beyond actual wagering or betting, including criminal evasion or circumvention of state licensing regimes for legal casinos, has been settled for decades.  For example, *United States v. DeLuna*, 763 F.2d 897, 906-07 (8th Cir. 1985), affirmed Travel Act convictions  where the defendant had a behind-the-scenes de facto management role in a legal casino and thereby "violat[ed] Nevada state law by conducting gambling operations without the necessary licenses, ... and by indirectly receiving gambling

---

[29] Because so many of the acts allege violate more than one of these statutes and some violate all three, it is important to note that defendants "no racketeering activity" argument only entitles them to dismissal if they can show that *none* of the crimes alleged in the FAC could possibly be RICO predicate acts.  If some, but not all, of the three different types of statutory violation alleged qualify (or may qualify, if the allegations as read most favorably to the plaintiff are eventually supported by evidence at trial) as RICO predicate acts, the defendants' entire argument concerning absence of "racketeering activity" fails.

moneys without the necessary licenses"), overruled on other grounds by *United States v. Inadi,* 475 U.S. 387 (1986).[30]  Similarly, *United States v. Goldfarb*, 643 F.2d 422 (6th Cir. 1981), affirmed the conviction of an individual who had purchased a minority interest in a legal Nevada casino but had then been found unsuitable to be licensed by the Nevada regulators, in part because of alleged associations with organized-crime figures.  He then purported to divest himself of his ownership stake but subsequently maintained (643 F.2d at 426) "a secret and illegal role" in the otherwise-lawful operations of the casino.[31]  That underlying violation of Nevada law, when combined with the requisite interstate commerce element, was sufficient to constitute a federal felony under the Travel Act.  See also *United States v. Vaccaro*, 602 F. Supp. 1132, 1135–36 (D. Nev. 1985) (Travel Act "does … not just [give rise to prosecutions against] those who run illegal gambling enterprises").[32]

---

[30] Indeed, in keeping with the Travel Act's broad inclusion of "any … gambling offenses in violation of the laws of the State in which they are committed," 18 U.S.C. § 1952(b)(i)(1), the court in *DeLuna* held that even criminal violations of Nevada gaming laws that were merely punishable as misdemeanors were "unlawful activity" under the Travel Act.  763 F.2d at 907, citing *United States v. Polizzi,* 500 F.2d 856, 873 & n. 17 (9th Cir.1974) ("Once a violation of a state criminal statute has been proved it is irrelevant whether that violation is classified as a felony or misdemeanor").

[31] Notably, the *Goldfarb* decision sustained a jury instruction that defined the state-law violations that could constitute "unlawful activity" under the Travel Act as encompassing violations of Nevada's regulatory requirements requiring "full and accurate disclosure of all persons who are connected with gambling in Nevada [so that] Nevada gaming authorities [can] properly perform their functions in excluding from the industry all who are in the authorities' opinions, unsuitable or undesirable for any number of reasons."  643 F.2d at 430.

[32] Defendants purport to be concerned that any application of the Travel Act to their wrongdoing would upset "the delicate balance between the powers of the federal and state sovereigns" (SW Br. at 5, quoting *United States v. Ferber*, 966 F. Supp. 90, 102-03 (D. Mass. 1997)).  But Congress decided when it enacted the Travel Act almost 60 years ago that a strong federal enforcement role was needed to supplement state law enforcement when it came to gambling.  Indeed, long-standing precedents like *DeLuna* show that the federal interest is so strong that a state-law misdemeanor can serve under the Travel Act as the predicate for a federal felony.

The Travel Act violations alleged here involving fraud on the MGC to misrepresent the suitability of the Wynn applicants in connection with obtaining the License (by lying about the involvement of convicted felons in FBT, lying about the Wynn Defendants' prior knowledge when some of those lies were exposed, and then further lying about prior misconduct in Nevada and Macau) are indistinguishable from those held sufficient to support criminal convictions in those cases. Defendants cite no authority to the contrary, and in particular nothing to support their insinuation that the Travel Act draws a distinction between criminal violations of regulatory statutes committed while securing a legal casino license and criminal violations committed later while the legal casino is open and operating, which would contradict the Travel Act's specific language covering acts "facilitat[ing] the promotion, management, establishment, or carrying on, of " a gambling business in violation of state law.[33]

---

*Ferber* itself had nothing to do with gambling, but with an attempt by the US Attorney's Office to base a Travel Act prosecution on an underlying state-law bribery theory by relying on a questionable interpretation of the Massachusetts gratuity statute that appeared to be broader than any interpretation of the statute that had ever actually used by state prosecutors bringing criminal charges in state court.

[33] Defendants argue that *United States v. Barbeito*, 2010 WL 2243878, at *35 (W.D. Va. June 3, 2010) holds that a state law gambling offense includable in Travel Act "unlawful activity" must involve "conduct 'that can be described generically as gambling.'" (FBT Br. at 16). *Barbeito* addressed a defendants' objection to being charged with a felony violation of RICO based on a state statute (by way of the Travel Act's definition of "unlawful activity involving "gambling") that made certain sales of raffle tickets punishable as a misdemeanor. The court found that the defendants' "situation is not unsympathetic under the facts of this case," but their "protestation is of no legal moment," *id.* at *38, because "gambling for the purpose of a Travel Act offense is defined by the law of the state in which the activity occurred." *Id.* at *35. The decision focused solely on whether raffle-ticket sales were "gambling" and did not suggest that there was any difference between selling illegal raffle tickets and fraudulently obtaining a license to conduct a legal raffle. Indeed, it is not clear from the opinion if all of the defendants convicted had personally sold any raffle tickets.

**B. Felony Violations of the Massachusetts Gaming Act's Anti-Fraud Provisions Are RICO Predicate Acts**

18 U.S.C. § 1961's definition of "racketeering activity" includes as a predicate act "any act or threat involving . . . gambling . . . which is chargeable under State law and punishable by imprisonment for more than one year."  There is no dispute that the criminal violations of the Massachusetts Gaming Act alleged here are "chargeable under State law" and punishable by "imprisonment in the state prison for not more than 5 years or in the house of correction for not more than 2 1/2 years."  M.G.L. c. 23K § 38. *See* FAC ¶¶29, 155(a).

Defendants' claim (FBT Br. at 8) that their lies were done in the context of "filling out paperwork" and "sitting for interviews with the state regulators", and that those activities, as such, do not constitute "gambling" is a red herring.  That "'gambling' means 'the act or practice of betting,' or 'the act of risking something on an uncertain event[,]'" (FBT Br. at 7, *quoting United States v. Mark*, 460 F. App'x 103, 107 (3d Cir. 2012)), or "'risking money' on a game "in order to realize a profit[,]'" (*id.*, quoting *Fuller v. Harrah's Entm't, Inc.*, No. 04-cv-2108, 2004 U.S. Dist. LEXIS 22097, at *12 (E.D. La. Oct. 29, 2004)), is not the issue.  Just as with their bogus evasions of Travel Act liability discussed above, the issue is not the definition of "gambling" considered in isolation, it is that the statutory language in section 1961(1) of acts "involving . . . gambling" necessarily covers a wider range of violations than just literal acts of gambling.  *See, e.g.*, *Kemp v. American Tel. & Tel. Co*., 393 F.3d 1354, 1361 (11th Cir. 2004) (sustaining civil RICO jury verdict against telephone company which, among other things, allowed its bills to be used to pass through charges associated with unlawful gambling conducted

by a third party).   None of the cases they cite for the proposition that the case law focuses on the

activity rather than how it is labeled by state law help them.[34]

*United States v. Genova*, 187 F. Supp.2d 1015 (N.D. Ill. 2002), *aff'd on other grounds*

333 F.3d 750 (7th Cir. 2003), on which defendants heavily rely (FBT Br. at 8-9; SW Br. at 4),

does them no good, not least because the discussion in the district court opinion on which they

seek to base a misleading argument by a strained analogy is pure dictum.   The Seventh Circuit's

opinion makes clear, although defendants fail to mention it, that violation of the Illinois

disclosure statute in question was at most punishable as a *misdemeanor*, when it is undisputed

that only state-law *felonies* can be RICO predicate acts.   333 F.3d at 758.[35]   Moreover, as

---

[34]  Indeed, all of the cases they cite for their "generic" approach *expand* rather than narrow the
scope of RICO liability, thus cutting against any argument that this Court is obligated to take a
crabbed or narrow view of what acts "involve gambling."   *Mark*, for example, held that a
violation of the Virgin Islands dogfighting statute fit into the "generic category" of "gambling"
even though the relevant statute was part of the health code and gambling was not a necessary
element of a criminal violation of it.   460 F. App'x at 107.   The language in *Fuller*, similarly,
was intended to expand the definition of "gambling."   *Fuller* rejected the defendant's argument
that RICO "gambling" does not include violation of Louisiana laws criminalizing certain aspects
of "gaming," an activity the state regulates separately from "illegal gambling," which is  defined
to include "conducting, … as a business, … any game, contest, lottery, or contrivance whereby a
person risks the loss of anything of value in order to realize a profit."   2004 WL 2452771 at *4.
Indeed, Louisiana *exempted* "gaming operations" from the prohibition of "illegal gambling," and
separately criminalized "gaming offenses," which include "skimming of gaming proceeds and
cheating in connection with gaming operations."   *Id.*   The court found that found that RICO
"gambling" encompassed Louisiana's "gaming offenses," because the "[t]he particular words
Louisiana chooses to refer to the type of activity generally known as 'gambling' does not control
the federal anti-racketeering law," *Id.*

In non-gambling contexts interpreting the same provision of RICO making certain state-law
felonies predicate acts, *United States v. Forsythe*, 560 F.2d 1127, 1137-38 (3d Cir. 1977),
rejected a claim that the relevant violation of a Pennsylvania statute punishing "corrupt
solicitation" was not "bribery" for RICO predicate act purposes, and *United States v. Garner*,
837 F.2d 1404, (7th Cir. 1987), rejected a claim that the relevant violation of an Illinois statute
publishing "official misconduct" was not "bribery" for RICO predicate act purposes.

[35] As noted above, a state-law misdemeanor can, if the other elements are present, be the
predicate for a federal Travel Act violation, which in turn can be a RICO predicate act, but since

defendants concede in a footnote (FBT Br. at 9 n.8), the Seventh Circuit concluded that there

was no underlying bribery in the case at all, thus making the district court's discussion of

whether or not an alleged misdemeanor violation of a disclosure statute supposedly motivated by

a desire to conceal a (non-existent) separate bribery scheme was a crime "involving bribery"

dictum twice over.  In any event, the FAC does not allege a situation in which a violation of an

unrelated and generic public disclosure statute is alleged to have been motivated by a desire to

avoid detection of a prior fully-accomplished violation of the Gaming Act, making the *Genova*

district court's analysis irrelevant and unhelpful to defendants.  To the contrary, the desire to

reap illicit profits from gambling activity in violation of Massachusetts law is a prototypical

motivation to lie to the MGC, and the prototypical reason the legislature specifically made such

lies a felony in section 38 of the Gaming Act.

### C.  The Mail and Wire Fraud Claims Sufficiently Plead Deprivation of Property

Defendants do not dispute that mail and wire fraud are predicate acts included expressly

in the list of 18 USC § 1961(1), but they argue that there can be no mail or wire fraud predicate

acts because (setting aside the separate honest-services fraud discussed below at 48-50) their

scheme involved "false statements to obtain a gaming license from a state gaming regulator,"

and "a state- issued gaming license does 'not rank as 'property,' for purposes of [the mail and

wire fraud statutes], in the hand of the official licensor,'" citing *Cleveland v. United States*, 531

U.S. 12 (2000). [36]   SW Br. at 2-3; *see also* FBT Br. at 10.  But as defendants concede,

---

the criminal violations of the Gaming Act alleged here are all felonies, that distinction between
the two federal statutes is irrelevant.  That said, the overwhelming majority of the state Gaming
Act violations alleged here also constitute federal Travel Act violations because one of more
defendants engaged in interstate travel and/or used the mails or other instrumentalities of
interstate commerce in connection with them.

[36] Since the Travel Act explicitly criminalizes not only interstate travel but also "use[] of the mail
or any facility in interstate or foreign commerce" with the intent to "promote, manage, establish,

*Cleveland's* ruling that a license is not "property" for purposes of mail fraud is expressly limited to licenses "*in the hands of the official licensor.*" 531 U.S. at 15 (emphasis added). *See also id.* at 13 ("a license is not 'property' *in the government regulator's hands*"); *id.* at 26-27 ("a Louisiana video poker license *in the State's hands* is not "property" under §1341"). The prosecution had not proceeded on a theory that the fraudulent scheme had any victim other than the state regulatory agency, and *Cleveland* explains, at length, that its ruling was driven by the unique concerns of a state, as opposed to a private, holder of a license. *See, e.g.,* 531 U.S. at 20 ("whatever interests Louisiana might be said to have in its video poker licenses, the State's core concern is regulatory"); *id.* at 23 (the licensing regime represents "paradigmatic exercises of the States' traditional police powers").[37]  As the court recognized in *United States v. Vigil*, 478 F. Supp. 2d 1285, 1309 (D.N.M. 2007), "the Supreme Court did not rule that the licenses could not constitute property; rather, the Supreme Court in *Cleveland v. United States* considered the more limited question whether state licenses to operate video poker machines were property in the hands of the State."

Indeed, *Cleveland* held that "we do not here question that video poker licensees may have property interests in their licenses."  531 U.S. at 25.  Defendants agree that "for the purposes of the mail fraud statute, the thing obtained must be property in the hands of the victim" (SW Br. at 2, quoting *Cleveland*, 531 U.S. at 15), and do not appear to have cited any authority for the

---

carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, including activity violating state gambling laws," virtually all of the mail and wire fraud violations alleged are also Travel Act violations and can be pleaded in the alternative as such.

[37] *See also* 531 U.S. at 21 (the licensing statute "asserts the State's 'legitimate interest in providing strict regulation'"); *id.* at 23 (and a State's "intangible rights of allocation, exclusion, and control amount to no more and no less than Louisiana's sovereign power to regulate"); *id.* at 24 (licensing power "implicates the Government's role as sovereign, not as property holder").

43

proposition that the economic value of the revenue flowing from the License is not "property" in the hands of the victim, here SSR.[38]  Any claim SSR is not a victim is not only contradicted by the Supreme Court's *Bridge* decision as shown above at 17-19, but also contrary to settled First Circuit law predating *Bridge* that "[n]othing in the mail and wire fraud statutes requires that the party deprived of money or property be the same party who is actually deceived.... [and] we see no reason to read into the statutes an invariable requirement that the person deceived be the same person deprived of the money or property by the fraud." *United States v. Christopher*, 142 F.3d 46, 54 (1st Cir. 1998).  Moreover, "[n]othing in *Cleveland* ... requires that to be a victim of mail fraud, a person has to already have the property in question. If it is a certainty that I would have obtained particular property except for the fraud, and you trick someone into transferring it to you rather than to me, then the mail fraud statute is violated, and I am the victim, or at least one of the victims." *Phoenix Bond & Indem. Co.*, 911 F. Supp. 2d 661, 671 (N.D.Ill. 2012).  Thus, it is not necessary for the License to have ever been issued to SSR or its business partner MSM for SSR to state a claim here.

Defendants also argue that SSR's allegation of the loss of the revenues it would have obtained from the future casino is an attempt to plead around *Cleveland* in a way precluded by *United States v. Berroa*, 856 F.3d 141 (1st Cir. 2017).  SW Br. at 3-4, FBT Br. at 9-10.  But *Berroa* has nothing to do with the fact pattern here.  The defendants were convicted at trial of obtaining medical licenses in Puerto Rico without passing the required written exam via a conspiracy in which a government employee created bogus documents falsely showing that they

---

[38] *See Allum v. BankAmerica Corp.*, 1998 WL 467021, at *2 (9th Cir. Aug 3, 1998) (noting that unlike damages for, e.g., libel or emotional distress, loss of plaintiff's professional license as result of alleged wrongdoing would have constituted injury to "business or property" sufficient to support a RICO claim).

had passed the exam.  Defendants were not alleged to have deprived the licensing authorities of anything beyond the medical licenses, which under *Cleveland* were not "property" in the *government*'s hands, and were not alleged to have thereby deprived other, honest applicants of medical licenses or other income they would have earned as licensed physicians, which would be the only analogy to SSR's allegations of injury here.[39]

The government's attempt to sidestep *Cleveland* was to point to the defendants' use of the fraudulently-obtained medical licenses by subsequently obtaining payments from healthcare consumers, which the First Circuit rejected as too attenuated: "Here, the defendant's alleged fraud in obtaining their medical licenses cannot be said to have naturally induced healthcare consumers to part with their money years later."  856 F.3d at 149-50 (internal quotation omitted). Here, by contrast, the causal impact of the defendant's fraud on depriving SSR of property (whether viewed as the License itself or the associated future revenues) is adequately pleaded for the reasons given above.[40]  The First Circuit in *Barroa* expressly reaffirmed its pre-*Bridge* holding in *Christopher* that a scenario like that SSR alleges is sufficient, finding only that on the specific facts of the case in front of it, reversal of the relevant aspect of the defendants'

---

[39] Put another way, the income that could be generated by being a licensed physician was not property "in the hands of the victim," i.e. the Puerto Rico licensing authorities, because they were not the ones who would have or could have earned that money.

[40] Because only one License could be issued in Region A and the Wynn applicants necessarily obtained it at the expense of MSM and SSR, they not only stand to make money with the License they deprived SSR of benefiting from, they stand to receive the same revenue stream from the same prospective casino patrons.  By contrast, the prosecution apparently did not even attempt in *Barroa* to identify other licensed physicians in Puerto Rico who lost revenue because of the acts of the fraudulently-licensed defendants, nor did the prosecution in *Cleveland* attempt to identify other video poker licensees in Louisiana who lost revenue as a result of the fraud.  The zero-sum nature of the Region A License award process makes what might have been impossibly speculative to trace in those cases simple and direct in this case.  FBT likewise profited directly from the injury to SSR because but for the fraudulent obtaining of the License, it never would have been able to sell the Everett Site for the premium price it received.

convictions was warranted "based on the lack of a sufficiently direct causal nexus."  856 F.3d at

152.

Contrary to defendants' claim (FBT Br. at 11), *United States v. Henry*, 29 F.3d 112 (3d

Cir. 1994), is not "on point."  That case involved public corruption tainting a competitive bidding

process and, as the defendants state, the Third Circuit majority held that:

> "Even in a fair process," the Second [sic] Circuit explained, "Bank A [the payer of
> the bribes that had tainted the process] might still have won the deposits. The issue,
> therefore, is whether the competing banks' interest in having a fair opportunity to
> bid for something that would become their property if and when it were received is
> *itself property*. We conclude that it is not."

FBT Br. at 11-12 (quoting *Henry*, 29 F.3d at 115).

There are serious questions whether *Henry* is still good law in light of the Supreme

Court's subsequent decision in *Bridge*, but even if it were, it is irrelevant here, because SSR has

explicitly alleged that (FAC ¶¶ 78, 141, 142) but for the defendants' wrongdoing the MSM/SSR

application for the License would have been granted.  SSR is seeking to recover the hard cash

revenue it lost as a result of the defendants' misconduct, not merely some intangible right to have

participated in a fairer process in which the Wynn applicants could plausibly have still prevailed

on the merits.[41]

---

[41] Moreover, it appears that in *Henry* there were multiple alternative bidders, so even if Bank A
had been disqualified, no single rival bidder would necessarily suffer any more tangible loss
because most of them would have lost out on the opportunity for a concrete financial benefit in
any event. Here, by sharp contrast, the FAC unequivocally alleges that, but for the fraud, the
Wynn applicants would never have gotten the License *and* the MSM/SSR proposal would have
been awarded the License.  Supra at 12-13.  SSR will have the burden at trial of proving that by
the preponderance of the evidence and, as noted above, the defendants may attempt to convince
the jury that MSM/SSR might still not have received the License even absent the fraud.  But that
is a potentially disputed issue of fact to be resolved at trial, not a basis for 12(b)(6) dismissal on
the face of the pleadings.

## VI.   THE ROLES AND CULPABILITY OF EACH DEFENDANT IN THE SCHEME AND IN THE COMMISSION OF RICO PREDICATE ACTS ARE ADEQUATELY ALLEGED[42]

We now turn to challenges made by specific defendants to the sufficiency of the FAC's

allegations as to their specific role.[43]  None of these challenges have merit.[44]

### A.  FBT

FBT relies almost entirely on the high-level arguments dealt with elsewhere in this brief,

conceding, for example, that its actions "might have been unethical, and even criminal under

Massachusetts state law."  FBT Br. at 11.[45]  But for the reasons already given in section V(B)

above, the Massachusetts state law violations are themselves RICO predicate acts and also

---

[42] Wynn Resorts & Wynn MA make no defendant-specific arguments.

[43] As defendants acknowledge (SW Br. at 13, citing *Aetna Cas. Sur. Co. v. P & B Autobody*, 43 F.3d 1546, 1560 (1st Cir. 1994)), SSR need only allege that each defendant is culpable for at least two of the many RICO predicate acts alleged, not that each defendant is personally culpable for all of them.

[44]  Defendants' complaints (MM Br. at 3-5, SW Br. at 13-15, KS Br. at 11) about the FAC supposedly impermissibly lumping them together via use in some places of collective shorthand terms like "Wynn Defendants" are groundless.  As has been shown, each defendant's specific role has been shown and the predicate acts committed by any or all of Steve Wynn, Maddox, and/or Sinatra are obviously also the predicate acts of Wynn Resorts and/or Wynn MA.

[45] FBT does make one red-herring argument that should be dealt with briefly.  It notes that three of its principals were charged in federal court with alleged crimes related to the casino development and acquitted at trial.  FBT Br. at 3.  The prosecution theory of those cases which the jury rejected (that the Wynn applicants had been duped by FBT) was incorrect and inconsistent with the allegations of the FAC.  FBT goes on, however (FBT Br. at 3-4), to tout the fact that the prosecutors had not brought a separate criminal prosecution consistent with SSR's separate theory of the case as if that were a relevant factor to the viability of the civil RICO claim.  The Supreme Court long ago directly rejected the argument that a criminal conviction was a necessary prerequisite for a civil RICO action in *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985), making the actions or inactions of the U.S. Attorney's Office completely irrelevant to the merits of SSR's claims.

support liability under the Travel Act and as mail and/or wire fraud.  FBT does not challenge the

adequacy of the specific pleading of its involvement in:

- The initial agreement to forge and backdate documentation to conceal the involvement of the criminals DeCicco and Lightbody in the ownership of FBT and the Everett Site.  FAC ¶¶ 88-90, 92, 94.

- The creation of a false "paper trail" in contracts and emails to be used as part of the Wynn applicants' cover story of their ignorance of the true facts.  FAC ¶ 93.

- The creation of multiple rounds of false documentation regarding the interests of DeCicco and Lightbody and when and under what circumstances they were bought out.  FAC ¶¶ 92, 94, 97-98.

- False representations embodied in the supposedly revised sale contract (after the earlier fraud was uncovered in part) that FBT knew would be submitted to the MGC. FAC ¶¶ 114, 116.

- False representations made separately by three of FBT's principals on its behalf in support of the bona fides of the supposedly revised transaction that FBT likewise knew would be submitted to the MGC.[46]  FAC ¶¶ 114, 115, 117, 120.

FBT challenges the pleading adequacy of the "honest services" mail-and-wire-fraud claim based

on its corrupt bargain with Mayor DeMaria to secure his assistance.  FBT Br. at 12-15.  None of

their challenges are meritorious.  As to the initial striking of the deal in or about early 2010, the

details are pleaded with sufficient notice for Rule 9(b) purposes:  the timing of the corrupt

---

[46] Gattineri's secret side deal (FAC ¶¶ 118-120) may reflect some disloyalty to his partners in FBT, but FBT as an entity still benefited because without Gattineri's false certification the transaction to sell the Everett Site to Wynn MA could not close and FBT would not get the lucrative payday it sought.

agreement (within a few months after FBT's October 2009 acquisition of the Everett Site) and its mechanism (to give the mayor a concealed "piece of action" from the subsequent sale of the property via bogus "consulting fees" paid to the mayor's sidekick and bagman the convicted criminal Jamie Russo) are set forth in paragraphs 23, 59, 60, and 115 of the FAC when read fairly and in conjunction.[47]

That the obvious purpose of this arrangement was to reward the mayor (who would not receive his promised payoff until FBT sold the Everett Site) for abusing the powers of his office to do whatever favors would maximize FBT's sales proceeds regardless of the public interest, and thus deprive the citizens of Everett of their intangible right to his honest services, is an equally fair inference from those factual allegations.[48]  If the Court considers Rule 9(b) to require that fair inference to be alleged more explicitly, that can easily be done by amendment.

---

[47] While none of the authority FBT cites holds that Rule 9(b) requires the FAC to identify by name which of FBT's five principals was originally approached by Mayor DeMaria in order to strike this bargain, that detail also can be easily provided by further amendment if it were thought necessary.

[48] The suggestion (FBT Br. at 13) that FBT's decision to hire Russo right after the mayor told them to hire Russo as a conduit for a payoff to the mayor does not give rise to an inference that FBT "agreed to the idea" does not pass the straight-face test.  Separately, the delayed payment made it unnecessary for FBT and the mayor to agree in advance on exactly which favors would be required before it was clear what the most profit-maximizing disposition of the site, which ended up being the sale to Wynn MA for casino use, would be.

Contrary to FBT's suggestion (FBT Br. at 15), SSR need not allege that putting Mayor DeMaria on the RICO enterprise's de facto payroll was a means of influencing the MGC.  Fraudulently obtaining the License from the MGC was a necessary but not sufficient step toward the ultimate goal of actually constructing and operating a lucrative casino on the Everett Site, and any number of corrupt favors from the Mayor of Everett might foreseeably be helpful in the actual construction on that site.

FBT's suggestion that it only violated the Massachusetts illegal gratuity statute by agreeing to pay off the mayor does not help it, because an "act . . . involving . . . bribery" in violation of state law is also a predicate act under 18 USC § 1961(1), and the cases cited supra at 41 n. 34 show that "gratuity" crimes can constitute acts involving bribery.  But the case they cite, *United States*

As to the FAC's alleged failure to allege with enough specificity that FBT followed through on its corrupt bargain and actually paid off the mayor via Russo once it had sold the Everett Site (FBT Br. at 13), the details remain within the defendants' knowledge and will require discovery. *See New England Data Servs., Inc. v. Becher*, 829 F.2d 286, 290 (1st Cir. 1987). What is clear from the public record, however, is that in early 2015 Russo sued FBT claiming he had not been paid the full amount he was owed from the sales proceeds of the Everett Site and in December 2016 that lawsuit was settled on undisclosed terms (supra at 13). Of course, the structure of FBT's corrupt bargain with the mayor, in which the mayor did not get paid up front, put the mayor at some risk of being shortchanged after FBT no longer required his assistance, but FBT cites no case that honest-services fraud liability can be avoided by the party that had promised the payoff failing to honor its end of the deal. In any event, to the extent the mayor had not yet received his full promised share of the payoff while the Russo lawsuit was still pending, that coincides perfectly in timing with his improper 2016 intervention to help the Wynn Defendants pressure a neighboring landowner whose cooperation was necessary for the construction of the casino. FAC ¶¶ 108-109.

Finally, contrary to FBT's insinuation (FBT Br. at 14-15) there is no need for a civil RICO plaintiff to allege that every single predicate act alleged be part of the causal chain of its specific injury as long as it is part of the same pattern of predicate acts that did cause that injury for the reasons shown infra at Section II. Indeed, it is common in alleging a pattern of racketeering activity to point out related predicate acts that by their nature only injured third parties rather than the plaintiff, by way of showing the extent of the pattern. *See*, *e.g.*, *Resolution*

---

*v. Sawyer*, 239 F.3d 31 (1st Cir. 2001), stands only for the proposition that a conviction for federal honest-services mail fraud can be obtained even if no violation of the Massachusetts gratuity statute occurred along the way.

*Trust Corp. v. Stone*, 998 F.2d 1534, 1545 (10th Cir. 1993) (noting proof at trial of comparable acts of fraud that had injured non-party banks and presumably caused no loss to the bank whose receiver was the plaintiff).

### B.  Steve Wynn

Steve Wynn claims that his well-documented "personal misconduct" cannot be a RICO predicate act (SW Br. at 16 -17), but ignores the specific allegations of the FAC.  Wynn's "personal misconduct" via serial sexual predation toward Wynn Resorts employees over a period of a decade constituted a long-running pattern of specific violations of Nevada's gaming suitability laws, as explained in great detail in the Nevada Complaint which Wynn Resorts has already almost entirely admitted the factual truth of.   FAC ¶¶ 36-38, MM Br., Exs. 1 (Nevada Complaint) and 2 (Nevada Settlement).  As alleged in the FAC (¶ 38), all of those suitability violations were also gross misdemeanors under Nevada law, and as shown by the cases cited above at 37-39 even a misdemeanor violation of Nevada gaming law is sufficient to support federal felony Travel Act liability (and thus RICO liability) if the requisite interstate commerce element is present, as it undoubtedly is for many of these violations.[49]

Separately, however, Steve Wynn's lies to the MGC aimed at concealing his long-running Nevada suitability violations are predicate acts in their own right.  His December 2013 lie to the MGC (FAC ¶ 130(b)) that Wynn Resorts compliance history in Nevada was "exemplary" and "spotless in every regard" cannot be defended by spinning it (SW Br. at 17-18)

---

[49] For example, the suitability violations involving sexual misconduct with flight attendants on the Wynn Resorts' private corporate jet (Nevada Complaint ¶¶ 71-76) are highly likely to have involved travel in interstate commerce and the hush-money payoffs to conceal certain of the violations are highly likely to have involved the use of the mails or other instrumentalities of interstate commerce.

as still true at the time just because he had not yet been caught.  Once he was caught, Wynn

Resorts paid the largest fine in the history of Nevada gaming-regulation enforcement based in

large part on violations committed by Steve Wynn himself well before December 2013.[50]  His

failure to disclose in his personal suitability application to the MGC his interest in the shell

vehicle used to funnel one of the multi-million-dollar hush money payments is a separate

freestanding predicate act.[51]  FAC ¶¶ 147, 161(b)

Beyond his undeniable responsibility for the contents of his own personal suitability

application, Steve Wynn's responsibility for the overall contents and accuracy of the corporate

applications on behalf of Wynn Resorts and Wynn MA and thus his culpability has been

adequately alleged.  FAC ¶¶ 19, 91, 130(e).  The FAC specifically alleges (¶19) that he "did not

delegate the pursuit of the . . . License to subordinates but played an active and [hands-on] role

throughout the process," as confirmed for example by his multiple direct and improper ex parte

communications with Crosby.[52]  He will be perfectly free to try to controvert the allegations of

---

[50] Not only is the felony violation of Massachusetts state law by lying to the MGC itself a RICO
predicate act, this lie was also a Travel Act violation, because Steve Wynn necessarily flew from
Nevada to Massachusetts (as alleged in FAC ¶ 155(d)) in order to lie to the MGC at the hearing
in question.  Additional details could be added in an amendment if not thought fairly implied in
the FAC.

[51] The defense that the true nature of his connection with "Entity Y" made it technically
unnecessary to be disclosed (SW Br. at 17) is obviously a fact-intensive disagreement with the
allegations that cannot be credited on a 12(b)(6) motion.  His counsel fails to disclose that SSR's
counsel responded to their blustering letter threatening sanctions by providing SSR's reasonable
basis for the allegation in the FAC and also specifically inviting them to provide us with
evidence substantiating their rival version of the facts.  They have failed to do so.  Moreover, the
just-released 2019 Wynn Report (at 33-43) additional factual details about Steve Wynn's
connection to Entity Y making it highly plausible that he was the beneficial owner required to
disclose it even if he had kept his name off of certain of the paperwork in order to obscure his
interest in the entity.  The FAC can if desired be amended to add this additional factual detail.

[52] That the violations of Massachusetts law via the ex parte communications are not specifically
alleged to be freestanding predicate acts does not detract from their probative value at showing

the complaint at a later stage of the case if he can produce evidence that he deferred entirely to

subordinates such as Maddox and Sinatra, but that is no ground for 12(b)(6) dismissal.[53]

Finally, the claim that Steve Wynn's specific false statements under oath to the MGC

(FAC ¶¶ 124-128) seeking to mislead the MGC about the extent to which he and Wynn Resorts

actively facilitated or tolerated criminal activity in their Macau casino cannot be insulated from

liability by a self-serving characterization of them (SW Br. at 15) as "musings" and mere

---

Steve Wynn's hands-on involvement and a broader pattern of intentional misconduct. *See also*
"Don't bet against me (Full Transcript): Steve Wynn puts his cards on the table", *Commonwealth
Magazine* April 15, 2014, available: https://commonwealthmagazine.org/gambling/002-dont-bet-
against-me-full-transcript/.

In response to a question concerning the MGC's investigation into Wynn Resorts' operations in
Macau, Wynn said he personally called Chairman Crosby to ask if Wynn's involvement in
Macau would disqualify Wynn MA in Massachusetts and said that he was "certainly not going to
surrender [his] operation in Macau." *Id.*  Wynn admitted in the same interview that the MGC
reversed its position on to the timing of the suitability hearings and the referendum after he
placed his second call to Chairman Crosby. *Id.*

[53] As this Court has held in a case defendants themselves cite, *Laker v. Freid*, 854 F. Supp. 923,
930 (D. Mass. 1994) (quoting *McGinty v. Beranger Volkswagen, Inc.*, 633 F.2d 226 (1st Cir.
1980)), "The clear weight of authority is that Rule 9 requires specification of the time, place, and
content of an alleged false representation, but not the circumstances or evidence from which
fraudulent intent could be inferred," which flows directly from the rule's express language
providing that "intent, knowledge, and other condition of mind . . . may be averred generally."
The FAC in any event alleges (¶ 88) that Steve Wynn personally met with both Maddox and
Sinatra at exactly the time they had learned of the involvement of convicted felons in the
ownership of FBT and the Everett Site and personally blessed the corrupt deal that Maddox and
Sinatra went back to Massachusetts to strike with FBT.  That is more than enough to make the
FAC's allegations of his own personal knowledge (FAC ¶ 88, 90) plausible at this stage, which
also takes away his pleading objection to the predicate acts involving his personal lie under oath
(FAC ¶ 100) that he lacked knowledge of the involvement of the criminals.

Separately, the 2019 Wynn Report suggests (at 90) that he may also claim to have relied on
advice of counsel as to what disclosure to the MGC was or was not required.  Subject of course
to the consequence that such a defense requires a privilege waiver, he will likewise be free to try
to establish that fact-intensive defense at an appropriate subsequent stage of the proceedings.

opinion.[54]   For example, given the admitted ubiquitous presence of at least some criminal

elements in the Macau casino world, no one was expecting or asking Steve Wynn to claim that

the Wynn Macau casino was 100% free of that.   Thus, his sworn statement (FAC ¶124(d)) that

"we do everything that you can reasonably do to stop it," while obviously short of a guarantee of

perfection, is not merely a  statement of vague optimism or opinion that could not possibly be

proven false, but a very specific factual claim of obvious materiality to a regulator considering

whether or not to grant a casino license in their own jurisdiction, yet it was factually false for the

reasons alleged.   FAC ¶¶ 125-127.

### C.  Matthew Maddox

Maddox's contentions that the FAC fails to sufficiently allege his knowledge of

Lightbody's criminal history are unavailing, but even more significantly Maddox fails to

acknowledge the FAC's unequivocal allegations that he falsely stated under oath to the MGC in

July 2013 that he had never even heard of Lightbody, when in fact he had worked with

Lightbody directly on multiple occasions only a few months previously on casino-related

matters. FAC ¶¶ 100, 106-107.   If he had admitted having met and worked with Lightbody yet

claimed ignorance about his criminal record that would have been a different lie, but that is not

the lie he chose to tell.   Since falsely claiming never to have met Lightbody at all was a plausible

strategy for avoiding follow-up questions about how much he had known about Lightbody's

criminal background, the lie was material to the overall "plan B" strategy of falsely portraying

the Wynn Defendants' as innocent victims of FBT's forged paperwork.   In addition, Lightbody's

active ongoing role in casino-related work throughout 2013, in which he dealt with multiple

---

[54] The FAC does not allege that violations of local law in Macau were freestanding RICO
predicate acts largely because the Travel Act does not extend to underlying violations of foreign
law as opposed to state law.  But the Wynn Defendants' modus operandi in Macau is highly
relevant background and context for their similar misconduct in Massachusetts.

Wynn-affiliated personnel (FAC ¶¶ 101-104, 106-107) was obviously inconsistent with the cover story that he had been bought out and had no further role.

Moreover, as also alleged in paragraph 100, Maddox separately lied to the MGC under oath on the same occasion by denying awareness of any additional owners of FBT even without knowing their names, contrary to what he had been specifically told by FBT itself at their first face-to-face meeting in November 2012.[55]

Beyond that, Maddox's primary strategy to minimize his role appears to be to point the finger at his now-former colleague Sinatra, suggesting that refraining from committing fraud on the MGC was supposed to be her job, and only her job.[56]  MM Br. at 9.  But the FAC sufficiently alleges that they both played a role.  For example, a fair reading of paragraphs 81, 87, 88 and 89 makes clear that they were both personally involved with the early negotiations with FBT, both personally involved with discussing with Steve Wynn and securing his blessing for the corrupt deal that would be made with FBT to conceal the criminal involvement in the Everett, and then both involved in striking that deal.[57]   Indeed, they jointly visited the Everett Site both with and

---

[55] Paragraph 81of the FAC sufficiently alleges actual notice to Maddox of the involvement of convicted criminals in FBT, which is more than enough given that knowledge and intent need not be alleged specifically as noted above.  To the extent Maddox wishes to argue that he reasonably failed to follow up on this information and ignored other red flags because it was supposedly someone else's job to deal with them, or had forgotten what he had been told by the time he made his false statement to the MGC, that is a fact-intensive defense he will be free to try to establish on a full record after discovery.

[56] Separately, the FAC does not specifically allege his culpability (or that of Steve Wynn) for the honest-services fraud involving Mayor DeMaria, nor does it need to.  That said, both Maddox and Wynn were aware of the benefits to their company of the mayor's "helpful" attitude and their knowledge of how FBT agreed to pay for that helpfulness is a topic to be explored in discovery.

[57] Again, to the extent the Court might think that the fair inferences to be drawn from the facts alleged are not sufficiently explicit, they can easily be made more explicit by amendment.

without Steve Wynn.  FAC ¶ 81, 88; 2013 Wynn Report at 70, 80.  All of this back and forth

between Nevada and Massachusetts easily establishes the interstate-commerce element of Travel

Act liability (FAC ¶¶ 89, 155(d)), and Maddox's suggestion (MM Br. at 10-11) that the FAC is

deficient in this regard, apparently because it does not specifically allege the exact date and flight

number of his travel, is unsurprisingly unsupported by any relevant authority.[58]

Moreover, Maddox's intimate involvement in the pursuit of the License, stemming from

among other things his role as a very senior officer (at one point president) of Wynn MA as well

as Wynn Resorts is sufficient to support the allegations of his personal responsibility for the false

statements contained in the formal written application submissions of Wynn MA and Wynn

Resorts, for essentially the same reasons that Steve Wynn is liable for them, and thus his

culpability for those predicate acts.  FAC ¶¶ 20, 91, 130(e).  Finally, although Maddox's intimate

role in the Macau operations and thus his knowledge of the pattern of wrongdoing there (FAC ¶¶

20, 40-42) is alleged by way of background and context, it would be easy by further amendment

to specify Maddox's personal culpability for the August 2014 predicate act of willfully refusing

to disclose the new investigation by the Macau authorities despite a direct question from the

MGC requiring such disclosure.  FAC ¶¶ 137-138.[59]

---

[58] Further amendment could specify some of the key travel dates within a fairly narrow range,
although there is no basis to think the law so requires.  Separately, his suggestion that the corrupt
deal he helped strike with FBT in December 2012 can't be part of a Travel Act violation because
it was merely an agreement to commit future crimes ignores the fact that the Travel Act
criminalizes interstate travel "with intent to . . . otherwise promote, manage, establish, carry on,
or facilitate the promotion, management, establishment, or carrying on" of the "unlawful
activity."  Flying to Massachusetts in order to reach an agreement for future "unlawful activity"
falls squarely within this language.

[59] Specifically, other public-record documents such as SEC filings make clear that Maddox was
the senior point person for managing the various investigations by the Macau authorities, making
it highly implausible that he would not have fully participated in the decision to defraud the
MGC by failing to reveal the new investigation despite a specific question calling for that

### D.  Kim Sinatra

That Maddox's attempt to point the finger at Sinatra is insufficient to shield him from his own liability for his involvement in the racketeering alleged in the FAC does not exonerate Sinatra.  She does not even attempt to claim that numerous predicate acts specifically alleged against her[60] are inadequate other than by the general claims addressed above at 40-42 that criminal deceit of the MGC cannot possibly be a RICO predicate act.  Moreover, as the senior executive listed on the corporate entities' applications as the primary contact person (FAC ¶ 130(e); 2013 Wynn Report at 106) she cannot duck liability for all the misstatements and omissions contained in those submissions (FAC ¶¶ 91, 95, 112, 115, 116, 119, 120 130(e)) any more than she can for her own lies under oath to the MGC (FAC ¶¶ 100, 111, 130(a), 130(c), 130(d)).

Given that knowledge can be averred generally (supra at 53 n. 53), her strained attempts (KS Br. at 13) to argue that the disclosures that put her on notice of the criminal ownership interests in FBT were sufficiently vague that she might not have fully understood them is at best a preview of a defense disputing the FAC's allegations of her knowledge.  That is not a ground for 12(b)(6) dismissal.[61]

---

disclosure.  *See* Letter from Matthew Maddox to United States Securities and Exchange Commission, September 5, 2013, attached as Exhibit 3.

[60] Sinatra does not address the allegations that she committed multiple violations of the Travel Act by traveling between Nevada and Massachusetts in furtherance of the unlawful agreement between the Wynn Defendants and FBT (FAC ¶ 89); ¶ 155(d)) and to give false testimony before the MGC (FAC ¶¶ 111, 130(a), 130(c), 155(d)), committed multiple acts of mail and/or wire fraud (FAC ¶¶ 91, 93, 95) and provided false testimony and written submissions to the MGC and its investigators (FAC ¶¶ 91, 95, 100, 116, 130(a), (c)-(e)).

[61] Similarly, her contention (KS Br. at 13) that the FAC does not provide sufficient factual backup for its unequivocal allegation that she knew of Jamie Russo's criminal past is irrelevant because Rule 9(b) does not require such backup detail to be pleaded.

Her various protestations (KS Br. at 12) that she was herself a victim of FBT's fraud do her no good, because they simply ignore the FAC's specific allegations (FAC ¶¶ 81, 87, 88, 90, 93) that, because she already knew about the criminal owners and past owners of FBT, the contrary representations made to her were never intended to fool her but, as she well knew, were the deliberate creation of a false paper trail intended to benefit all defendants.

As to the long-running pattern of Nevada suitability violations and the failure to disclose them to the MGC, her protestation that the Nevada Complaint only specifies (Nevada Complaint ¶¶ 41) her knowledge (as of 2013) of the most egregious incident with the largest hush-money payoff and thus not the whole pattern is unavailing, not least because is that specific payoff is exactly the one that was deliberately obscured by Steve Wynn's fraudulently omissive personal suitability application (FAC ¶ 147) that she was in charge of helping to shepherd through the process.   Moreover, Sinatra is not accused simply of non-disclosure but of affirmatively lying to the MGC on multiple occasions about Wynn Resorts' "higher standard of probity," "best practices," and "successful compliance program" due to "tone at the top," all at a time when she knew full well that the "tone at the top" was set by a sexual predator who used multi-million-dollar hush-money payments to conceal his wrongdoing with the active assistance of others in senior management, including members of the "compliance committee."  FAC ¶ 130.

Finally, as the point person and designated contact for the Wynn applicants' license submissions, she was necessarily the person most responsible for deciding how to respond to the MGC's August 2014 directive to disclose any pending regulatory investigations in other jurisdictions that had not previously been disclosed.  She is thus personally culpable for the predicate acts committed by the willful failure to disclose both an IRS investigation regarding

money-laundering issues and a new Macau investigation into suspicious land-deal circumstances strikingly similar to those at the Everett Site.  FAC ¶¶ 137-138.

## VII.   THE FAC ADEQUATELY PLEADS THAT THE DEFENDANTS' RACKETEERING ACTIVITY CONSTITUTED A PATTERN

The Defendants' arguments that the FAC does not sufficiently plead the "pattern" element of its RICO causes of action both ignore the actual allegations of the FAC and misapply the case law they cite.

As defendants concede (FBT Br. at 16, WR Br. at 10), the statutory language requires only two separate predicate acts (separated in time by less than 10 years), which the FAC unquestionably does.  The Supreme Court has said that the "pattern" requirement also requires the predicate acts to be "related . . . and amount to or pose a threat of continued criminal activity." *H.J., Inc. v. Northwestern Bell Tel. Co*., 492 U.S. 229, 239 (1989).  *H.J.* went on to explain that a "flexible approach" to continuity was required, 492 U.S. at 238-39, and that continuity could accordingly be shown in multiple ways (492 U.S. at 242):

> A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months, and threatening no future criminal conduct, do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct. Often a RICO action will be brought before continuity can be established in this way. In such cases, liability depends on whether the *threat* of continuity is demonstrated. . . .  Whether the predicates proved establish a threat of continued racketeering activity depends on the specific facts of each case. . .  A RICO pattern may surely be established if the related predicates themselves involve a distinct threat of long-term racketeering activity, either implicit or explicit. . .  In other cases, the threat of continuity may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business.

*See also Home Orthopedics Corp. v. Rodriguez*, 781 F.3d 521, 528-30 (1st Cir. 2015) (quoting and summarizing *H.J.*).    Because the "relatedness test is not a cumbersome one for a RICO

plaintiff," *Feinstein v. Resolution Trust Corp.*, 942 F.2d 34, 44 (1st Cir. 1991), we address

continuity first before returning to relatedness.

### A.  The FAC Pleads Continuity

Defendants here claim (FBT Br. at 16-17; WR Br. at 9-14; SW Br. at 7) that there is no

threat of continued criminal activity here and that the approximate 21-month time period

between the first predicate act specifically aimed at obtaining the License by fraud in November

or December 2012 (FAC ¶¶ 88, 89, 155(d)) and the last predicate act in August 2014 that

influenced the MGC's September 2014 vote (FAC ¶ 137) is simply not long enough as a matter

of law if there is no continuing threat.  Both of these contentions are wrong.

In particular, because the Wynn Defendants had secured the award of the License despite

being unsuitable as a matter of law by lying about the facts showing they were unsuitable, they

were at risk of losing the License at any moment if their continuing unsuitability were exposed,

and were thus highly incentivized to commit ongoing acts of fraud to prevent that exposure.

Indeed, when Steve Wynn's personal unsuitability was eventually exposed by the media in 2018,

Wynn Resorts reacted by forcing him out of the company and then obtaining a ruling of the

MGC (FAC ¶ 19; 2018 Wynn Order) that, since he was no longer in a control position, his own

continuing suitability was no longer relevant going forward to the suitability of Wynn MA as the

holder of the License.  That fortuitous public exposure makes an ongoing cover-up pointless

does not negate the continuity element.  *See Heinrich v. Waiting Angels Adoption Servs., Inc.*,

668 F.3d 393, 410 (6th Cir. 2012) ("lack of a threat of continuity of racketeering activity cannot

be asserted merely by showing a fortuitous interruption of that activity such as by an arrest").[62]

---

[62] *See also Feinstein*, 942 F.2d at 46 (suggesting subsequent actions would be relevant for pattern purposes if they "served to perpetuate or conceal the fraud"); *Olive Can Co. v. Martin*, 906 F.2d

Moreover, as the Nevada gaming regulators have now established and Wynn Resorts has admitted, Wynn Resorts' corporate failure to appropriately deal with Steve Wynn's repeated acts of sexual predation constituted additional and ongoing violations (extending through at least 2016 and 2017) of Nevada's suitability requirements for Wynn Resorts as a corporation, with predictable spillover consequences for its suitability in Massachusetts.  Thus, the Wynn Defendants were incentivized to affirmatively lie as might be necessary not only to prevent exposure of lies during the License acquisition process in 2013 and 2014, but to prevent exposure of other misconduct that was still ongoing.[63]

Continuing deception of the MGC was not the only threat of future racketeering as of the date the License was issued, because obtaining the License was necessary but not sufficient to get the planned casino built, and open and corruption of other public officials and agencies might well prove necessary.  Indeed, the FAC specifically pleads (FAC ¶¶ 59, 60, 80, 108, 109, 155(c)) that Mayor DeMaria of Everett, corruptly enlisted by FBT as early as 2009 to abuse his office as might prove necessary or useful, assisted the Wynn Defendants in 2016, almost two years after

---

1147, 1151-52 (7th Cir. 1990) (summarizing key facts of prior decision in *Ashland Oil Inc. v. Arnett*, 875 F.2d 1271 (7th Cir. 1989), where the defendants had "committed arson and bankruptcy fraud in addition to mail and wire fraud. The arson consisted of the burning of records to prevent the discovery of the fraud and the bankruptcy fraud was also to prevent discovery. These acts, therefore, are indicative of a threat of continued activity . . . .").

By contrast, in cases like *Framingham Union Hosp., Inc. v. Travelers Ins. Co*., 721 F. Supp. 1478 (D. Mass. 1989), cited by defendants, the alleged "cover-up" had stretched on for so many years without any new substantive fraud being committed that there was apparently no plausible inference of such a threat.

[63] Because their ongoing communications with the MGC are not all in the public record (FAC ¶ 149), one or more defendants may well, in fact, have lied to the MGC subsequent to 2014 and perhaps as recently as 2019 and thus committed further predicate acts that will be revealed in discovery, but all that matters for continuity is that the threat of such further crimes is present whether or not it has actually manifested itself.

the License had been issued, to help pressure a recalcitrant neighboring property owner who was an obstacle to the casino's construction.[64] That the Wynn Defendants made a substantial illegal campaign contribution (FAC ¶ 143) after receiving the favorable initial MGC further suggests, even if not a predicate act by itself, a "down payment" toward further attempts at political corruption that, at a minimum, posed a reasonable threat of maturing into further predicate acts. *See, e.g., Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 20 (1st Cir. 2000) (pattern element could have been established if allegations had been that defendants intended to operate hotel indefinitely by criminal means rather than discontinuing such means once plaintiff investor had been squeezed out).

Separately, the Supreme Court held in *H.J.* that, even without the same specific showing of risk of future repetition, continuity exists where "it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business (in the sense that it is not a business that exists for criminal purposes)."  492 U.S. at 243.  *See Libertad v. Welch*, 53 F.3d 428, 446 (1st Cir. 1995) (citing *H.J.* and reversing lower-court grant of summary judgment to defendants

---

[64] To the extent that FBT's financial motivation ended when it got paid for the Everett Site some time after the License was issued in November 2014, that would at best mean that the allegations supporting open-ended continuity are even stronger for the second cause of action (which does not involve FBT) than for the first cause of action (which does involve FBT).  But FBT, as the party originally responsible for making the corrupt bargain that secured Mayor DeMaria's assistance, cannot duck liability for the fruits of that corrupt bargain manifesting as additional assistance to the casino project as late as 2016.  FAC ¶¶ 108-109, supra at 13.  Moreover, that Mayor DeMaria's piece of the action was to be funneled to him via FBT's "consulting" payment to Russo and that Russo's lawsuit against FBT and its affiliates claiming that he had not received all the payment he was due did not get settled until December 2016 (supra at 13) supports a reasonable inference of FBT's ongoing involvement with at least that facet of the scheme as late as 2016.  Indeed, to the extent FBT no longer needed Mayor DeMaria's assistance after it had sold the land but the Wynn Defendants did, that could, and would, both incentivize FBT to seek to shortchange Mayor DeMaria on his promised share of the proceeds (via Russo) and incentivize the Wynn Defendants to make sure Mayor DeMaria got paid.  Discovery may well reveal that the Wynn Defendants took a keen interest in the resolution of Russo's lawsuit against FBT.

because there was sufficient evidence on the continuity element:  "It is not the nature of the conduct itself, however, that suggests a threat of continuing; it is the fact that the [defendants'] regular way of conducting their affairs involves [those] illegal acts . . . .")

Here, Wynn MA (the RICO enterprise itself in the Second Cause of Action and the focal point of the association-in-fact enterprise in the First Cause of Action) was formed solely to pursue the License in Region A and develop and operate the casino if the License could be obtained (FAC ¶ 18; 2013 Wynn Report at 5, 10, 96), so the racketeering activity alleged here has so permeated the enterprises throughout their "legitimate" existence as to make it the regular way their business has been conducted.  Indeed, the Seventh Circuit has held that even the accomplishment of a scheme's apparent final goal does not prevent a finding of threat of continuing racketeering activity if it is clear that, had the goal not been accomplished as early as it had been, the defendants would likely have continued to commit additional racketeering acts for whatever additional time might prove necessary.  In *Shields Enterprises v. First Chicago Corp.*, 975 F.2d 1290, 1296 (7th Cir. 1992), that court reversed a lower court grant of summary judgment, finding sufficient evidence for a jury trial on the pattern element even though the alleged predicate acts of extortion lasted only over an eight-month period and there was no threat of repetition once the goal was achieved at the end of that comparatively brief period.  Even so, the evidence was sufficient for a reasonable jury to find a RICO pattern given that the evidence suggested that "whenever the Technology Group shareholders stood in the way of some goal First Chicago wanted to accomplish in relation to CBSI, First Chicago turned to extortion to accomplish its goal."  975 F.2d at 1296.

Here, what is particularly striking about the role of fraud on the MGC in the defendants' "regular way of conducting the affairs" of the RICO enterprises here is how they were able to

shift gears after the fortuitous partial exposure of their original plan and devise a new "plan B" fraud to continue to pursue the same ultimate goals.  Once it became clear that the falsity of the original documents concealing the ownership interest of the felons in FBT and the Everett Site had been discovered, the strategy changed to lying about the Wynn Defendants' previous knowledge of that scheme (portraying them instead as hapless victims), purporting to renegotiate the deal, and then obtaining and submitting to the MGC additional false certifications from FBT's principals falsely claiming full compliance with the renegotiated deal.

That fraud was the regular way the enterprises' business was conducted is further demonstrated by the lies (FAC ¶¶ 124-130) intended to conceal previous and ongoing misconduct in Nevada and Macau.  Indeed, a pattern of similar misconduct repeated in different circumstances itself demonstrates continuity and a threat of future repetition.  *See ICONICS, Inc. v. Massaro*, 192 F. Supp. 3d 254, 270-71 (D. Mass. 2016) (denying summary judgment to defendants because evidence was sufficient for jury to find continuity, given that defendants had perpetrated similar misconduct twice and thus might in the future "repeat their racketeering acts in new contexts.").[65]   Here, given similar patterns of shady business dealings, deception, and regulatory violations by Wynn MA and/or its control persons in three different jurisdictions (Nevada, Macau, and now Massachusetts), the inference that any future casino project (whether

---

[65] By contrast, in *Giuliano v. Fulton*, 399 F.3d 381, 391 (1st Cir. 2005), the court found no continuity because no such regular practice was alleged and "To the contrary, [the complaint] acknowledged that all of the racketeering activity was focused on the singular objective of wresting control of the racetrack away from [plaintiff].  Once achieved, the illegal scheme, as alleged, would end."

another one elsewhere in Massachusetts or in yet a fourth jurisdiction) would be tainted by the same habitual misconduct is fully plausible.[66]

Even without the numerous independent indicia of a threat of continuing racketeering activity discussed above, defendants' contention that the approximate 21-month time period between the first predicate act specifically aimed at obtaining the License by fraud in November or December 2012 (FAC ¶¶ 88, 89, 155(d)) and the last predicate act in August 2014 that influenced the MGC's September 2014 vote (FAC ¶ 137) is simply not long enough as a matter of law is inaccurate.[67]  This argument fails for two reasons even assuming arguendo no threat of future racketeering.  First, it requires sweeping away as not sufficiently "related" (which is erroneous for the reasons given below and at, at most, will be a disputed issue for the jury) additional predicate acts alleged to have occurred as early as 2005 and as recently as 2016.  FAC ¶¶ 36, 41, 59-60, 108-109.  Second, there is simply no per se rule holding a 21-month timespan too brief for closed-ended continuity.  To the contrary, the First Circuit in *Home Orthopedics* expressly held, 781 F.3d at 529, that for "closed-ended continuity" purposes, durations in that range (less than "a few weeks or months" on one end and perhaps four years on the other) "fall somewhere in the middle," where the time period itself is not dispositive either way so the courts

---

[66] The defendants are disingenuously trying to have it both ways.  On the one hand, they insinuate (WR Br. at 11) that that the pattern element is not established because the FAC supposedly only alleges a single scheme, although the law is clear that multiple schemes, while potentially relevant, are not required to establish RICO liability.  *Efron*, 223 F.3d at 16 (*citing H.J.*, 492 U.S. at 241).  But they then ask the Court to disregard all of the allegations of their parallel schemes of misconduct in Macau and Nevada by claiming it is unrelated, which is inaccurate for the reasons given below at 69-70.

[67] One defense brief at least grudgingly concedes a timespan of "approximately 18 months" (FBT Br. at 17) while another disingenuously focuses on a period of "less than a year" (WR Br. at 10) by simply ignoring the predicate acts that are clearly alleged (FAC ¶155(a)-(b); 161(b)) to have occurred both before and after calendar 2013.

must look to other "indicia of continuity," not as mechanical requirements, but as part of a "natural and commonsense approach to RICO's pattern element."[68]

Defendants' last defense on pattern involves invoking prior cases finding lack of pattern in situations involving "narrow scheme(s) to defraud a single victim" or obtain a single contract or seize control of a single, ongoing business.  WR Br at 11-12.  But in light of the "natural and commonsense approach" mandated by the First Circuit, the facts alleged here are simply not, as a matter of law, such a "narrow scheme."  For example, in *Giuliano*, 399 F.3d at 390, the "narrow scheme" (as noted above) involved a factional fight over control of a racetrack regulated by the MGC's predecessor the Massachusetts Racing Commission.  As a crucial element concluding that there was no sufficient basis for the pattern element, the First Circuit held that there was no "societal threat" because it did "not view the Massachusetts state courts or the Commission as 'victims' of the alleged racketeering scheme."  399 F.3d at 390 n. 8.  There was thus no broader public interest in which faction controlled the track and which faction had been ousted, and no victim other than the losing faction.  Here, by contrast, the victimization of the MGC and the broader public interest, going beyond the victimization of the business interests of SSR and MSM, is manifest.

Moreover, in *Giuliano* (and similar cases), the operations of the business being fought over would apparently continue in more or less the same fashion regardless of the winner of the allegedly fraud-tainted fight for control, meaning the outcome of that fight would have no

---

[68] Defendants' insinuation (WR. Br. at 12) that this Court's decision sustaining the adequacy of the pattern allegations in *Laker v. Freid*, 854 F. Supp. 923 (D. Mass. 1994), depended primarily on the length of a 37-month time period ignores that this Court cited with approval (854 F. Supp. at 930) the decision in *A.I. Credit Corp. v. Hartford Computer Group, Inc.*, 847 F. Supp. 588 (N.D. Ill. 1994), sustaining pattern allegations involving only 13 months as sufficient, thus confirming that time period as such is not dispositive as long as it is more than a few months.

obvious impact on employers, customers, or the general public.[69]   Here, by contrast, the fraud

changed the location of a major casino-building project (as to which each of the finalist

applicants had promised spend at least $500 million – Wynn License Award at 12) from SSR's

site in Revere to FBT's site in Everett.   The consequences of the fraud-tainted decision were thus

not simply limited to the rival applicant groups but created all sorts of ripple effects for

thousands of other individuals and businesses in the greater Boston area who would, or would

not, stand to gain or lose depending on which site was chosen.[70]

---

[69] Similarly, in *Efron*, the outcome of the fight over which investors did or did not control a
particular hotel construction project had no broader relevance or impact on any other
constituencies. 223 F.3d at 18.  This Court's decision in *Bowdoin Construction Corp. v. Rhode
Island Hospital Trust Nat'l Bank*, 869 F. Supp. 1004 (D. Mass. 1994), did not use the specific
word "narrow" but focused on the fact that the allegations all revolved around "an allegedly
fraudulent arrangement for the renovation of" a specific hotel, with it being unclear that there
was any broader public interest affected beyond the private interest of those like the plaintiff,
who was the general contractor who had gone unpaid as a result of the collapse of the financing
scheme.  Indeed, one key factor in that decision was that while the case was pending, the
Supreme Court decided *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164
(1994), making the plaintiff's allegations of securities fraud largely untenable as RICO predicate
acts and further undermining any possibility that the broader public interest might be implicated
by the dispute.

Indeed, the problems caused by the toxic corporate culture found in Wynn casinos elsewhere
may have already come to Massachusetts.  In a pending sexual-harassment lawsuit brought
against Wynn MA and Wynn Resorts by one of their early Boston-area hires, the plaintiff alleges
that she was systematically sexually harassed in the workplace by Wynn MA's Chief
Information Officer Tom Dillon, who had previously worked at the Wynn casino in Macau and
who allegedly responded to her complaints about his inappropriate physical contact with her by
saying "Why?  This was always okay over in Macau." *See Bracket-Kelly v. Dillon et al.*,
Middlesex Superior Court, Civil Case No. 1881CV01663.

[70] Indeed, the financial stakes involved in this case are orders of magnitude higher than those in
the cases defendants cite as rejecting a showing of pattern in "narrow" cases, which itself is a
fact relevant to the "natural and commonsense" approach the First Circuit mandated in *Home
Orthopedics*.  For example, in *Systems Management, Inc. v. Loiselle*, 303 F.3d 100, 106 (1st Cir.
2002), the First Circuit acknowledged that *H.J.* had held that a single scheme could give rise to
RICO liability "but only if it is reasonably broad and far reaching" before reversing the judgment
in favor of the plaintiff below on pattern grounds because the evidence showed defendant had
fraudulently maintained a contract to provide janitorial services "by comparatively trivial

**B.  The FAC Sufficiently Alleges Relatedness of All Predicate Acts Alleged**

As already noted, the "relatedness test is not a cumbersome one." *Feinstein*, 942 F.2d at

44.  All that is needed are allegations showing that the predicate acts "have the same or similar

purposes, results, participants, victims, or methods of commission, or otherwise are interrelated

by distinguishing characteristics and are not isolated events." *H.J.*, 492 U.S. at 240.  Defendants

do not appear to dispute that the numerous alleged predicate acts from late 2012 through at least

August 2014 directly aimed at fraudulently influencing the MGC's decision on the License are

all related.  They make two non-relatedness arguments, both of which fail.

First, they suggest (FBT Br. at 17) that the honest-services fraud involving FBT's

promised payoff to Mayor DeMaria is unrelated, presumably because the initial arrangement to

put the mayor on the "payroll" had been reached before the Wynn Defendants entered the

picture.  But the honest-services fraud alleged is that the mayor was promised in or about 2010 a

cut of FBT's ultimate sale proceeds, laundered through the mayor's bagman Russo as a supposed

"consulting" fee, in return for providing whatever future favors (via abuse of his official

position) might turn out to be necessary as FBT's plans for the property unfolded.  FAC ¶¶ 23,

59, 60.  Thus, when the Wynn Defendants entered the picture and their casino became the

intended use that would maximize FBT's payday (and thus the mayor's payday), the mayor had

already been incentivized to assist the new joint goal of FBT and the Wynn Defendants in

pursuing the casino, in whichever ways an abuse of his public office might prove of assistance.

In other words, the mayor's improper assistance, which might well be crucial in making the

---

chiseling." *Grover v. Larkin Iron Works, Inc*., 2011 WL 476619, at *2 (D. Mass. Feb. 7, 2011),
denied a 12(c) motion to dismiss a RICO claim on pattern grounds and distinguished *Loiselle* on
the grounds that the stakes in that case exceeded $100,000 and were thus not "comparatively
trivial" like those in *Loiselle*.

construction of the casino feasible above and beyond the need to get the License from the MGC, was an additional feature of the property that FBT could offer to the Wynn Defendants.  That the one casino-favoring abuse of power by the mayor that is already verified by documents in the public record did not occur until 2016 (FAC ¶¶ 109-110) simply confirms that the casino development scheme was a lengthy and multi-faceted project that still had numerous additional obstacles to overcome after the MGC had issued the License.[71]

Second, they claim (WR Br. at 10) that the Wynn Defendants' prior and ongoing misconduct in Nevada and Macau is unrelated, even though they appear to concede that lying about it to the MGC was material.[72]  But the relatedness is established by very need to lie about it.  Because the casino business is so highly regulated, and the regulators are so concerned about the suitability of licensees, the Wynn Defendants' track record in Nevada and Macau was of keen interest to the MGC – as can be seen from the MGC's prompt reaction to the revelation last year of the long-standing pattern of suitability violations in Nevada related to Steve Wynn's history of sexual predation against employees and its enabling and coverup by other senior Wynn Resorts management including Sinatra.  Steve Wynn was forced out in order to convince the MGC that his personal suitability to be involved with a Massachusetts casino was no longer relevant going forward.  *See* 2018 Wynn Order; 2019 Wynn Report at 1.  Sinatra was terminated from her position and is therefore no longer required to maintain suitability as an individual qualifier, and Wynn Resorts and Wynn MA have just this past week been begging the MGC in a

---

[71] As noted above at 49, discovery will be necessary to reveal exactly how much FBT paid Russo and when it was paid and how much of that payment flowed through to Mayor DeMaria when.

[72] As set forth above at 37-39, at least some of the Nevada violations, all of which were prosecutable as gross misdemeanors under Nevada law even though the Nevada regulators chose to limit themselves to administrative sanctions, were also federal Travel Act felonies and thus RICO predicate acts.

public hearing to let bygones be bygones, not on the grounds that the lengthy pattern of Nevada

suitability violations for which Wynn Resorts has already conceded liability to the Nevada

regulators is irrelevant to their institutional fitness to hold the License in Massachusetts but

solely on the grounds that new management has supposedly cleaned house and will avoid future

such incidents.  Because suitability or other regulatory violations in any jurisdiction where the

Wynn Defendants operate can jeopardize the License in Massachusetts, predicate acts related to

those other violations are related, or at least sufficiently plausibly related for 12(b)(6) purposes.

## VIII.   The FAC Sufficiently Alleges RICO Conspiracy Liability Against All Defendants

There is no dispute that conspiracy liability under 1962(d) requires an underlying RICO

violation, but the defendants' 1962(c) violations have been alleged for the reasons set forth

above.  To establish RICO conspiracy liability, "a plaintiff must show that each defendant in the

RICO conspiracy case joined knowingly in the scheme and was involved himself, directly or

indirectly, in the commission of at least two predicate acts." *Libertad*, 53 F.3d at 441.  *See also*

*Feinstein*, 942 F.2d at 41 (same).  Here, the defendants' conspiratorial agreement and entry into

the core scheme is specifically alleged in paragraphs 88 and 90 of the FAC, and each defendant's

direct or indirect involvement in the commission of at least two predicate acts is set forth in

section V above (with each predicate act committed by any of Steve Wynn, Maddox, or Sinatra

also being an act committed by Wynn MA and Wynn Resorts).[73]  No more is needed.

Defendants cite cases (WR Br. at 24 n. 23) invoking the so-called intra-corporate conspiracy

doctrine, but that doctrine is completely inapplicable when the conspiracy is not solely limited to

a corporation and its own agents, employees, or subsidiaries, so FBT's presence as a co-

---

[73] To the extent the Second Circuit authority cited by defendants (WR Br. at 24) requires more
pleading particularity than the First Circuit does it is irrelevant, and in any event more detail
could if desired be provided by amendment.

conspirator renders it irrelevant.  *See Sullivan v. National Football League*, 34 F.3d 1091, 1099

(1ˢᵗ Cir. 1994) (doctrine inapplicable when there is not complete "unity of interests" among

conspirators but some may pursue their own interest independent of that of the collective).[74]

## IX.    SSR HAS ADEQUATELY PLEADED ITS STATE LAW CLAIMS

SSR has alleged more than sufficient facts to plausibly suggest that Defendants engaged

in "an unfair method of competition" through numerous illegal and unfair acts, which states a

claim under M.G.L. c. 93A, § 11. While defendants contend that a § 11 claim requires a

"commercial transaction" between SSR and defendants, that is not the law. "Parties need not be

in privity for their actions to come within the reach of c. 93A." *Kattar v. Demoulas*, 739 N.E.2d

246, 258 (Mass. 2000).  A "commercial transaction" requirement does not apply to a claim by a

competitor for unfair competition. *See Stop & Shop Supermarket Co. v. Loomer*, 837 N.E.2d

712, 717-18 (Mass. App. Ct. 2005) (applying "commercial transaction" standard because "this

case does not concern an unfair method of competition between two competing business

entities").[75] The Massachusetts courts have repeatedly found § 11 liability in cases involving

competitors who never contracted with one another.  *See Augat, Inc. v. Aegis, Inc.*, 565 N.E.2d

415, 419-21, 422 n.7 (Mass. 1991) (upholding § 11 liability where competitor aided and abetted

---

[74] That said, we now realize that paragraphs 164-167 of the FAC may contain a drafting glitch or at least a lack of clarity.  The intent was to plead a conspiracy claim against FBT with respect to both the RICO violation alleged in the first cause of action and the separate  (but overlapping) RICO violation alleged in the second cause of action even though FBT is not a defendant in the second cause of action because it is not alleged to have directly conducted the affairs of the RICO enterprise (Wynn MA) alleged in the second cause of action.  To the extent the Court believes the current wording does make that sufficiently clear we respectfully request leave to amend to correct that glitch.

[75] Defendants rely almost entirely on *Mastoran Restaurants, Inc. v. Commonwealth Div. of Capital Asset Mgmt.*, 2001 WL 1811963 (Mass. Super. Ct. Dec. 31, 2001), which was issued prior to *Loomer* and did not consider whether the "unfair method of competition" prong of § 11 incorporates a "commercial transaction" requirement.

plaintiff's general manager in improperly soliciting key employees before leaving company); *Beninati v. Borghi*, 61 N.E.3d 476, 485-86 (Mass. App. Ct. 2016) (similar). The FAC alleges that SSR was in a functional business partnership to obtain and profit from the Region A License, which would have drastically increased the value of its land and guaranteed substantial revenue for the foreseeable future, while defendants all sought to profit from the Wynn applicants' rival application for the License in a zero-sum competition, and did so through criminal and unlawful means.[76]  Accordingly, Plaintiff has stated a claim for unfair competition under § 11.

SSR has also stated plausible claims for intentional interference with advantageous relations. While Steve Wynn suggests that his interference with SSR's relationship with MSM is not shown, his criminal actions made MSM's performance for SSR's benefit impossible. *See Harrison v. NetCentric Corp.*, 744 N.E.2d 622, 633 n.15 (Mass. 2001) ("[I]t is not necessary to show that the third party was induced to break the contract. Interference with the third party's performance may be by prevention of the performance . . . [or] by depriving him of the means of performance").  Moreover, defendants caused SSR to lose potential future advantageous relationships with MSM not limited to the four corners of the contract. *See Owen v. Williams*, 77 N.E.2d 318, 322 (Mass. 1948) ("an existing or even a probable future business relationship from which there is a reasonable expectancy of financial benefit is enough").[77]

---

[76] Plaintiff and defendants were engaged in trade or commerce through their real estate dealings, among other things. *See* M.G.L. c. 93A, § 1(b) (buying, selling, renting, or leasing property is trade or commerce).

[77] And it is irrelevant that defendants did not make fraudulent representations directly to MSM because, under well-established law, any improper means of interference, whether direct or indirect, can be the basis of an intentional interference claim. *See* Restatement (Second) of Torts § 766 cmts. h, k ("The rule stated in this Section applies to any intentional causation whether by inducement or otherwise…There is no technical requirement as to the kind of conduct that may result in interference with the third party's performance of the contract.") (quoted in part in *Harrison*, 744 N.E.2d at 633 n.15).

Sinatra inaccurately states that SSR must prove an improper purpose to recover on such a claim. In fact, the law requires only that a defendant's interference be "improper in motive *or means*." *Blackstone v. Cashman*, 860 N.E.2d 7, 12-13 (Mass. 2007) (emphasis added). It is unnecessary to show both. *See Draghetti v. Chmielewski*, 626 N.E.2d 862, 869 & n.11 (Mass. 1994). The allegations of criminal acts and violations of the public policy underpinning the Massachusetts casino gambling law establish the impropriety of the means by which defendants damaged Plaintiff's business opportunities. *See United Truck Leasing Corp. v. Geltman*, 551 N.E.2d 20, 24 & n.10 (Mass. 1990) (violation of statutes or common-law rules may be improper means). Finally, SSR adequately alleges Sinatra's knowledge of SSR's lost opportunities because the FAC alleges that she was "heavily involved in the pursuit of the Gaming License" and was "overseeing the Wynn Defendants' due diligence," and that defendants were specifically aware of the contract between Plaintiff and MSM.  FAC ¶¶ 21, 76, 87.[78]

## X.  DEFENDANTS' ANTI-SLAPP "SPECIAL MOTION" IS GROUNDLESS

Three defendants claim that the state-law claims (and only the state-law claims, for obvious Supremacy Clause reasons) violate the Massachusetts "anti-SLAPP" statute.  This argument is groundless.  As the First Circuit noted in *Steinmetz v Coyle & Caron Inc.*, 862 F.3d 128, 133 (1st Cir. 2017), the Supreme Judicial Court's decision in *Blanchard v. Steward Carney*

---

In *Hunneman Real Estate Corp. v. Norwood Realty, Inc.*, 765 N.E.2d 800 (Mass. App. Ct. 2002), the interference claim failed because they did not cause a third party to discontinue a relationship or fail to perform under a contract – not based on the person or entity to whom statements were made. *See id.* at 809.

[78] The SSR-MSM agreement was submitted to the MGC and made publicly available ( http://massgaming.com/wp-content/uploads/Mohegan-Ground-Lease.pdf), and it is highly implausible that Sinatra would have been unaware of any material submissions of the competing applicant.

*Hosp., Inc*. 75 N.E.3d 21 (Mass. 2017) dramatically changed the law by recognizing new grounds for denying special motions like that made here.  While *Steinmetz* suggests a multi-step inquiry, it is simpler here to take the steps in reverse order.

*Blanchard* changed prior Massachusetts law by holding that the nonmoving party (here, SSR) may defeat a special motion under the anti-SLAPP statute by, among other things, demonstrating that "its primary motivating goal in bringing its claim, viewed in its entirety, was not to interfere with or burden defendants' petition rights but to seek damages for the personal harm to it from the defendants' alleged legally transgressive acts."  75 N.E.3d at 38 (citation and quotation omitted).  On remand, the trial court in *Blanchard* denied the motion on that very basis, because it concluded that plaintiffs' defamation claims were "colorable" and primarily motivated by the desire "to seek relief from allegedly tortious harm, not to interfere with the defendants' petition rights."  2017 WL 7361049, at *3 (Super Ct. Suffolk Co. Dec. 7, 2017).

This is a damages action.  SSR seeks to recover the hundreds of millions of dollars in revenue it would have received pursuant to its contract with MSM had the MGC awarded the License to the MSM/SSR proposal so that the Region A casino would have been built on SSR's Suffolk Downs site, as would have happened but for defendants' RICO and state-law violations.  Defendants' insinuation that the prospect of recovering compensation for a nine-figure economic loss was not the primary motivation for this lawsuit cannot be taken seriously.[79]  The magnitude

---

[79] The suggestion (AS Br. at 4) that this lawsuit was brought in 2018 rather than 2014 suggests an improper non-financial motive makes no sense at all and is unsurprisingly supported by no citation to authority.  Lawsuits seeking to chill or intimidate will by definition generally be more effective if brought sooner, just like lawsuits seeking injunctive relief.  By contrast, for a lawsuit seeking only damages for past wrongdoing to be brought several years later (and comparatively close to the end of the period prescribed by the relevant statute of limitations) is commonplace.  That the Wynn Defendants came under intense renewed scrutiny by the MGC in 2018 is a result of the public media revelations of their prior misconduct, which rapidly resulted in the departures of defendants Wynn and Sinatra and the admission by Wynn Resorts that it had no defense to the

of the losses SSR suffered can be seen from its contract with MSM (SSR/MSM Lease) as well as

the MGC's decision (Wynn License Award at 11) indicating that MSM was prepared to invest

over $500 million in developing a casino on the Suffolk Downs site and obviously believed it

would turn a profit (even after paying SSR a guaranteed minimum of $35 million a year).  The

defendants have separately argued (invalidly, as shown above at section II) that their wrongdoing

was not the proximate cause of SSR's loss.  But that does not eliminate the fact that SSR has lost

an extraordinarily valuable business opportunity as a result of the MSM/SSR License application

not being granted, and thus cannot undermine SSR's motivation to vigorously litigate causation

as well as any and all other disputed liability issues in order to seek compensation for that loss

from any defendant against whom it has a colorable claim.

It is noteworthy that the potential damages the plaintiffs sought in *Blanchard* (for

"reputational damage and emotional distress", 2017 WL 7361049, at *3) are much "softer" than

the hard-dollar loss of future revenues with a minimum $35 million annual guarantee at issue

here, and it is well-known that defamation causes of action, like those made in *Blanchard*, are

not infrequently advanced for non-financial motives that could be pejoratively characterized as

an intent to "chill" future speech by the defendants.  Even so, the court found that the desire to

recover damages, not the intent to chill future "petitioning activity" by the defendants, was what

primarily motivated the *Blanchard* plaintiffs.

Separately, *Blanchard* held, 75 N.E.3d at 39, that a "necessary but not sufficient factor"

in determining a plaintiff's motivation "will be whether the nonmoving party's claim at issue is

colorable or worthy of being presented to and considered by the court . . . i.e. whether it offers

---

Nevada regulators' allegations of a decade-long pattern of violation of Nevada gaming law.
Those revelations also provided additional factual grounds for SSR's damages claims.

some reasonable possibility of a decision in the party's favor." Defendants claim (AS Br. at 4) that SSR's *state-law* claims are "meritless" solely by summarizing their arguments in favor of dismissing the *federal* RICO claims, to which the state anti-SLAPP statute does not apply). But not only are the federal RICO claims more than "colorable" for the reasons set forth at length above, defendants do not even attempt in their anti-SLAPP brief to show that SSR's state-law claims are not colorable, and they have elsewhere devoted barely six pages of their hundred-plus pages of briefing to addressing the state-law claims, which are viable for the reasons given above at Section IX. In the wake of *Blanchard*, the First Circuit has declined to apply the more stringent 12(b)(6) standard in assessing whether or not a claim is "colorable" in the context of an Anti-SLAPP motion, stating "we cannot conclude that the [] claim offers no reasonable possibility of a decision in the [plaintiffs'] favor" in its favorable determination as to the colorable merits of the plaintiffs' defamation claim. *Steinmetz v. Coyle & Caron, Inc.*, 862 F.3d 128, 141 (1st Cir. 2017).

Finally, all of the foregoing assumes purely arguendo that the movants were engaged in "petitioning activities" protected by the Anti-SLAPP law in the first place. But they have not met their burden to demonstrate that. Movants have cited no case standing for the proposition that seeking a lucrative monopoly from a government agency is an example of the constitutional right to petition the government for the redress of grievances, any more than, for example, seeking a government contract or a government job is "petitioning activity" rather than purely self-interested. Indeed, in *Duracraft Corp. v. Holmes Products Corp.*, 691 N.E.2d 935 (Mass. 1998), the Supreme Judicial Court held that deposition testimony given in an administrative proceeding was not protected petitioning activity because the witness, a former employee of the

adverse party, had allegedly violated a non-disclosure agreement.[80]  Just as under *Walker Process* federal law excludes fraud on the patent office from the protection of the *Noerr-Pennington* immunity doctrine (see supra at 25-28) because such self-interested fraud is not "petitioning activity," the anti-SLAPP statute should not be presumed to apply to such activities in the first place.[81]

As the Supreme Judicial Court noted in *Kobrin v. Gastfriend*, 821 N.E.2d 60, 67 (Mass. 2005), the paradigm anti-SLAPP situation involves "private citizens . . . exercising their constitutional right to speak out against development projects or other matters of concern to them and their communities." *Steinmetz* involved exactly that fact pattern:  the plaintiffs had been denied permission to build a new house by the Cohasset Conservation Commission due to lobbying by concerned neighbors, so plaintiffs retaliated by suing the landscape design firm the neighborhood association had retained to help explain their concerns about the proposed development.  862 F.3d at 133-34.  By contrast, the movants here are wealthy and notoriously litigious out-of-state parties who came to Massachusetts in pursuit of profit and now seek to avoid being held accountable for the damage caused by their corruption of the MGC's decision-making process.  They are not within the scope of the anti-SLAPP statute's protections.

---

[80] The *Blanchard* defendant was a hospital which responded to public and regulatory concern about unsafe practices by stating its position about the culpability of certain employees, who then responded by suing for defamation.  75 N.E.3d at 27-28.

[81] By contrast *North American Expositions Co. LP v. Corcoran*, 898 N.E.2d 831 (Mass. 2009), involves a fact pattern very similar to *Noerr-Pennington*.  The aggrieved plaintiff was denied use of a public facility because of a contentious interpretation of a statute allegedly giving the defendants (competitors of plaintiff) a "monopoly" on its use.  Defendants' lobbying efforts to convince the governmental entity of the correctness of the statutory interpretation that denied plaintiff access were thus classic petitioning activity of the sort *Noerr-Pennington* would protect in a federal antitrust claim.

## XI.    IN THE ALTERNATIVE, LEAVE TO AMEND SHOULD BE GRANTED

The FAC is already long and full of well-pleaded factual detail.  It more than sufficiently states the causes of action it pleads for the reasons set forth above.  Nonetheless, many of the defendants' criticisms amount to nothing more than carping that it is still insufficiently detailed and/or does not state what we believe are the fair inferences and conclusions arising from the facts pleaded with sufficient explicitness.  Should the Court agree with any of these criticisms, many of those purported defects can be fully addressed through amendment, both as to certain items noted above and as to others.  Moreover, new relevant information continues to be revealed all the time both due to ongoing public investigations of the defendants' misconduct and our own ongoing investigation, which continues to obtain information and documents even though formal discovery has not yet commenced.  There is thus no basis for thinking further amendment, should the Court find any portion of the FAC insufficiently particularized or lacking some specific element alleged with sufficient explicitness, would be futile.

**CONCLUSION**

For the foregoing reasons, all of the defendants' motions should be denied.

Respectfully submitted,

/s/ Steven G. Storch
Steven G. Storch (admitted *pro hac vice*)
John W. Brewer (admitted *pro hac vice*)
Kelly McCullough (admitted *pro hac vice*)
Storch Amini PC
2 Grand Central Tower
140 East 45th Street, 25th Floor
New York, NY  10017
Telephone: (212) 490-4100
Email: sstorch@storchamini.com
Email: jbrewer@storchamini.com
Email: kmccullough@storchamini.com

Inga S. Berstein (BBO #627251)
David A. Russcol (BBO #670768)
Zalkind Duncan & Bernstein LLP
65A Atlantic Avenue
Boston, Massachusetts 02110
Telephone: (617) 742-6020
Email: iberstein@zalkindlaw.com
Email: drusscol@zalkindlaw.com

Joseph R. Donohue (BBO# 547320)
Donohue & Associates
The Charlestown Navy Yard, Shipway Place Unit C2
Boston, Massachusetts 02129
Telephone: (508) 641-8848
Email: jrdonohuelaw@gmail.com

*Attorneys for Plaintiff Sterling Suffolk Racecourse, LLC*

## **CERTIFICATE OF SERVICE**

I certify that this Motion was filed electronically through the Court's CM/ECF system on

April 5, 2019 and served electronically on all counsel of record.


/s/ Steven G. Storch_____
Steven G. Storch