UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STERLING SUFFOLK RACECOURSE, LLC,<br><br>       Plaintiff,<br><br>v.<br><br>WYNN RESORTS, LTD; WYNN MA, LLC; STEPHEN WYNN; KIMMARIE SINATRA; MATTHEW MADDOX; and FBT EVERETT REALTY, LLC,<br><br>       Defendants. | No. 1:18-cv-11963 PBS<br><br>(Leave to File Granted 4/18/19) |

**REPLY IN SUPPORT OF STEPHEN WYNN'S**
**<u>MOTION TO DISMISS THE FIRST AMENDED COMPLAINT</u>**

# **TABLE OF CONTENTS**

I. The Alleged RICO "Enterprise" and "Person" Are Not Distinct – Count 2 ........................1

II. Lack of Vertical Relatedness – Count 2 ................................................................................2

III. Alleged Predicate Acts by Mr. Wynn ...................................................................................3

IV. But-For Causation ..................................................................................................................6

V. Proximate Cause .....................................................................................................................7

VI. Mail/Wire Fraud, Travel Act Violations, and RICO "Gambling" ....................................8

VII. State Law Claims Must Be Dismissed ..................................................................................9

# **TABLE OF AUTHORITIES**

**Cases**

*Ali v. Jawad*,
   No. 16-CV-00879, 2017 WL 1375197 (E.D. Cal. Apr. 17, 2017) ...........................................4

*Bucklew v. Hawkins, Ash, Baptie & Co., LLP.*,
   329 F.3d 923 (7th Cir. 2003) ...................................................................................................2

*Carvel Corp. v. Noonan*,
   818 N.E.2d 1100 (N.Y. 2004) ................................................................................................10

*Cedric Kushner Promotions, LTD. v. King*,
   533 U.S. 158 (2001) .................................................................................................................1

*Cruz v. FXDirectDealer, LLC*,
   720 F.3d 115 (2d Cir. 2013) .....................................................................................................2

*D. Penguin Bros. Ltd. v. City Nat. Bank*,
   587 F. App'x 663 (2d Cir. 2014) ..............................................................................................3

*Empire Merchants, LLC v. Reliable Churchill LLP*,
   902 F.3d 132 (2d Cir. 2018) .................................................................................................8, 9

*Kemp v. AT&T Co.*,
   393 F.3d 1354 (11th Cir. 2004) ................................................................................................8

*Mear v. Sun Life Assur. Co. of Canada (U.S.)/Keyport Life Ins. Co.*,
   No. 06-CV-12143-RWZ, 2008 WL 245217 (D. Mass. Jan. 24, 2008) ....................................2

*N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale*,
   567 F.3d 8 .............................................................................................................................4, 7

*N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*,
   781 F.3d 182 (5th Cir. 2015) ....................................................................................................2

*Santander Consumer USA Inc. v. Walsh*,
   762 F. Supp. 2d 217 (D. Mass. 2010) ....................................................................................10

*U1it4less, Inc. v. Fedex Corp.*,
   871 F.3d 199 (2d Cir. 2017) .....................................................................................................1

*United States v. Berroa*,
   856 F.3d 141 (1st Cir. 2017) ....................................................................................................9

*United States v. DeLuna*,
   763 F.2d 897 (8th Cir. 1985) ....................................................................................................8

*United States v. Frost*,
    125 F.3d 346 (6th Cir. 1997) ..............................................................................................9

*United States v. Goldfarb*,
    643 F.2d 422 (6th Cir. 1981) ..............................................................................................8

Defendant Stephen Wynn respectfully submits this Reply in support of his Motion to Dismiss the First Amended Complaint ("FAC") (Dkt. 83).[1] Plaintiff's Opposition is nothing more than an attempt to confuse the issues so that this frivolous lawsuit will proceed to discovery. As set forth below, and in Mr. Wynn's Memorandum in support of his Motion to Dismiss ("Memo") (Dkt. 84), the FAC fails to state the elements of a proper RICO cause of action and fails to plead any predicate acts involving Mr. Wynn with specificity. Perhaps recognizing these flaws, and despite that fact that Plaintiff has already amended the Complaint once, the Opposition attempts to "amend" the FAC again through various claims that are not actually pled in the FAC. This is, of course, improper. The Court should dismiss the FAC with prejudice and not allow Plaintiff's misuse of the RICO statute to continue.

## I. The Alleged RICO "Enterprise" and "Person" Are Not Distinct – Count 2

Plaintiff's expansive reading of the *Cedric Kushner* decision is flawed. While the First Circuit has not had occasion to address *Kushner*, other circuits have rejected attempts to expand its narrow holding. In *Kushner*, the Supreme Court reaffirmed that Section 1962(c) liability requires: "(1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, LTD. v. King*, 533 U.S. 158, 161 (2001). The Court narrowly held that the sole owner of a closely-held corporation could be a "person" distinct from a corporate "enterprise" and was careful to distinguish the "significantly different" circumstances where a "corporation was the 'person' and the corporation, together with all its employees and agents, were the 'enterprise.'" *Id.* at 164. *See also U1it4less, Inc. v. Fedex Corp.*, 871 F.3d 199, 208 (2d Cir. 2017).

Plaintiff seeks to use *Kushner* for the broad proposition that separate legal incorporation

---

[1] Mr. Wynn hereby incorporates the arguments set forth in the Reply briefs of the other defendants.

1

is sufficient to make a "person" and an "enterprise" distinct.  This approach has been flatly rejected by multiple courts of appeal, which have held, post-*Kushner*, that a corporate parent is not typically a "person" distinct from a corporate subsidiary "enterprise."  *See U1it4less*, 871 F.3d at 207-08; *Bucklew v. Hawkins, Ash, Baptie & Co., LLP*., 329 F.3d 923, 934 (7th Cir. 2003); *N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*, 781 F.3d 182, 203 (5th Cir. 2015).  There is nothing beyond mere legal distinctiveness to analyze, because there are no allegations in the FAC "showing that any [Wynn] entity operated outside of a unified corporate structure guided by a single corporate consciousness."  *U1it4less*, 871 F.3d at 207.

Of course, Wynn Resorts, associating with its employees—Mr. Wynn, Ms. Sinatra, and Mr. Maddox—to operate Wynn MA, a wholly-owned subsidiary, cannot form an enterprise.  *See Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 121 (2d Cir. 2013) ("The requirement of distinctness cannot be evaded by alleging that a corporation has violated the statute by conducting an enterprise that consists of itself plus all or some of its officers or employees.").  Plaintiff does not, for instance, describe the individual defendants "as a separate and distinct group of individuals associated with it in furtherance of a common scheme, but rather as acting for it in a traditional principal-agent relationship."  *See Mear v. Sun Life Assur. Co. of Canada (U.S.)/Keyport Life Ins. Co.,* No. 06-CV-12143-RWZ, 2008 WL 245217, at *9 (D. Mass. Jan. 24, 2008) ("Because Sun Life, a corporation, can only act through its employees, officers, subsidiaries and agents, the former is not distinct from the latter for the purpose of distinguishing a RICO person from a RICO enterprise . . . .").

### II. Lack of Vertical Relatedness – Count 2[2]

---

[2]  Count 1 is limited to predicate acts involving FBT Everett, whereas Count 2 includes predicate acts related to Mr. Wynn's alleged personal misconduct and activities in Macau.  *See* FAC ¶¶ 152-63.

To the extent Plaintiff alleges the "enterprise" consists only of Wynn MA, there is yet another fatal flaw. That is, unlike an "association in fact" enterprise comprised of the corporate entities and individual defendants, **many of the alleged predicate acts have nothing to do with—and indeed pre-date the very existence of—Wynn MA.**[3] As the Second Circuit explained:

> [A] complaint does not state a RICO claim merely by alleging racketeering activity and denominating a legal entity a "RICO enterprise." A RICO violation requires a specific relationship between the enterprise and the pattern of racketeering: under § 1962(c), that the enterprise's affairs be conducted "through" the pattern of racketeering. In other words, a plaintiff must also plausibly "allege that a nexus exist[s] between the enterprise and the racketeering activity that is being conducted."

*D. Penguin Bros. Ltd. v. City Nat. Bank*, 587 F. App'x 663, 667 (2d Cir. 2014) (citations omitted). With respect to Mr. Wynn, this lack of relationship between the "enterprise" and the alleged "predicate acts" is most glaring as to allegations of personal misconduct in Nevada dating back to 2005. Wynn MA wasn't even organized until 2011, wasn't registered as a Massachusetts foreign corporation until 2013, *see* Exhibit A to Maynard Decl., and was "formed for the purpose of applying for a Category 1 Gaming License in Massachusetts." FAC ¶ 18. Even assuming the truth of a "long-running pattern of specific violations of Nevada's gaming suitability laws," Opp. at 51, these violations have nothing to do with an enterprise consisting only of Wynn MA. **Therefore, all Nevada misconduct allegations must be disregarded** in determining whether any predicate acts by Mr. Wynn have been properly pleaded.[4]

### III. Alleged Predicate Acts by Mr. Wynn

---

[3] Plaintiff's pleading of predicate acts relating only to Wynn Resorts as conducted through a Wynn MA enterprise is a failed attempt to plead around the distinctiveness problem set forth in Section I.

[4] The allegations regarding personal misconduct must also be disregarded in determining the longevity of Wynn MA for purposes of the pattern analysis. For instance, in arguing that there was sufficient continuity to form a "pattern," Plaintiff states that the Count 2 enterprise was used for "predicate acts alleged to have occurred as early as 2005." Opp. at 65. This cannot be, as Wynn MA did not exist in 2005.

It bears repeating that Plaintiff has pleaded two substantive RICO counts involving two different enterprises. For each enterprise, Plaintiff must show that each defendant committed at least two predicate racketeering acts.

**With respect to Count 1, the Opposition does not identify any specific predicate act in which Mr. Wynn allegedly participated.** Instead, the Opposition implies that Mr. Wynn is responsible for all Count 1 predicate acts because he "did not delegate the pursuit of the" MGC license but "played an active and [hands-on] role throughout the process." Opp. at 52. The allegation that Mr. Wynn was involved in the licensing process is not an allegation that he engaged in any particular predicate act.[5] The Opposition's argument for a sort of *Dotterweich* or "supervisory liability" for RICO predicate acts is unsupported by citation to any authority. It is black-letter law that "plaintiff must give **each defendant** notice of **the particular predicate act it participated in** and must allege each predicate act **with specificity.**" *Ali v. Jawad*, No. 16-CV-00879, 2017 WL 1375197, at *2 (E.D. Cal. Apr. 17, 2017).[6] *See also* Mem. at 13.

For Count 2, the Opposition defends only four predicate acts specific to Mr. Wynn:

*First*, the Opposition argues that Mr. Wynn's "serial sexual predation toward Wynn Resorts employees over a period of a decade constituted a long-running pattern of specific violations of Nevada's gaming suitability laws." Opp. at 51. These are not RICO predicate acts for the Wynn MA enterprise. *See* Section III, *supra*. They are neither vertically related to the

---

[5] The Opposition also claims that Mr. Wynn was responsible "for the overall contents and accuracy of the corporate application on behalf of Wynn Resorts and Wynn MA." Opp. at 52. Whether or not that statement is of any legal consequence, it is not a fact alleged anywhere in the FAC, and therefore must be disregarded.

[6] At best, the FAC alleges a single Count 1 predicate act with respect to Mr. Wynn—that when asked if he had known that criminals were involved in FBT, he replied that he had not. FAC ¶ 100. But Plaintiff did not plead that Mr. Wynn knew FBT had criminal owners, or how Mr. Wynn would have known FBT had criminal owners. Mem. at 17. *See also N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale*, 567 F.3d 8, 13 (1st Cir. 2009) ("The courts have uniformly held inadequate a complaint's general averment of the defendant's 'knowledge' of material falsity, unless the complaint also sets forth specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading.").

"enterprise," nor horizontally related to other predicate acts alleged in the FAC. *See* Mem. at 6.

*Second*, the Opposition argues that Mr. Wynn's statement at a December 2013 MGC hearing that "Our history in Las Vegas has been exemplary, spotless in every regard" constitutes a RICO predicate act. FAC ¶ 130(b); Opp. at 51. To the extent this statement is even capable of being a "false, fictitious, or fraudulent statement" under Massachusetts law, Plaintiff has not alleged that Wynn Resorts had been the subject of any enforcement actions when the statement was made. What is more, **Plaintiff actually altered Mr. Wynn's words in an attempt to insulate the FAC from Mr. Wynn's Motion to Dismiss.** Mr. Wynn did not say in December 2013 "Our history in Las Vegas **has** been exemplary, spotless in every regard," as quoted in the FAC to imply that Mr. Wynn was describing compliance in 2013. Rather, Mr. Wynn described the process by which Wynn Resorts was "entering a new market in Macau" in the pre-2004 (or perhaps pre-2002) timeframe,[7] and the need to be found suitable by Macau regulators:

> Our history in Las Vegas **had** been exemplary, spotless in every regard. We **had** been in business in New Jersey. We **had** never received a negative vote in all of the years, wherever we were. We **had** nothing to prove and nothing to explain in terms of our past.

12/16/13 Suitability Hr'g Tr. at 29:8-13 (Exhibit B to Maynard Decl.).[8] Again, even assuming the truth of the allegations of misconduct dating back to 2005, Mr. Wynn was discussing a time period prior to 2005. The FAC does not allege any misconduct in the pre-2005 time frame such that Mr. Wynn's statement recounting a pitch to Macau regulators could be false.[9]

*Third*, the Opposition argues that Mr. Wynn's statement at a December 2013 MGC

---

[7] The FAC alleges that Wynn Resorts' subsidiary received a license from Macau in 2002. FAC ¶ 40.

[8] The Court can take judicial notice of the Hearing Transcript as a public record. *See In re Vertex Pharms. Inc., Secs. Litig.*, 357 F. Supp. 2d 343, 352 n.4 (D. Mass. 2005).

[9] Plaintiff has made much of the IEB's 199-page "Investigative Report Regarding Ongoing Suitability of Wynn MA, LLC," going so far as to attach it to the Opposition. It is notable that nowhere in the Report does the IEB conclude that Mr. Wynn made a false statement to the MGC or the IEB.

5

hearing that "we do everything that you can reasonably do to stop [criminality in Macau]" constitutes a RICO predicate act. Plaintiff does not allege how this statement was false. There is no allegation that Wynn Resorts did not do what was possible to stop criminal activity in Macau, only that some criminal activity took place in Macau and that Wynn Macau maintained relationships with certain junket operators. *See* FAC ¶¶ 125-27. Even if Mr. Wynn was aware of criminal activity in Macau—which is not specifically alleged[10]—that does not mean Wynn Macau was not taking reasonable steps to stop such activity or that Mr. Wynn knew Wynn Macau was not taking reasonable steps to stop such activity.

**Fourth**, the Opposition argues that the failure to disclose "Entity Y" constitutes a RICO predicate act. This allegation fails because the FAC, through sleight of hand, does not actually allege that Mr. Wynn "wholly owned" Entity Y, but only that Entity Y was wholly owned by *someone*. *See* Mem. at 17. Notably, the Opposition also does not state that Mr. Wynn "wholly owned" Entity Y, but simply argues that it was "highly plausible that he was the *beneficial owner*." (emphasis added).[11] Beneficial ownership is not alleged in the FAC and, in any case, is not the criteria for disclosure listed on the MGC's form. *See* Exhibit C to Maynard Decl.

### IV.   But-For Causation

Mr. Wynn's briefing on but-for causation demonstrated that Count 1 is hopeless. All of the salient facts allegedly concealed from the MGC were known to the MGC *before* it voted to grant Wynn MA the license.[12] *See* Mem. at 8-11. Plaintiff's only attempt to dispute this is

---

[10]   The allegation is simply that "Wynn Resorts and the individual Wynn Defendants at all times were aware of the criminal activity occurring inside the Wynn Macau casino." FAC ¶ 127. For the reasons stated in Mr. Wynn's Memo at 14, this type of "group pleading" as to knowledge can be disregarded.

[11]   Presumably, this sleight of hand statement was an attempt to avoid a Rule 11 motion, given that there could be no reasonable basis for Plaintiff to plead that Mr. Wynn himself "wholly owned" Entity Y LLC.

[12]   To the extent it claims that Defendants "mischaracteriz[e] the allegations of the FAC" by failing to recognize certain aspects of the alleged fraud, Plaintiff mischaracterizes Mr. Wynn's arguments. Mr. Wynn's memorandum addressed the allegations at Paragraphs 110-120 of the FAC. *See* Memo at 10-11. In particular, the IEB Report

relegated to a footnote, which claims that "[t]he key for proximate cause is the **second phase** of the fraud, where the Wynn Defendants covered up their prior conspiracy with FBT . . . ." Opp. at 23 n.11 (emphasis added).  Plaintiff's newfound theory—that there was a "second phase" of the fraud, and only the "second phase" caused Plaintiff's injury— is too little, too late.  The newfound theory is belied by the FAC, which states that "in July 2013, the Wynn Defendants were known to the Gaming Commission to have associated with known felons **and to have failed to disclose those affiliations**." FAC ¶ 110 (emphasis added).  Moreover, any attempt to salvage Count 1 through the "second phase" theory hinges on adequately pleading Messrs. Wynn's and Maddox's, and Ms. Sinatra's pre-existing knowledge of criminality of the FBT ownership group.  Such knowledge has not been adequately pleaded, certainly not to the standard set forth in *N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale*, 567 F.3d 8, 13 (1st Cir. 2009).  *See* Mem. at 17; Maddox Mem. at 10-12; Sinatra Mem. at 12-23.

## V. Proximate Cause

Yet again Plaintiff glosses over the fact that Mohegan Sun, and not Plaintiff, was the applicant competing with Wynn MA for a gaming license.  Plaintiff was merely Mohegan Sun's **potential landlord**.  There must have been many other Mohegan Sun business partners that would have stood to gain "hard cash revenue," Opp. at 46, had Mohegan Sun been granted the license.  That Plaintiff was a prospective landlord does not put it in any different position than Mohegan Sun's other business partners.  The fact remains that the MGC was the primary entity injured by the alleged scheme, Mohegan Sun was secondarily injured by the alleged scheme, and Plaintiff was, at best, only a third-level "victim" among many other third-level "victims."  *See*

---

informed the Commission in December 2013 that "Charles Lightbody may have a legal reversionary interest in the event Anthony Gattineri does not repay his promissory note obligations," rendering the so-called "second phase" allegations in Paragraph 117 moot.

7

*Empire Merchants, LLC v. Reliable Churchill LLP*, 902 F.3d 132, 144 (2d Cir. 2018). ("The Supreme Court has repeatedly affirmed that the availability of 'a more immediate victim [that] is better situated to sue' cuts against finding proximate cause.").

### VI. Mail/Wire Fraud, Travel Act Violations, and RICO "Gambling"

The RICO statute includes acts "involving . . . gambling" within the definition of "racketeering acts." Plaintiff fails to cite a single cases where the activities alleged here—submitting paperwork and giving testimony to a state gaming authority— constitute RICO "gambling."[13] Moreover, the assertion that cases cited by Defendants expand the scope of RICO liability is unavailing. Those cases considered the nature of defendants' activities—for instance dogfighting—rather than analyzing the language of the statutes at issue. The inquiries focused on whether defendants' activities constituted "gambling" in the generic sense. Here, statements to a state agency do not constitute "gambling"—even if the state agency regulates gaming.

As to the Travel Act, a plain reading of the statute shows that the activity alleged must involve "gambling . . . offenses." Accordingly, in the cases cited by Plaintiff, *Goldfarb* and *DeLuna*, the court found Travel Act violations where defendants were "**conducting gambling operations** without the necessary licenses." See *United States v. DeLuna*, 763 F.2d 897, 907 (8th Cir. 1985) (emphasis added); *United States v. Goldfarb*, 643 F.2d 422, 427 (6th Cir. 1981). Here, by contrast, Defendants were not "conducting gambling operations." Instead, Defendants allegedly made false statements to obtain a license **prior to** conducting gambling operations. As with RICO, the fact that the alleged acts involved statements in an application for a gaming

---

[13] The one case Plaintiff cites in an attempt to show that "gambling" should be read expansively involved a telephone company passing through charges "associated with unlawful gambling." See *Kemp v. AT&T Co.*, 393 F.3d 1354, 1361 (11th Cir. 2004). There, the defendant included fees in its bills charged by a third-party company that conducted a telephonic gambling game. While the defendant did not conduct the gambling operation, its unlawful activity involved a third party's active conduct of a gambling operation. No such gambling activity is alleged here.

8

license does not transform those acts into "gambling offenses."

Finally, as to mail fraud, Plaintiff is correct that the party deprived of "property" (i.e., the "victim") need not be the party who relied on the fraudulent misrepresentation. However, "even the cases which have held that convictions may rest upon the deceit of a person other than the ultimate victim contemplated that the deception was causally related to the scheme to **obtain property from the victim**." *United States v. Berroa*, 856 F.3d 141, 152 (1st Cir. 2017) (quoting *United States v. Frost*, 125 F.3d 346, 360 (6th Cir. 1997)). The only possible "property" Plaintiff could allege Defendants here schemed to obtain is (1) the gaming license from the MGC; and (2) funding from potential gaming customers. The first, pursuant to *Cleveland*, is not "property" in the hands of the entity from which it was obtained (i.e., Massachusetts), and the second fails due to the proximate cause issues discussed in *Berroa*.[14] As discussed *supra*, there is no proximate connection between Defendants' alleged deception of the MGC and Plaintiff's loss. Even assuming the Court could consider Wynn MA's competitor Mohegan Sun—which is not the RICO plaintiff— as the "victim" (despite the fact that Wynn MA did not obtain anything from Mohegan Sun), it would not resolve the broader proximate cause issue. Plaintiff was not a potential licensee and any harm Plaintiff suffered was one step removed from harm suffered by Mohegan Sun. *See generally Empire Merchants*, 902 F.3d 132.

### VII. State Law Claims Must Be Dismissed

Rather than attempt to distinguish the Chapter 93A case relied on by Mr. Wynn, the facts

---

[14] Plaintiff argues *Berroa* would be analogous to the case at bar only if the government there had argued that other physicians who did not receive licenses—not customers—were the "victims" of the mail fraud scheme. Opp. at 45. However, Plaintiff's position is not equivalent to doctors who did not receive licenses—it is equivalent to potential landlords of physicians who did not receive licenses. The analogy does nothing to assuage the federalism concerns expressed by the First Circuit. Just as state-issued licenses "invariably are sought and obtained in an effort to realize some monetary profit," *Berroa*, 956 F.3d at 150, they are often limited in number such that they are sought to the exclusion of other applicants, with potential trickle-down effects on, for instance, the potential landlords of unsuccessful applicants. Under Plaintiff's theory, "virtually any false statement in an application [sought to the exclusion of other applicants] could constitute a federal crime." *Id.*

9

of which are nearly identical to the one at bar, Plaintiff asserts that *Mastoran* is not good law because it was issued prior to *Stop & Shop Supermarket Co. v. Loomer*. According to Plaintiff, *Loomer* held that the "commercial transaction" requirement does not apply to unfair competition claims. *See* Opp. at 71 n.75. That is false. *Loomer* simply stated in dicta that the case before it did not involve unfair competition. *See Loomer*, 837 N.E.2d 712, 717-18 (Mass. App. Ct. 2005). The plain language of Chapter 93A clearly requires that unfair competition claims arise from conduct taking place in a "business context." *See, e.g.*, *Santander Consumer USA Inc. v. Walsh*, 762 F. Supp. 2d 217, 240 (D. Mass. 2010) (applying commercial transaction analysis to motion to dismiss unfair competition claim). Of course, the commercial transaction need not be *between* plaintiff and defendant, but still must exist *somewhere* (perhaps between defendant and customers). Two entities seeking a license from a state agency does not create a commercial transaction with the state agency. *See* Mem. at 19.

Notably, the Opposition does not even attempt to counter Mr. Wynn's arguments regarding the claim for intentional interference with a contractual relationship, and focuses only on the intentional interference with advantageous relations claim. While Plaintiff correctly notes that "there is no technical requirement as to the **kind** of conduct that may result in interference," Opp. at 72 (emphasis added), Mr. Wynn's argument is not focused on the "kind" of interference, but on the fact that Mr. Wynn's conduct was not directed at Mohegan. Plaintiff cites no authority which disputes that principle that "conduct constituting tortious interference with business relations is, by definition, conduct directed . . . at the party with which the plaintiff has or seeks to have a relationship." *Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1104 (N.Y. 2004). The FAC does not allege—and the Opposition does not argue— that Mr. Wynn directed any conduct at Mohegan, the party with which Plaintiff had a business relationship.

Respectfully submitted,

STEPHEN A. WYNN

By his attorneys,

*/s/ Brian T. Kelly*
Brian T. Kelly (BBO No. 549566)
Joshua C. Sharp (BBO No. 681439)
NIXON PEABODY LLP
Exchange Place
53 State Street
Boston, MA 02109
617-345-1000
bkelly@nixonpeabody.com
jsharp@nixonpeabody.com

Dated:  April 19, 2019

## CERTIFICATE OF SERVICE

I hereby certify that on April 19, 2019 a copy of the forgoing was served electronically on all counsel of record.

*/s/ Joshua C. Sharp*
Joshua C. Sharp