1           IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MASSACHUSETTS
2

3    STERLING SUFFOLK RACECOURSE,        )
     LLC,                                )
4                                        )
                      Plaintiff          )
5                                        )  CA No. 18-11963-PBS
            -VS-                         )  Pages 1 - 102
6                                        )
     WYNN RESORTS, LTD., et al,          )
7                                        )
                      Defendants         )
8

9                      **MOTION HEARING**

10

           BEFORE THE HONORABLE PATTI B. SARIS
11          UNITED STATES CHIEF DISTRICT JUDGE

12

13

14

15

16                              United States District Court
                                1 Courthouse Way, Courtroom 20
                                Boston, Massachusetts  02210
17                              May 6, 2019, 9:42 a.m.

18

19

20

21

22

                        LEE A. MARZILLI
23                   OFFICIAL COURT REPORTER
                 United States Distric Court
24               1 Courthouse Way, Room 7200
                      Boston, MA  02210
25                      (617)345-6787

1    A P P E A R A N C E S:

2         INGA S. BERNSTEIN, ESQ. and DAVID A. RUSSCOL, ESQ.,
     Zalkind Duncan & Bernstein, 65a Atlantic Avenue, Boston,
3    Massachusetts, 02110, for the Plaintiff.

4         STEVEN STORCH, ESQ. and JOHN W. BREWER, ESQ.,
     Storch Amini PC, 140 East 45th Street, 25th Floor, New York,
5    New York, 10017, for the Plaintiff.

6         PETER A. BIAGETTI, ESQ. and DAVID J. KETE, ESQ.,
     Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, PC,
7    One Financial Center, 42nd Floor, Boston, Massachusetts,
     02111, for Wynn Resorts, Ltd., Wynn Mass., and Matthew
8    Maddox.

9         BRIAN T. KELLY, ESQ. and JOSHUA C.H. SHARP, ESQ.,
     Nixon Peabody LLP, 100 Summer Street, Boston, Massachusetts,
10   02110, for Stephen Wynn.

11        JAMES N. KRAMER, ESQ., Orrick, Herrington & Sutcliffe
     LLP, 405 Howard Street, San Francisco, California, 94105,
12   for Kimmarie Sinatra.

13        AARON M. KATZ, ESQ., Ropes & Gray LLP, MA,
     Prudential Tower, 800 Boylston Street, Boston,
14   Massachusetts, 02199-3600, for FBT Everett Realty, LLC.

15        CHRISTOPHER WELD, JR., ESQ., Todd & Weld,
     One Federal Street, 27th Floor, Boston, Massachusetts,
16   02110, for FBT Everett Realty, LLC.

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2           THE CLERK:  Court calls Civil Action 18-11963,

3    Sterling Suffolk Racecourse v. Wynn Resorts, et al.  Could

4    counsel please identify themselves.

5           MR. STORCH:  For the plaintiff, Steven Storch of

6    Storch Amini.

7           MR. BREWER:  John Brewer of Storch Amini.

8           MS. BERNSTEIN:  Inga Bernstein of Zalkind, Duncan

9    & Bernstein.

10           MR. RUSSCOL:  David Russcol, Zalkind, Duncan &

11    Bernstein.

12           MR. BIAGETTI:  And for defendants, Wynn Resorts,

13    Wynn Mass., and Matthew Maddox, Peter Biagetti.

14           MR. KETE:  For the same defendants, David Kete.

15           MR. KATZ:  Good morning, your Honor.  Aaron Katz

16    for FBT Everett Realty, LLC.  Chris Weld from Todd & Weld is

17    also here on behalf of FBT.

18           MR. KRAMER:  Good morning, your Honor.  James

19    Kramer from Orrick, Herrington & Sutcliffe on behalf of Kim

20    Sinatra.

21           THE COURT:  Thank you.

22           MR. KELLY:  Good morning, your Honor.  Brian Kelly

23    on behalf of Mr. Steve Wynn.

24           MR. SHARP:  Josh Sharp on behalf of Steve Wynn.

25    Good morning.

1          THE COURT:  All right, thank you.  You may be

2     seated.

3          I am using this courtroom because my courtroom is

4     undergoing renovations, but unfortunately the acoustics are

5     absolutely terrible, so you need to speak up as you're

6     addressing me.  I know you've got a sequence that's already

7     been prepared, but I want to make it clear.  For each point,

8     will the plaintiff have someone designated to deal with it

9     so it's not all at once?

10          MS. BERNSTEIN:  We will.

11          THE COURT:  I think that's more helpful to me.

12     And we'll break if we're not done at 11:00 for 15, 20

13     minutes.

14          All right, Mr. Biagetti.

15          MR. BIAGETTI:  Thank you, your Honor.  Again, I'm

16     Peter Biagetti for Wynn Resorts, Wynn Massachusetts, and

17     Matt Maddox.  Pursuant to the sequence that we provided, I

18     will speak first to three what we believe are irreparable

19     deficiencies in the RICO claims:  a lack of a pattern,

20     belatedness under the statute of limitations, and the lack

21     of standing and proximate cause.  These all arise, as you

22     know, Judge, out of a challenge to the award of the casino

23     license to Wynn Massachusetts and not to, among others,

24     Mohegan Sun.  That challenge is currently the subject, has

25     been, of scrutiny by a state agency, the Massachusetts

1    Gaming Commission.  It is the subject of a pending civil

2    challenge by the losing applicant, Mohegan Sun, via

3    certiorari review.

4              THE COURT:  What is the status of the state court

5    litigation?

6              MR. BIAGETTI:  That litigation is pending.  It's

7    been on hold pending what was happening at the Gaming

8    Commission but is very much alive.

9              THE COURT:  So, as I understand it, the Gaming

10   Commission made a decision within the last week or so.

11             MR. BIAGETTI:  Last week, yes.

12             THE COURT:  So does that reopen the state court

13   proceeding?

14             MR. BIAGETTI:  I believe it had been on hold, and

15   now it continues, yes.

16             THE COURT:  And that's a challenge by Mohegan?  Is

17   that it?

18             MR. BIAGETTI:  Mohegan among others, yes, to the

19   process itself.

20             THE COURT:  Is it raising -- none of you talked

21   too much about this.  Is it raising the same kinds of

22   claims?

23             MR. BIAGETTI:  It is, Judge.  I will get to it

24   when we talk about standing.

25             THE COURT:  All right.  It's not so much standing

1    as much as whether or not I should defer until I let the

2    state court do its -- so, in other words, if Mohegan won, I

3    might go down one path, and if Mohegan lost, I might go down

4    another.

5            MR. BIAGETTI:  True, but even more immediately, in

6    our view, respectfully, the fact that there are two other

7    incentivized challengers to the process and the result --

8    namely, the Gaming Commission, which has now continuing

9    authority, and Mohegan, which as the losing applicant has

10   this petition under way -- the Supreme Court cases make

11   clear that the availability of those other challenges is

12   something you should take into account when you review the

13   fact that the injury that they have alleged, the plaintiff

14   has alleged, is too attenuated.

15           THE COURT:  Let me ask you this:  Who's the judge

16   in the state court who has it?

17           MR. BIAGETTI:  It's in the BLS.  I don't know who

18   the judge is.

19           THE COURT:  We don't know who the judge is?

20           MR. WELD:  I'm just told by Mr. Starr that it's

21   Judge Sanders, so I believe that's the BLS, so it would be

22   Judge Sanders or Salinger.  They rotate.

23           THE COURT:  Thank you.  All right.

24           MR. BIAGETTI:  So state agency scrutiny, state

25   court litigation and review.  And we believe that it is not,

1    on the facts alleged, the stuff of a federal RICO claim,

2    particularly when, as I just alluded to, the purported

3    plaintiff is a would-be vendor to a would-be winner, had

4    Wynn itself not prevailed.

5           I'm going to start with these three deficiencies,

6    Judge, because they are not simply with regard to what

7    Sterling has not alleged.  They are with regard to what

8    Sterling cannot state with regard to RICO on the facts

9    alleged.

10          THE COURT:  All right, let's get to them.  All

11   right, so the first one is?

12          MR. BIAGETTI:  Pattern.

13          THE COURT:  Pattern.

14          MR. BIAGETTI:  Right, and I've provided a handout

15   as well as at least one excerpt, your Honor, from

16   Paragraph 8.  All you have to do is get to Page 5.

17          (Discussion off the record.)

18          MR. BIAGETTI:  If you look at just the preamble to

19   Paragraph 8, your Honor, it's really as far, respectfully,

20   as you need to go.  The complaint according to Sterling

21   arises out of a series of unlawful acts that allegedly were

22   perpetrated, quote, "in order to unlawfully acquire the

23   gaming license," one license in one process which is

24   completed, finite; there will not be another process; there

25   will not be another license; one victim immediately, the

1    MGC, and one loser, Mohegan.  It's the quintessence, Judge,

2    of what you recognize, and so many other courts in the First

3    Circuit have, of a finite, closed-ended, single-purpose,

4    unitary scheme, just one.  And it's completed, it's done;

5    and so, therefore, no matter how many acts, episodes,

6    subparts were supposedly perpetrated within that scheme, its

7    single purpose and unitariness dooms it as a matter of law.

8         THE COURT:  I don't think the courts have gone

9    that far.

10        MR. BIAGETTI:  Well, let me do two things briefly.

11        THE COURT:  I mean, you're right that they're

12   viewed more with askance when it's single purpose; but if

13   you have a large pattern of fraudulent acts, even for a

14   single purpose, it doesn't -- the court needs to examine it.

15        MR. BIAGETTI:  Okay, fair enough, but what I'd

16   like to do is take you through briefly the pattern that's

17   alleged in the two RICO counts and then talk about a couple

18   of those cases.  So I have a handout that I provided to you

19   just to help do that.  The first --

20        THE COURT:  It's a 21-month, single-purpose

21   alleged conspiracy, right?

22        MR. BIAGETTI:  Yes, that's right.  The alleged

23   scheme here in the first claim, you're right, is that there

24   were fraudulent and omissive statements submitted to the

25   Commission from, according to the plaintiff, January, 2013,

 1   through September, 2014.  Now, we don't think September,

 2   '14, is the well-pleaded endpoint because that is when the

 3   straw vote was taken on the award of the license, the

 4   so-called "Phase 2" inquiry.  The determination that was

 5   allegedly extracted by fraud is the suitability, the

 6   threshold --

 7           THE COURT:  I don't want to jump to that.  That's

 8   a harder argument for you.  I want to just deal with the

 9   pattern, which I'm struggling with.  All right.

10           MR. BIAGETTI:  All right, but indulge it as

11   whatever that is, 17 months, you still have, when you look

12   at the scheme alleged in the first count, essentially four

13   fraudulent submissions.  And you can see about halfway down

14   here we've given you the allegation, and then we've given

15   you the actual paragraphs in which the dates of those

16   omissive statements and submissions allegedly occurred:

17   January of '13, July of '13, and December of '13.  You've

18   got eleven months, and you've got four submissions.  That's

19   it.

20           Now, there is an allegation of causing Mayor

21   DeMaria to abuse his powers.  If you look closely at the

22   paragraphs that we've mentioned, it's hard to fix when they

23   claim this happened.  We believe it is at some unspecified

24   time between October, '09, and again the December, 2013 vote

25   on suitability, but the pattern ends there because that's

1    when the determination is allegedly fraudulently extracted.

2              And then, finally, there's an allegation of Travel

3    Act violations to Massachusetts; but when you look closely,

4    those are simply to obtain the information needed and the

5    alleged assents for those fraudulent submissions.  So in its

6    essence, as specifically pleaded, four submissions and the

7    acts leading up to them all in January through December,

8    2013.

9              Now, we challenged that.  You recall here, Judge,

10   that we've already gone through an original complaint and a

11   motion to dismiss.  We challenged.  We --

12             THE COURT:  But I didn't read that.  We put that

13   aside.  I didn't even read it.

14             MR. BIAGETTI:  Absolutely, absolutely.  But on the

15   amendment, in the 59 or so paragraphs that got added, what

16   the plaintiff did was add this notion of concealment.  It

17   was an attempt to breathe continuity into a finite,

18   completed scheme.  And that's the second --

19             THE COURT:  Can we just go through, because I

20   think this is important --

21             MR. BIAGETTI:  Sure, please.

22             THE COURT:  -- the alleged fraudulent

23   submissions --

24             MR. BIAGETTI:  Yes.

25             THE COURT:  -- and whether or not they state a

1    claim.  Some of the alleged fraudulent submissions had to do

2    with the property --

3             MR. BIAGETTI:  Correct.

4             THE COURT:  -- and whether or not it was

5    mob-related.

6             MR. BIAGETTI:  Correct.

7             THE COURT:  All right, so are you challenging

8    whether or not those were fraudulent statements?

9             MR. BIAGETTI:  Sure, yes.

10            THE COURT:  Okay, so let's talk about that.

11            MR. BIAGETTI:  Yes.  And, again, I think my

12   brothers can talk about the underlying predicate acts, but

13   to --

14            THE COURT:  Oh, I see, I see, I see.  All right.

15            MR. BIAGETTI:  -- put it succinctly, we believe

16   that the allegedly concealed ownerships were, in the

17   plaintiff's words, matters of public record, in the Boston

18   Business Journal, in the Globe, in the Gaming Commission's

19   investigatory report, and even addressed by the Gaming

20   Commission when it made its ruling in December.

21            THE COURT:  All right, so that raises a separate

22   set of issues, but what makes this case a little bit unusual

23   is that there are conceded lies.  That often doesn't happen,

24   I mean, right, about the property and about the sexual

25   activity?  So what you're saying is, "But the Gaming

1  Commission knew it anyway."  That's the basic defense that

2  you're -- well, because there were misrepresentations,

3  right?

4         MR. BIAGETTI:  With regard to the underlying

5  predicate acts, yes.  But the argument that I'm focused on

6  right now is, even if you indulge that as true, that there

7  was concealment, fraudulent and omissive statements to the

8  Gaming Commission, those happened in eleven months.

9         THE COURT:  Okay, so just we'll narrow this down.

10  There's a concession that there's sufficiently stated facts

11  for fraudulent concealment before the Gaming Commission, but

12  you're saying that it wasn't over a long enough span of time

13  to constitute a threat, a threat of contin- -- well, no,

14  those are two different issues.

15         MR. BIAGETTI:  Continuity, no continuity.

16         THE COURT:  Because you could argue there's a

17  pattern, right, because there's at least two of them?

18         MR. BIAGETTI:  Sure.

19         THE COURT:  Okay, so there's a pattern of,

20  concededly, fraudulent statements.

21         MR. BIAGETTI:  There are multiple related acts.

22         THE COURT:  Right, there are at least two of them.

23         MR. BIAGETTI:  But they are aimed at a single

24  goal.

25         THE COURT:  Okay, I get it.  All right, so I'm

1   trying to see what's conceded.  There are at least two,

2   which is all the statute requires, fraudulent concealments,

3   broadly as the ownership of the FBT property and the sexual

4   cover-ups, if you will, in Nevada.  And what you're saying

5   is, "But that was over too brief a period of time."  So

6   that's all the statute requires is two.

7           MR. BIAGETTI:  Uh-huh.

8           THE COURT:  Right?  I've got that right?

9           MR. BIAGETTI:  Yes, if there were --

10          THE COURT:  So now the question is, there are at

11  least two in a brief period of time.  You could talk about

12  whether it's nine months, or what was the other one, 21

13  months?  I'll have to hear about that.  But, anyway, and

14  what you're saying is, it's closed-ended because it was

15  single purpose and doesn't threaten a continuity.  So it's

16  not about a pattern.  That would be wrong because there are

17  at least two.

18          MR. BIAGETTI:  Well, yes, but the continuity is

19  more than two acts.  There are plenty of cases --

20          THE COURT:  I understand.  The statute requires

21  two for there to be a pattern.  You're talking about --

22          MR. BIAGETTI:  The statute requires at least two.

23          THE COURT:  There are two.

24          MR. BIAGETTI:  Yes.

25          THE COURT:  Okay, so now the question is whether

1    that's enough.

2         MR. BIAGETTI:  Yes.

3         THE COURT:  Okay.

4         MR. BIAGETTI:  Okay.  And, again, I'm going to

5    save for my brothers out of efficiency the deficiencies with

6    regard to predicate acts, but for purposes of the pattern

7    argument, even if you had four false or fraudulently

8    omissive statements, you wouldn't have enough here because

9    you wouldn't have that continuity.  As the First Circuit

10    said in *Efron*, even where there are multiple related acts,

11    when they're all aimed at a single goal and had a finite

12    nature, they do not constitute sufficient continuity for a

13    pattern.  "A plaintiff must show

14    a realistic prospect of continuity over an open-ended period

15    yet to come."  That's the *Home Orthopedics* case, and we

16    simply don't have that here.  The best illustrations, your

17    Honor -- and the same is true with regard to the second

18    claim, the second RICO claim.

19         THE COURT:  The first one was false statements

20    about the mob and the backdated documents and that sort of

21    thing.

22         MR. BIAGETTI:  That's right.

23         THE COURT:  The second one had to do with the

24    Mayor.

25         MR. BIAGETTI:  Yes, okay, so even if the

1    allegation with regard to the Mayor -- and, again, you can't

2    tell when it is that he supposedly was offered some phantom

3    stake and when he supposedly acted on that.  The only

4    allegation is that there's an unrelated intervention by him

5    with regard to an abutting tenant in 2016, so we don't think

6    that would even be related.

7            THE COURT:  Did the Gaming Commission know about

8    the allegations involving the Mayor?

9            MR. BIAGETTI:  Involving the Mayor, at the time of

10   the --

11           THE COURT:  Grant of the license?

12           MR. BIAGETTI:  I don't believe so.

13           THE COURT:  So now they know when they just

14   recently recommitted to the license.

15           MR. BIAGETTI:  Yes, yes.

16           THE COURT:  Was that examined by the Gaming Commission?

17           MR. BIAGETTI:  Was that addressed?

18           THE COURT:  Yes.

19           MR. BIAGETTI:  No.

20           THE COURT:  The allegations about the Mayor and

21   the side deal with the Mayor?

22           MR. BIAGETTI:  I don't believe so.

23           THE COURT:  Did the Gaming Commission address the

24   backdated documents?

25           MR. BIAGETTI:  Well, the Commission has addressed

1  all of the issues regarding the alleged concealment of the

2  ownership of felons, including the documents they submitted,

3  sure, and they have decided as recently as last week not to

4  change any of their decisions.

5          THE COURT:  Yes, instead to impose this big fine.

6          MR. BIAGETTI:  Right.  So just to finish up on

7  pattern, because there is a second claim which the

8  plaintiffs have made on amendment, and this one says that

9  certain of the defendants operated Wynn Massachusetts as an

10 enterprise.

11         THE COURT:  Oh, yes.

12         MR. BIAGETTI:  Okay?  But the purpose, supposedly,

13 of that enterprise, as you can see in our first blurb here,

14 the alleged enterprise's purpose was applying for a

15 Category 1 gaming license.  And the alleged acts are -- we

16 listed them again, but they're basically all those false

17 statements again; and now we have these allegations of

18 concealment, concealment of what went on years prior,

19 allegedly, in Macau and Nevada, including the sexual

20 misconduct allegations, and then an allegation that somehow

21 after the award of the license, that there has been some

22 sort of continuing concealment.  No affirmative acts of such

23 concealment alleged, but just the flavor of it, again, in

24 our view, is an attempt to add continuity.

25         THE COURT:  Which paragraph are you talking about?

1   You're talking about the Travel Act allegations with respect

2   to the enterprise, right?

3            MR. BIAGETTI:  The Travel Act, yes.

4            THE COURT:  So what are you saying, that that's

5   not enough?  I think they're claiming that's part of the

6   pattern.

7            MR. BIAGETTI:  That's not enough.  Sure, certainly

8   it's part of the alleged pattern.  They haven't sufficiently

9   pleaded Travel Act violations, my brother will address, but

10  even if they did, the purpose of the traveling was to obtain

11  the false or fraudulently omissive statements that were

12  submitted in eleven months toward a single goal.

13            So the last point on pattern is this, and it's the

14  next page, 3.  We'll just summarize for your Honor points

15  that are made in the briefs with regard to your very good

16  point, which is, when does a plaintiff allege more than two

17  acts, and even allege concealment, but still not breathe

18  continuity into that finite scheme?  *Apparel Art* is the best

19  example, Justice Breyer when he talks about several false

20  statements including a cover-up.  There it was 13 months of

21  acts, but he says, "Taken together, they comprise a single

22  effort to obtain and to keep one contract.  And "to keep" is

23  important language because you're going to hear plaintiff's

24  counsel say, "Well, gee, they may have gotten suitability

25  determination in December of '13, but the only way they kept

1    it was this continuing failure to disclose."  It's simply

2    not enough.  As Justice Breyer said, eventually lying about

3    fraudulent participation is not enough to breathe

4    continuity.

5            A couple of other cases here, but the two by you

6    two years after *Apparel Art* are really the most instructive,

7    in my view.  In *Boden Construction*, the one we've got in the

8    middle of the page, to remind you, Judge, there were

9    allegations of --

10           THE COURT:  The year I became a judge, not to date

11   myself.

12           MR. BIAGETTI:  It's a comprehensive, apt, and

13   illustrative opinion, 103 acts of mail and wire fraud in

14   that case; but you correctly found that all the alleged acts

15   revolve around the perpetration and concealment of an

16   allegedly fraudulent arrangement for the renovation of the

17   Sea Crest Hotel.  The coverup there lasted 18 months, and so

18   you undertook the analysis, you went beyond the two acts,

19   and you found there, as we would say here, that there's only

20   a single- purpose scheme, not enough to allege a pattern.

21   And because it's now happened on amendment -- in fact, on

22   the amendment, besides adding 56 paragraphs, they scrapped

23   two RICO theories, they added this new one, the Wynn Mass.,

24   and they still can't get there, respectfully.  Why?  Because

25   these are irreparable flaws.  These are flaws that cannot

1   be --

2           THE COURT:  Well, what about the argument that

3   they were engaged in crooked or slimy, or whatever word you

4   want to use, deals in Macau, so it predated this conspiracy

5   and therefore is likely to postdate it?

6           MR. BIAGETTI:  This is what's important about

7   that, though, your Honor.

8           THE COURT:  They're not claiming those are RICO

9   acts.  They're just claiming there's a long-term, I don't

10  know, course of conduct, if you will.

11          MR. BIAGETTI:  If you look at the words, both of

12  the two counts and even conceded in the opposition, they're

13  saying that it's not so much that the behavior in Macau and

14  Nevada is an act; it's that the concealment of those

15  behaviors in the fraudulent and omissive statements that

16  were submitted over eleven months is somehow part of the

17  pattern.  And that's why we are saying that even if there is

18  such concealment during that short period of time, adding

19  that layer, that air of concealment does not breathe

20  continuity into it.  All right?

21          THE COURT:  Okay, we need to move on a little bit

22  because we'll be here for the entire week.

23          MR. BIAGETTI:  Okay, I'm finished on Paragraph --

24  I have two more irreparable deficiencies, but I hope that

25  your Honor will hear me on those in a moment.  Thank you.

```
 1                    THE COURT:  All right, who's --
 2                    MR. STORCH:  Your Honor, first of all, the
 3      selected excerpts from the --
 4                    THE COURT:  Now, first of all, you're too
 5      soft-spoken, so you need to belt it out because this mic is
 6      terrible.
 7                    MR. STORCH:  It will take me a while to modulate
 8      my voice.
 9                    THE COURT:  You're Mr. Storch?
10                    MR. STORCH:  Yes, I am.
11                    THE COURT:  And where are you from?
12                    MR. STORCH:  New York City.
13                    THE COURT:  All right, I've heard of it, yes.
14                    (Laughter.)
15                    MR. STORCH:  East Side, you know, towards the
16      river.
17                    THE COURT:  All right, that's fine.
18                    MR. STORCH:  So, your Honor, first, on this notion
19      that it's an eleven-month span of time, my brother leaves
20      out allegations in Paragraphs 137, 138, and 120 of the
21      complaint --
22                    THE COURT:  137 --
23                    MR. STORCH:  -- 137, 138, and 120 of the complaint
24      which indicate fraudulent representations in June of 2014
25      and August of 2014.
```

1          THE COURT:  Can I get there for a minute.

2          So 137, 138, and 120, is that it?

3          MR. STORCH:  Yes, your Honor.

4          THE COURT:  All right.

5          MR. STORCH:  With respect to this notion that this

6   is just a one-off, one-object scheme, the cases, first of

7   all, don't say that if there's one scheme, one object, that

8   that necessarily is the death knell for a RICO claim.  I

9   think a key distinguishing factor in those cases is that the

10  court looked at them and said, you know, this has the feel

11  of a garden- variety type of business dispute.  These are,

12  with respect to the hotel in your Honor's case, two factions

13  that are arguing over a hotel.  It doesn't have any broader

14  import.  There are not likely any broader victims.

15          Here we have a situation where just in the last

16  week, not only was there the fine, which I understand is the

17  largest in the history of the gaming industry in the United

18  States, tacked on with the Nevada fine of some $55 million,

19  but the Commission went out of its way to say that they're

20  not sure that this company can be trusted.

21          THE COURT:  Where does it say that?

22          MR. STORCH:  When they put in a monitor because

23  they --

24          THE COURT:  See, I don't know these things.  Did

25  somebody submit their opinion for the record?

1          MR. STORCH:  Yes, we did, your Honor, last week.

2    I think it was on Thursday, if I'm not mistaken.

3          THE COURT:  All right.

4          MR. STORCH:  The Commission actually imposed a

5    monitor for the next five years, gave the Wynn defendants

6    the opportunity to come in after three years and seek to

7    have it lifted.  Now, the reason you put a monitor in is

8    because you're worried that something else might happen,

9    that you don't fully trust that entity to operate.  So I

10   think that's something that shows that there is the threat

11   that this company could engage in continuing activities.

12          There's something else in that decision from the

13   Commission last week.  They go out of their way to point out

14   that Mr. Maddox, the CEO, while the Commission investigation

15   was going on, had people surveil the witnesses that the

16   Commission was interviewing.  The Commission went out of its

17   way criticizing Mr. Maddox for doing that and saying that it

18   could -- and if I can just quickly find the words of the

19   Commission -- "Mr. Maddox's authorization of the operation

20   was careless and exposed the investigation to risk by

21   shaking the trust of critical witnesses who were in the

22   process of being interviewed."

23          This is an organization, your Honor, that

24   conceals; when it's caught, it attacks; and when it finally

25   has no alternative, selectively releases facts.  It doesn't

 1   come clean.  It still to this day has not come clean with

 2   the Commission.  Mr. Maddox --

 3            THE COURT:  Well, how much did the Commission --

 4   you've made certain allegations about the mob and the mob

 5   owning the property and backdating documents and

 6   relationships with the Mayor, et cetera.  How much did the

 7   Commission know about all that?

 8            MR. STORCH:  The Commission knew that there was a

 9   question as to whether or not Mr. Lightbody and Mr. DeCicco

10   still had an interest, and when, if their interest was

11   actually transferred, it was transferred.  The Commission

12   took testimony, asked for information as to what the status

13   of these individuals were.  Particularly with respect to

14   Mr. Lightbody, they were told that Mr. Lightbody was out.

15   Mr. Maddox had testified before the Commission, says

16   Mr. Lightbody has no relationship any longer with either

17   Wynn or FBT.

18            What Mr. Maddox didn't say, and as we allege in

19   the complaint is, just some two months earlier he had met

20   with Mr. Lightbody, who was helping him to acquire a piece

21   of property that Wynn needed in order to complete its casino

22   project.  What he didn't tell the Commission was that he was

23   emailing with people at FBT seeking their help to get that

24   parcel of property.

25            THE COURT:  Did they know about this alleged side

1   deal with Russo, who was a consultant for the Mayor, and the

2   allegation that it was money that was going to be going into

3   the Mayor's pocket?

4           MR. STORCH:  Not to my knowledge, your Honor.

5           THE COURT:  That was not part of the

6   investigation?

7           MR. STORCH:  I have not seen that being part of

8   any investigation.  That was an allegation that we have in

9   our complaint and that I think first materialized when we

10  filed our complaint.

11          THE COURT:  I didn't hear you.  Materialized when?

12          MR. STORCH:  When we filed our amended complaint

13  in this action.

14          So in terms of just the closed-end aspect of it,

15  our complaint sets forth a 21-month period.  As *Efron* said,

16  the First Circuit case, *Efron* said 21 months is actually

17  okay under the Supreme Court precedence.  It means, though,

18  for 21 months, we want to see something more.  We don't want

19  to just see, hey, the number of predicate acts and it's 21

20  months.  Let's see something more.

21          The "something more," your Honor, is what we are

22  seeing even last week.  This is a company that it cannot be

23  said is not a risk to commit more of these defalcations; and

24  certainly, while maybe there's less of a risk today because

25  there's a monitor watching them, before that monitor was put

1  in, obviously the Commission thought there was certainly a

2  risk of some ongoing misbehavior.  So for those reasons,

3  your Honor, we believe that the --

4      THE COURT:  I'm going to find allegations with

5  respect to continuity in Paragraphs 137, 138, and 120?

6  Those are your core --

7      MR. STORCH:  Well, those are the ones that stretch

8  it out beyond, your Honor.

9      THE COURT:  Beyond?

10     MR. STORCH:  Beyond the eleven months that I was

11 responding to.

12     THE COURT:  Oh, but not beyond the 21 months that

13 you're asserting?

14     MR. STORCH:  Right, correct.  But our complaint

15 has numerous other allegations of fraudulent conduct

16 starting in November of 2012 and going throughout the time

17 period 2012 up until the time of the license.

18     THE COURT:  Is there anything that goes beyond the

19 2014, 9/2014?

20     MR. STORCH:  Well, your Honor, there is this

21 issue:  We have alleged in our complaint about the Mayor

22 being on the payroll.  We do allege in our complaint that in

23 2016, that --

24     THE COURT:  Well, you didn't allege he was on the

25 payroll.  You alleged --

1           MR. STORCH:  We alleged that he was getting a

2    piece of --

3           THE COURT:  That he was getting some of the

4    proceeds from the real estate transaction, right?

5           MR. STORCH:  That's correct.

6           THE COURT:  Through Mr. Russo?

7           MR. STORCH:  That's correct.  And what we do

8    allege in the complaint is that in 2016, that the Wynn

9    people were again having a problem of getting another parcel

10   of land that they needed for the casino site, and that they

11   attempted to get the tenant to leave.  He refused to leave.

12   They went to the Mayor's office, and then shortly thereafter

13   somebody from the Building Department showed up and

14   basically listed all these violations that this person had,

15   even though just a few months earlier they had come and

16   found it completely clean.

17          THE COURT:  So you're saying that's evidence of

18   continuity?  Is that why that's relevant, in your view?

19          MR. STORCH:  Yes, that's right, your Honor.  And

20   there is a lawsuit pending on that with the -- that

21   individual and his business are suing claiming, "Look, this

22   is part of a conspiracy to throw me out between Wynn and the

23   Mayor's office."

24          THE COURT:  And that's in State Court?

25          MR. STORCH:  That's in State Court, your Honor.

```
1              THE COURT:  Superior?

2              MR. STORCH:  I believe it's in Superior Court.

3              THE COURT:  All right, thank you.

4              MR. STORCH:  Thank you.

5              THE COURT:  All right, so, now, you have --

6              MR. BIAGETTI:  Your Honor, I wanted to make --

7              THE COURT:  -- standing and proximate cause.

8              MR. BIAGETTI:  Yes.  I wanted to make one point

9     about statute of limitations, and then end by focusing on

10    proximate cause, and then sit.  Will that work?

11             THE COURT:  Yes.  This case probably won't go away

12    on statute of limitations.

13             MR. BIAGETTI:  Because your Honor asked a couple

14    of questions about what was known, and so I just wanted to

15    make clear very quickly what our statute of limitations

16    argument is, and this is Page --

17             THE COURT:  You know, you've briefed this all to

18    death, and I'm --

19             MR. BIAGETTI:  Yes, just very briefly,

20    respectfully, what we're basically saying there in the

21    statute of limitations argument is, the suitability

22    determination happens in December of '13.  You add four

23    years to that, you get to December of '17, and this case is

24    filed nine months later in September of '18.  So by

25    September of -- what we're saying is that the injury accrued
```

1    and the acts were known or knowable at the time of that

2    suitability determination.

3            THE COURT:  Yes, you briefed it that way.

4            MR. BIAGETTI:  Yes, it's that simple, and it's

5    based on what the MGC --

6            THE COURT:  I don't see why you know your harm

7    until the other side gets it.  I mean, I see your argument.

8    It's not crazy.  It's just you don't know of your injury

9    till you've lost the contract.

10           MR. BIAGETTI:  Well, suitability, though -- they

11   don't even have the opportunity -- look at it this way,

12   respectfully:  They don't even have the opportunity to be

13   injured by anything in the Phase 2 process if they haven't

14   already been allegedly injured by the threshold

15   determination.  That's the date when the clock starts

16   ticking.

17           THE COURT:  I get it.  Just it's unlikely to go

18   away on statute of limitations.  Okay, so --

19           MR. BIAGETTI:  Let me talk about standing and --

20           THE COURT:  Because I'm more concerned about

21   whether this states a RICO claim.

22           MR. BIAGETTI:  Okay, all right.

23           THE COURT:  So we have a single-purpose conspiracy

24   to get a license, and there's enough probably alleged --

25   there are more than two acts, so that's enough for a

1    pattern, and your argument is that there's not enough to

2    show continuity.  So, now, that's been fully vetted here.

3    We've argued that.  So you're moving on now to standing,

4    right?

5              MR. BIAGETTI:  Yes, standing and proximate cause,

6    and then I'll sit.  And, by the way, even if --

7              THE COURT:  You know, I don't have all morning, so

8    standing.

9              MR. BIAGETTI:  Here we go.  The standing and

10   proximate cause argument, again, I set out the barebones of

11   what they've alleged in the handout at Page 6, your Honor,

12   which makes clear, first of all, what they're alleging,

13   okay, which is that they were fraudulently deprived of

14   benefits by Wynn all via deceiving the non-members of the

15   Gaming Commission.  So they're saying that the deception of

16   the Commission somehow is the proximate cause of their

17   injury.  And under the cases, we quoted *George Lussier*, but

18   it's clear from so many that a RICO plaintiff can't simply

19   point to something and say it's a cause; it must be the

20   proximate cause, and you can't get there here for three

21   reasons.  There are three independent factors which, in our

22   view, break the cause in a chain.

23             Briefly, the first one is agency action in its

24   discretion with regard to who gets the license.  Here,

25   Mohegan was the only other applicant in Phase 2.  But

1    Phase 2, after the suitability determination, which we say

2    is, you know, and which they claim is the critical, you

3    know, extraction of a fraudulent benefit, by Phase 2, the

4    factors that the Commission is considering include finances,

5    economic development, building and site design, mitigation,

6    stuff that has nothing to do, respectfully, your Honor, with

7    suitability.  There is no way to say that had Wynn Mass.

8    been eliminated as unsuitable, that Mohegan would have been

9    selected.  In fact the statute, and we quote it here, gives

10   the Commission the discretion to award a contract to no one

11   at all, or to, for example, invite more bids, or to require

12   a fix.  It's exactly what they did with regard to the

13   allegedly concealed ownership:  They required those

14   certifications.

15          And as for, you know, looking back in terms of

16   what happened --

17          THE COURT:  But on a, what would you say, on a

18   motion to dismiss level, I don't know that I can decide

19   whether or not --

20          MR. BIAGETTI:  Oh, I think if you look --

21          THE COURT:  I don't even know.  What's Mohegan?

22   Was there an issue with them?  I haven't followed this whole

23   thing, okay?  So what was the issue with Mohegan?  Was there

24   an issue with Mohegan?  Did they have finance or economic

25   issues?

1          MR. BIAGETTI:  No.  What the Commission did --

2    and, first of all, we offered it as an exhibit to our motion

3    to dismiss, which we believe you may rightfully entertain

4    because the decision is referenced in the complaint, and the

5    decision is agency action of which you may take judicial

6    notice.  And if you look at it, it's about five pages of a

7    chart, and what the Commission does is criterion by

8    criterion.  They have a column for Wynn and they have a

9    column for Mohegan, and they take that gestalt of criteria,

10   and they ultimately make a decision.

11          THE COURT:  Yes, they decide your guy is better,

12   but there was no knock-out punch with Mohegan, right?  It

13   wasn't like they were mob-infiltrated or anything like that.

14          MR. BIAGETTI:  No.

15          THE COURT:  All right, so, I mean, it's not as

16   if -- how do I say this on a pleading standard, that they

17   would have gotten it or they wouldn't have gotten it?  Now,

18   maybe they were second, but if the Commission had known all

19   this stuff, they wouldn't have chosen them.

20          MR. BIAGETTI:  But it's exactly the "would have"

21   that is our point.  In other words, they cannot show that

22   the elimination of Wynn would have inevitably led to the

23   coronation of Mohegan and therefore to the preclusion of

24   their injury.  It's the fact that there is speculation

25   there, that you would have to apportion loss between

1   intervening events, that's the whole point of the cases.

2   Okay, so that's the first intervening independent.

3           The second one is, they're not the applicant.

4   Sterling had been an applicant in Phase 1.  And you're

5   right, Judge, it makes your head spin, but they were an

6   applicant in Phase 1 with I believe Caesars.  The Commission

7   did raise questions with regard to Caesars.  Caesars drops

8   out, which means now Suffolk, which is, after all, just a

9   landowner -- they own a racetrack that they hope will

10  someday be --

11          THE COURT:  But the thing with -- I read

12  somewhere, I think it was either in the complaint or the

13  briefs, that there was a contract that gave --

14          MR. BIAGETTI:  Yes, there's a lease.

15          THE COURT:  -- an absolute right to, if Mohegan

16  got it, to lease the land to Mohegan, right?

17          MR. BIAGETTI:  Riddled with contingencies, Judge,

18  and we quoted some of them in our brief.

19          THE COURT:  Enough, though, to get you through a

20  pleading standard.

21          MR. BIAGETTI:  But, again, even if, even if the

22  lease were to stand, my point is that by Phase 2, because

23  Caesars got knocked out, Sterling didn't have a dance

24  partner.  They elected not to proceed as an applicant in

25  Phase 2 -- Mohegan did -- and they elected instead to become

1    a prospective vendor, a hoped-for landlord to Mohegan in the

2    event that Mohegan won.  So you have no guarantee that

3    Mohegan is going to win, and even if they win, you have no

4    guarantee that Mohegan is going to follow through on the

5    contract with Sterling.  As they said in their opposition,

6    and they're right, that contract, that lease, prospective

7    lease is riddled with "standard outs" for the prospective

8    lessee.  If you allowed RICO injury to be found in that

9    situation, every disappointed vendor to Mohegan, the folks

10   who hoped to sell them the playing cards would have a RICO

11   claim arising out of the fact that the MGC --

12          THE COURT:  You'd better not suggest it.  You'll

13   get all these other suits, huh?

14          (Laughter.)

15          MR. BIAGETTI:  That's right.  I guess that's a

16   silver lining.  But that's my point.  It's no different.

17   It's no different.

18          THE COURT:  All right, all right.

19          MR. BIAGETTI:  Last one.  Last one, and I'm done.

20          THE COURT:  One and done, all right.

21          MR. BIAGETTI:  Yes, and it's sort of where I

22   started but I'll pick up.  The Supreme Court cases, *Anza,*

23   *Hemi*, *Holmes*, they all ask fact-finders like you, Judge, or

24   evaluators of claims at motions to dismiss, to look to see

25   whether there are other potential vindicators of the alleged

1    wrong here.  And, as I mentioned, you've got the certiorari

2    petition by Mohegan.  In one of the handouts that I've

3    provided -- I think it's the one at Page 7 -- it talks about

4    what Mohegan is looking for in that petition.  Mohegan had a

5    legitimate expectation that the Commission would follow the

6    law in awarding the license, and they have asserted harm by

7    the Commission's alleged deviations from that standard.

8    That's the way you challenge this action.

9         THE COURT:  But what happens if Mohegan wins?  Do

10    they suddenly take over Encore?

11         MR. BIAGETTI:  You know, that's in the wisdom of

12    the State Court, but that's precisely --

13         THE COURT:  But, I mean, does that make this suit

14    go away?

15         MR. BIAGETTI:  -- challenging the process.  I

16    think the plaintiffs would say "no," but I'll leave that to

17    them.  My point is that you have incentivized --

18         THE COURT:  I see, that's right, because if

19    Mohegan wins and they get Encore, that's not going to help

20    Sterling.  I see.

21         MR. BIAGETTI:  And the second incentivized

22    challenge, just to the last point that my brother made and

23    I'll sit down, is the Commission itself.  The Commission has

24    continuing authority, Judge, over the suitability of the

25    applicant, meaning Wynn Mass.

1            THE COURT:  There was a two-to-one vote, right, so

2    it was a really close vote?

3            MR. BIAGETTI:  On some issues it was a two-to-one

4    vote, yes.  But what the Commission said, and it's the last

5    handout that we have for you, is that -- I'm going to put it

6    up because it bears review.  And this was the subject of

7    submissions by both sides last week to your Honor.  But what

8    the Commission finally ultimately decided was that "After

9    careful review of the record in this matter, the Commission

10   concludes that there is no substantial evidence to support a

11   finding that Wynn Mass., Wynn Resorts, or any of its

12   associated qualifiers," meaning the individuals, "willfully

13   provided false or misleading information."

14           The Commission itself, after hearing all of these

15   allegations, said, "We stand by our decision.  We don't

16   know."  They said, quote, "There is no way for us to know

17   what we would have done had we known some of this back in

18   2013."

19           But my point to you, finally, Judge, is, they

20   declined to so speculate in a state agency review, which is

21   exactly where this ought to be.  You should not, at the

22   invitation of plaintiff on a belated, flawed RICO claim,

23   accept that invitation to speculate on cause.

24           THE COURT:  What's the RFA-1 licensing process?

25   Is that the entire suitability as well as the --

1          MR. BIAGETTI:  Yes.  That's the Region 1 process

2    which has two phases.

3          THE COURT:  The two phases.

4          MR. BIAGETTI:  Correct.  Thank you so much for

5    your --

6          THE COURT:  And there's no collateral estoppel or

7    res judicata here with the agency decision?

8          MR. BIAGETTI:  You may take judicial notice of

9    agency decision, agency findings we cited, yes.

10         THE COURT:  I see, I can take it, but it's not

11   binding.

12         MR. BIAGETTI:  Correct.

13         THE COURT:  Okay, thank you.

14         MR. BIAGETTI:  Again, the point here is not simply

15   the result but the fact that it's been challenged.  Thank

16   you.

17         MS. BERNSTEIN:  Good morning, your Honor.

18         THE COURT:  Good morning.

19         MS. BERNSTEIN:  I will address both statute of

20   limitations, if you want to hear about it, and proximate

21   cause.  I'll touch briefly on statute of limitations.  I

22   think you're absolutely correct that you simply cannot know

23   of your injury until you're told the license is going to

24   somebody else.  That happens in September.  And it's not

25   awarded when you get the whole layout of how does Wynn do

1    and how does Sterling Suffolk do until you get the November

2    decision, but, in any event, the complaint in this case was

3    timely.

4              THE COURT:  That's been well briefed.

5              MS. BERNSTEIN:  Thank you.

6              As to proximate cause, they're saying that the MGC

7    had the authority to make this decision, and it did, but

8    what we are saying is, they were misled and didn't know

9    important information, and the harm to our client flowed

10   from that.  So what we have to show for proximate cause is

11   that there's some direct relation between the injury

12   asserted and the injurious conduct alleged.  And the *Holmes*

13   case, which really sets it all out, makes it clear that

14   proximate cause is a flexible concept that does not lend

15   itself to black letter rule that will dictate the result in

16   every case, and they're looking

17   to, so both for direct relation and for kind of how much of

18   a mess is this going to cause for us?  So is it going to be

19   a problem if somebody not in direct relation who didn't

20   receive the misrepresentation themselves claims injury

21   because how are we going to apportion damages?

22             THE COURT:  What do I do with the fact that the

23   Gaming Commission now knows most of it and that they didn't

24   change their decision?

25             MS. BERNSTEIN:  Well, I would ask the Court -- and

1    I'm sorry your Honor didn't see it before.  We filed what's

2    document 115 with our explanation for the Court as to just

3    some highlights of the decision and giving you that decision

4    so you could be aware of it, but the Commission clearly

5    said, "We are not saying what we would have done had we

6    known this."

7            Wynn has undergone pretty close, except for

8    Maddox, a top-to-bottom reorganization, and so what the

9    Commission was looking at is suitability now.  They have

10   this big building over there that they would like to see

11   open in June, if possible, so they're assessing suitability

12   now.  And they say in their decision at Page 38, "There's no

13   way for the Commission to definitively determine whether the

14   company," Wynn, "would have been deemed unsuitable at a

15   particular point in time between 2013 and the present, and

16   there's no way for the Commission to determine what steps

17   the company might have taken in 2013 to address these

18   matters if it had been disclosed, given that the Commission

19   focuses on suitability today."

20           They go on, however, to point to some incredibly

21   damaging things that happened, by the way, after the first

22   suitability determination.  And, by the way, at that

23   Commission hearing, they made it absolutely clear that their

24   expectation is that suitability is an ongoing question.  So

25   while there was a suitability determination in that

1    December, 2013 time period for Wynn, that suitability

2    determination was ongoing.  And they were asked whether

3    there were other things out there, and the general counsel

4    failed to disclose allegations of sexual predation and

5    settlements of massive settlement figures in multiple, not

6    just one or two but multiple cases that were not disclosed.

7            And they were concerned that there was a memo

8    written by a lawyer who represented Wynn at a mediation with

9    a former employee who alleged that she was raped by Mr. Wynn

10   in the course of this mediation in the summer of 2014.  That

11   was told to the Wynn general counsel.  That lawyer -- it's

12   called the "Abbott memo" -- wrote up a memo about what

13   happened and sent it to the general counsel, Kim Sinatra,

14   who's a defendant in this action.  So she was told that.

15   She didn't say anything to the Commission about it, although

16   there had been a direct request by the suitability

17   investigators for information about other settlements and

18   things like that.

19           And there was also a separate allegation -- I know

20   it's complicated, and we tried to lay out kind of the highlights

21   that matter for you, but --

22           THE COURT:  Did the Gaming Commission know about

23   all the allegations involving FBT's property or the Mayor?

24           MS. BERNSTEIN:  No.  That hearing had nothing to

25   do with FBT.  This last hearing was only about Steve Wynn's

1   sexual predation and what they knew about that and what they

2   did about that and how they treated their employees.

3            THE COURT:  So was this whole issue with the Mayor

4   ever -- I know I keep --

5            MS. BERNSTEIN:  No, no, no.  Nothing about FBT,

6   nothing about the Mayor, nothing about Macau was dealt with

7   in this hearing.  This hearing --

8            THE COURT:  What about the first hearing?

9            MS. BERNSTEIN:  In the first hearing, there was

10  some information about some of the hidden ownership

11  interests in the FBT property, but, as I think Mr. Storch

12  said earlier, not all of that was disclosed.  And

13  significantly, in June of 2014, one of the owners, previous

14  owners, signed something that he had given up his interest

15  to this other guy, but he -- I'm sorry, I'm confusing

16  this -- but in so doing, he basically put in a false

17  submission because he didn't disclose the ownership interest

18  or the income stream that would flow to another individual,

19  and that was in June of 2014.

20           THE COURT:  Was that Russo?

21           MS. BERNSTEIN:  That is -- I'm sorry, I'm getting

22  my -- Paragraph 120, Gattinari's representation about

23  Lightbody's interest, that it was gone but it wasn't in fact

24  gone.  And all of this stuff about the fix is in Paragraphs,

25  I believe, 110 to 120.  So kind of what the Commission

1    looked into in that December hearing about the FBT ownership

2    interest is in there, both what was disclosed at that time

3    and what was not disclosed at that time.  And there were

4    important things that they acknowledge were not disclosed at

5    that time.  And they try to say, well, that's -- I don't

6    know how they can say that's not enough, but it was pretty

7    important stuff.

8           And back to what the Commission recently was

9    looking at, which is the sexual predation stuff, they talked

10   about, you know, some of its concerns about the Abbott memo,

11   which came out in July of 2014, which had this revelation

12   about the allegation of a rape of an employee, and Sinatra

13   didn't disclose it.  And they say, "Sinatra, who was

14   intimately involved with the licensing process, denied being

15   aware of the allegations contained in the Abbott memo --"

16   this is in the course of their investigation -- "despite

17   being forwarded a copy to her company email address and

18   having responded to that email.  The Commission is inclined

19   to conclude that her denial was motivated by

20   self-preservation, given the proximity of the issuance of

21   the memo to the licensing decision."  And then the

22   Commission goes on to say, "We need not spend time

23   describing why it was essential that Mr. Wynn, Ms. Sinatra,"

24   and some others whose actions were looked into by the

25   Commission.  "Certainly their continued employment would

1    make a finding that the company possesses the requisite

2    integrity, honesty, good character and reputation

3    exceedingly difficult to impossible, but they have been

4    removed, so we will not toil over that point."

5           So they are basically, the Commission is saying,

6    "Wow, that was awful," $35 million worth of fine, which they

7    point out is in response to their actions before the

8    Commission from the very moment they started pursuing the

9    license to the present.  So the fine covers the entire

10   period of wrongdoing that they know about it, although they

11   didn't go back to look at these FBT and may not even be

12   aware of these FBT issues.  So --

13          THE COURT:  Now, what do you think about the -- if

14   Mohegan Sun wins or loses, what impact does that have on

15   this litigation?  If it wins, what, and if it loses, what?

16          MS. BERNSTEIN:  Well, Mohegan Sun is suing the

17   Gaming Commission for the license --

18          THE COURT:  Yes.

19          MS. BERNSTEIN:  -- related to their denial, and

20   they're not going to, I don't believe, they can't stand in

21   the shoes of Sterling Suffolk for their losses.

22          THE COURT:  But let's say they lose, and the

23   Gaming Commission is upheld in every decision, is that the

24   end of the deal for your client?

25          MS. BERNSTEIN:  Well, I would submit that this is

1   an entirely separate action.  That's a 1983 action.  It

2   relates to the authority of the Gaming Commission to do what

3   it did.  Our action relates to the injury that Sterling

4   Suffolk experienced as a result of the wrongdoing.  So I

5   would submit that they're entirely separate actions, and

6   certainly the other action won't redress the injury caused

7   to our client.  And --

8           THE COURT:  Except if Judge Sanders, or on appeal

9   to the SJC, decides that the Gaming Commission was

10  appropriate, took into account all the salacious conduct and

11  still granted the license with the fine -- let's say they

12  say, "All right, a lot of yucky stuff went on, but still, at

13  the end of the day, those people are gone and the fine is

14  paid, and we'll uphold the discretion of the --" is that the

15  end of this suit because there's no way Sterling could ever

16  now get the deal?

17          MS. BERNSTEIN:  Well, we're not -- we're looking

18  for damages.  There's no way Sterling could get the deal

19  now.  That ship has sailed.  We're seeking recovery for the

20  injuries they sustained as a result of it.

21          THE COURT:  It's just hard.  Now, let's say

22  Mohegan wins --

23          MS. BERNSTEIN:  If Mohegan wins --

24          THE COURT:  What happens?

25          MS. BERNSTEIN:  Well, Suffolk Downs, which is the

1    property that our client owned, and was, by the way,

2    completely core and central to the decision by the --

3            THE COURT:  Then you have a winning case because

4    even if -- or at least a much stronger case -- if Mohegan

5    wins, then you can at least say, "Well, maybe Encore is

6    still built, but we would have been the --"

7            MS. BERNSTEIN:  I don't know why we would have to

8    wait.  And I say, the question that you're wrestling with

9    now is, is there an injury?  We say there is.  And the

10   wrongful conduct was the lies that they submitted to the

11   Gaming Commission.  And I would submit to your Honor that

12   it's not at all clear that Mohegan Sun will advance.  I

13   mean, this case has been actively investigated and pursued

14   by Sterling Suffolk.  I don't know that Mohegan will be in a

15   position to present the same evidence that's been developed

16   here and that we are prepared to continue to develop in

17   discovery, and it certainly won't redress the harm.

18           THE COURT:  Excuse me.  In State Court, is it

19   based on an administrative record, or is there discovery?

20           MS. BERNSTEIN:  Just the administrative record.

21           THE COURT:  So it's like an administrative appeal.

22           MS. BERNSTEIN:  Yes.  It's going to be exceedingly

23   limited.  I mean, they lost already, and they're appealing

24   through certiorari, but --

25           THE COURT:  Oh, they lost before Judge Sanders?

```
 1            MS. BERNSTEIN:  Yes, right?

 2            MR. STORCH:  They lost, and it was sent back down

 3    for --

 4            MS. BERNSTEIN:  I'm sorry.  I'm not as familiar --

 5            THE COURT:  None of you briefed it, but obviously

 6    I want to be respectful of the State Court processes, which

 7    may or may not facilitate a resolution here.  If Mohegan Sun

 8    wins because it was inappropriately granted, you go down one

 9    path.  Then you can't argue that there's a proximate

10    causation issue.  If Mohegan Sun loses, it may or may not be

11    dispositive.  It's hard to say on what grounds.  I'd have to

12    see it.  I'm just curious.

13            MS. BERNSTEIN:  I understand the impulse, but I

14    would suggest that it's not fair to these plaintiffs to make

15    them wait for a totally collateral challenge to the

16    Commission's action.  This is claims against the wrongdoers

17    in Wynn and associates.  That is not -- and the current --

18            THE COURT:  I'm not proposing to stay this.  I'm

19    just simply saying, if something comes up in the interim --

20            MS. BERNSTEIN:  I'm sure you'll hear about it.

21            THE COURT:  I'm sure I'll hear about it, if not on

22    the front page of the Globe, certainly in filings, but I

23    might need reargument about how that affects this.

24            MS. BERNSTEIN:  Well, I mean, if that eventually

25    comes up, it can certainly and will be addressed.
```

1          And I think back to the questioning that you had

2    earlier for Mr. Biagetti was, how can you decide this now at

3    the pleading stage?  They're going to have plenty of

4    opportunities to challenge the sufficiency of the evidence,

5    which functionally, your Honor, is what I think they're

6    trying to do.  And those are questions for, at a minimum,

7    for a more developed record with the opportunity to do some

8    discovery, and it is just completely premature here.

9          THE COURT:  I think we need to move on.

10         MS. BERNSTEIN:  Okay, thank you.

11         THE COURT:  I'm thinking -- after you, how many

12   people are there?  One more?

13         MR. KATZ:  Possibly one more.

14         THE COURT:  Mr. Kelly and -- oh, two more.  So

15   what we'll do is, why don't we get through this issue, and

16   then we'll take a break.  So probably 15 minutes and 15

17   minutes?

18         MR. KATZ:  Your Honor, I want to address the

19   enterprise issue on the association-in-fact RICO counts.

20   Those are the only RICO counts that FBT is a member of, but

21   I also want to address the predicate acts.  And I think they

22   really do bleed together, so rather than break in between

23   those two arguments, I'd like to make them together.

24         THE COURT:  Fifteen minutes, okay.

25         MR. KATZ:  Just to back up a step, okay, FBT, who

1    is FBT?  FBT was the owner of the Everett parcel where the

2    Encore is now being built.  We have no role in the casino.

3    We have no relationship with Wynn at this point.  There has

4    been no relationship with Wynn since the closing on that

5    parcel, which I think was in January of 2015.  We were never

6    going to own or operate the casino.  We were not a

7    qualifier.  We were not an applicant for a casino license.

8           So what is FBT doing here?  I feel like I'm caught

9    in the crossfire between Mohegan Sun's business partner

10   Sterling firing at Wynn.  The reason why FBT is in this

11   courtroom is because they needed to find a RICO claim to get

12   into Federal Court, and they know that the RICO claim that

13   is just based on the Wynn entity has a serious legal defect;

14   that the defendant, the deep-pocketed defendant, RICO

15   defendant, is also the RICO enterprise itself.  They have

16   attempted to plead around that problem by going this

17   association-in-fact route, where FBT is all of a sudden in

18   an association-in-fact RICO enterprise with the Wynn

19   enterprises and Wynn executives.

20          Now, at the beginning of our brief, I pointed out

21   that this was an implausible -- it is an implausible

22   association-in-fact.  Why is that?  There was not just a

23   state investigation, the investigations in Administration

24   Enforcement Bureau in violation for the Mass.

25   Gaming Commission, there was a U.S. Attorney's investigation

1    into all of the so-called mob ownership issues that your

2    Honor has referenced.  We are not conceding that FBT was

3    ever mob owned.  We are not conceding that FBT or any of its

4    members made false statements to the Gaming Commission.  The

5    only thing I'd concede is that the U.S. Attorney's Office

6    thought that there was enough evidence of false statements

7    to Wynn --

8          THE COURT:  Right, it was a different kind of

9    theory altogether.

10          MR. KATZ:  It was a different type of theory

11    altogether.  And so basically you had a U.S. Attorney's

12    Office investigation, which included wiretaps, which

13    included undercover sting operations, which included

14    cooperating witnesses at grand jury, including Wynn

15    witnesses going into the grand jury and testifying under

16    oath.  There were wiretaps that I can't speak about in open

17    court but would address some of the questions that your

18    Honor has about what did the IEB know, what did the Gaming

19    Commission indirectly know?  I'm happy to --

20          THE COURT:  IEB stands for?

21          MR. KATZ:  Investigations and Enforcement Bureau.

22    It's essentially a law enforcement arm that works at the

23    behest of the Mass. Gaming Commission.  So they have State

24    Police --

25          THE COURT:  It wasn't clear from the pleadings.

1    So they are the equivalent of what, the State Police?

2            MR. KATZ:  Yes.  I would say almost like Secret

3    Service or Postal Inspectors.  They're very specialized.

4    They work for the Gaming Commission.  They did work hand in

5    glove with the FBI on the investigation into FBT and its

6    members, including my client, Mr. DeNunzio.

7            Now, the theory in the federal criminal trial, it

8    was a wire fraud count, but the theory was that my client,

9    Mr. DeNunzio, and another FBT member, Anthony Gattinari, had

10   made false statements to both the Gaming Commission and Wynn

11   in order to deprive Wynn of money; namely, that Wynn would

12   not have agreed to pay $75 million for the land had

13   Mr. DeNunzio and Mr. Gattinari been open and honest with

14   Wynn that Mr. Lightbody retained a 12 percent ownership.  It

15   was not a sort of "fraud on the MGC to help Wynn obtain the

16   license" theory because of *Cleveland*, right?

17           THE COURT:  Yes, but the government lost on that.

18           MR. KATZ:  And the government lost.  And so what

19   they do here -- because obviously Wynn can't be the victim

20   here of FBT's alleged lies to the Gaming Commission.  Wynn

21   has to be part of the association-in-fact, right?  So

22   they're now saying they're in cahoots.  The reason that's

23   implausible is because after years of investigation, the

24   FBI, the U.S. Attorney's Office, the Gaming Commission, the

25   IEB, none of them ever jumped to this conclusion.  And you

1 look at Paragraph --

2    THE COURT:  But I can't do that on a motion to

3 dismiss.

4    MR. KATZ:  I think under *Twombly* you can, your

5 Honor.  I also think under Rule 9(b) because, remember, this

6 is a fraud case.

7    THE COURT:  Well, they've claimed, and is this

8 true or not, that there was a side deal with a guy named

9 Russo and that money was going to be funneled to the Mayor?

10 I mean, that stuck with me.  Was that vetted in the criminal

11 trial?

12    MR. KATZ:  So the Massachusetts Gaming Commission

13 knew that Jamie Russo, or James Russo, was due to receive,

14 under a consulting agreement that went back some ways, a 3

15 percent share of the proceeds from the Everett parcel sale.

16 So the Gaming Commission knew that.  That was also raised at

17 the federal criminal trial.  It's an allegation in the

18 indictment in the federal criminal trial where, of course,

19 our defense is that there was no hidden ownership at all.

20 It wasn't that, "Oh, Wynn is not a victim.  They're our

21 coconspirator."  That was not our defense.

22    THE COURT:  And was it known that some of that was

23 to go to the Mayor?  I stick with that because that does

24 sound like --

25    MR. KATZ:  So your Honor --

1          THE COURT:  -- something of concern, let's put it

2      that way, if it's true.

3          MR. KATZ:  I would like to address that.  I can't

4      do it in open court.  If your Honor wants a particular fact,

5      I would like to raise it at sidebar.

6          THE COURT:  I don't think we can unless all the

7      attorneys get to see it.

8          MR. KATZ:  I will just say that that was part of

9      the federal criminal investigation, whether there was a

10     kickback arrangement with Mayor DeMaria.  It was, I will

11     say, thoroughly investigated.  I can't reveal everything

12     that was part of that investigation in open court because

13     there is a protective order.  I believe the IEB knew about

14     that aspect of the FBI's investigation of the Mayor's

15     office, and that was never deemed to be credible.  And if

16     you look at the complaint here, and this is why --

17         THE COURT:  So it was part of the criminal trial

18     or not?  In open court, it was not?

19         MR. KATZ:  It was not because there was no -- it

20     was part of the investigation that the FBI did and the U.S.

21     Attorney's Office did, but it wasn't part of the criminal

22     trial because there was no credible evidence that Mayor

23     DeMaria was going to be receiving money through Jamie Russo

24     as a funnel.  And if you look at the complaint -- and this

25     is why Rule 9(b) is so important in cases like this, where

1   they're not just claiming fraud against Wynn and FBT but

2   they're saying the Mayor was in on it; they're saying Steve

3   Crosby, the former Commissioner of the Gaming Commission,

4   was in on it.

5          THE COURT:  No, not really.

6          MR. KATZ:  If you look --

7          THE COURT:  No, no.

8          MR. KATZ:  If you look, he's not a defendant, your

9   Honor, but he is replete in the paragraphs, I think it's

10  around 56 --

11         THE COURT:  But they're not claiming he got a

12  kickback or anything?

13         MR. KATZ:  No, not a kickback, but they're saying

14  that he was a bad actor, that he was not doing his job

15  properly.

16         THE COURT:  But it wasn't the same as what they're

17  alleging with respect to the Mayor.

18         MR. KATZ:  Agreed, agreed a hundred percent.  But

19  if you look at the kickback allegations with respect to

20  that, they are unbelievably thin.  I don't think they even

21  satisfy *Twombly* and Rule 8, but they certainly don't satisfy

22  Rule 9(b).  They are the very definition of conclusory.

23         Now, back to the enterprise issue, Judge,

24  Paragraph 88, I think you really need to pay attention to

25  Paragraph 88.  When addressing whether they have plausibly

1    and in satisfaction of Rule 9(b) alleged an

2    association-in-fact involving FBT, they simply say,

3    "Accordingly, at some point no later than November or

4    December, 2012 --" that's when the option agreement is

5    signed -- "the Wynn defendants and FBT entered into a mutual

6    understanding that FBT would create whatever false and

7    backdated paperwork might be necessary for purposes of the

8    Wynn defendants' application in order to make ownership of

9    the Everett site appear less tainted than it actually was."

10   They don't provide the details that Rule 9(b) requires to

11   actually flesh out that conclusory allegation.  I think you

12   can resolve the association-in-fact question both on *Twombly*

13   grounds and Rule 9(b) grounds.  They simply have not pled

14   the facts sufficient for an association-in-fact fraud

15   enterprise.

16          But there is a reason, your Honor, why the bulk of

17   our brief -- and we started with the racketing acts, the

18   predicates, do they actually allege any predicates, because

19   it was cleanest, simplest off ramp available to this Court,

20   and it resolves all of the Court's questions about, what are

21   we doing here in Federal Court while there is a State Court

22   proceeding, and, more importantly, a state administrative

23   agency that is addressing, maybe not to their liking, but

24   addressing and resolving all of these issues?

25          *Cleveland v. The United States*, we'll start there.

1    That's the case where there was a false application to the

2    Louisiana State Gaming Commission, the Louisiana equivalent

3    of the Massachusetts Gaming Commission.  And the wire fraud,

4    a criminal wire fraud case, the wire fraud claim there was

5    that, "Look, you made false statements to the Louisiana

6    Gaming Commission in order to obtain this license to operate

7    slot machines."  And the Supreme Court said that is not a

8    wire fraud.  A license in the hands of a state agency is not

9    property.  And the reason it's not property is twofold:  One

10   it's not tangible, right?  And it's not the type of

11   intangible right that you can transfer and sell.  This is a

12   regulatory license.  But the second is, the Supreme Court

13   was deeply, gravely concerned that the federal government

14   would start injecting itself into matters of local concern.

15        This case is even more offensive than what the

16   U.S. Attorney's Office did in *Cleveland* where the Supreme

17   Court said "no."  Here, they're asking this Court, and maybe

18   even a jury, to decide, what would the Gaming Commission

19   have done if all of these lies had been aired out back in

20   2012 and '13 and '14?  I agree, there is an Encore building

21   now built, and that may be some sort of anchor in the MGC's

22   decision-making right now.  It's probably part of the

23   analysis.

24        THE COURT:  You can see it from the courthouse.

25        MR. KATZ:  You can see it from the courthouse,

1    right.  So I agree with my sister that that is sort of in

2    the mix, so to speak, when they're deciding now whether to

3    take the license away.

4            THE COURT:  Yes, they rushed through the people.

5            MR. KATZ:  Right.

6            THE COURT:  They imposed a fine.  They've got a

7    building.  Their hands were tied a bit, right?

8            MR. KATZ:  Right, but in -- so in the decision

9    that was released last week, the Gaming Commission said it

10    would be impossible to actually go back, step back and say,

11    "What would we have done had all of these allegations been

12    aired out?"

13            THE COURT:  That's proximate cause.

14            MR. KATZ:  I don't think so, your Honor, because

15    what *Cleveland* says is, you can't plead this as a wire

16    fraud, right, because it's not property and because we don't

17    want the federal government injecting itself into matters of

18    local concern, right?  So what they're trying to do is plead

19    around *Cleveland*, plead essentially the *Cleveland* facts as a

20    Travel Act predicate, plead it as a 1961(1)(a) state law

21    gambling offense, and none of those things are actually

22    racketeering acts.

23            THE COURT:  Well, can I just say, I understand you

24    have a very strong argument with respect to *Cleveland*, but

25    that's only one of their theories.

1          MR. KATZ:  Correct.

2          THE COURT:  The involving gambling, that's not so

3    self-evident.  And so there are a number of cases that talk

4    about it not just involve like a blackjack, an actual

5    gambling offense in terms of the act of gambling, but also

6    higher-level management kinds of violations that involve

7    gambling administration.

8          MR. KATZ:  True, but --

9          THE COURT:  So there's something broader than what

10   you're urging me to do.

11         MR. KATZ:  No, I don't think so, your Honor.  So

12   certainly if you're secretly and illegally running a

13   gambling enterprise, even if it's, say, a casino hotel,

14   right, if Steve Wynn all of a sudden unbeknownst to the

15   Gaming Commission comes in and starts, you know, acting as

16   the pit boss, even though they say, "Hey, Steve Wynn is out,

17   he's not suitable, he doesn't have a license anymore," but

18   he comes in and starts running the casino operation, I think

19   the federal government could bring that as a 1961(1)(a)

20   offense as long the casino is actually up and running.

21            But what they're saying were offenses involving

22   gambling were acts that predate by at least five years any

23   of the gambling operations that may take place at the

24   Encore.  They're saying that, "Hey, *Cleveland v. United*

25   *States*, the U.S. Attorney's Office couldn't allege that as

1    wire fraud, but they could have just charged it as a RICO

2    offense."  I mean, that's essentially what they're saying,

3    that *Cleveland* is easy to plead around by saying, "If you

4    apply for a license, a gambling license fraudulently, or you

5    make false statements to get that license, you can't be

6    charged with wire fraud, but, hey, you can be charged with a

7    RICO offense," because, after all, what are you going to do

8    with that gambling license?  You're going to repeatedly

9    engage in gambling offenses, right?  I mean, you're going to

10   get up and running.  You're going to --

11            THE COURT:  I just don't think you have case law

12   that goes this way.  Let's say you fraudulently apply to run

13   a gambling establishment, you're saying you can't charge

14   that as a gambling violation?  You violate state law in how

15   you apply it to run a gambling enterprise?  I mean, I

16   understand your very narrow issue, which is it doesn't --

17   you want me to say it just has to involve the act of

18   gambling as opposed to the act of applying to run a gambling

19   institution, but I don't know the case law supports such a

20   narrow reading.

21            MR. KATZ:  Right.  So I think, your Honor, I have

22   two answers to that.  One is, there may be an unripe RICO

23   violation under 1961(1)(a).  So maybe once the gambling

24   business gets up and running and they start taking bets, you

25   can go back and say, "Hey, you obtained that fraudulently,

1    and therefore you essentially are illegally operating a

2    casino."

3            THE COURT:  Yes.

4            MR. KATZ:  But the second thing is, the person

5    that would have standing to bring a claim like that would

6    not be Sterling Suffolk.  They are focused not on the actual

7    activities going on in the casino because, of course, none

8    have taken place, and they're not saying they're injured by

9    any of the acts in the casino.  They're focused squarely on

10   the licensing process.  And I think it is beyond bizarre to

11   consider the possibility that the Gaming Commission would

12   just say, "We're not going to readdress whether Wynn would

13   have won the license had we known all this stuff in 2014,"

14   okay?  But Sterling can come into Federal Court and

15   basically, you know, put the Gaming Commissioners -- what

16   would they do, put the Gaming Commissioners under oath and

17   say, "I know as an administrative matter you guys are

18   refusing to do a do-over in the administrative tribunal, but

19   we're going to have a do-over right here in Federal Court,

20   and we're going to ask you, what would you have done?  And

21   we're going to have a jury decide whether you're telling the

22   truth when you say it's just not possible to know."  That is

23   exactly what the Supreme Court said --

24           THE COURT:  That goes back to proximate cause, not

25   whether -- because I don't know that you can say it's not

1  involving gambling to make a fraudulent statement about your

2  application; you don't disclose either, you know, allegedly,

3  mob ties or allegedly sexual violations.  It's not involving

4  gambling?  I guess I -- I hear your argument, but I'm

5  struggling with that.

6        MR. KATZ:  Well, I think, your Honor, that would

7  read "involving" to essentially mean "related to."  It would

8  basically supplant and replace the word "involving" with

9  something that has an even more broader connotation.

10  There's not a single case that they can point to where a

11  1961(1)(a) offense has been predicated on something other

12  than actual gambling activity, where there's actual gambling

13  activity taking place.

14        THE COURT:  *Goldfarb*?

15        MR. KATZ:  There is gambling in *Goldfarb*.  I mean,

16  that's the case where there was a casino that was up and

17  running.

18        THE COURT:  Right, but the violation had to do

19  with the administration of it, not actually that they were

20  cheating at the gambling, or that they were extorting money

21  to pay back the gambling.  I mean, that was about the

22  running of a gambling business.

23        MR. KATZ:  Right, but the individual who is

24  actually running the gambling business I would say is more

25  involved in gambling than simply the person who is, like,

1    dealing cards at the card table.

2            THE COURT:  All I can say is that this opinion

3    won't be written by June 23, or whenever it is you're

4    opening, if that's the distinction that -- I mean, I got

5    more briefs than I think you get in most cases.

6            MR. KATZ:  But, Judge, I think, you know, to look

7    back at what the offense is, especially in the RICO counts

8    where FBT is a defendant, the association-in-fact, they're

9    saying it's all confined to this licensing process, which

10   predates any gambling activity by five years, and that is

11   precisely the type of question, what would a state

12   administrative tribunal have done that the Supreme Court in

13   *Cleveland* --

14           THE COURT:  I understand, I understand.  I

15   understand.  It's a causation issue.  How do you prove that

16   the Commission -- so much has happened -- what they would

17   have done if they had known all this stuff about sexual

18   predation, et cetera?

19           MR. KATZ:  Respectfully, your Honor, I don't think

20   so.  I think you can read the word "involving" and certainly

21   you can read the Travel Act in a way that says, if you can't

22   point to misconduct that occurred in closer relationship

23   with gambling than this, you can't be in Federal Court,

24   because what we cannot have a Federal Court doing and a

25   federal jury doing is saying, "What would the Gaming

1    Commission have done?  Would they have actually issued the

2    license had they known all this stuff?"  Because if the

3    answer is, the Gaming Commission would have issued the

4    license anyways, maybe they would have put a fine on them,

5    right?

6              THE COURT:  All right, thank you.  I get the

7    issue.  We need to move on.  We're at eleven o'clock.  Who's

8    going to handle these issues?  Mr. Storch?

9              MR. STORCH:  Yes.  Your Honor, with respect to the

10   plausibility of FBT being involved in this enterprise, as we

11   lay out in the complaint --

12             THE COURT:  Would you bring the mic up a little

13   bit.  I know this is awkward.

14             MR. STORCH:  Is this any better?  Why don't I do

15   this.  Now I'm working without notes.  Your Honor, with

16   respect to it not being plausible that FBT was part of this

17   enterprise, FBT, as our complaint alleges, was central to

18   this.  This casino could not have gotten off the ground

19   without FBT because there was no other site that the Wynn

20   defendants had.  They needed this site.  The problem was,

21   the site came along with criminals, and they couldn't

22   disclose that.  So they, as we allege in the complaint,

23   agreed among themselves that they were going to conceal

24   those criminal elements, and they had to because the

25   requirement of the statute was, they had to disclose the

1    ownership for the 20 prior years.  So FBT was integral to

2    this.  It made numerous misrepresentations to the

3    Commission.  It helped facilitate agreements between the

4    Wynn defendants and Mr. Lightbody in terms of acquiring

5    additional property.  It was the instrument through which

6    the arrangement with the Mayor was made.  FBT, and we lay it

7    out in the complaint -- I don't want to belabor it unless

8    your Honor has specific questions about what we allege about

9    FBT --

10           THE COURT:  But what I do want is, subject to

11   Rule 11 and the *Iqbal-Twombly* standard, the new piece here

12   is the allegation with respect to the Mayor, which, I mean,

13   he's an elected official.  What is your good-faith basis for

14   believing that?

15           MR. STORCH:  Our good-faith basis, your Honor, is

16   based on interviews with people who were present.  And we're

17   a little reluctant because of some of the confidential

18   issues and what's ongoing with certain potential

19   investigations, we're a little bit hesitant about

20   disclosing --

21           THE COURT:  I don't know what to do with that.

22   Each of you appear to be relying on confidential

23   information.  It is something that I think the Gaming

24   Commission didn't have because it sounds as if it's

25   evolving; or it may be true, it may be not true, but I don't

1    know what to do with that.

2              MR. STORCH:  Okay.  Your Honor, we're happy to --

3              THE COURT:  Think about it.

4              MR. STORCH:  Well, yeah.

5              MR. KATZ:  Mr. Storch, if you want to put it under

6    seal, post-argument submissions on the confidential stuff,

7    I'm fine with that.

8              THE COURT:  Think about it, and maybe you talk

9    afterwards.

10             MR. STORCH:  Okay.  But those are interviews, your

11   Honor, and also other corroborating evidence that we could

12   also lay out.

13             THE COURT:  We don't want to besmirch somebody's

14   reputation in this lawsuit if it's already been dispensed

15   with, as your brother says over there.

16             MR. STORCH:  Right.  We'll talk about that and see

17   where we come out.

18             THE COURT:  All right.

19             MR. STORCH:  With respect to the issues, which I

20   think your Honor is correct that it relates to proximate

21   causation, you know, what would the Commission have done, I

22   think this is not in the realm of speculation.  At the time

23   that the licenses were awarded, there was a decision that

24   outlined the attributes of the two competing applicants, the

25   Mohegan Sun applicant and Wynn, and it's clear from that

1    evaluation that Mohegan Sun clearly met every standard, in

2    fact exceeded --

3            THE COURT:  So why weren't they picked?

4            MR. STORCH:  Well, your Honor, that's kind of the

5    thrust of our action, which is that the Commission was

6    misled, that there were misstatements that were made, that

7    there was --

8            THE COURT:  No, but most of what you talked about

9    had to do with Wynn, not about something wrong about Mohegan

10   Sun.  I mean, you're saying basically they were a

11   competitor, that Wynn just beat them out, and if the

12   Commission had known everything that you say, they would

13   have clearly chosen Mohegan Sun?

14           MR. STORCH:  Well, because the Commission found

15   Mohegan Sun was clearly qualified.  They were clearly

16   qualified.

17           THE COURT:  I see.

18           MR. STORCH:  And if you take Wynn out of this

19   picture, Mohegan Sun gets the license.  There were only two

20   applicants.  I know they want to speculate and say, well,

21   the Commission may have just decided they're not going to

22   award any license, but based on an extensive record and the

23   investigation and the glowing reports, frankly, of Mohegan

24   Sun, it really is in the realm of just mere speculation that

25   somehow the Commission would have said, "Okay, well, you

1    know what?  We've now found out this stuff about Wynn, so

2    we're going to disqualify everybody and not grant the

3    license."

4              THE COURT:  Mohegan Sun has not joined this suit,

5    so --

6              MR. STORCH:  Mohegan Sun has taken its own

7    independent course of action.  The relief they're seeking is

8    different than the relief that SSR is seeking.  The relief

9    that we are seeking here is in no way duplicative in any way

10   of what Mohegan Sun would be seeking.  In fact, if Mohegan

11   Sun brought a damage claim --

12             THE COURT:  But if Mohegan Sun wins the license,

13   you're not going to get a piece of the profits.

14             MR. STORCH:  That's correct.  That deal is over.

15   The property that SSR owned has been sold.  It's no

16   longer --

17             THE COURT:  You're out of luck.

18             MR. STORCH:  We're out of luck, and we think

19   unlawfully out of luck.  But the damages that we seek here

20   are separate and distinct from anything that Mohegan Sun

21   would be seeking.  And in fact, if Mohegan Sun brought an

22   action for damages, they'd have to deduct as expenses the

23   amount that we're claiming in this lawsuit, so there would

24   be no chance of a double recovery; and there's no difficulty

25   in terms of the allegation because the agreement laid out

1  very specifically how SSR was to be paid.

2          THE COURT:  I shouldn't derail you.  You need to

3  talk about the predicates because we'll take a break around

4  11:15.

5          MR. STORCH:  Okay, fine.  On the predicate acts,

6  your Honor, first, on the "involving gambling," we've

7  briefed that.  We've cited cases where the Travel Act was

8  found to apply to gaming as opposed to gambling, where the

9  state law had actually cut out gaming from the gambling

10  statute and put it into its own separate statute.  We cited

11  cases, the *AT&T* case, where the telephone company was

12  passing on billing while in connection with some gambling

13  operations, but *AT&T* wasn't conducting any gambling

14  operations.  And we cited a case where someone who was

15  behind the scenes had not made full disclosure of his

16  involvement where the Travel Act was found to apply.  None

17  of those were actually involved in the act of gambling.

18          If you take my brother's argument --

19          THE COURT:  The Travel Act, do you agree with him,

20  though, on the -- what was it, the "involving gambling"

21  argument?

22          MR. STORCH:  Do I agree with his argument as to --

23          THE COURT:  In other words, you were just

24  referring to the Travel Act.

25          MR. STORCH:  Yes, right, and the "involving

1   gambling" really comes out of the RICO statute.  All right,

2   the Gambling Act actually is a little bit broader.  It talks

3   about promoting -- I may be misquoting the exact language --

4   promoting, establishing.  It has a whole range of things,

5   not just, you know, gambling itself.  So I think the Travel

6   Act was meant to be very broad.  And in fact, when the

7   Travel Act was passed, it was because the federal government

8   saw such danger in gambling, that it could be such a threat,

9   that they wanted to have their own federal structure

10  superimposed over the state structure because of the threat

11  of infiltration of crime into gambling.  So the Travel Act

12  was actually written and passed to be very expansive.  It

13  wasn't meant to be crabbed or very limited.  But under their

14  argument, up until the day that the Encore opens, there

15  could be no Travel Act violation, but the next day, that

16  there could be, and that's just an unduly limited reading,

17  we think, of the Travel Act and of the RICO statute as it

18  incorporates it.

19          Actually, what the Travel Act says is

20  "Facilitating the promotion, management, establishment, or

21  carrying on of a gambling business in violation of state

22  law."  It's a very broad statute.

23          One last thing on the wire fraud.  On the wire

24  fraud analysis, those cases all deal with a situation where

25  the court says that property in the hands of the state or

1    licensed in the hands of the state is not property.  None of

2    them deal with the issue of a damage claim against the

3    recipient of the license who now has an income stream, and

4    that we're seeking damages for their wrongful conduct which

5    denied us that income stream.

6                THE COURT:  That's a stretch for you.  I mean,

7    that's a hard case for you to get around.

8                MR. STORCH:  We don't have a case to support that,

9    your Honor, but I do think that those cases, they are very

10   specific about saying "in the hands of the government."

11               THE COURT:  Wasn't that Carolina one just -- it

12   was about a gaming license, wasn't it?

13               MR. STORCH:  Yes, it was, your Honor.  But, again,

14   these cases are very specific:  It's "in the hands of the

15   government," and that's the distinction that we would make.

16               THE COURT:  Okay.  Well, thank you.  I think it's

17   a good time for us to break now.  Just before we do this

18   organizing, Mr. Kelly, what are you going to be discussing?

19               MR. KELLY:  I'll try to cut to the chase --

20               THE COURT:  No, not right now.  We're going to

21   take a 15- or 20-minute break, but what is the issue you're

22   going to address?

23               MR. KELLY:  Your Honor, I'd like to address

24   Count 1, the "but for" causation defect, and then Count 2,

25   the many defects in that, particularly with respect to the

```
1   recent opinion by the Gaming Commission.

2           THE COURT:  So is that going to overlap some?

3           MR. KELLY:  I don't think so.

4           THE COURT:  And what are you going to discuss?

5           MR. KRAMER:  James Kramer, your Honor.  Some

6   specific elements as it relates to my client, Kim Sinatra.

7   There are some State Court claims against her, and I just

8   want to briefly talk about --

9           THE COURT:  Yes, we haven't talked about the State

10  Court claims.

11          MR. KRAMER:  And I promise I will probably be

12  probably five minutes.

13          THE COURT:  It's an important case.  I've

14  allocated the morning.  I just don't want to get repetitive

15  because one of the things, if I keep the RICO claim, then I

16  will address the State Court claims, but if I don't, I may

17  remand the action, so -- and it probably should go to -- so

18  I wouldn't probably resolve the State Court claims just for

19  the fun of it.  It sounds like the State Court -- so I'm not

20  going to spend as much time on the State Court claims.

21          Okay, thank you.  We'll stand in recess.

22          THE CLERK:  All rise.

23          THE COURT:  Come back in about 20 minutes, say,

24  20, 25 minutes?

25          (A recess was taken, 11:12 a.m.)
```

```
 1                    (Resumed, 11:43 a.m.)

 2            THE COURT:  Let's just sit and get going and just

 3     hand it to her, okay?  That's good.  All right, Mr. Kelly.

 4            MR. KELLY:  Yes, good morning, your Honor.  If you

 5     don't mind, I'll stand right here and have my papers there

 6     if needed.

 7            THE COURT:  I never have a problem hearing you,

 8     Mr. Kelly.

 9            (Discussion off the record.)

10            MR. KELLY:  So I just want to make it clear for

11     the record that on behalf of my client, Mr. Wynn, he is not

12     conceding, that is not conceding that there are any properly

13     pled racketeering acts against him.  That's number one.

14            Number two, I'd like to first address Count 1,

15     which is the RICO substantive count which focuses on the

16     supposed failure to reveal the criminal activities involving

17     FBT.  I would submit to the Court that that count is flawed

18     because it fails to set forth the required "but for"

19     causation because none of the so-called lies about FBT could

20     have caused the Commission to grant the gaming license to

21     Wynn Resorts, and here's why:  If you look at the complaint

22     itself -- let me show you Paragraph 110 -- there's a clear

23     date problem that the plaintiff has.  In Paragraph 110 it's

24     clear, as they've alleged in their complaint, the amended

25     complaint now, that as of July, 2013, the Wynn defendants
```

1   were known to the Gaming Commission to have associated with

2   known felons and to have failed to disclose those

3   affiliations.  That's in their own complaint.    Shortly

4   thereafter in their complaint, in Paragraph 139, they

5   concede, as they must, that the Gaming Commission awarded

6   the license much later, over a year after they obviously

7   already knew about these things involving FBT.

8        Now, the problem for the plaintiff's Count 1 do

9   not end there because I think, as we pointed out in our

10  brief, there is, as has been noted, there's an investigatory

11  arm of the Mass. Gaming Commission called the IEB; and that,

12  as the Court has pointed out, you're correct, a lot of state

13  troopers, a lawyer, and they investigated a lot of these

14  allegations.  And in fact, back in December of 2013, well

15  before this license was awarded, they issued a report, and

16  we attached it to Document 84.  It's Exhibit A to Document

17  84, and in our opening brief at Pages 9 and 10 we put forth

18  a chart which is hopefully helpful, and I'd like to put it

19  back up so the Court can take a look at it because the chart

20  shows what's already known to the Commission in December of

21  2013.

22        So on what is I guess the left-hand side of the

23  chart is what's in the amended complaint, and yet that's

24  already been reported upon and known about by the IEB in

25  December of 2013, so the right-hand side is in fact

 1    everything that they knew about.

 2              THE COURT:  So you're saying there's nothing new?

 3    There's nothing new in the complaint that was not presented

 4    to the IEB or the Commission?

 5              MR. KELLY:  I think the only thing that's a close

 6    call --

 7              THE COURT:  Wasn't there a backdating thing?

 8              MR. KELLY:  Well, that is there.  The backdating

 9    is -- on this chart, if you look in the right-hand side,

10    fourth one down --

11              THE COURT:  Excuse me.  Let me just get to this.

12    This is --

13              MR. KELLY:  This is Docket 84.  This would be

14    Steve Wynn's opening brief.

15              THE COURT:  Page?

16              MR. KELLY:  Well, it's our Page 9, but on the

17    docket it's Page 14.  And it talks about --

18              THE COURT:  I see.  So there is backdating there.

19              MR. KELLY:  Yes.  There's also the stuff about

20    Lightbody being a convicted felon.  There's also the stuff

21    about DeCicco being convicted.  And then there's even, if

22    you go to the next part of this chart, the top of the next

23    page, you'll see that "The IEB," the investigatory arm of

24    the Gaming Commission, "knew in December of 2013 that

25    Lightbody may have a legal reversionary interest in the

1    event," blah-blah-blah.

2         So these matters were no big secret to the Gaming

3    Commission, and in fact they award the license despite this.

4    So that's why I think the Court with respect to the "but

5    for" causation theory could in fact dismiss Count 1.  And

6    significantly again for my client, there aren't two

7    racketeering acts alleged against him in Count 1.

8         Count 2, Count 2 is also a RICO substantive count,

9    and that one's --

10        THE COURT:  Well, wait a minute.  So what is the

11   one you said that the Gaming Commission did not know?  Do

12   you remember?

13        MR. KELLY:  Yes.  I think the only allegation that

14   could be argued that was not before them was whether or not

15   De Salvio entered into a secret side agreement with

16   Gattinari.  That's at the bottom of Page 10, but this is

17   certainly not a misrepresentation, in our view, that is

18   found in the mail fraud statute.

19        THE COURT:  Why?

20        MR. KELLY:  Because, as we've set forth in our

21   brief, we don't think it's -- first of all, Steve Wynn had

22   no idea about it, so with respect to my client, it's not a

23   proper predicate.  And, secondly, we don't think it's

24   actionable under the case law that we set out there.  And we

25   think there's also perhaps a reference -- there might be a

 1   reference to the Mayor issue that the Court mentioned

 2   earlier that's not in what I just pointed out.  But the

 3   Mayor issue, again, how is Steve Wynn supposed to know that?

 4   But, secondly, with respect to the Mayor, we don't think

 5   it's legally sound as an honest services accusation because

 6   there's no quid pro quo, as required to be alleged, in the

 7   amend complaint on the Mayor issue.  Secondly, we think as

 8   pled, as they pled it in the amended complaint, they focused

 9   on 2016, which is, of course, after this was awarded.  So I

10   think to Mr. Katz's point under 9(b), the way they pled it

11   is wrong.  So if you take all of that into consideration, we

12   would urge the Court to dismiss Count 1.          We'd also

13   urge the Court to dismiss Count 2 for a variety of reasons.

14   I won't go over all the ones my colleagues have gone over,

15   but I would like to point out a couple of critical things

16   about Count 2.  Count 2 is the RICO substantive charge that

17   focuses on the alleged misstatements regarding the sexual

18   misconduct allegations.

19             Now, first of all, I think it has to be pointed

20   out that the Gaming Commission itself has said it was not

21   misled.  It just issued the report.  That report doesn't

22   help them.  That report is devastating to them because if

23   the Court looks at Pages 17 to 21 of the Gaming Commission's

24   recent order, it says multiple times it was not misled; and,

25   in fact, I would urge the Court to focus on the top of

1   Page 18.

2           THE COURT:  Well, something must have triggered

3   the $35 million fine.

4           MR. KELLY:  It did, but it wasn't the

5   misrepresentation.

6           THE COURT:  What was it?

7           MR. KELLY:  That's inaccurate, and that's not

8   the --

9           THE COURT:  Well, what was it?  They didn't

10  disclose it first time around, right?  And you can't say

11  Mr. Wynn didn't know, so --

12          MR. KELLY:  Well, wait a minute.  They imposed the

13  $35 million fine because Wynn Resorts, according to them,

14  failed to comply with their own internal sexual harassment

15  policies.  They didn't say it was because there's

16  misrepresentations that were made.  And in fact they say

17  twice on Page 17, "There's no substantial evidence that Wynn

18  Resorts, Wynn Mass., or any of the associated qualifiers

19  willfully provided false or misleading information to the

20  Commission during the review process."  And they say it

21  again.  And more importantly, more importantly, I think,

22  because all of these so-called racketeering acts are based

23  upon alleged lies, at the top of Page 18 of the report they

24  say --

25          THE COURT:  When did this report come down?

1          MR. KELLY:  Last week, your Honor, and we filed

2     something Friday.  I apologize, but it just came down, so we

3     filed something Friday.  What's the docket number on that?

4     Let me check.

5          THE COURT:  I'll find it.

6          MR. KELLY:  Well, anyway, to me, your Honor, I

7     think for the Court's purposes, if you look at the top of

8     Page 18, you can see it says, "None of the applications,"

9     none of them, "contain any questions that specifically

10    required the disclosure of information related to the

11    allegations, settlements, or other evidence of wrongdoing at

12    issue here."

13         So if their applications didn't require them to

14    provide this information, why are we here?  How can we be

15    here saying there's racketeering acts because there was

16    falsehoods?  There wasn't.  None of the applications even

17    required it, and, in fact, in this report just issued last

18    week they say they were not misled.

19         Now, $35 million is a big number, it catches

20    anyone's attention, but that has nothing to do with them

21    finding there were falsehoods.  It has everything to do with

22    the fact that, according to them, Wynn Resorts did not

23    follow its own internal policies.  So the Court should not

24    be misled by the fact that there was this prominent and

25    fairly well -publicized award.  It did not pertain to

1    falsehoods.  And in fact they say there were no falsehoods,

2    and they say none of the applications in fact contained any

3    questions that requested the information that's ostensibly

4    falsehoods.  So I think that's an important point for the

5    Court to consider when analyzing Count 2.

6             THE COURT:  So this is what's new for me from how

7    I prepared this, this report, what weight do I give the

8    report?  In other words, there certainly were lots of

9    serious allegations when I started preparing this, and

10   you're saying I have to take that as dispositive that the

11   Commission said that they didn't feel misled?

12            MR. KELLY:  Well, your Honor, I'd say the

13   plaintiff helpfully put it into the record and said you

14   could take judicial notice of it, and we agree with that.

15   And we'd also point out that the Commission spent a lot of

16   time on it.  They had hearings, they had investigators, and

17   the Court should -- if the body that was supposedly duped

18   says it wasn't duped, then why should we be in Federal Court

19   on a civil RICO case claiming, you know, all this duping is

20   a cause of action?  There was none.  There was none.  So

21   that's what I'm suggesting the Court should do.

22            I think the report also on Page 20 shows that

23   Mr. Wynn was not required to disclose this entity-wide that

24   they go on and on about, so --

25            THE COURT:  I'm going to have to obviously read

 1    it, but you think I can take almost as a judicial notice of

 2    the fact finding?

 3              MR. KELLY:  I do.

 4              THE COURT:  Or do you think it's collateral

 5    estoppel as to the fact-finding?

 6              MR. KELLY:  I do, and it's Pages 17 to 21 I'd urge

 7    the Court to look at most.  Obviously the whole thing, but

 8    that's where I'm getting this argument from.

 9              THE COURT:  If they say they're not sure what they

10    would have done back in the day, but now that they've fired

11    Sinatra and Wynn and paid the fine, they're suitable now,

12    the distinction between then and now.

13              MR. KELLY:  But I think they also say in there

14    they're not even sure what would have happened if they had

15    known all this back then, to one of my colleague's points

16    earlier.  Therefore, how can this downstream third putative

17    victim -- you know, they're not Mohegan Sun -- they're a

18    potential landlord of Mohegan Sun -- how can they --

19              THE COURT:  There's a binding contract, so I don't

20    know, they're not so remote, not like the card dealers or

21    whatever the hypothesis was.  But what you're saying is, if

22    the Commission itself says it wasn't misled, what weight do

23    I give that in this analysis?

24              MR. KELLY:  It's like in these False Claims Act

25    cases -- I forget the name of the Supreme Court case that

1    recently came down -- where if the federal government is

2    saying it wasn't defrauded, then a private whistleblower

3    bringing a civil qui tam case can't claim the federal

4    government was defrauded.  It's similar.  And I forget the

5    name of the case.  Anyway --

6              MR. KATZ:  *D'Agostino* is the First Circuit case,

7    *D'Agostino*.

8              MR. KELLY:  It's following the Supreme Court

9    precedent.  It's the same idea.  The Gaming Commission is

10   saying it wasn't lied to, and yet they want to make a RICO

11   case out of this notion that the Gaming Commission was lied

12   to.

13             THE COURT:  In fairness to them, they did all this

14   before they had an opinion.

15             MR. KELLY:  Well, yes.

16             THE COURT:  It suddenly came down Friday or

17   Thursday.

18             MR. KELLY:  That's true, your Honor, that's true.

19   I'm not saying they should have had a crystal ball, but we

20   all do have the opinion now.  So that's, I think, a very

21   significant development that the Court should take into

22   consideration in dismissing Count 2.

23             But then there's two more nuanced arguments.  I'm

24   not sure if the Court wants to hear them, but I'd like to

25   make them quickly, if I can, and the first of all goes to

1  this idea of vertical relatedness.  That is, they have

2  chosen in Count 2 to make this subsidiary, Wynn Mass., the

3  enterprise.  Now, that's a mistake for what I'll get to in a

4  bit, but because they made the subsidiary, Wynn Mass., the

5  enterprise, that means a lot of these racketeering acts have

6  to be stricken anyway because a lot of these racketeering

7  acts predate the formation of the 2011 Wynn Mass.

8  subsidiary.  So they've created a problem for themselves by,

9  in Count 2 anyway, calling Wynn Mass., the subsidiary, the

10  enterprise.  And that leads to a separate problem which

11  makes Count 2 defective, and that's the so-called

12  distinctiveness issue, which I think we briefed quite a bit;

13  and that is that, in our view, under the post-Supreme Court

14  *Kushner Law*, there's those three Appellate Court decisions

15  which say you can't have the subsidiary be the enterprise

16  when the parent company is a RICO defendant.  And those

17  three cases are from the Second Circuit, the Seventh

18  Circuit, and Fifth Circuit, and the pinpoint cites can be

19  found at Document 102 at the top, Page 6 of 15 on the

20  record.  So those are the various reasons why we think

21  Count 2 should be thrown out; and as I said from the outset,

22  there are not two properly pled racketeering acts against

23  Mr. Wynn.

24          With respect to Counts 4 through 6 --

25          THE COURT:  They do claim he --

1           MR. KELLY:  I'm not going to address Counts 4

2     through 6, the state law --

3           THE COURT:  All right, fine.  Thank you.

4           Who's going to address these?

5           MR. STORCH:  I'm going to try to talk up this

6     time, your Honor.

7           THE COURT:  All right.

8           MR. STORCH:  First, with respect to the Commission

9     allegedly knowing all the things that were withheld, there

10    are at least two things that are not on the chart.  One your

11    Honor mentioned, the De Salvio side agreement with respect

12    to Mr. Gattinari, but also what was not known to the

13    Commission when they were doing investigation was that

14    Mr. Maddox, who was telling the Commission that he had no

15    idea who Mr. Lightbody was, had in fact met just a couple of

16    months earlier with Mr. Lightbody and was enlisting his

17    services to help with respect to both the application

18    process and acquiring property, so those were things that

19    were not disclosed.

20          Your Honor asked what weight --

21          THE COURT:  Yes, what weight because would these

22    things -- given the Commission knew so much at that point,

23    the allegations of rape, the mob involvement, the whole

24    thing, and they still kept with the decision, even if this

25    is true, how do I know it would have been material to the

1   decision?

2            MR. STORCH:  The decision back at the time of the

3   licensing, your Honor?

4            THE COURT:  Or I guess the debate.

5            MR. STORCH:  The original licensing?

6            THE COURT:  Yes.

7            MR. STORCH:  I think you can get that from the

8   decision itself.  I mean, they make a statement that Wynn is

9   out, Kim Sinatra is out, Mark Shore is out, the director is

10  out; and they say there's no way, if these people were

11  there, they could be found suitable.  So I think from there

12  you can see that the Commission, if these people had been

13  there and they had known this information, there would have

14  been a finding of unsuitability.

15           Also, you asked how much weight you should give to

16  the Commission finding that they were not misled.  I submit

17  it's none because the Commission didn't find that.  What the

18  Commission said was that they were extremely troubled by the

19  failure to come forward with the information.  They said it

20  was difficult to fathom why it was not disclosed to them.

21  They talked about troublesome undercurrents because of the

22  nondisclosure.  What they concluded was, they didn't have

23  enough evidence to show that it was a willful nondisclosure,

24  not that they weren't misled but that there wasn't

25  willfulness.  And they pointed to a couple of instances,

1    your Honor, where I think it would be unfair to say, oh,

2    we're going to take the Commission's findings.  In

3    particular, they focused in on Kim Sinatra.  Kim Sinatra, as

4    we allege in the complaint, was the lead with Mr. Maddox

5    with respect to the FBT situation.  She was the general

6    counsel.  She had known Wynn.  She had received information

7    about Mr. Wynn's past wrongdoings.

8              The Commission attempted to subpoena her to the

9    hearings.  She refused to comply with the subpoena.  They

10   asked her after the hearings were done if she would come and

11   she would clarify certain things; she refused to show up.

12   That's clearly evidence that would have been pertinent to

13   whether or not there was willfulness.

14             That proceeding as compared to here, your Honor,

15   if Ms. Sinatra in this proceeding refuses to obey a subpoena

16   and come and testify, I submit there are probably going to

17   be different ramifications of that.  If she comes here and

18   takes the Fifth Amendment, there will be adverse inferences

19   that we would draw in this proceeding.  So in that

20   proceeding, for whatever reason, the Commission clearly felt

21   it didn't or couldn't exercise power to command Ms. Sinatra

22   to come there and to explain why, in response to a specific

23   email asking her for disclosure, she didn't disclose it.  So

24   the finding that we couldn't on this record find willfulness

25   is also hampered by what the Commission was able to compel.

1          I also note again, I noted it earlier, that

2     Mr. Maddox had surveillance going out on witnesses, and the

3     Commission expressed its concern about what effect that was

4     having on ongoing witness investigations.  I submit in this

5     case, if anybody had gone and surveilled witnesses and led

6     those witnesses to be concerned, there would be a very

7     different result and a very different attitude towards that

8     and towards the fact-finding.  So I think that's a reason

9     why the Commission decision is not binding, because all they

10    made was a determination that based on their record, they

11    could not discern willfulness.  They were concerned enough

12    about how they had been misled, about how it was

13    unfathomable that they hadn't been disclosed this

14    information, that they imposed what we understand is the

15    largest fine ever in the casino business and imposed the

16    monitor.

17          The last point, your Honor, just on the second

18    enterprise, on the enterprise being the subsidiary, we

19    believe *Kushner* stands for the proposition that that is an

20    appropriate enterprise.  The *Kushner* case was a situation

21    where you had a hundred percent shareholder, the person who

22    controlled the company, that was the person, and the

23    enterprise was the hundred percent owned corporation.  The

24    cases that they cited in their replies, two of them don't

25    even deal with *Kushner*.  It's not even clear that they were

1    aware at that point that *Kushner* had been decided.  And the

2    other one goes on to say that if the subsidiary is being

3    used as an instrument to promote the fraud, then, under

4    *Kushner*, that would be an appropriate enterprise.  And what

5    we allege right here is that Wynn MA was in fact --

6              THE COURT:  What do you do with continuity on Wynn

7    MA once the employees or the officers who are the most

8    troubling have been fired?  How do we get to continuity?  I

9    understand the concern about continuity if these people

10   hadn't been fired.  In other words, there's a line of cases

11   which is single- purpose, a single-purpose RICO conspiracy

12   generally isn't enough unless there's some threat of

13   continuity.  Now, if these folks were still there, I think

14   you'd win this as a slam dunk, but they're not there.  So

15   with respect to this -- or even with respect to FBT because

16   that's over with, right, how do we get the continuity piece?

17   That's what I'm struggling with, and maybe the Commission

18   was too because they imposed a monitor, but the real people

19   you'd be worried about have left.

20             MR. STORCH:  Right, and we have cited cases, your

21   Honor, for the proposition that the defendants don't get off

22   because they've been caught.  Now, there are cases that say,

23   look, if a defendant has been arrested and it stopped the

24   enterprise, that doesn't mean that continuity is not there.

25   The only reason that this came out before the Commission was

1   because of a Wall Street Journal article.  The first

2   reaction of this company, including Mr. Maddox -- in fact,

3   Mr. Maddox was prominent in it -- was to attack the victims.

4   That was their first reaction.  It was only after a very

5   well-documented Wall Street Journal article and then Nevada

6   picked it up that finally it got picked up by the

7   Massachusetts Commission.  So to say, "Hey, look, continuity

8   shouldn't apply here because, look, now we've all been

9   thrown out because we're caught," that's not what the cases

10   say, your Honor.

11           THE COURT:  I see.  So you're just saying -- and I

12   suppose Mr. Maddox is still there.

13           MR. STORCH:  Correct, correct.

14           THE COURT:  Yes, that's a tough one.  All right,

15   thank you.  Is there one last argument?

16           MR. KRAMER:  Thank you, your Honor.  James Kramer

17   for Kim Sinatra.  I'll keep it brief, your Honor.  So the

18   claims against Ms. Sinatra, the former general counsel, are

19   that she knowingly lied, engaged in a RICO enterprise,

20   interfered with contractual relations, and engaged in unfair

21   business practices.  But that's not what's pled.  What's

22   pled is, she did a bad job on the license application.  And

23   we've got to figure out, are we going with what's in the

24   complaint, or are we going with what's in the report that

25   came out last week?  And we have to make a decision because

1   if we're going with what's in the complaint, your Honor,

2   there is nothing there.  We in our brief made clear, there's

3   no allegation Ms. Sinatra knew that one of the people

4   involved was a felon.  The only allegation is that she knew

5   someone had a, quote/unquote, "checkered past."  As you saw

6   from Mr. Kelly's chart, that was all out there.

7          As it relates to Mr. Wynn, the only allegation is,

8   she was aware of a 2005 settlement that was brought to her

9   attention in 2012 by Ms. Wynn.  And the allegation is,

10  Ms. Wynn said, "Hey, something happened in 2005.  You were

11  not the general counsel.  Someone else looked at it.  Will

12  you take a look?"

13         THE COURT:  I thought there were two alleged

14  rapes.

15         MR. KRAMER:  The second one happened, your Honor,

16  in -- the alleged rape happened in 2014.  And, again, this

17  is not in the complaint.  So what I'm focused on is, are we

18  going to talk about what's in the complaint or what's not?

19  As to the 2014, I'll get to that right now.  That's the

20  Abbott memo, and here's what happened:  In 2013

21  Massachusetts passes on Phase 1 for Wynn.  Subsequent to

22  that, subsequent to that, the Abbott memo comes out in July

23  of '14.

24         Now, the way Wynn Resorts was structured in the

25  day, you had the various properties.  Each property, like

1    Las Vegas, had its own general counsel and own HR.  Macau,

2    own general counsel, own HR.  Ms. Sinatra was not the

3    general counsel of Wynn Las Vegas.  She was not the general

4    counsel of Wynn Macau.  She's the general counsel of the

5    holding company.  What would happen is, reports of these

6    types of violations would go to the local GCs and the local

7    HR.  They would only be brought to her attention if the

8    local general counsel raised this with her.  All this is in

9    the Massachusetts report, your Honor.  The structural part,

10   all this is in there.

11            THE COURT:  So what are you urging me to look at,

12   the complaint or the report?

13            MR. KRAMER:  Well, I don't know what you're going

14   to do.  Your Honor, either way it's good for Ms. Sinatra --

15   and I will come to that in a minute -- but either way it's

16   good because here, what Massachusetts says is, look, the

17   local guy, Kevin Tourek, who was general counsel Las Vegas,

18   he got a memo, and that memo went to Mr. Wynn's private

19   lawyer, and Mr. Wynn's private lawyer sent it to

20   Ms. Sinatra.  And Ms. Sinatra, respectfully, was not

21   properly subpoenaed.  I represented her.  They sent me a

22   note a day before the hearing saying, "Would you accept a

23   subpoena?"  I said, "She's out of town."  She was.  She was

24   on the East Coast.  And they said "Fine," and they let it

25   go.  She was not subpoenaed --

1          THE COURT:  She was what?

2          MR. KRAMER:  She was on the East Coast.  She was

3     here in Boston.

4          THE COURT:  Oh, it was a subpoena from --

5          MR. KRAMER:  They never sent a subpoena.  They

6     sent me a note saying would she come out?

7          THE COURT:  I'm just -- Nevada?

8          MR. KRAMER:  I'm sorry.  She was in Nevada on

9     family business with her children, and Massachusetts said,

10    "Would she be willing to voluntarily come out?"  They did

11    not send me a subpoena, and we said "No".  That's the short

12    version.

13         And, more importantly, she sat for three days.  I

14    sat with her for three full days down the street from here,

15    full testimony, and they were done.  They had plenty of

16    time.  She fully cooperated, I promise you.  And you know

17    what she hadn't --

18         THE COURT:  -- on a motion to dismiss.

19         MR. KRAMER:  I understand, your Honor, but you

20    were talking about -- I'm responding to the argument.  My

21    point is, though, on the Abbott memo in '14, that came out

22    after all this.  And the record in the report, if you choose

23    to listen to the report, is, there was a document she

24    received, and in the back of that document, if she had read

25    it carefully, she would have seen the sentence that says

1    "And I was raped."  She never read that.  That's what the

2    testimony was.  None of the witnesses could say that she

3    read it.  None of the witnesses could say they ever talked

4    with Ms. Sinatra about the rape allegation.  And, by the

5    way, the case settled for $9,000, and the person recanted,

6    so --

7              But going to the complaint, there is nothing in

8    the complaint except as it relates to the 2005 settlement,

9    which happened on someone else's watch, which Ms. Wynn

10   brought to

11   Ms. Sinatra's attention.  Ms. Sinatra checked with everyone

12   involved.  They said it was handled properly.  And she asked

13   the specific question:  "Do we need to make a further

14   disclosure?"  Seven years later, "Do we have to make a

15   disclosure?" and was told "No."

16             THE COURT:  By who?

17             MR. KRAMER:  By the lawyers who were involved.

18   She talked to the top gaming lawyers in Nevada, a man named

19   Frank Schreck --

20             THE COURT:  Oh, so out in Nevada?

21             MR. KRAMER:  Yes, ma'am.  And they said, "Was this

22   decision disclosed to anyone?" and was told "No."

23             But even if you were to consider the report, the

24   report itself says at Page 18 of the report, which I know

25   you haven't read yet, says it's not even clear this type of

1   stuff should have been disclosed.  The questions weren't

2   drafted in a way.  So, again, Ms. Sinatra is in a RICO case

3   for doing a bad job on a license.  She's in a RICO case.

4   And, by the way, she wasn't fired.  She left.  She got her

5   full severance, full indemnity, and if you read the report,

6   you'll see all of that.  If you read the press releases, you

7   will see all of that.

8           THE COURT:  What weight would you say I should

9   give the report?

10          MR. KRAMER:  Your Honor, I think that you

11  should --

12          THE COURT:  This lawsuit in a way has been a bit

13  transformed, I mean, as of Friday.

14          MR. KRAMER:  I think you go with what's in the

15  complaint.  I think the plaintiffs have a burden to plead

16  specific facts under 9(b) to support --

17          THE COURT:  So I should ignore the report?

18          MR. KRAMER:  That's what I would say, but if

19  you're inclined --

20          THE COURT:  I saw your colleagues --

21          MR. KRAMER:  They can disagree, and that's fine.

22  I'm focused on Ms. Sinatra because there's nothing against

23  her.  But I'm not afraid of the report.  They put it at

24  issue, and if you read it, you're going to see that it would

25  have made no difference.  The issues on causation are clear;

1  it would make no difference.  But I do want to be clear,

2  your Honor.  Ms. Sinatra is being called heads for fraud,

3  and if you look at the four corners of the complaint, it

4  barely mentioned her, right?  On an interference with

5  contract claim, they don't even show that she was aware of a

6  relationship with Sterling.  How could she interfere?  They

7  don't show any improper conduct.  She was filling out a

8  license for Wynn Resorts.  We now know that whatever she

9  knew about the 2005 settlement did not need to be disclosed,

10  per Page 18 of the Massachusetts report, but yet she's being

11  held for that tort?  Unfair business practices?  If they

12  want her in the case, they've got to do better.  That's

13  reality.

14         But, your Honor, the one thing I do want to

15  emphasize, and if you remember one thing from my argument

16  today, if you do read the report, please read the report --

17         THE COURT:  Believe me, I'll read it.

18         MR. KRAMER:  Okay, but don't go on what they say

19  in their Submission 115.  They paraphrase supposedly is what

20  my sister said for years --

21         THE COURT:  I'll read the whole report.

22         MR. KRAMER:  Okay.  But one of the things they try

23  to do is beef up Elaine Wynn, and they say that Ms. Wynn is

24  now the Board chair of Wynn Resorts and you should believe

25  her.  Your Honor, she hasn't been on the Board for years and

1    years and years.  She's not now.  She got voted off when her

2    term expired, never got reelected, and is not on the Board

3    and is not the Board chair.  But their letter 115 tells you

4    that.  You can just look at the website.

5          My point is, people have been pretty fast and

6    loose up here with what people say and what the documents

7    say.  If you carefully dispassionately say "Should Kim

8    Sinatra be in this case," you will reach one conclusion,

9    which is she should not.

10          THE COURT:  Thank you.

11          MR. KRAMER:  Thank you, your Honor.

12          THE COURT:  At some point, I am struggling with

13    what weight to be given to this report.  Do I build it into

14    the complaint?  Do I take it as truth?

15          MS. BERNSTEIN:  I --

16          THE COURT:  No, no, I'm going to -- no.

17          MS. BERNSTEIN:  We've got two.  I think that what

18    has been said kind of covers both realms that we've tried to

19    cover, but the report has -- I'm not sure we have enough

20    information yet.  I think the report is telling and can give

21    you something to think about because of the fact that there

22    was a decision to impose this punishment, and there's a lot

23    of information about wrongdoing and cover-ups related to the

24    sexual predation piece.

25          THE COURT:  You submitted it, so you think I can

1   read it and take it into account?

2          MS. BERNSTEIN:  Yes, right.  I don't think it --

3          THE COURT:  Is there anyone who doesn't agree with

4   that?  You've all referenced it.

5          MR. KATZ:  Your Honor, so I think it's a little

6   more nuanced, respectfully.

7          THE COURT:  All right, well, it's her turn, so if

8   it's more nuanced, you'll have to come back to me.

9          MR. KATZ:  If I can have two minutes after she's

10  finished.

11          MS. BERNSTEIN:  The reason I say it's a little

12  incomplete, because it incorporates by reference the IEB

13  investigative report which came out in March of this year,

14  and we don't have all of the exhibits that were a part of

15  that or the exhibits that were appended to the decision that

16  was issued last week, and one critical one is Exhibit J at

17  that hearing, which is where Steve Wynn -- I'm sorry --

18  where they accept the bulk of the factual findings or all of

19  the factual findings as phrased -- it was talked about

20  differently at different points in the hearing -- that are

21  in the IEB investigation.  And the IEB investigation is

22  incorporated by reference.  I believe that somebody attached

23  that one.  That's in the record too somewhere.  So a lot of

24  those facts they conceded and agreed to.

25          So it is not just the decision.  It is the IEB

1    report that contains facts, many of which were stipulated to

2    by the Wynn defendants.  So obviously it could always be an

3    option to amend that was included in our submissions, and

4    there is much more that we now know, but there is still so

5    much we don't know.  And, frankly, we should, we contend, be

6    given the opportunity to do discovery because we have fairly

7    pled the allegations in the complaint; and then there is

8    going to be a broader record for review at later more

9    appropriate stages of the case for decisions based on

10   sufficiency of evidence, et cetera.

11            As to Ms. Sinatra, and I'm sure Mr. Storch may

12   have some additional things specifically to say about the

13   RICO predicates, but she -- oh, one more thing about -- at

14   the hearing, she did -- it's true, she wasn't fired.  She

15   was given a $9.5 million severance, and she signed the

16   agreement for that severance on the day she was deposed by

17   the IEB.  And the Commissioners at the IEB hearing said they

18   found it very interesting how little she could recall about

19   all of the things that they had -- one of the Commissioners

20   had a tally of twenty-seven times, or I don't remember what

21   the precise number was, but she made a point of saying there

22   were quite a number of things that she could not recall when

23   she went through her deposition as a part of their

24   investigation.  So there's a whole lot more to this that we,

25   frankly, believe our clients should be entitled to develop

1    because there is a lot that was not disclosed to the

2    Commission in the process.

3             And as to what Ms. Sinatra knew, she is a Wynn

4    defendant.  Wherever the allegations say "Wynn defendants,"

5    she is included in those allegations.  And although she

6    claimed not to know about the FBT true ownership issues

7    before they were brought to her attention and she claimed to

8    be surprised, I think there are inferences that can be drawn

9    that that's subject to some question, and a fact-finder

10   could choose to disbelieve a statement, a self-serving

11   statement of that sort.

12            THE COURT:  Well, you have to make a decision

13   because it's your complaint that's being evaluated.  Do you

14   want me to consider the Commission report or not?  Do you

15   want to let me know?

16            MS. BERNSTEIN:  I think that I would feel more

17   comfortable.  I think that that is an appropriate for a

18   follow-on letter or something to the Court about our views

19   on that.

20            THE COURT:  Now, arguably I could take judicial

21   notice of it, arguably, but I don't have a clear message

22   from them either, so --

23            MR. KELLY:  I think we do want you to consider it,

24   and in fact I think the letter on May 2 from plaintiff's

25   counsel said that providing you with a copy, some or all of

1  which may be subject to judicial notice, so that may be to

2  the extent appropriate because it's part of the record on

3  the pending motion, so I think it's critical because as I

4  pointed out --

5          THE COURT:  So you're content?

6          MR. KELLY:  Yes, please.

7          MR. BIAGETTI:  So less nuanced.  Wynn Mass., Wynn

8  Resorts, and Mr. Maddox all welcome your review of the

9  report for the causation reasons I talked about before, and

10  because they specifically address the failure to

11  intentionally mislead by either Wynn Mass. as applicant or

12  Mr. Maddox.

13          MR. KATZ:  The reason I think it's just a touch

14  more nuanced, Judge, is because there was the Mass. Gaming

15  Commission decision back in 2014 as well which did speak to

16  FBT's members, including my client in the criminal case,

17  Mr. DeNunzio.  I don't think you need to look at necessarily

18  what facts the Commission reached or found and say, oh,

19  that's conclusive on fact-finding, because in 2014 they

20  found that my client had intentionally fraudulently

21  backdated documents.  We contested that point in the federal

22  criminal case.  Mr. DeNunzio does not concede and we do not think

23  it's --

24          THE COURT:  Right, but I'm only doing at the

25  pleading stage right now.

1        MR. KATZ:  Correct, correct.  But I think where

2   it's even more critical, though, Judge, that you should

3   consider both of these decisions, the 2014 which dealt with

4   the FBT ownership issue and this new one last week which

5   deals with the sexual predation issues, which FBT had

6   nothing to do with, of course, is that they demonstrate that

7   there is a state administrative agency --

8        THE COURT:  Can I say that I'm not going to go on

9   that grounds.  It says RICO.  It doesn't say there's an

10  exhaustion requirement or whatever.

11       MR. KATZ:  And I'm not arguing exhaustion, but I

12  think it shows why there's not a single case where a state

13  licensing decision has been the basis for a federal criminal

14  case, either under the Travel Act or the wire fraud statute,

15  at least one that succeeded, or RICO.

16       THE COURT:  I don't know.  If there are enough

17  adequate allegations of fraud, fraudulent predicates, and it

18  hits the pattern stage, I don't know that a Gaming

19  Commission decision one way or another wipes out the cause

20  of action.

21       MR. KATZ:  No, but I think what it does

22  demonstrate, your Honor, is that these are exactly why you

23  shouldn't read the Travel Act and RICO to encompass as a

24  predicate act this stuff because there is a Gaming

25  Commission and an IEB that's looking at this.

1        THE COURT:  I don't know that I agree with that,

2   but, anyway, did you want to just finish?

3        MR. STORCH:  On this point, if I may just --

4        THE COURT:  And then Mr. Kelly, and then we're

5   done.

6        MR. STORCH:  Your Honor, we also welcome your

7   Honor reviewing that decision.  I think that's just part of

8   the issue.  The real question I think, as your Honor raised,

9   is what import does that have?  And we would sort of like an

10  opportunity just to address that, since that is something

11  new that's come up.

12       THE COURT:  I'm here.  And can I say, I know no

13  one has any sympathy for me, but do you know how long it

14  took me just to read everything that was submitted, just

15  reading it?  Not to mention what my poor law clerk went

16  through trying to look up all the cases.  I don't want

17  another round of briefs and oppositions and replies and

18  surreplies.  I think that is not in all of our interests.

19  So unless there's a case from the State Court or a

20  supplemental report from the Gaming Commission, I don't know

21  that I want another round of briefing.

22       MR. STORCH:  Your Honor, if I may just --

23       THE COURT:  You can talk right now about it, yes.

24       MR. STORCH:  We do not believe that's binding on

25  us.  We do not believe there is any collateral estoppel, any

1   binding on us over the findings.  We believe it's pertinent

2   to the issue of this continuity and showing that there is

3   this danger of continuation.  If we had had that report,

4   frankly, before we filed the amended complaint, we would

5   have put those allegations into the amended complaint.  So I

6   think that that report could be read in conjunction with our

7   complaint to show that we're not talking about, as counsel

8   said, a one-off and the situation is closed.  It's far from

9   that.  This didn't end in 2014.  It's still ongoing, and now

10  we have a monitor.  So that's how I would ask the weight

11  your Honor to give it.

12          THE COURT:  Yes, it's a public report, it's a

13  public fact-finding, and I forget the rule of evidence it's

14  under, but it's usually a hearsay exclusion if there's a

15  fact-finding.  I haven't read it yet, but I'm assuming -- I

16  mean, there's at least one judge on there, right, so there's

17  a fact-finding.  But I'll read it.

18          MR. STORCH:  Thank you, your Honor.

19          THE COURT:  I'll take judicial notice of it.

20          MR. KELLY:  Just briefly, your Honor, I think if

21  they had this report at the time they were considering their

22  lawsuit, they wouldn't have brought it because, again, at

23  the top of Page 18 it says, "None of the applications --"

24  none -- "contained any questions that specifically required

25  the disclosure of information related to the allegations,

1    settlements, or other evidence of wrongdoing at issue here."

2    So, you know, if the Commission is pointing out that they

3    weren't lied to, that should end the issue here.  The fact

4    that sexual harassment claims are serious and troublesome

5    doesn't mean they're RICO predicates.  And what they've

6    alleged here is all these lies, and the Commission itself

7    says, "We weren't lied to."  And the Massachusetts state law

8    statute does in fact require willfulness for there to be a

9    false statement; and if there are no underlying state law

10    violations, then the Travel Act doesn't come into effect.

11          Thank you.

12          THE COURT:  Thank you.

13          MR. BIAGETTI:  Your Honor, I just, if I may, I

14    just have --

15          THE COURT:  You want the last word, as they say?

16          MR. BIAGETTI:  Only with regard to Mr. Maddox

17    because I represent him as well, and I just wanted to remind

18    the Court -- obviously we briefed it separately -- but the

19    claims with regard to Mr. Maddox's role also fail for the

20    separate reason of Rule 9(b) particularity.  And I call your

21    attention only to Paragraph 10 and 36 through 38 of the

22    complaint.  Those are the places where plaintiff names those

23    senior officials who allegedly participated in all this

24    concealment and cover-up, and in every single situation they

25    name people by name, and Mr. Maddox conspicuously is

1    excluded in each of those.  All the rest is impermissible

2    lumping and alleging that he knew things by virtue of his

3    status, which do not meet the standard for particularity.

4              THE COURT:  Thank you to everyone.  Two things:

5    I'm taking this under advisement, and I'm staying discovery

6    till I sort it out.  So thank you.

7              THE CLERK:  All rise.

8              (Adjourned, 12:29 p.m.)

1                     C E R T I F I C A T E

2

3
UNITED STATES DISTRICT COURT )
4    DISTRICT OF MASSACHUSETTS    ) ss.
CITY OF BOSTON                )
5

6

7            I, Lee A. Marzilli, Official Federal Court

8    Reporter, do hereby certify that the foregoing transcript,

9    Pages 1 through 102 inclusive, was recorded by me

10   stenographically at the time and place aforesaid in Civil

11   Action No. 18-11963-PBS, Sterling Suffolk Racecourse, LLC v.

12   Wynn Resorts, Ltd., et al, and thereafter by me reduced to

13   typewriting and is a true and accurate record of the

14   proceedings.

15           Dated this 23rd day of May, 2019.

16

17

18

19

20           /s/ Lee A. Marzilli
     _____
21   LEE A. MARZILLI, CRR
     OFFICIAL COURT REPORTER
22

23

24

25