### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

```
_____
                                )
STERLING SUFFOLK RACECOURSE, LLC, )
                                )
                Plaintiff,      )
                                )
        v.                      )
                                )
WYNN RESORTS, LTD.,             )          Civil Action
WYNN MA, LLC,                   )          No. 18-11963-PBS
STEPHEN WYNN,                   )
KIMMARIE SINATRA,               )
MATTHEW MADDOX, and             )
FBT EVERETT REALTY, LLC,        )
                                )
                Defendants.     )
_____)
```

### MEMORANDUM AND ORDER

November 15, 2019

Saris, C.J.

This lawsuit arises from the quest for a gaming license in the Greater Boston area. Plaintiff Sterling Suffolk Racecourse, LLC ("SSR") alleges that the Defendants corrupted the Massachusetts Gaming Commission's ("MGC") application process for the Region A, Category 1, License (the "License") conducted in 2013 and 2014 in order to secure the only available license for Defendant Wynn MA, LLC ("Wynn MA"). SSR would have been the landlord of the other applicant for the License, Mohegan Sun Massachusetts ("MSM"), and it claims that Defendants' conduct denied MSM the License as well as the resulting profits from

1

operating the only casino in the greater Boston area, some of which would have been owed to SSR. SSR's Amended Complaint asserts claims for substantive violations of and conspiracy to violate the Racketeer Influenced Corrupt Organization Act ("RICO"), violations of Massachusetts Chapter 93A, and tortious interference with contract and business relations.

Defendants have moved to dismiss the Amended Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) on multiple grounds. Three of the Defendants -- Wynn Resorts, Ltd., Wynn MA, and Michael Maddox -- also have moved to dismiss the state law claims as impermissible under Massachusetts' anti-SLAPP statute because they arise out of protected petitioning activity.

After hearing, and review of the extensive briefing, the Court **ALLOWS** the Defendants' motions to dismiss for failure to state a claim (Dkt. Nos. 72, 75, 77, 79, 83). The Court concludes that the viable alleged predicate acts of racketeering activity arising from the alleged "corruption" of the license application process do not constitute a pattern sufficient to support a RICO claim because the alleged scheme has neither open-ended nor closed continuity. The Court dismisses SSR's federal RICO claims with prejudice but dismisses the state law claims without prejudice to being re-filed in state court. The

2

Court also **DENIES AS MOOT** the Wynn entities and Maddox's motion to dismiss pursuant to the anti-SLAPP statute (Dkt. No. 80).

**BACKGROUND**

Unless otherwise noted, the following factual background comes from the Amended Complaint and must be taken as true at this stage. See Foley v. Wells Fargo Bank, N.A., 772 F.3d 63, 71 (1st Cir. 2014).

## I.   **The Parties**

SSR is a Massachusetts limited liability company which owned the Suffolk Downs Racecourse located in Revere and East Boston until May 2017. SSR contracted with MSM to lease the Suffolk Downs Racecourse to MSM for a percentage of its annual casino revenues, subject to a $35 million minimum annual payment.

Wynn Resorts is a Nevada corporation with its principal place of business in Las Vegas, Nevada. Wynn Resorts operates casinos in Nevada, Macau, and, as of recently, Massachusetts. Wynn MA is a Massachusetts limited liability company with its principal place of business also in Las Vegas, Nevada. Wynn MA is a wholly owned subsidiary of Wynn Resorts, which was formed for the purpose of applying for a Massachusetts Category 1 gaming license.

Steve Wynn was the CEO of Wynn Resorts until his resignation in February 2018. Steve Wynn also served as the CEO

of Wynn Resorts' majority-owned subsidiary Wynn Macau, Ltd. from September 2009 to February 2018.

Kimmarie Sinatra was the General Counsel and an Executive Vice President of Wynn Resorts and a director of Wynn Macau, Limited until July 2018. After Steve Wynn, Sinatra was functionally the senior most member of Wynn Resorts' management team.

Maddox has been the President and Chief Financial Officer of Wynn Resorts since 2013, and he has been the Chairman of Wynn Resorts since Steve Wynn's resignation in February 2018. Maddox also served as the President and Treasurer of Wynn MA at all relevant times. Since March 2003, Maddox has held various positions at Wynn Resorts' Macau-related subsidiaries.

FBT Everett Realty, LLC ("FBT") is a Massachusetts limited liability company with its principal place of business in Cambridge, Massachusetts. Although the ownership of FBT has changed over time, originally Paul Lohnes owned a 50% interest, Gary DeCicco owned a 19.5% interest, Anthony Gattineri owned a 15% interest, Charles Lightbody owned a 12.5% interest, and Dustin DeNunzio owned a 3% interest. In 2009, FBT acquired a parcel of land in Everett, Massachusetts (the "Everett Site"). Then, in November 2014, FBT sold the Everett Site to the Wynn entities for $35 million. Wynn Resorts opened the "Encore Boston Harbor" casino at the Everett Site in June 2019.

## II.  **Procedural History**

SSR filed an Initial Complaint on September 7, 2018.
Defendants subsequently moved to dismiss the Initial Complaint.
Instead of responding to Defendants' motions to dismiss
directly, SSR then filed an Amended Complaint on February 15,
2019. Defendants renewed their motions to dismiss the Amended
Complaint on March 8, 2019. SSR then opposed Defendants'
motions. The Court held a hearing on the pending motions to
dismiss on May 6, 2019.

## III. **Alleged Facts**

The Amended Complaint alleges the following facts, many of
which are disputed.

### A.    **The Application Process**

In 2011, Massachusetts passed the Massachusetts Gaming Act,
which established a process for the development of three
destination resort casinos in Massachusetts, one in each of
three geographic regions. Region A covered the greater Boston
area, including Suffolk, Middlesex, Essex, Norfolk, and
Worcester Counties. In order to operate a casino, a prospective
operator was required to apply to the newly formed Massachusetts
Gaming Commission ("MGC") for a "Category 1 License."

The License application process was broken into two phases.
In Phase I, the MGC's Investigations and Enforcement Bureau (the
"IEB") investigated the applicants' suitability in matters

related to finance and integrity. The applicants, anyone with a financial interest in the applicants' business, close associates of the applicants, and all persons owning 5% or more of common stock of any applicant were subject to the suitability investigation. Once the IEB and MGC determined that an applicant was a suitable candidate for the License, the applicant would move on to Phase II of the application process. In Phase II, the applicants submitted to the MGC a site-specific proposal addressing issues related to finances, economic development, building and site design, and mitigation for the proposed casino project. The MGC considered these materials, sought additional information from the applicants as necessary, and, ultimately, held a vote to award the License to the applicant with the best proposal.

### B.   FBT Background

In 2009, FBT purchased the Everett Site. Of FBT's five original equity owners, two of those owners had criminal histories. Lightbody was convicted of grand larceny and identity theft in 2007. Over the years, he separately has been charged with ten assaults, three counts of illegal weapons possession, and two counts of witness intimidation. Lightbody also is known to be associated with the mafia. Meanwhile, DeCicco was convicted of multiple counts of mail fraud related to insurance

claims he filed in connection with suspicious fires on his personal property.

Lightbody has close ties to the Mayor of Everett, Carlo DeMaria. In the fall of 2009, at the suggestion of Mayor DeMaria, the owners of FBT gave a 3% non-equity interest in the company to Jamie Russo. Russo was an "affiliate" of Lightbody and a consultant for Mayor DeMaria. Dkt. No. 71 ¶ 59.  The purpose of giving Russo an interest in FBT was to pass on to Mayor DeMaria some of the proceeds from any future sale of the Everett Site. Russo also had a criminal history. In 1992, Russo pleaded guilty to a charge of fourth-degree larceny -- a misdemeanor -- after being caught using forged and stolen credit card numbers at a casino in Connecticut.

### C.   Wynn-FBT Partnership

Wynn Resorts was interested in obtaining a Massachusetts gaming license from at least 2012. Originally, Wynn Resorts partnered with Robert Kraft, the principal owner of the New England Patriots, to seek a license for a casino in Foxborough, Massachusetts. This partnership fell apart in May 2012 when it became clear that the Town of Foxborough would not approve the prospective casino project.

In late summer or fall 2012, Wynn Resorts began to explore a partnership with FBT. Representatives for Wynn Resorts and FBT met at the Everett Site for the first time in November 2012. At

that meeting, FBT owner DeNunzio informed Sinatra and Maddox that "an individual with a checkered past" was then an owner of FBT but that he was taking steps to give up his interest. Id. ¶ 81. Later that same month, Wynn Resorts agreed to pay $100,000 per month for an option to purchase the Everett Site for $75 million if and when Wynn MA received the License. During the legal due diligence process conducted in December 2012, Mayor DeMaria informed a lawyer/lobbyist for Wynn Resorts that Lightbody had a criminal history. FBT's lawyers separately told Wynn Resorts' lawyers that at least one FBT owner had a criminal history. And, on December 14, 2012, the Boston Business Journal reported that DeCicco was a convicted felon and that he appeared on FBT corporate paperwork that had been publicly filed earlier in 2012. Wynn Resorts took no further steps at this point to investigate the ownership history of the Everett Site after DeCicco's criminal record was publicized.

On or about December 19, 2012, Wynn Resorts and FBT formalized their option agreement in writing (the "Option Agreement"). In addition to setting the purchase price for the Everett Site, the Option Agreement provided that FBT would collaborate with Wynn Resorts and Wynn MA in the development of the property, including with respect to obtaining subdivision approvals, permits, and a permanent road easement and performing environmental remediation. The Option Agreement also contained

the representation that "[t]o the best of [FBT's] knowledge, neither [FBT] nor any Person associated with [FBT] has ever engaged in any conduct or practices which any of the foregoing Persons should reasonably believe would cause such Person to be" deemed unsuitable by the MGC. Id. ¶ 90. Defendants knew that this representation was false due to FBT's association with Lightbody, DeCicco, and, possibly, Russo. Around the same time, Defendants reached "a mutual understanding" that FBT would create whatever false and backdated paperwork might be necessary for purposes of Wynn MA's License application. Id. ¶ 88. Maddox and Sinatra consulted directly with Steve Wynn before making this deal with FBT.

In January 2013, DeNunzio created a backdated 2012 operating agreement for FBT (the "Backdated Operating Agreement") which falsely indicated that DeCicco did not have an ownership interest in FBT as of January 2012. The Backdated Operating Agreement claimed that DeCicco had transferred his interest to Gattineri. However, prior to the creation of the Backdated Operating Agreement, DeCicco already had executed a Memorandum of Transfer dated "April __ 2012," in which he transferred the entirety of his interests to Lightbody. Id. ¶ 92. On January 17, 2013, DeNunzio emailed Sinatra purporting to confirm that the only equity holders of FBT were himself, Lohnes, and Gattineri. Eleven days later, on January 28, 2013,

DeNunzio arranged for Gattineri and Lightbody to execute a Memorandum of Transfer, backdated to December 14, 2012, memorializing Lightbody's transfer of his interest in FBT to Gattineri for a $1.7 million promissory note.

### D.   **Wynn MA's License Application**

On or about January 15, 2013, Wynn MA submitted its initial suitability application materials for the License to the MGC. Maddox, Sinatra, and Steve Wynn were each involved in preparing, submitting, and/or directing the preparation and submission of the application materials.

### 1.   *Lightbody's Involvement*

Shortly after Wynn MA submitted its application materials to the MGC, the IEB began investigating the Everett Site's ownership as part of assessing the suitability of Wynn MA. In the course of that investigation, the MGC was tipped off by the FBI that wiretaps in an unrelated case suggested that Lightbody maintained a concealed ownership interest in FBT. When FBT learned in July 2013 that the IEB was investigating Lightbody's ownership interest in FBT, DeNunzio created a new backdated Memorandum of Transfer showing that Lightbody had transferred his interest in FBT to Gattineri as of August 15, 2012, four months before Defendants entered into the Option Agreement. Pursuant to their "mutual understanding," however, Sinatra and

the other Wynn Defendants knew that these documents had been falsified for the purposes of Wynn MA's License application.

In July 2013, Sinatra and Maddox also sat for under oath interviews with the IEB. In those interviews, both Sinatra and Maddox claimed to have never heard of Lightbody. They also claimed to be unaware of any owners of FBT other than Lohnes, DeNunzio, and Gattineri. Maddox testified that it was "Not my job" to know whether a person with a criminal background was involved in the deal with FBT. Id. ¶ 100. Later, in his September 9, 2013 interview with IEB, Steve Wynn claimed that both Maddox and he had "zero" knowledge of the fact that certain members of the FBT ownership group had criminal backgrounds. Id. Sinatra also testified that she had "zero" knowledge of that fact. Id. During the same interview, Steve Wynn stated, "Criminal activity is criminal activity . . . . And there's no place for it in a relationship with us. And if we're sloppy and we allow people who are engaged in criminal activity to do business with us, we should be criticized for it and held responsible." Id.

Yet the Wynn Defendants maintained a relationship with Lightbody throughout 2012, 2013, and even into 2014. In the spring of 2013, the Wynn Defendants were attempting to purchase a small piece of property adjacent to the Everett Site. The owner of the property was reluctant to sell and told Maddox that

he would only deal with Lightbody. Maddox requested that
DeNunzio help, and DeNunzio in turn reached out to Lightbody.
Maddox then met with Lightbody at least twice in the spring of
2013, and DeNunzio and Lightbody eventually convinced the owner
in June 2013 to agree to an option on a long-term lease of the
property to an affiliate of Wynn Resorts. Also, in June 2013,
Lightbody worked with Wynn employees to generate public support
in Everett for Wynn MA's casino proposal. Maddox and Sinatra had
primary responsibility within the Wynn organization for
overseeing the Everett referendum process and knew of
Lightbody's involvement. On June 22, 2013, Everett voters
approved Wynn MA's public proposal. And, throughout 2013 and
2014, Lightbody campaigned against the MSM casino project,
spending thousands of dollars of his own money on signs and
advertising supporting the anti-SSR side of the public
referendum in Revere and donating to the "No Eastie Casino"
campaign that sought to block the MSM casino project. Id. ¶ 101.
Lightbody was even arrested in October 2013 for physically
assaulting a participant at a pro-MSM rally in Revere.

On November 21, 2013, the Boston Globe published a story
revealing Lightbody's concealed interest in the Everett Site. On
the same day, Defendants announced that they had negotiated an
amendment to the Option Agreement that reduced the exercise
price from $75 million to $35 million to eliminate the so-called

"casino premium." Id. ¶ 112. However, the Option Agreement
shifted other financial obligations from FBT to Wynn MA and Wynn
Resorts, which offset the reduction in exercise price.

    2.  MGC Suitability Hearings

On December 13, 2013, the MGC held a hearing to address
concerns about the ownership of FBT. At the hearing, Sinatra
testified that she had been "shocked" and "surprised" when she
learned in the summer of 2013 that FBT's ownership included
convicted criminals and she complained that "it's awfully hard
if people are running around and not telling you the truth." Id.
¶ 111. The Wynn Defendants claimed that they had acted in good
faith and had not learned of the criminal element in FBT's
ownership until after they entered into the Option Agreement. To
cure the problem, Defendants renegotiated the Option Agreement
and offered to provide signed confirmations of ownership from
FBT's owners. Accordingly, the MGC voted to approve the amended
Option Agreement at the December 13, 2013 hearing.

On December 16, 2013, the MGC held another hearing, this
time to consider the suitability of Wynn MA for the License.
Then, on December 23, 2013, Defendants provided the MGC signed
confirmations of ownership from Lohnes and DeNunzio. The signed
confirmations disclosed for the first time that Russo also held
a 3% interest in the proceeds from any sale of the Everett Site.
The signed confirmations, however, did not disclose that

13

Gattineri still owed Lightbody $1.7 million pursuant to the
promissory note exchanged for the Lightbody's interest in FBT,
which would be paid from the proceeds of the sale of the Everett
Site. Nevertheless, on December 27, 2013, the MGC issued a
favorable Phase I suitability decision with respect to Wynn MA.

   3.   *Gattineri's Ownership Confirmation*

Unlike Lohnes and DeNunzio, Gattineri did not provide a
signed confirmation before the MGC voted on the suitability of
Wynn MA. The MGC set a deadline of June 2014 for Gattineri to
provide his signed confirmation. Gattineri initially refused to
sign the confirmation because he was upset about the reduction
of the Option Agreement's exercise price that Defendants had
agreed to in November 2013. Gattineri's lawyer even declared
that Gattineri would not sign the confirmation.

In order to change Gattineri's mind, the Wynn Defendants
sent their "operative" Robert DeSalvio to California to meet
with Gattineri in person. Id. ¶ 118. There, DeSalvio reached a
secret side agreement with Gattineri, which promised to pay him
the difference between the original exercise price and the
revised exercise price for his share of the Everett Site
(approximately $1.9 million). Gattineri then signed a
confirmation stating that he had "not mortgaged, pledged, or
assigned [his] own interest in the Company, nor [had he] granted
to any person or entity an option, warrant or other right to

14

[his] interest in the Company or the economic interests represented hereby, in whole or in part." Id. ¶ 117. Gattineri's confirmation still did not disclose the promissory note that he had given to Lightbody. Gattineri later admitted that if he failed to pay the note according to its terms, Lightbody would be able to take back his equity interest in FBT.

4.   *Wynn's Ex Parte Contacts with the MGC*

Throughout the application process, Steve Wynn also had several ex parte communications with then-Chairman of the MGC, Stephen Crosby. Steve Wynn spoke ex parte with Crosby before Wynn MA submitted its application, although the Amended Complaint does not allege the substance of this communication. In or about February 2013, Steve Wynn contacted Crosby to demand that Spectrum Gaming Group -- an investigator hired by the IEB to investigate license applicants -- be assigned to MSM's application rather than Wynn MA's application. (Spectrum had specialized knowledge of the Macau gaming industry, and the Wynn Defendants knew that it would likely uncover evidence of Wynn Resorts' illegal business dealings in Macau. And in or about April 2013, Steve Wynn called Crosby to request that the Everett community vote on the casino project be allowed to occur before the IEB announced its determination as to suitability. Crosby subsequently persuaded the rest of the MGC to adopt "emergency

regulations" which permitted the Everett community vote to be brought forward. Id. ¶ 132.

In July or August of 2014, a representative for one of the Wynn Defendants contacted at least one member of the MGC to pressure him to change his vote in order to support the Wynn MA application. On or about August 1, 2014, the MGC asked the Wynn Defendants to disclose by August 22, 2014 any pending regulatory investigations that had not previously been disclosed. In their response, Wynn Resorts and Wynn MA (1) failed to disclose an IRS investigation regarding whether Wynn Resorts violated money-laundering laws, and (2) disclosed but misrepresented the subject matter and scope of a new investigation initiated by the government of Macau in July 2014 into Wynn Resorts' purchase of land rights.

### 5.   *License Award*

On September 16, 2014, the MGC voted to award the License to Wynn MA instead of MSM. On the same day, the MGC signed a conditional agreement to award the license to Wynn MA on or about November 6, 2014. On November 6, 2014, the MGC officially awarded the License to Wynn MA. Wynn Resorts submitted a response to the MGC's proposed conditions for licensing which affirmatively represented its acceptance of the condition to "compl[y] with all applicable federal, state and applicable and lawful local laws, rules and regulations, now in effect or as

hereafter promulgated or amended." Id. ¶ 139. In November 2014,
pursuant to the amended Option Agreement, Wynn MA acquired the
Everett Site.

### E.   Post-Award Conduct

Once the development of the casino at the Everett Site was
under way, the Wynn Defendants determined that they needed to
acquire another piece of property adjacent to the Everett Site.
On or about June 8, 2016, the property owner agreed to sell the
property to Wynn MA subject to a requirement that the property
be "free and clear of all tenants." Id. ¶ 108. At the time,
however, the property was under lease to ADH Collision ("ADH")
until 2019 with an option to extend until 2029, and ADH refused
to terminate its lease. Steve Wynn discussed this issue with
Mayor DeMaria and Maddox. Then, the property owner filed a
complaint with the City of Everett Building Department (the
"Building Department") regarding ADH. Just a few days later, in
August 2016, Inspectors from the Building Department visited ADH
and subsequently issued a Notice of Violations to ADH, even
though ADH had already been inspected earlier in the same year
and the Building Department inspectors found no violations then.
The SSR does not allege that the Building Department inspectors
were directed to issue the Notice of Violations by Mayor
Demaria, but it does allege that the Building Department was
"under the sway of Mayor DeMaria." Id. ¶ 109. Nor does SSR

17

provide any further details regarding the outcome of this episode.

### F.   Other Wynn Issues

SSR also alleges other wrongdoing by the Wynn Defendants that is not directly related to the core allegations in this case, but which SSR contends the Wynn Defendants concealed or misrepresented in the course of the application process for the License. These allegations relate to two topics: (1) Wynn Resorts' operations in Macau and (2) Steve Wynn's sexual misconduct and the related cover-up.

On October 17, 2013, at hearing before the MGC, Steve Wynn denied that there was any criminal activity at Wynn Resorts' casinos in either Macau or Las Vegas:

- "we are obeying all of the rules and regulations of Macau and employing all of the standard and ethical standards for which we are known for over 45 years - I am the longest lasting continuous licensee in the history of the state at this point 46 or 47 years;"

- "when you press them and you say is there any criminal activity going on in my company, they shut up, because if they said it, they couldn't prove it because it's not true. And I would sue them from here to next week;" and

- "[t]he question is I am concerned about any criminal activity, illegal activity going on [sic] the premises of my businesses in Las Vegas or Macau . . . . And that I am willing to be held responsible for that standard of behavior. I hope I am being very specific now. I am referring to the standard of conduct that we employ on our own premises and the diligence that we employ to avoid criminal activity on our own premises."

Id. ¶ 124. On December 16, 2013, at another hearing before the MGC, Steve Wynn repeated this claim, "[b]ut the issue is do we allow illegal activity in our casinos? The answer is no, no. Do we do everything that you can reasonably do to stop it? Yes." Id.

### 1.   Macau

In 2002, Wynn Macau SA, a majority-owned subsidiary of Wynn Resorts, entered into a twenty-year casino concession agreement with the Macau government to become one of just six authorized casino operators. Today, Wynn Resorts operates two casinos -- the Wynn Macau and the Wynn Palace -- in Macau through its indirect subsidiaries. The Amended Complaint alleges that Wynn Resorts has engaged in at least two illegal or improper land transactions in Macau and that its casinos sponsor criminal activity there.

In August 2009, Wynn Macau SA, paid approximately $18 million to Nam Van Development Company ("Nam Van") for the exclusive rights to land needed for the expansion of the Wynn Macau. At the time, Maddox served as Chief Financial Officer of Wynn Macau SA and was extensively involved in the purchase of the rights to the property and in the development and construction efforts for the Wynn Macau. This purchase was improper because three of the founders of Nam Van -- Edmund Ho,

Stanley Ho, and Ng Lap Seng -- either had criminal histories or were at some point in time government officials in Macau.

In May 2012, Wynn Resorts paid approximately $50 million to Tien Chiao Entertainment and Investment Company Limited ("Tien Chiao") for the exclusive rights to land where the Wynn Palace is now located. Later, the owners of Tien Chiao were publicly identified as He Ganglin and He Gangyon, two brothers from the He family, a prominent Beijing family with relatives in senior positions in the Chinese government and military, and Cliff Cheong, a longtime partner of and advisor to Edmund Ho. In July 2014, Macau's Land and Public Works Department issued a statement that it had no information about Tien Chiao holding an interest in the land that was supposedly the subject of the May 2012 deal. Records produced by the same department in January 2015, showed Wynn Macau SA as the earliest documented applicant for the subject land rights.

Casino operators in Macau also "rely heavily on the use of third-party junkets and junket operators that recruit and extend lines of credit to mainland Chinese high-roller clients due to the restrictions on the enforceability of gambling debts in mainland China." Id. ¶ 46 Both the Wynn Macau and the Wynn Palace contract with numerous junket operators who are affiliated with criminal triads. The Wynn Defendants knew of the criminal affiliations of its junket operators. Further, in June

20

2011, Hong Kong businessman, Carson Yeung, was arrested on
suspicion of operating a money laundering scheme out of Macau
casinos, including the Wynn Macau. Yeung was convicted on the
money laundering charges in March 2014. Also, in November 2012,
Macau police detained Pang Yufeng at the Wynn Macau casino.
Although the reasons for Pang's arrest are unclear, local media
reported at the time that Pang had ties to the disgraced former
politician Bo Xilai and that the arrest was part of a broader
crackdown on political corruption. Pang also was affiliated with
one of the junkets operating out of the Wynn Macau.
Nevertheless, Wynn Macau continued its relationship with the
junket operator despite Pang's arrest.

> ## 2. *Steve Wynn's Sexual Misconduct*

In January 2018, it was revealed that since at least 2005
Steve Wynn has engaged in a pattern of sexual misconduct.
Further, certain of the Wynn Defendants had participated in the
cover-up of this misconduct and its concealment from gaming
officials in both Nevada and Massachusetts. In 2005, Wynn
Resorts paid $7.5 million to a female employee to resolve
allegations that Steve Wynn raped her. The payment was made
through a shell company, Entity Y LLC, controlled by Steve Wynn.
Sinatra knew of this payment no later than January 2012. In
2006, Wynn Resorts paid $975,000 to another female employee to
resolve allegations that in 2005 and 2006 Steve Wynn had engaged

in unwanted, nonconsensual sexual contact with her. Later, Wynn Resorts' senior management also learned of other incidents of sexual misconduct by Steve Wynn and other senior executives of the company but failed to investigate them. When this conduct eventually came to light, Steve Wynn was forced to resign his positions at Wynn Resorts in February 2018. Sinatra was also subsequently terminated in July 2018. In public filings with the Nevada Gaming Control Board, Wynn Resorts has admitted that this conduct violated Nevada's gaming suitability statutes and regulations.

The Wynn Defendants did not disclose any of this conduct to the IEB or MGC during the License application process. On July 30, 2013, Sinatra told the IEB "there's a regulatory standard and then there's an "us" standard. And we've generally considered ourselves to have a higher standard of probity with respect to people that we employ." Id. ¶ 129. On December 16, 2013, Steve Wynn told the MGC "Our history in Las Vegas has been exemplary, spotless in every regard." Id. At that same meeting, Sinatra told the MGC, "the idea of compliance is that it needs to be an essential part of your entire corporate culture . . . . One of the hallmarks and essential features of a successful compliance program is what the books will tell you is the tone at the top. I think that you probably got an idea of our tone at the top from Mr. Wynn's presentation." Id. Further, the RFA-2

submitted by Sinatra on behalf of Wynn MA on December 31, 2013 stated "Wynn Resorts is fully committed to full and complete regulatory compliance in every jurisdiction in which it operates" and that the proposed casino at the Everett Site would "be an extension of and leverage Wynn Resorts' extensive experience and best practices in implementing, performing and integrating internal controls." Id.

Once the allegations of Steve Wynn's sexual misconduct became public, the MGC opened its own investigation, which lasted for more than a year. In April 2019, the MGC held a three-day public hearing to address whether Wynn MA should be deemed unsuitable to continue holding the License and, on April 30, 2019, the MGC issued a final decision.[1] The MGC concluded that Wynn MA was still a suitable holder of the License, although it expressly declined to analyze whether it would have reached the same decision as to Wynn MA's suitability if it had known of Steve Wynn's sexual misconduct in 2013 at the time of the original suitability determination. The MGC also concluded that Defendants' failure to disclose Steve Wynn's violations to the MGC did not constitute willful violations of the

---

[1]     Since it was issued in April 2019, the information contained in the MGC's decision is not alleged in the Amended Complaint. The Court takes judicial notice of the decision and its findings. See Giragosian v. Ryan, 547 F.3d 59, 66 (1st Cir. 2008).

Massachusetts Gaming Act. But the MGC did fault Wynn Resorts for (1) failing to comply with its own human resources and sexual harassment policies, and (2) failing to disclose to the MGC two developments in related litigation involving the company and its board of directors. As a consequence, it imposed a $35 million fine on Wynn Resorts and a $500,000 fine on Maddox. In addition, the MGC required that Wynn MA be subject to independent monitoring for a period of five years.

IV.   **The RICO Enterprises and Predicates**

SSR alleges two separate RICO enterprises:  The first is an "association-in-fact" RICO enterprise involving all Defendants. The second enterprise only involves the Wynn Defendants, and SSR contends that Wynn MA operated as a RICO enterprise run by Wynn Resorts, Steve Wynn, Maddox, and Sinatra. The Amended Complaint alleges the following conduct constituted RICO predicate acts for both alleged RICO enterprises:

- False and misleading statements made to the MGC regarding the ownership/financial interests of convicted criminals in FBT in violation of the Massachusetts Gaming Act;

- False and misleading statements made to the MGC regarding the ownership/financial interests of convicted criminals in FBT in violation of the federal mail and wire fraud statutes;

- A scheme designed to cause Mayor DeMaria to abuse the powers of his public office for the benefit of Defendants in violation of the federal honest services mail and wire fraud statute;

- Travel in interstate commerce by the Wynn Defendants to prepare false documents to be submitted to the MGC and to give false testimony to the MGC in violation of the federal Travel Act.

For the second RICO enterprise only, the Amended Complaint alleges the following additional RICO predicate acts:

- False and misleading statements made to the MGC regarding Steve Wynn's sexual misconduct in violation of the Massachusetts Gaming Act and the federal mail and wire fraud statutes;

- False and misleading statements made to the MGC regarding Wynn Resorts' business practices in Macau in violation of the Massachusetts Gaming Act and the federal mail and wire fraud statutes;

- Additional violations of the federal Travel Act in connection with the Wynn Defendants' violations of the Nevada suitability statutes.

## ANALYSIS

### I.   Legal Standard

In analyzing a Rule 12(b)(6) motion to dismiss, the Court must set aside any statements in the complaint that are merely conclusory and examine the factual allegations to determine if there exists a plausible claim upon which relief may be granted. Foley v. Wells Fargo Bank, N.A., 772 F.3d 63, 75 (1st Cir. 2014). However, pursuant to Federal Rule of Civil Procedure 9(b), a plaintiff "alleging fraud or mistake . . . must state with particularity the circumstances constituting fraud or mistake." For fraud, Rule 9(b) "requires plaintiffs to specifically plead 'the time, place, and content of an alleged

25

false representation,'" <u>Mulder v. Kohl's Dep't Stores, Inc.</u>, 865

F.3d 17, 22 (1st Cir. 2017) (quoting <u>United States ex rel.</u>

<u>Heineman-Guta v. Guidant Corp.</u>, 718 F.3d 28, 34 (1st Cir.

2013)), as well as the "identifying the basis for inferring

scienter," <u>N. Am. Catholic Educ. Programming Found., Inc. v.</u>

<u>Cardinale</u>, 567 F.3d 8, 13 (1st Cir. 2009). "Rule 9(b)'s

requirements apply to both general claims of fraud and also to

'associated claims . . . where the core allegations effectively

charge fraud.'" <u>Mulder</u>, 865 F.3d at 21-22 (quoting <u>N. Am.</u>

<u>Catholic</u>, 567 F.3d at 15). In construing the complaint, the

Court must otherwise draw all reasonable inferences in the

plaintiff's favor. <u>Foley</u>, 772 F.3d at 75.

## II. <u>RICO Claims</u>

The Amended Complaint asserts two claims for primary

violations of the RICO statute. A successful civil RICO claim

consists of four elements: "(1) conduct (2) of an enterprise

(3) through a pattern (4) of racketeering activity." <u>Sedima,</u>

<u>S.P.R.L. v. Imrex Co.</u>, 473 U.S. 479, 496 (1985) (footnote

omitted). The Amended Complaint also asserts a claim for

conspiracy to violate the RICO statute. If the Amended

Complaints fails to state "a substantive RICO claim upon which

relief may be granted, then the conspiracy claim also fails."

<u>Efron v. Embassy Suites (P.R.), Inc.</u>, 223 F.3d 12, 21 (1st Cir.

2000). Defendants contend that the Amended Complaint fails to

adequately allege each of the necessary elements for primary violation of the RICO statute and, therefore, all three RICO claims must be dismissed.

### A.   Racketeering Activity

What constitutes "racketeering activity" under the RICO statute is determined exclusively by reference to 18 U.S.C. § 1961(1). See Beck v. Prupis, 529 U.S. 494, 497 n.2 (2000) (finding that § 1961(1) "contains an exhaustive list of acts of 'racketeering,' commonly referred to as 'predicate acts'"). Defendants argue that the predicate acts alleged in the Amended Complaint do not qualify as racketeering activity within the meaning of the RICO statute.

### 1.   Massachusetts Gaming Act Violations

Section 1961 defines "racketeering activity" to include "any act or threat involving . . . gambling . . . which is chargeable under State law and punishable by imprisonment for more than one year." On this basis, SSR claims that Defendants' false statements made to the MGC in violation of the Massachusetts Gaming Act are predicate acts. Defendants do not dispute that these violations are felonies punishable by imprisonment for more than one year. Instead, they overplay their hand by arguing that these violations do not involve gambling.

"The test for determining whether the charged acts fit into the generic category of the predicate offense is whether the indictment charges <u>a type of activity generally known or characterized in the proscribed category</u>." <u>United States v. Mark</u>, 460 F. App'x 103, 107 (3d Cir. 2012) (quoting <u>United States v. Forsythe</u>, 560 F.2d 1127, 1137 (3d Cir. 1977)); <u>see also</u> <u>United States v. Garner</u>, 837 F.2d 1404, 1418 (7th Cir. 1987). Defendants argue that the alleged violations of the Massachusetts Gaming Act do not fit within the generic definition of gambling because they do not involve betting. Rather, SSR accuses Defendants of making false and fraudulent statements as part of a state licensing process, which cannot generically be described as "gambling." Given the broad reach of the RICO statute, the Court declines to adopt such a restrictive reading. <u>Roma Constr. Co. v. Russo</u>, 96 F.3d 566, 579 (1st Cir. 1996) (Lynch, J., concurring); <u>cf.</u> <u>Mark</u>, 460 F. App'x at 107 (violation of Virgin Islands dog fighting statute qualified as "gambling" predicate act); <u>Fuller v. Harrah's Entm't, Inc.</u>, No. Civ.A. 04-2108, 2004 WL 2452771, at *4 (E.D. La. Oct. 29, 2004) (violations of Louisiana "gaming" statute that regulated legal gambling qualified as "gambling" predicate acts). SSR has alleged a fraud on the Massachusetts state <u>casino</u> licensing process. Indeed, the Amended Complaint details multiple violations of the anti-fraud provisions of the Massachusetts

28

Gaming Act, which is the statute that regulates legal gambling in the Commonwealth of Massachusetts. Although the alleged violations may not arise directly from betting, they nevertheless involve gambling because they were aimed at securing a license to run an active gambling operation. The authority relied upon by Defendants does not advance their position. See United States v. Genova, 333 F.3d 750, 758 (7th Cir. 2003) (violation of a state financial disclosure requirement did not qualify as a "bribery" predicate act because it was only a misdemeanor). Therefore, the Court finds that Defendants' alleged violations of the Massachusetts Gaming Act qualify as RICO predicate acts.

Following the MGC's determination in April 2019 that Defendants' failure to disclose Steve Wynn's sexual misconduct did not violate the anti-fraud provisions of the Massachusetts Gaming Act, Defendants argue that those instances of non-disclosure cannot be § 1961(1)(A) or Travel Act RICO predicate acts. See Dkt. 116 at 3-4. This issue was not fully briefed. In any case, the Court does not address this argument here because (1) even if Defendant's position is correct, SSR has still adequately alleged at least two RICO predicate acts, and (2) the Court is nevertheless dismissing SSR's RICO claims for failing to adequately plead other elements.

2.   *Mail and Wire Fraud*

The parties agree that a violation of the federal mail and wire fraud statute constitutes "racketeering activity" under the RICO statute. Defendants argue, however, that SSR has not adequately alleged mail and wire fraud because their false statements to the MGC were not aimed at "obtaining money or property." 18 U.S.C. § 1341. In support of this argument, Defendants rely on the Supreme Court's decision in Cleveland v. United States, 531 U.S. 12 (2000), and the First Circuit's subsequent decision in United States v. Berroa, 856 F.3d 141 (1st Cir. 2017). In Cleveland, the Supreme Court vacated the defendant's mail fraud conviction for making false statements in an application for a state gaming license. 531 U.S. at 26-27. The Supreme Court held that "for purposes of the mail fraud statute, the thing obtained must be property in the hands of the victim." Id. at 15. And the gaming license was not property in the hands of the state because the state's "core concern" was regulatory rather than proprietary. See id. at 20-21. In Berroa, the First Circuit interpreted Cleveland as "broadly and unequivocally instruct[ing] that '[s]tate and municipal licenses' generally 'do not rank as "property,"' sufficient to support a conviction under § 1341." 856 F.3d at 149 (quoting Cleveland, 531 U.S. at 15) (second alteration in original).

Thus, Defendant's alleged fraud on the MGC does not constitute mail and wire fraud.

Nevertheless, SSR argues that it has adequately alleged mail and wire fraud because MSM (not the MGC) is the victim of Defendants' fraud. And, in the hands of MSM, the License is property. See Cleveland, 531 U.S. at 25 ("[W]e do not here question that video poker licensees may have property interests in their licenses . . . ."). In Berroa, however, the First Circuit rejected a similar argument by the Government as an "effort to circumvent Cleveland." 856 F.3d at 149-50 (describing Government's argument that consumers of health care services were victims of scheme rather than medical licensing board).

SSR claims that its mail and wire fraud theory finds support in Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639 (2008), and United States v. Christopher, 142 F.3d 46 (1st Cir. 1998), but neither case is on point. Bridge concerns the causal relationship necessary to give a plaintiff standing to pursue a civil RICO claim, not what types of conduct are actionable as mail and wire fraud. See 553 U.S. at 654. Meanwhile, Christopher addresses whether a scheme must deceive the same person that it ultimately deprives of money or property to sustain a claim for mail and wire fraud, not what constitutes property for the purposes of the mail and wire fraud statute. See 142 F.3d at 52-53. In any case, both decisions predate the First Circuit's

decision in Berroa, which definitively disposes of SSR's argument.[2]

### 3.   Honest Services Fraud

The parties also agree that honest services fraud qualifies as a predicate act under the RICO statute. SSR alleges that Defendants committed honest services fraud through a kickback scheme involving Mayor DeMaria. Defendants argue that the Amended Complaint fails to adequately plead the quid pro quo necessary to sustain a charge of honest services fraud. See United States v. McDonough, 727 F.3d 143, 152 (1st Cir. 2013).

In its Amended Complaint, SSR alleges two events relevant to the scheme involving Mayor DeMaria. First, in the fall of 2009, FBT gave Russo a 3% non-equity interest in FBT to pass through to Mayor DeMaria some of the proceeds from the eventual sale of the Everett Site. Second, in the summer of 2016, the Building Department issued a notice of violations to ADH. The Amended Complaint fails to allege that the 3% non-equity interest was granted in exchange for a promise to perform an official act in a certain way or based on expectation that the mayor would exercise some influence on defendants' behalf as the opportunity arose. Id. at 152-53. The Amended Complaint does

---

[2]   Indeed, the First Circuit's Berroa opinion directly addressed Christopher, finding that it raised a "distinct issue" that was not dispositive of the issue in Berroa. 856 F.3d at 152.

allege that Steve Wynn spoke to Mayor DeMaria about ADH and that the Building Department was "under the sway of Mayor DeMaria," but it does not allege that Steve Wynn or any other Defendant asked Mayor DeMaria to do anything with respect to ADH or even that they expected Mayor DeMaria to do anything. Significantly, the passage of nearly seven years between these two events belies the inference that they are connected. Indeed, the first event occurred before the alleged criminal conspiracy arose, and the second occurred after (1) the conspiracy had achieved its objective (i.e., the award of the License) and (2) Wynn Resorts and Wynn MA already had purchased the Everett Site from FBT. The only arguable misconduct stemming from these allegations is an unlawful gratuity, which is not on its own actionable as honest services fraud. See United States v. Sawyer, 85 F.3d 713, 730 (1st Cir. 1996). Accordingly, the Amended Complaint does not adequately allege honest services fraud under the heightened pleading standards of Rule 9(b).

### 4.   *Travel Act Violations*

Plaintiff alleges Travel Act violations involving fraud on the MGC to misrepresent the suitability of the Wynn applications in connection with obtaining the license. Violations of the federal Travel Act are RICO predicates. See 18 U.S.C. § 1961(1). The Travel Act makes it illegal to "travel[] in interstate or foreign commerce or use[] the mail or any facility in interstate

or foreign commerce, with intent to" engage in "unlawful activity." Id. § 1952(a). "Unlawful activity" includes "any business enterprise involving gambling . . . in violation of the laws of the State in which they are committed or of the United States." Id. § 1952(b). Defendants again argue that the violations of the Massachusetts Gaming Act do not "involve gambling" within the meaning of the Travel Act because they were as part of a casino licensing process, rather than the actual operation of a casino.

With respect to the Travel Act, however, Defendants find even less support in the caselaw for this position. In United States v. Nardello, 393 U.S. 286, 290 (1969), the Supreme Court endorsed an interpretation of the Travel Act that the statute's use of the term "extortion should refer to those acts prohibited by state law which would be generically classified as extortionate." See also United States v. Barbeito, Crim.A. 2:09-cr-00222, 2010 U.S. Dist. W.L. 2243878 at *35 (S.D. W. Va. June 3, 2010) (involving the misdemeanor sale of raffle tickets). However, the cases relied upon by Defendants do not address the precise question raised in this litigation involving fraudulently obtaining a license to conduct gambling. Several courts have found that activities related to gambling were sufficient predicates for Travel Act violations even if the activities did not directly involve gambling but instead

governed the operation of a gambling establishment. See, e.g.,
United States v. DeLuna, 763 F.2d 897, 906-07 (8th Cir. 1985)
(holding unlicensed operation of gambling establishment violated
Travel Act); United States v. Goldfarb, 643 F.2d 422, 430 (6th
Cir. 1981) (concealment of ownership interest in casino in
violation of Nevada law constituted Travel Act violation). Here,
the Massachusetts Gaming Act generally applies to the operation
of a gambling establishment, even if the specific alleged
violations may not arise directly from betting. Defendants'
alleged misrepresentations to the MGC therefore are viable
Travel Act predicates.

Steve Wynn makes the additional argument that the alleged
violations of the Nevada gaming suitability statutes stemming
from his sexual misconduct are not violations of the Travel Act.
He points out the Amended Complaint does not adequately allege
that violations of the Nevada gaming suitability statutes
involved travel in either interstate or foreign commerce. The
only relevant allegation in the Amended Complaint is that "at
least some of [the Nevada violations] involved interstate travel
or the use of the mail or other facilities in interstate
commerce." Dkt. No. ¶ 38. Plaintiffs do not make sufficient
factual allegations to support this conclusory statement.
Therefore, SSR has not adequately pleaded those specific Travel
Act violations as RICO predicate acts.

* * * *

Based on the foregoing analysis, the Court finds that the
Amended Complaint adequately pleads the following RICO predicate
acts for both alleged RICO enterprises:

- False and misleading statements made to the MGC
  regarding the ownership/financial interests of
  convicted criminals in FBT in violation of the
  Massachusetts Gaming Act; and

- Travel in interstate commerce by the Wynn Defendants
  to prepare false documents to be submitted to the MGC
  and to give false testimony to the MGC in violation of
  the federal Travel Act.

For the second RICO enterprise only, the Amended Complaint
adequately pleads the following additional RICO predicate acts:

- False and misleading statements made to the MGC
  regarding Steve Wynn's sexual misconduct in violation
  of the Massachusetts Gaming Act; and

- False and misleading statements made to the MGC
  regarding Wynn Resorts' business practices in Macau in
  violation of the Massachusetts Gaming Act.

### B.  Pattern

To prevail on its RICO claim, SSR needs to prove not only
that Defendants engaged in "racketeering activity," but that the
predicate acts amounted to a "pattern." See Sedima, 473 U.S. at
496. "By statute, the 'pattern' element requires a plaintiff to
show at least two predicate acts of 'racketeering activity.'"
Efron, 223 F.3d at 15. Yet courts have read into the statute the
additional requirements that the predicate acts (1) be related
to one another, and (2) amount to or pose a threat of continued

36

criminal activity. <u>See</u> <u>H.J. Inc. v. Nw. Bell Tel. Co.</u>, 492 U.S. 229, 239 (1989). Defendants argue that the alleged predicate acts do not constitute a pattern sufficient to support a RICO claim. The Court analyzes whether the adequately pleaded predicate acts (i.e., the alleged Massachusetts Gaming Act and Travel Act violations) satisfy the RICO statute's pattern requirement.

### 1. *Relatedness of Predicate Acts*

The "relatedness test is not a cumbersome one for a RICO plaintiff." <u>Feinstein v. Resolution Tr. Corp.</u>, 942 F.2d 34, 44 (1st Cir. 1991). And a RICO plaintiff only needs to show that the predicate acts "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." <u>H.J. Inc.</u>, 492 U.S. at 240. The Court finds that the adequately pleaded predicate acts satisfy this flexible test because they all involve Defendants' alleged deception of the MGC to secure the License.

### 2. *Continuity*

A RICO plaintiff can establish continuity in two different ways, by showing: (1) Defendants engaged in "conduct that by its nature projects into the future with a threat of repetition, or (2) Defendants were responsible for a "closed period of repeated conduct" that "amounted to . . . continued criminal activity."

37

Id. at 237, 241. For so-called "open-ended" continuity, a RICO
plaintiff must show "a realistic prospect of continuity over an
open-ended period yet to come." Feinstein, 942 F.2d at 45. For
"closed" continuity, the First Circuit has prescribed a "natural
and commonsense approach" that focuses on "indicia of
continuity," including: (1) whether the predicate acts affected
many individuals, or just a closed group victims; (2) whether
the predicate acts comprise multiple schemes, as opposed to one
scheme with a singular objective; and (3) whether the scheme(s)
had the potential to last indefinitely, instead of having a
finite nature. See Langan v. Smith, 312 F. Supp. 3d 201, 207-08
(D. Mass. 2018) (quoting Home Orthopedics Corp. v. Rodriguez,
781 F.3d 521, 529 (1st Cir. 2015)). Defendants argue that SSR
has failed to adequately allege either open-ended or closed
continuity during the twenty-one-month period between November
or December 2012, the date of the first alleged predicate act,
and August 2014.

Neither of the alleged RICO enterprises has open-ended
continuity. The association-in-fact enterprise involving FBT and
the Wynn Defendants disbanded once Wynn MA secured the License
and acquired the Everett Site from FBT. SSR does not allege that
FBT retains any continuing interest in the Wynn Resorts casino.
Further, Steve Wynn and Sinatra have since left their control
positions at Wynn Resorts and Wynn MA. Only the Wynn entities

and Maddox continue to operate in Massachusetts and have dealings with the MGC. And, in any case, Wynn MA has already secured the License and opened the Encore Boston Harbor casino at the Everett Site. Given these facts, the Court does not find that there is (or ever was) a realistic prospect that the association-in-fact enterprise will continue to operate into the future or that it is likely to conduct further racketeering activity.

The analysis of the Wynn MA enterprise is a closer question since Wynn MA continues to operate in Massachusetts and interact with the MGC. SSR argues that Wynn MA and the other Wynn defendants have continued to deceive the MGC even after the License was awarded. As evidence of a threat of repetition in the future, SSR points to various allegations of troubling conduct in the Amended Complaint: Steve Wynn's sexual misconduct and the related cover-up by payoffs in Nevada, "shady business dealings" in Macau, the alleged gratuity to Mayor DeMaria, and an unspecified illegal campaign contribution in Massachusetts. They are not alleged as predicate acts, and only one (the alleged gratuity) is even related to the license application.

This argument fails for at least two reasons. First, most of the other allegedly illicit activities are within the larger Wynn organization (i.e., Macau and Nevada), and do not establish that Wynn MA's regular way of conducting business carries a risk

of an encore of future racketeering activity -- particularly now that Wynn and Sinatra are out the door. Second, and more importantly, the predicate acts themselves all relate to a single, discrete scheme to defraud the MGC, which is generally not enough to establish open-ended continuity. See Home Orthopedics, 781 F.3d at 531 ("We find that an open-ended pattern would fail here for largely the same reasons that a closed pattern would."); see also H.J. Inc., 492 U.S. at 242 (observing that a small number of predicate acts occurring close together in time must create a "specific threat of repetition extending indefinitely into the future" to "supply the requisite threat of continuity"); Shields Enters., Inc. v. First Chi. Corp., 975 F.2d 1290, 1295 (7th Cir. 1992) (noting that "short-lived criminal activity with a natural end point is not sufficiently continuous to constitute a RICO pattern").

SSR's arguments regarding closed continuity, meanwhile, are unsupported by the caselaw. The First Circuit has "consistently declined to find continuity where the RICO claim concerns a single, narrow scheme targeting few victims." Home Orthopedics, 781 F.3d at 530 (quoting Giuliano v. Fulton, 399 F.3d 381, 390 (1st Cir. 2005)); see, e.g., Giuliano, 399 F.3d at 390 (sixteen predicate acts over six-month period aimed at fraudulently obtaining property from owner and his company did not satisfy continuity requirement); Efron, 223 F.3d at 20 (twenty-one-month

scheme to defraud co-investors in hotel construction project did not satisfy continuity requirement).

Here, the adequately pleaded predicate acts all involve fraud on the MGC to secure the License. They comprised a single scheme, spanning somewhere between eighteen and twenty-four months, with the specific objective of securing the License for Wynn Resorts to build a destination casino at the Everett Site, and affecting a relatively narrow set of victims (the MGC and, arguably, MSM and SSR). Under controlling First Circuit precedent, this is insufficient to establish closed continuity. Therefore, the Court finds that SSR's RICO claims fail because the Amended Complaint does not adequately allege the continuity necessary to satisfy the RICO statute's pattern requirement.

## III. **State Law Claims**

The Amended Complaint asserts that this Court has jurisdiction over SSR's state law claims by virtue of supplemental jurisdiction.[3] "As a general principle, the unfavorable disposition of a plaintiff's federal claims at the

---

[3]    SSR concedes there is no diversity jurisdiction for its state law claims. SSR, FBT, and Wynn MA are all Massachusetts limited liability corporations. The Amended Complaint does not allege the citizenship of their constituent members, see Pramco, LLC ex rel. CFSC Consortium, LLC v. San Juan Bay Marina, Inc., 435 F.3d 51, 54 (1st Cir. 2006) (holding "the citizenship of [an LLC] is determined by the citizenship of all of its members"), but it seems likely that at least some members of SSR and FBT are Massachusetts citizens.

early stages of a suit, well before the commencement of trial, will trigger the dismissal without prejudice of any supplemental state-law claims." Rodriguez v. Doral Mortg. Corp., 57 F.3d 1168, 1177 (1st Cir. 1995); see also Langan, 312 F. Supp. 3d at 209 (declining to exercise supplemental jurisdiction over state law claims following dismissal of civil RICO claims). Because the Court is dismissing the RICO claims, it also will dismiss the state law claims without prejudice to being re-filed in state court. And, for the same reason, the Court denies without prejudice the motion to dismiss the state law claims pursuant to Massachusetts' anti-SLAPP statute.

## IV.   Amendment

Finally, SSR asks that it be granted leave to amend should the Court dismiss the Amended Complaint for failure to state a claim. The Court will not allow SSR another roll of the dice. SSR has had two opportunities to plead a viable RICO theory. The Amended Complaint was filed after Defendants moved to dismiss the initial complaint, meaning SSR already has been given one chance to cure pleading deficiencies identified by Defendants. Further, the essential facts underlying SSR's RICO claims have been known to the public for years as a result of contemporaneous reporting and the voluminous MGC investigation reports. Therefore, the Court finds that SSR has already had a fair opportunity to plead a viable set of claims but has failed

to do so. <u>See</u> <u>In re Biogen Inc. Sec. Litig.</u>, 857 F.3d 34, 46 (1st Cir. 2017) (upholding district court's denial of leave to amend where it "gave the plaintiffs the full time they requested in order to file the initial amendment and allowed that Amended Complaint, and the plaintiffs had the motion to dismiss in hand for nearly four months before the district court ruled"). The request for leave to amend is denied.

<b><u>ORDER</u></b>

Defendants' motions to dismiss the federal RICO claims for failure to state a claim (Dkt. Nos. 72, 75, 77, 79, 83) are **ALLOWED**. The federal claims (Counts I, II, and III) are dismissed with prejudice. The Wynn entities and Maddox's motion to dismiss the state law claims pursuant to the anti-SLAPP statute (Dkt. No. 80) is **DENIED AS MOOT**. The state claims (Counts IV, V, and VI) are dismissed without prejudice to being re-filed in state court.

SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
Chief United States District Judge